**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY,** | § § § § | |
| *Plaintiffs*, | § § | |
| **v.** | § § § | **CIVIL ACTION NO. 3:21-CV-1547-E** |
| **CARY ROSSEL, et al.,** | § § § | |
| *Defendants*. | § | |

---

**BRIEF IN SUPPORT OF DEFENDANTS CARY ROSSEL
AND JEREMY ROSSEL'S MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,

By: */s/ John A. Scully*
    JOHN A. SCULLY
    State Bar No. 17936500
    John.Scully@cooperscully.com
    NISHA P. BYERS
    Texas State Bar No. 00791460
    Nisha.Byers@cooperscully.com

**COOPER & SCULLY, P.C.**
900 Jackson Street, Suite 100
Dallas, Texas  75202
Telephone: 214-712-9500
Facsimile: 214-712-9540

**ATTORNEYS FOR DEFENDANTS
CARY ROSSEL AND JEREMY ROSSEL**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.    STATEMENT OF FACTS ............................................................................ 3

III.    EVIDENCE IN SUPPORT OF MOTION ...................................................... 5

IV.    SUMMARY JUDGMENT STANDARDS ....................................................... 5

V.    ARGUMENT ................................................................................................. 6

    A.    Fraud and Fraudulent Nondisclosure ...................................................... 6

        1.    Plaintiffs' Claims of Fraud and Fraudulent Nondisclosure Are Barred by the Statute of Limitations ........................................... 7

            a.    Plaintiffs' Claims Accrued at the Point that Reasonable Diligence Would Have Led Them to Discover Their Injury .............. 7

            b.    By July 20, 2015, Plaintiffs Knew of or Should Have Discovered Their Alleged Injury Through the Exercise of Reasonable Diligence ......................................................... 8

            c.    Plaintiffs Fraud Claims Are Not Subject to the Discovery Rule ....... 13

        2.    Defendants are Entitled to Summary Judgment on Plaintiffs' Claims of Fraud and Fraudulent Nondisclosure Because Plaintiffs Have No Evidence to Support The Elements of Those Claims .............................. 14

            a.    Plaintiffs Have No Evidence of Fraud ............................................... 15

            b.    Defendants Are Entitled to Summary Judgement on Fraud claims based on Billings after July 20, 2015 Because as a Matter of Law Plaintiffs Could Not Have Justifiably Relied on Representations from Anyone at Next Health ................................... 16

            c.    Plaintiffs Have No Evidence of Fraudulent Nondisclosure ............. 19

            d.    Plaintiffs Have No Evidence that Defendants Are an Alter Ego of Next Health ................................................................................... 20

    B.    Conspiracy to Commit Fraud .................................................................... 21

        1.    Plaintiffs Have No Evidence of Defendants' Participation in a Conspiracy to Commit Fraud .................................................... 21

    C.    Fraudulent Transfer ................................................................................. 23

1.    Plaintiffs Have No Evidence that Defendants Violated TUFTA .............. 23

      a.    Plaintiffs Have No Evidence of Fraudulent Transfers from the Entities to Next Health ...................................................................... 25

      b.    Plaintiffs Have No Evidence of Fraudulent Transfers from Next Health to Defendants ........................................................................ 26

D.    Violations of 18 U.S.C. § 1962(c) ........................................................ 27

   1.    Plaintiffs' Civil RICO Claim Against Defendants Are Barred by the Statute of Limitations.................................................................... 27

   2.    Plaintiffs Have No Evidence that Defendants Had the Intent to Defraud, as Required for Mail Fraud and Wire Fraud, Two of the Predicate Acts Alleged in Plaintiffs' RICO Claim ................................... 28

E.    Additional or Exemplary Damages, Attorney's Fees, and Costs......................... 29

VI.    PRAYER...................................................................................... 29

# TABLE OF AUTHORITY

**Cases**                                                                                     **Page(s)**

*Abraham v. Singh,*
    480 F.3d 351 (5th Cir. 2007) ................................................................. 28

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
    483 U.S. 143 (1987) ........................................................................... 27

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................... 5

*Apani Southwest, Inc. v. Coca-Coca Enterprises, Inc.,*
    300 F.3d 620 (5th Cir. 2002) ................................................................. 21

*Austin v. Kroger Texas L.P.,*
    864 F.3d 326 (5th Cir. 2017) ................................................................. 6

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.,*
    590 S.W.3d 471 (Tex. 2019) ................................................................. 16

*Bell v. Marmaxx Operating Corp,*
    2021 WL 5505561 (N.D. Tex. Nov. 23, 2021) ........................................... 6

*Bombardier Aerospace Corporation v. SPEP Aircraft Holdings, LLC,*
    572 S.W.3d 213 (Tex. 2019) ................................................................. 19

*BP America Production Co. v. Marshall,*
    342 S.W.3d 59 (Tex.2011) ................................................................... 8

*Bradford v. Vento,*
    48 S.W.3d 749 (Tex. 2001) ................................................................. 19

*Bridas S.A.P.I. C. v. Government of Turkmenistan,*
    447 F.3d 411 (5th Cir. 2006) ................................................................. 21

*Celotex Corp, v. Catrett,*
    477 U.S. 317 (1986) ........................................................................ 5, 6

*Deshazo v. Nations Energy Co. Ltd.,*
    286 F. App'x 110 (5th Cir. 2008) .......................................................... 28

*Etan Indus., Inc. v. Lehmann,*
    359 S.W.3d 620 (Tex. 2011) ............................................................. 8, 13

**Cases**                                                **Page(s)**

*Field v. Mans*,
  516 U.S. 59, (1995) ......................................................................................... 16

*Grant Thornton LLP v. Prospect High Income Fund*,
  314 S.W.3d 913 (Tex. 2010) ............................................................................ 17

*Hooks v. Samson Lone Star, Ltd. P'ship*,
  457 S.W.3d 52 (Tex. 2015) ................................................................................ 8

*In re Enron Corp. Sec., Derivative & Erisa Litig.*,
  762 F. Supp. 2d 942 (S.D. Tex. 2010).......................................................... 21, 22

*In re GTG Solutions, Inc.*,
  642 S.W.3d 41 (Tex. App.—El Paso 2021) ................................................. 20, 21

*In re Mercer*,
  246 F.3d 391 (5th Cir. 2001) ............................................................................ 16

*Ins. of N. Am. v. Morris*,
  981 S.W.2d 667 (Tex. 1998) ............................................................................. 19
*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*,
  546 S.W.3d 648 (Tex. 2018) ............................................................... 15, 17, 18

*Kerlin v. Sauceda*,
  263 S.W.3d 920 (Tex. 2008) .......................................................................... 8, 14

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) .......................................................................................... 28

*Lewis v. Bank of Am. NA*,
  343 F.3d 540 (5th Cir. 2003) ....................................................................... 16, 17

*Lewis v. Danos*,
  83 F.4th 948 (5th Cir. 2023) ........................................................................ 27, 28

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) .............................................................................. 6

*Little v. Smith*,
  943 S.W.3d 414, 420 (Tex. 1997) ....................................................................... 7

*Mancorp, Inc. v. Culpepper*,
  802 S.W.2d 226 (Tex. 1990) .............................................................................. 20

**Cases**  <span style="float:right">**Page(s)**</span>

*Massey v. Armco Steel Company*,
  652 S.W.2d 932 ............................................................................................. 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................... 5, 6

*McMeens v. Pease*,
  878 S.W.2d 185 (Tex. App.—Corpus Christi 1994, writ denied ................. 7

*Middaugh v. Interbank*,
  528 F.Supp.3d 509 (N.D. Tex. Mar. 23, 2021) ........................................... 7

*Miller v. Keyser*,
  90 S.W.3d 712 (Tex. 2002) ......................................................................... 14

*Mills v. City of Port Arthur, Texas*,
  2006 WL 3531460 (E.D. Tex. Dec. 4, 2006) ............................................. 21

*Provident Life & Accident Ins. Co. v. Knott*,
  128 S.W.3d 211 (Tex. 2003) .................................................................... 7, 13

*S.V. v. R.V.*,
  933 S.W.2d 1 (Tex. 1996) ....................................................................... 7, 13

*Sandt v. Energy Maint. Servs. Grp. I, LLC*,
  534 S.W.3d 626 (Tex. App.—Houston [1st Dist.] 2017, pet. denied ........... 7

*Schlumberger Tech. Corp. v. Swanson*,
  959 S.W.2d 171 (Tex. 1997) ....................................................................... 19

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*,
  435 S.W.2d 854 (Tex.1969) ........................................................................ 22

*Shafipour v. Rischon Dev. Corp.*,
  2015 WL 3454219 (Tex. App.—Eastland May 29, 2015, pet. denied) ......... 17

*Shell Oil Co. v. Ross*,
  356 S.W.3d 924 (Tex.2011) ..................................................................... 8, 13

*St. Germain v. Howard*,
  556 F.3d 261 (5th Cir. 2009) ................................................................. 28, 29

*Taylor v. Rothstein Kass & Co. PLLC*,
  2020 WL 554583 (N.D. Tex. 2020) ............................................................ 15

**Cases**                                                                                    **Page(s)**

*Triplex Communications Inc. v. Riley*,
   900 S.W.2d 716 (Tex. 1995) ........................................................................... 21

*U.S. v. Briscoe*,
   65 F.3d 576 (7th Cir. 1995) ............................................................................. 29

*U.S. v. Mann*,
   493 F.3d 484 (5th Cir. 2007) ........................................................................... 28

*U.S. v. Patterson*,
   294 Fed.Appx. 985 (5th Cir. 2008) ................................................................. 28

**Statutes**

18 U.S.C. § 1341 ................................................................................................. 28
18 U.S.C. § 1343 ................................................................................................. 28
18 U.S.C. § 1956 ................................................................................................. 28
18 U.S.C. § 1962 ................................................................................................. 28
Section 24.005(b) ..................................................................................... 24, 25, 26
Tex. Bus. & Com. Code § 24.005(a)(1) ............................................................. 24
Tex. Bus. & Com. Code § 24.009(b) ................................................................. 24
Tex. Civ. Prac. & Rem. Code § 16.004 ............................................................... 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY,** | § § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § § | **CIVIL ACTION NO. 3:21-CV-1547-E** |
| **CARY ROSSEL, et al.,** | § § § | |
| *Defendants*. | § | |

---

**BRIEF IN SUPPORT OF DEFENDANTS CARY ROSSEL AND JEREMY ROSSEL'S
MOTION FOR SUMMARY JUDGMENT**

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW** Defendants Cary Rossel and Jeremy Rossel ("Defendants"), and respectfully move this Court to grant them summary judgment on Plaintiffs' claims of common law fraud, fraudulent nondisclosure, conspiracy to commit fraud, fraudulent transfer, and violations of 18 U.S.C. § 1962(c), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Northern District of Texas Local Rule 56.

## I.     INTRODUCTION

Plaintiffs in this case are United Healthcare Services, Inc. and United Healthcare Insurance Company ("Plaintiffs").[1]  In their Second Amended Complaint, Plaintiffs allege that over a multi-

---

[1] The plaintiffs in the above-captioned case are United Healthcare Services, Inc. and United Healthcare Insurance Company. Plaintiffs' designated 30(b)(6) representative, Jonathan Wilson conceded in his 30(b)(6) deposition that United Healthcare Insurance Company has "no independent damages" from United Healthcare Services, Inc. and that he does not "believe at this point [United Healthcare] Insurance Company needs to be a plaintiff." App. 6-7. Plaintiffs' counsel subsequently stated on the record that they would be willing to "clean up the case" by removing United Healthcare Insurance Company from the case. App. 8-10. Accordingly, the Court should dismiss all of United Healthcare Insurance Company's claims.

year period they paid over $100 million to Next Health and its affiliated companies (collectively "Next Health") for out-of-network lab tests and drugs provided to United members by Next Health.  Dkt 584, ¶ 3.  Having willingly paid that money over many years, Plaintiffs now improbably alleges that every single claim submitted to United by Next Health, as ordered by United's contracted doctors for United's members, was fraudulent.  Dkt 584.  Plaintiffs allege various misrepresentations in connection with the submission of lab and pharmacy bills to United for payment, including alleging that misrepresentations were made about members paying their co-pays.  Dkt 584, ¶ 300.  Plaintiffs further allege that the "Next Health Executives," including Defendants, are responsible for the allegedly fraudulent misrepresentations, under directly or an alter ego theory of liability. Dkt 584, ¶¶ 355-56.

However, the evidence establishes that Plaintiffs were aware of allegations of fraud, and in particular with regard to the non-payment of co-pays, as to at least one of Next Health's labs, its parent company Next Health, and one of its executives, as early as July 20, 2015.  Thus, Plaintiffs' claims are affirmatively barred by limitations, or in the alternative, by Plaintiffs' lack of justifiable reliance on any representations that occurred from that date forward.  In addition, after completion of discovery, Plaintiffs have no evidence of any of the elements of alter ego or direct fraud against these Defendants.

Plaintiffs also allege that Defendants conspired with other current and former Next Health Defendants to commit fraud against Plaintiffs as to lab testing done by the ADAR group, which ran sober homes.  Dkt 584, ¶¶ 395-400.  However, Plaintiffs have no evidence of a meeting of the minds as to the alleged wrongful conduct, to obtain funds from insurers for illegitimate lab services.  They have no evidence, beyond mere speculation and innuendo, that Defendants Cary

Rossel's actions were anything other than routine, legitimate business practices. Consequently, there is no evidence to support the allegations that Defendants conspired to defraud Plaintiffs.

Plaintiffs claim various transfers of cash violated the Texas Uniform Fraudulent Transfer Act, both for transfers made from various entities to Next Health and for transfers made from Next Health to Defendants and others. Dkt 584, ¶¶ 458-480.  Plaintiffs have no evidence to show that at the time the transactions were made, Plaintiffs were a creditor, or that these transfers were made with actual intent to hinder, delay or defraud Plaintiffs, as required by the statute, rather than made in the ordinary course of business.

Finally, Plaintiffs allege liability against Defendants under RICO. Dkt 584, ¶¶ 482-513.  After completion of discovery, Plaintiffs have no evidence establishing that Defendants took any action related to Next Health with the intent to defraud, a key element in not only United's fraud claim but also the RICO predicates alleged.  Further, Plaintiffs were on notice of alleged billing fraud by Next Health in July of 2015, and thus their RICO claim, filed against Defendants more than four years later in September of 2019, is time-barred.

Defendants are therefore entitled to summary judgment on Plaintiffs' claims for fraud, conspiracy to commit fraud, fraudulent transfers, and RICO violations.

## II.   STATEMENT OF FACTS

Plaintiffs are two subsidiaries of United Healthcare Group, a $500 billion company with diverse lines of business related to health services and insurance. App. 19; UnitedHealth Group Inc., The Wall Street Journal, (Nov. 14, 2023: 4:04pm), https://www.wsj.com/market-data/quotes/UNH . As part of its robust fraud detection system, Optum, another United Healthcare Group entity, was responsible for monitoring potential fraud in the various lines of United businesses. App. 21-23. On July 20, 2015, an Optum employee filed a complaint to report

allegations of fraud, waste, and abuse by Josh Daniel[2] and United Toxicology, LLC ("United Toxicology") against Cigna. App. 34-35. The complaint describes in great detail Cigna's rigorous audit of United Toxicology, which concluded United Toxicology was charging excessive fees while waiving any customer cost share for services rendered. App. 35. Cigna's financial exposure to United Toxicology was in excess of $5 million. *Id.* Based on these findings, Optum's Research and Validation team requested that United Toxicology be flagged and put on "post pay review." *Id.*

On the same day that Optum filed its complaint, Plaintiffs created a document summarizing information for in-house counsel to review in order to make a legal recommendation. App. 36. Plaintiffs now claim that document is "privileged." Within weeks, however, Plaintiffs placed a "hard flag" on United Toxicology allegedly upon suspicion that it was a "phantom lab," a lab on paper only. App. 24-25. Regardless of the nomenclature, the evidence shows that, following July 20, 2015, Plaintiffs had concerns about operations of United Toxicology. App. 11-12.

Plaintiffs' well-funded and highly-trained Special Investigations Unit ("SIU") purports to have uncovered illicit schemes in 2016 that gave rise to their fraud, conspiracy to defraud, and RICO, claims against Defendants. Dkt 584, ¶ 7. Yet, Plaintiffs waited to file any action against Defendants or any other Next Health executive until September 30, 2019. *See* Dkt. 293. This is in spite of criminal indictments against "Next Health bosses," Andrew Hillman and Semyon Narasov. *See United States v. Hillman et* al, No. 3:18-cr-00475-JJZ-1 (N.D. Tex. Sep. 24, 2018). In contrast, Plaintiffs' meticulous SIU investigation had allegedly produced enough evidence to justify a lawsuit against Next Health in as early as 2017. *See United Healthcare Services Inc. et al v. Next Health LLC et al*, No. 3:17-cv-00243 (N.D. Tex. Jan. 26, 2017). *See* Dkt 584.

---

[2] Josh Daniel is a former defendant in this case who settled; his settlement agreement is the subject of several motions to compel lodged against Plaintiffs.

### III.    EVIDENCE IN SUPPORT OF MOTION

The Defendants rely on the following evidence in support of their Motion, which evidence is contained in the Appendix filed contemporaneously with the Motion and Brief, and which evidence is incorporated herein by reference:

Exhibit A: Excerpts from Deposition Transcript of Jonathan Wilson (App. 2-33)

Exhibit B: MEDIC Complaint (App. 34-35)

Exhibit C: Plaintiffs' Privilege Log (App. 36-45)

### IV.    SUMMARY JUDGMENT STANDARDS

The purpose of summary judgment is to pierce the pleadings and to assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To accomplish this, summary judgment procedure is designed to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp, v. Catrett*, 477 U.S. 317, 323-24 (1986).

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Substantive law determines which facts are material; generally, a fact is material if the fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant can satisfy its summary judgment obligations by pointing out to the district court that there is an absence of evidence on an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 325.  Once the moving party properly supports its motion, the burden shifts to the non-moving party, who may not rest upon mere allegations, but must instead designate specific facts showing that there is a genuine issue for trial. *Id.* at 323-24; *Matsushita*, 475 U.S. at

587. All evidence and reasonable inferences must be viewed in the light most favorable to the non-movant. *Matsushita*, 475 U.S. at 587.

The non-movant's burden is not satisfied with "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the non-movant fails to produce evidence to support one or more essential elements of its claim, or if the critical evidence on a fact is so weak or tenuous it could not support a judgment in favor of the non-movant, summary judgment must be granted. *See Celotex*, 477 U.S. at 322-23; *Little*, 37 F.3d at 1075. "[A] movant may support a motion for summary judgment by pointing out that there is no evidence to support a specific element of the nonmovant's claim." *Bell v. Marmaxx Operating Corp*, Civil Action No. 3:20-CV-01910-X, 2021 WL 5505561, *2 (N.D. Tex. Nov. 23, 2021) (citing *Austin v. Kroger Texas L.P*., 864 F.3d 326, 335 (5th Cir. 2017)).

## V.   ARGUMENT

### A.   Fraud and Fraudulent Nondisclosure

Plaintiffs allege that Defendants are liable "as a principal" for fraud and fraudulent nondisclosure perpetuated by Next Health against Plaintiffs because Defendants "knowingly participated" in various allegedly fraudulent claims submitted to Plaintiffs by Next Health. Dkt. 584, ¶ 380. Plaintiffs also allege that Defendants, as Next Health Executives, are liable for various entities' fraud as alter egos of Next Health, ALG, Medicus, US Toxicology, UTox, True Labs, and the "Class A Pharmacies". Dkt. 584, ¶¶ 355-56. Plaintiffs' fraud claims are time barred because they were not brought within the four-year statute of limitations. Additionally, Plaintiffs' claims of fraud and fraudulent nondisclosure against Defendants, individually, fail because Plaintiffs have no evidence of one or more of the elements of each cause of action. As a matter of law, Plaintiffs could not have justifiably relied on billing submitted after they were on notice of alleged billing

fraud. Additionally, Plaintiffs' theory of alter ego liability fails because Plaintiffs have no evidence sufficient to satisfy the high burden of piercing the corporate veil.

> 1. ***Plaintiffs' Claims of Fraud and Fraudulent Nondisclosure Are Barred by the Statute of Limitations***

> > a. **Plaintiffs' Claims Accrued at the Point that Reasonable Diligence Would Have Led Them to Discover Their Injury**

Under Texas law, the statute of limitations for a fraud cause of action is four years. Tex. Civ. Prac. & Rem. Code § 16.004; *Little v. Smith*, 943 S.W.3d 414, 420 (Tex. 1997). "As a general rule, a cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). A claim for fraud accrues "when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *Middaugh v. Interbank*, 528 F.Supp.3d 509, 546 (N.D. Tex. Mar. 23, 2021) (citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)). Further, "[k]nowledge of facts which would have excited inquiry into the mind of a reasonably prudent person, which, if pursued by him with reasonable diligence, would lead to the discovery of the fraud, is equivalent to knowledge of the fraud as a matter of law." *Id.* (citing *McMeens v. Pease*, 878 S.W.2d 185, 188 (Tex. App.— Corpus Christi 1994, writ denied)). Once a party is on inquiry notice of an alleged fraud, the limitations period begins. *See Sandt v. Energy Maint. Servs. Grp. I, LLC*, 534 S.W.3d 626, 642 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (concluding that nature of allegations in publicly available court filings put party on inquiry notice of allegations and obligated party to investigate). Accrual in fraud cases is not based on the discovery rule. *See S.V. v. R. V.*, 933 S.W.2d 1, 4 (Tex. 1996)).

Although "reasonable diligence" can be an issue of fact, in some circumstances, "[courts] can still determine as a matter of law that reasonable diligence would have uncovered the wrong."

*Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 58 (Tex. 2015) (citations omitted); *see*, *e.g.*, *BP America Production Co. v. Marshall*, 342 S.W.3d 59, 69 (Tex.2011) ("[A]s a matter of law, the Marshalls would have been able to discover BP's fraud through the use of reasonable diligence."); *Kerlin v. Sauceda*, 263 S.W.3d 920, 926 (Tex. 2008) ("As a matter of law, the Ballis could have discovered the existence of any claims before limitations expired through the exercise of reasonable diligence."); *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam).  A plaintiff's access to "readily accessible and publicly available information" which would lead them to discover their injury is sufficient to trigger their duty to exercise reasonable diligence. *See, e.g., Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929 (Tex.2011); *Marshall,* 342 S.W.3d at 59 (Tex. 2011).  Accordingly, Plaintiffs' fraud claims are time-barred because they are based on allegedly fraudulent activities Plaintiffs knew of or should have discovered by exercising reasonable diligence by at least July 20, 2015, more than four years before the date on which Plaintiffs filed their motion for leave to amend to add Defendants—September 30, 2019. *See* Dkt. 293.

      **b.**      **By July 20, 2015, Plaintiffs Knew of or Should Have Discovered Their Alleged Injury Through the Exercise of Reasonable Diligence**

Plaintiffs assert that they were injured by paying "at least approximately $106 million for lab services and prescriptions." Dkt. 584, ¶ 513. They do not identify exactly when they discovered their injury but claim that they "did not discover the harm caused by its reasonable reliance on Defendants' fraudulent claims until 2016." Dkt. 584, ¶ 359. While the Defendants deny involvement in any fraudulent billing practices, the evidence, establishes that Plaintiffs did know about allegedly fraudulent billing practices by United Toxicology, a Next Health lab, and knew, or by reasonable diligence should have known about the same practices allegedly occurring at Next Health, well before September 30, 2015.

United Healthcare Group ("United Group") is a publicly-traded holding company that holds two subsidiaries: Optum and United Healthcare Services, Inc. App. 19. "United Healthcare" and "UHC" are the brand names for one of the legal entities that filed suit in this case, United Healthcare Services, Inc. ("Plaintiff United Healthcare"). App. 20-21. Optum is United Group's health services line of business, while Plaintiff United Healthcare is the health insurance line of business. In 2015, one of Optum's "important purposes" was to help Plaintiff United Healthcare with allegations of fraud, waste, and abuse. App. 22-23.

In United's 30(b)(6) deposition, its corporate representative, Jonathan Wilson ("Mr. Wilson"), was confronted with a National Benefit Integrity MEDIC Complaint Form dated July 20, 2015, and produced by Plaintiffs ("MEDIC Complaint"). *See* App. 34-35. The MEDIC Complaint is a form used to "report complaints of fraud, waste, and abuse." App. 34. The complainant, Lisa Slater ("Ms. Slater"), is an employee of Optum. *Id.* Ms. Slater mistakenly identifies Optum as "a division of UnitedHealthCare." *Id.* A more apt way to describe Optum in 2015 is a subsidiary of United Healthcare Group. App. 19. Nonetheless, one of Optum's purposes in 2015 was to help a fellow United Healthcare Group subsidiary, Plaintiff United Healthcare, with allegations of fraud, waste, and abuse. App. 22-23.

On July 20, 2015, Ms. Slater filed this document with Health Integrity, LLC to report that Cigna's SIU suspected that Josh Daniel and United Toxicology, LLC ("United Toxicology") were using fraudulent billing practices. App. 34-35. The MEDIC Complaint alleges that United Toxicology was billing the insurance company "excessive fees" for drug testing services while "waiving any cost share of the customer." App. 35. It further states that Cigna obtained "a copy of [United Toxicology's] parent company's [Next Health's] billing practice" that indicated United Toxicology "bills the insurance company directly while waiving any cost share of the customer."

9

App. 35. After receiving the bill, the Cigna investigators called United Toxicology and confirmed that "the customers were neither receiving a bill nor expected to pay their cost share for drug testing services . . . [United Toxicology] consider[ed] the insurance payment as payment in full." App. 35.  The substance of the July 20, 2015 MEDIC Complaint indicates that Optum, a United Healthcare Group company, who had as one of its "important purposes" to help Plaintiff United Healthcare with allegations of fraud, waste, and abuse, had notice of suspected fraud at Next Health's lab, United Toxicology, at that time.

The MEDIC Complaint put Plaintiff United Healthcare on notice of the alleged fraud as to Next Health and its executives. The MEDIC Complaint specifically identifies Josh Daniel, the "president and/or CEO of Next Health and an owner of the company," as a suspect for fraud. *See* Dkt. 584, ¶ 37; App. 35. It also references the allegedly fraudulent billing practices of United Toxicology's parent company, which was Next Health. Because Plaintiffs were put on notice of Next Health's alleged involvement, including the alleged involvement of one of its executives, in the alleged fraud, their fraud claims against all of Next Health's executives, including Defendants, began to accrue on July 20, 2015, at the latest, for any alleged billing fraud.

Plaintiffs' corporate representative admitted that the MEDIC Complaint put Plaintiffs on notice of Next Health's alleged fraud. Mr. Wilson stated that, as of July 20, 2015, "[Plaintiffs were] on notice of potential fraud at United Toxicology as against Cigna." App. 28.  Plaintiff United Healthcare has asserted that it was making payments to United Toxicology at that time. Dkt. 584, ¶¶ 112, 114.  It is unimaginable that Plaintiff United Healthcare, a company that claims to take fraud so seriously, and has an entire department dedicated to fraud detection, the SIU, would not have had concerns about the fact that a laboratory billing Plaintiffs was being investigated for billing fraud, with financial exposure in excess of $5 million.  In fact, Plaintiff United Healthcare

quickly placed a "hard flag," a measure that stops payment to a lab, on United Toxicology. App. 13.

Of note, two entries in Plaintiffs' privilege log indicate Next Health entities were being investigated prior to September 2015. First, an entry is titled "55901 Phantom Template" with the description "documentat[i]on reflect[i]ng prior direction of in-house counsel and summarizing information for in-house counsel to review and make legal recommendation." App. 36. That entry, apparently addressing prior direction from in-house counsel to conduct an investigation, and summarizing that information, is dated July 20, 2015, the exact same day Plaintiffs were put on notice of alleged billing fraud at United Toxicology. *See id.*  Further entries in the privilege log evidence that the investigation was started even earlier than July 20, 2015.  App. 36-45. Mr. Wilson claims that the hard flag placed on United Toxicology was related to the possibility that United Toxicology was a "phantom lab," an industry term for a lab on paper only. App. 12. Another entry in the Privilege Log dated 4/7/15 indicates that Plaintiffs were investigating Pioneer and US Tox as of that date. App. 43. The entry title is "MEDICUS+PIONEER+US TOX –Graphical Summaries" and has the description: "Graphical summary of data compiled for analysis at the direction of in-house counsel and attached to correspondence sent to in-house counsel for review." *Id.*  Here, it appears that as part of the ongoing Medicus investigation, Plaintiffs expanded their investigation to other Next Health labs. Regardless of what nomenclature Plaintiffs chose to use regarding their investigation into United Toxicology, Plaintiffs were investigating potential fraud at United Toxicology prior to July 20, 2015, as noted in Plaintiffs' own privilege log.

In fact, Plaintiffs' privilege log contains dozens of entries dating from March 2014 to June 2015 indicating that Plaintiffs' legal department was compiling and summarizing data, researching, and considering legal action against Medicus Labs, another Next Health entity. App.

36-45. It is evident from the progression of the entries that Plaintiffs had serious concerns about multiple Next Health entities.  Given that Plaintiffs were conducting an investigation into Medicus as far back as 2014, and given that Optum received the MEDIC Complaint noting alleged billing fraud was occurring, including by a Next Health executive, Plaintiffs, sophisticated health insurance companies, knew or should have known that United Toxicology, as well as its parent, Next Health, was allegedly engaging in billing practices that Plaintiffs contend are fraudulent.

At the very least, the MEDIC Complaint should have immediately sparked a United SIU investigation into Josh Daniel and United Toxicology's billing practices. As Mr. Wilson confessed in his deposition:

> [Plaintiffs'] allegation in the current lawsuit is that Next Health did not collect any money from the members. The Cigna investigator says that Next Health didn't collect – based on whatever the fee forgiving audit was that Cigna performed, the results of that said 85 percent of customers didn't receive a bill. But then where I – and – then it, it also – the similarities it ref – it references high charges, which is true of, our claims as well.

App. 29. The MEDIC Complaint put Plaintiffs on notice of allegations of the exact type of fraud that it would later allege in this lawsuit against Defendants and the other individual defendants. Plaintiff United Healthcare, the "largest health insurer in the world" with nearly unlimited resources, insists that it takes fraud "seriously." Dkt. 666 at p.8; *see also* <u>UnitedHealth Group Inc.,</u> The Wall Street Journal, (Nov. 14, 2023: 4:04pm), https://www.wsj.com/market-data/quotes/UNH (United's parent company has a market capitalization of $500 billion); App. 26.  The MEDIC Complaint also mentions that the Office of the Inspector General contacted Cigna about suspected fraud at a laboratory Plaintiffs insureds were using. App. 34-35.  As previously noted, United Healthcare has its own SIU of highly trained personnel that investigate allegations of fraud, waste, and abuse. There is no credible reason why Plaintiffs could not have conducted an investigation into who the Next Health executives were, the associated Next Health entities, and the allegations

12

of billing fraud.  To not do so is not reasonable.  Instead, Plaintiffs waited ***over four years*** to file their lawsuit against Defendants. During that time, Plaintiffs had countless opportunities, including with or after the filing of its initial complaint against Next Health, and a year after the 2018 indictments of "Next Health bosses" Andrew Hill and Semyon Narasov, to file suit against Defendants and failed to do so.

When Plaintiff United Healthcare did investigate United Toxicology, it purportedly "found in [United's] commercial business that there was fee forgiving and high bills." App. 29. Those are the same mechanisms of fraud alleged in the MEDIC Complaint! *See* App. 34-35. Accordingly, Plaintiffs had the requisite notice, resources, and expertise to have discovered their alleged injury and the alleged facts that they rely on to assert their claims against Defendants upon receiving the July 20, 2015 MEDIC Complaint, and likely even sooner.

In sum, on July 20, 2015, Plaintiffs were "apprised of facts, conditions, and circumstances sufficient to cause a reasonable person to make inquiry that would lead to the discovery" of Next Health's alleged fraudulent billing practices, and ultimately, Defendants' alleged involvement with Next Health, forming the basis for United's claims against them for the alleged fraud. *See Etan Indus.,* 359 S.W.3d at 623.  The facts that are the basis of Plaintiffs' fraud claims were known or could have been discovered by Plaintiffs through their network of comprehensive systems designed to detect and prevent fraud, waste, and abuse. On July 20, 2015, this data was "readily accessible" to United, and Plaintiffs' fraud claims began to accrue. *See Ross,* 356 S.W.3d at 929. At that point, facts had "come into existence that authorize[d] [Plaintiffs] to seek a judicial remedy," yet they failed to do so. *See Provident Life*, 128 S.W.3d at 221.

### c.    Plaintiffs Fraud Claims Are Not Subject to the Discovery Rule

The Texas Supreme Court has stated that, in terms of statute of limitations accrual, fraud cases are separate and distinct from those in which the discovery rule applies. *S.V. v. R.V.*, 933

S.W.2d 1, 6 (Tex. 1996) (cleaned up) ("[a]ccrual of a cause of action is deferred in two types of cases": (1) "those involving allegations of fraud" and (2) "[t]he other type, in which the discovery rule applies."). Therefore, the discovery rule does not apply to Plaintiffs' fraud claims.  Moreover, Plaintiffs claims are not governed by the discovery rule because their claims "could have been discovered through the exercise of reasonable diligence." *See Kerlin*, 263 S.W.3d at 925.  The facts conclusively show that Plaintiffs were put on inquiry notice and, by the exercise of reasonable diligence, should have discovered the injury on or before July 20, 2015.

In sum, on or before July 20, 2015, Plaintiffs had suffered the injury they allege occurred from their alleged fraud claims, and knew or with reasonable diligence should have known of the fraud allegedly committed by the Executives. However, Plaintiffs failed to file their fraud claims against Defendants for those claims within four years of their discovery of the alleged facts that form the basis of the alleged fraud, and their fraud claims are therefore barred by the statute of limitations.

### 2. Defendants are Entitled to Summary Judgment on Plaintiffs' Claims of Fraud and Fraudulent Nondisclosure Because Plaintiffs Have No Evidence to Support The Elements of Those Claims

Plaintiffs allege that Defendants are "liable as a principal for the [alleged] fraud perpetrated against Plaintiffs by Next Health and its subsidiary labs and pharmacies." Dkt. 584, ¶ 380. Plaintiffs further allege that Defendants "knowingly participated" in various fraudulent claims submitted by Next Health to United.

As an initial matter, under Texas law, when a corporation commits fraud, its corporate agents are protected from personal liability unless a claimant can show the agent acted as the alter ego of the corporation or individually committed the tort alleged. *See Miller v. Keyser,* 90 S.W.3d 712, 716-17 (Tex. 2002). "Liability in these cases is based on the agent's own actions, not his status as an agent." *Id.* at 717.  This District has recently noted that, "it is not clear that Texas law

recognizes a cause of action for 'participation in fraud' that is separate from a direct claim for fraud or conspiracy," and that a plaintiff likely has to plead that a party "himself engaged in fraudulent conduct with the requisite knowledge and intent." *Taylor v. Rothstein Kass & Co. PLLC*, No. 3:19-CV-1594-D, 2020 WL 554583, at *7 (N.D. Tex. 2020). Defendants may not be held personally liable for Next Health's alleged fraud unless Plaintiffs show they personally committed fraud or are alter egos of Next Health. Accordingly, to the extent that Plaintiffs attempts to hold Defendants directly liable for fraud, as opposed to piercing the corporate veil, Plaintiffs must demonstrate that Defendants personally committed a fraud. *See id.* For the reasons discussed below, Plaintiffs have no evidence that Defendants committed fraud and, thus, they are entitled to summary judgment.

### a.    Plaintiffs Have No Evidence of Fraud

To establish fraud, a plaintiff must show that: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff justifiably relied on the representation and suffered injury as a result. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

Plaintiffs have no evidence of any of the elements of fraud as to these Defendants. Specifically, Plaintiffs have no evidence that Defendants made any material false representation, knowingly or recklessly, with the intention to induce Plaintiffs to act in reliance, or that Plaintiffs justifiably relied on such a misrepresentation, and Plaintiffs were injured.  In fact, Plaintiffs have no evidence of a single representation made by Defendants directly to Plaintiffs, let alone a fraudulent one. App.   14-16, 18.   The alleged facts fail to connect Defendants' conduct, individually, as to any of the alleged fraudulent activity of Next Health.

15

Plaintiffs also have no material evidence of Defendants' knowledge of any false assertion on their part, that they made a reckless assertion, or of their intent to induce Plaintiffs into relying on such an assertion. Thus, Plaintiffs cannot show that Defendants themselves had the requisite knowledge that any representation they made were false and the requisite intent to induce Plaintiffs to act upon the representation.

Finally, as discussed in detail below, Plaintiffs have no evidence that they justifiably relied on any false statement made by Defendants. In fact, Plaintiffs have no evidence of any communications they had with Defendants during the time period at issue which could have prompted Plaintiffs' reliance.

> **b.    Defendants Are Entitled to Summary Judgement on Fraud claims based on Billings after July 20, 2015 Because as a Matter of Law Plaintiffs Could Not Have Justifiably Relied on Representations from Anyone at Next Health**

To prove fraud, a plaintiff must show that it relied on defendant's allegedly fraudulent representations and that such reliance was justified. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas*, *Inc*., 590 S.W.3d 471, 496–97 (Tex. 2019) ("To establish the fourth element, the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable."). A fraud plaintiff "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (citing *Field v. Mans*, 516 U.S. 59, 71, (1995)). Moreover, a person may not justifiably rely on a representation if "there are 'red flags' indicating such reliance is unwarranted." *Id.* (citing *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001)). Courts also take into consideration the sophistication of the party claiming fraud; a party cannot "blindly rely" on a defendant's representation when the party's "knowledge, experience, and background warrant investigation into any representation[ ]"

before relying on it. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018) (quoting *Shafipour v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.)). Courts take into consideration a party's "individual characteristics, abilities, and appreciation of facts and circumstances" at the time the representation is made. *Id.* at 656 (quoting *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). "[W]orld-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook." *Id.*

Two cases guide the determination here of whether Plaintiffs justifiably relied on the alleged fraud and whether their expertise should have led them to further investigate certain "red flags." In *Lewis v. Bank of America*, the Fifth Circuit cited to the plaintiff's background, familiarity with the topic at issue, access to professionals, and amount of money involved in the transaction to determine whether plaintiff's reliance on the fraud was justifiable:

> Lewis, an individual with both a business background and familiarity with retirement accounts, should have viewed this series of events as a red flag warranting further investigation of the tax consequences of the loan transaction. Viewing the circumstances in their entirety, including Lewis's access to professional accountants, the amount of money involved in the transaction, and the ambiguous nature of [the defendant's] "assurance," Lewis's decision to enter into the transaction without undertaking additional investigation into its tax consequences was not justifiable.

*Lewis*, 343 F.3d. at 547 (footnote omitted). In *JPMorgan v. Orca Assets*, the Supreme Court of Texas has also held that the sophistication of the plaintiff and amount of money transacted are factors in deciding justifiable reliance:

> Both JPMorgan and Orca are sophisticated business entities, composed of knowledgeable, skilled, and experienced people who were more than capable of overseeing the negotiation and execution of the oil-and-gas deal at issue in this case. And the transaction at the heart of this case was no small deal. The six leases Orca ultimately received, after weeks of intense, detail-oriented negotiation, covered 919 acres and came at a cost of $3.2 million.

17

> Such world-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize "red flags" that the less experienced may overlook.

*JPMorgan,* 546 S.W.3d at 656.

Plaintiffs are highly sophisticated parties, replete with a network of comprehensive systems designed to detect and prevent fraud, waste, and abuse. They should have, and in fact did, detect what they believed to be fraudulent billing practices at United Toxicology and its parent, Next Health, by at least July 20, 2015, as shown in Section V.A.2, *supra*.  Thus, regardless of what representations Plaintiffs allege were made by Next Health and its executives after that date, with regard to billing by an entity that was a subsidiary or affiliated with Next Health, Plaintiffs could not have justifiably relied on those representations as they were on notice of numerous "red flags."

The MEDIC Complaint put Plaintiffs on notice of United Toxicology and Next Health's alleged fraud. Second, Plaintiffs had been conducting investigations of Medicus before the MEDIC Complaint, under its SIU department, and under legal counsel direction.  Further, from the privilege log, it is apparent that in addition to the SIU investigation of Medicus, Plaintiffs began initiating other investigations into Pioneer Laboratories and US Toxicology, both Next Health entities, as early as April 7, 2015. App. 43.  Accordingly, given all of the investigations Plaintiffs were conducting into Next Health and its affiliates, it is not reasonable to suggest Plaintiffs were justified in relying on any representations made by Next Health or any of the Defendants.

At the very latest, Plaintiffs knew of allegations of billing fraud by United Toxicology and its parent, Next Health, by July 20, 2015, which precludes Plaintiffs from having "justifiably relied" on Next Health's entities' billing from that date forward.  Instead, it appears Plaintiffs chose to allow submitted claims despite red flags and evidence of alleged billing fraud, and then try to recover those amounts, or just not pay for the services their members received.

For these reasons, Defendants are entitled to summary judgment on Plaintiffs claims of fraud.

### c.        Plaintiffs Have No Evidence of Fraudulent Nondisclosure

Fraud by non-disclosure, a subcategory of fraud, occurs when a party has a duty to disclose certain information and fails to disclose it. *Bombardier Aerospace Corporation v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)). To establish fraud by non-disclosure, the plaintiff must show: (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury. *Id.* at 219-220 (citing *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001)). In general, there is no duty to disclose without evidence of a confidential or fiduciary relationship. *Id.* at 220 (citing *Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)). A fiduciary duty arises "as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships." *Id*. A confidential relationship is one in which the "parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest." *Id*.

Plaintiffs have no evidence that (1) Defendants deliberately failed to disclose material facts; (2) Defendants had a duty to disclose such facts to Plaintiffs; (3) that Plaintiffs were ignorant of the facts and did not have an equal opportunity to discover them; (4) that Defendants intended for Plaintiffs to act or refrain from acting based on the nondisclosure; or (5) that Plaintiffs relied on Defendants' non-disclosure which resulted in injury.

Primarily, Plaintiffs have no evidence that Defendants, in their personal capacity, had a duty to disclose any facts to Plaintiffs at all. Plaintiffs have no evidence that show a "formal relationship" or "confidential relationship" between Plaintiffs and either of the Defendants, individually, that would satisfy the second element of the fraudulent nondisclosure cause of action.

Additionally, Plaintiffs have no evidence that Defendants had the requisite intent required for the first and fourth elements. Plaintiffs have no evidence that Defendants intentionally failed to disclose any material facts or that they intended for Plaintiffs to act or refrain from acting based on any nondisclosure. Plaintiffs also have no evidence that they did not have an equal opportunity to discover the alleged facts making up Plaintiffs' claim for fraudulent non-disclosure. Finally, Plaintiffs have no evidence that they justifiably relied on any non-disclosure by Defendants which resulted in injury, for the reasons discussed *supra*. Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim of fraudulent non-disclosure.

### d.   Plaintiffs Have No Evidence that Defendants Are an Alter Ego of Next Health

Plaintiffs allege that the corporate form of ALG, Medicus, US Toxicology, UTox, True Labs, the Class A Pharmacies, and/or Next Health should be disregarded because Next Health and the Next Health Executives caused the entities to be used for the purpose of perpetrating an actual fraud upon United, which was committed primarily for the benefit of Next Health and the Next Health Executives. Dkt. 584, ¶ 356.

Sometimes referred to as "pierc[ing] the corporate veil," an alter ego claim seeks to disregard a corporate entity and hold the entity's individual owners or officers liable for a claim against the entity. *In re GTG Solutions, Inc*., 642 S.W.3d 41, 45 (Tex. App.—El Paso 2021) (quoting *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990)). Alter ego "veil-piercing" is only permissible "when there exists such unity between corporation and individual that the

corporation ceases to be separate and when holding only the corporation liable would promote injustice." *Id.* "'The alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases.'" *Mills v. City of Port Arthur, Texas*, No. 1:05-CV-298, 2006 WL 3531460, at *10 (E.D. Tex. Dec. 4, 2006) (quoting *Bridas S.A.P.I. C. v. Government of Turkmenistan (Bridas II)*, 447 F.3d 411, 416 (5th Cir. 2006)).

Plaintiffs have no evidence that Defendants employed corporate fiction to evade an existing legal obligation, achieve or perpetuate monopoly, circumvent a statute, or protect themselves from crime or justify wrong. Therefore, Plaintiffs have no evidence that Defendants are an alter ego of Next Health or any other entity.

## B.   Conspiracy to Commit Fraud

### 1.   *Plaintiffs Have No Evidence of Defendants' Participation in a Conspiracy to Commit Fraud*

Under Texas law, a claim for civil conspiracy requires: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Apani Southwest, Inc. v. Coca-Coca Enterprises, Inc.*, 300 F.3d 620, 635 (5th Cir. 2002) (quoting *Massey v. Armco Steel Company*, 652 S.W.2d 932. 934 (Tex. 1983)). "Civil conspiracy requires specific intent. For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct ***at the inception*** of the combination or agreement." *Triplex Communications Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995) (emphasis added).

A conspiracy to defraud must have a common purpose, supported by a concerted action to defraud, and each member must have the understanding that the other has that purpose." *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 971 (S.D. Tex. 2010). "There must be an agreement or understanding between the conspirators to inflict a wrong against, or

injury on, another, a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.'" Id. (quoting *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex.1969)).

Plaintiffs allege that Defendants conspired with others to commit fraud against Plaintiffs as to testing that was done by sober homes operated by the ADAR group. Dkt. 584, ¶ 398. According to Plaintiffs, the so-called conspirators agreed to the object of the conspiracy, "to obtain funds from commercial insurers for illegitimate lab services." Dkt. 584, ¶ 397. Plaintiffs allege that, in furtherance of the so-called conspiracy, Jeremy and other Next Health executives met with Erik Bugen to "discuss models to increase the amount of funds that they could obtain from commercial insurers for illegitimate lab serves." Dkt. 584, ¶ 398. Plaintiffs assert that, at this alleged meeting, the group of Next Health executives "encouraged Bugen to pay additional physicians to use their credentials so that referrals would be more spread out and less likely to draw attention, and to expand from illegitimate lab services into other Next Health products, including illegitimate prescriptions." Dkt. 584, ¶ 398. Moreover, Plaintiffs allege that Defendants and others "approved three substantial loans to Erik Bugen that were intended to give Bugen the ability to purchase homes that could house individuals with commercial insurance from whom urine specimens could be collected and sent to Next Health." Dkt. 584, ¶ 398. Plaintiffs further assert Jeremy doing due diligence on the properties purchased by the trust and Cary agreeing "to act as the trustee for the properties while Bugen paid back the loans" constitutes the Defendants' "overt acts." *Id.*

At the outset, Plaintiffs have no evidence that at the time of the alleged meeting that Jeremy knew of the design to further an illicit conspiracy to defraud Plaintiffs. Plaintiffs have no evidence specific to Jeremy's state of mind at that time. Further, Jeremy's presence at such a meeting would not necessarily mean he was privy to any designs of Erik Bugen or any other Next Health executive. The allegation that Jeremy knowingly had a hand in "encourag[ing]" Erik Bugen to perform any illicit act is completely unsupported by evidence.

Despite making such allegations, Plaintiffs have no evidence that Defendants had a meeting of the minds to defraud Plaintiffs when they participated in a vote with other Next Health executives to loan the company's money, or when they took actions relating to the trust holding the aforementioned properties. These actions are legitimate business endeavors and show no awareness of any agreement or meeting of the minds to engage in the wrongful conduct cited by Plaintiffs.  Plaintiffs have no evidence to show that Defendants were aware of the alleged harm when they voted to approve loans and took actions relating to the trust holding properties. Thus, since there is no evidence that Defendants were aware of the alleged harm *at the inception* of the agreement, the Court must grant Defendants' Motion for Summary Judgment as to Plaintiffs' civil conspiracy claim against Defendants.

## C.      Fraudulent Transfer

### 1.      *Plaintiffs Have No Evidence that Defendants Violated TUFTA*

Defendants are entitled to summary judgment on Plaintiffs' fraudulent transfer claim because Plaintiffs have no evidence that any transfers to Defendants were made with the actual intent to hinder, delay, or defraud Plaintiffs.[3]  Under the Texas Uniform Fraudulent Transfer Act

---

[3] It is unclear from Plaintiffs' Second Amended Complaint whether Jeremy Rossel is included in Plaintiffs' fraudulent transfer claim. Although Plaintiffs state the cause of action is against "Next Health Executives," Jeremy Rossel is not mentioned anywhere in that section of the Complaint.

("TUFTA") "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com. Code § 24.005(a)(1). Under TUFTA, a "debtor" is any "person who is liable on a claim." *Id*. § 24.002(6). Section 24.009(b) of TUFTA states:

> (b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:
>
>> (1) the first transferee of the asset or the person for whose benefit the transfer was made; or
>>
>> (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

Tex. Bus. & Com. Code § 24.009(b). Thus, a good faith subsequent transferee is not liable for any fraudulent transfer which occurred in the prior transfer chain. Section 24.005(b) provides factors to determine actual intent:

> (1)    the transfer or obligation was to an insider;
>
> (2)    the debtor retained possession or control of the property transferred after the transfer;
>
> (3)    the transfer or obligation was concealed;
>
> (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5)    the transfer was of substantially all the debtor's assets;
>
> (6)    the debtor absconded;
>
> (7)    the debtor removed or concealed assets;

(8)     the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)     the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)    the debtor transferred the essential assets of the business to a lien or who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code § 24.005(b).

Plaintiffs allege that two sets of transfers are fraudulent: (1) cash transfers from ALG, Medicus, US Tox, UTox, True Labs, Apex Pharma, Dallasite, Executive Healthcare, and Total Pharma to Next Health from 2015 to 2017; and (2) cash transfers from Next Health to Next Health Executives from 2016-2018. *See* Dkt. 584, ¶¶ 458-479.

> ### a.     Plaintiffs Have No Evidence of Fraudulent Transfers from the Entities to Next Health

Plaintiffs claim of fraudulent transfer against Defendants fails because, as to the transfers to Next Health, Plaintiffs have no evidence they were a "creditor" within the meaning of the statute when all of the transfers alleged were made, or that any transfers were made to hinder, delay or defraud any "creditor," and in particular Plaintiffs. Plaintiffs have no evidence of a substantial majority of the factors listed in the statute. Plaintiffs have no evidence that the entities retained possession or control of the property transferred after the transfer, or that the transfers made from these entities to Next Health were concealed. *See id.* §§ 24.005(b)(2)-(3). Plaintiffs have no evidence that, prior to these transfers, any of these entities had been sued or threatened with suit. *See id.* § 24.005(b)(4). Plaintiffs have no evidence that these transfers were of substantially all the debtor's assets. *See id.* § 24.005(b)(5). Plaintiffs have no evidence that any of these entities absconded or removed or concealed assets. *See id.* §§ 24.005(b)(6)-(7). Plaintiffs have no evidence

that the value of the consideration received was substantially less than the amount transferred. *See id.* § 24.005(b)(8). Nor do Plaintiffs have evidence that the entities became insolvent shortly after the transfers were made. *See id.* § 24.005(b)(9). Plaintiffs also have no evidence that the entities transferred the essential assets of the business to a lienor who transferred the assets to an insider of the entities. *See id.* § 24.005(b)(11). Therefore, Plaintiffs have no evidence that Defendants are liable under TUFTA for the transfers made from ALG, Medicus, US Tox, UTox, True Labs, Apex Pharma, Dallasite, Executive Healthcare, or Total Pharma to Next Health.

### b. Plaintiffs Have No Evidence of Fraudulent Transfers from Next Health to Defendants

Similarly, Plaintiffs have no evidence that Plaintiffs were a "creditor" when all of the transfers alleged to be fraudulent were made, or that any transfers from Next Health to Defendants were made with the actual intent to hinder, delay, or defraud Plaintiffs. Plaintiffs have no evidence that Next Health retained possession or control of the property transferred after the transfer, nor could they. *See id.* § 24.005(b)(2). Plaintiffs have no evidence that the transfers made from Next Health to Defendants were concealed. *See id.* § 24.005(b)(3). Plaintiffs have no evidence that these transfers were of substantially all the Next Health assets, nor could they. *See id.* § 24.005(b)(5). Plaintiffs also have no evidence that Next Health absconded or removed or concealed assets. *See id.* §§ 24.005(b)(6)-(7). Plaintiffs have no evidence that the value of the consideration received was substantially less than the amount transferred to Defendants. *See id.* § 24.005(b)(8). Nor do Plaintiffs have evidence that Next Health became insolvent shortly after the transfers to Defendants were made. *See id.* § 24.005(b)(9). Plaintiffs also have no evidence that Next Health transferred the essential assets of the business to a lienor who transferred the assets to an insider of the Next Health. *See id.* § 24.005(b)(11). Finally, Plaintiffs have no evidence that would indicate that these transfers were not reimbursements of incurred expenses on behalf of the business, salary, or regular

distributions that executives received in accordance with Next Health's operating agreement. In fact, in their Complaint, Plaintiffs do not point to a single instance of any alleged fraudulent transfer to Defendant Jeremy Rossel.  Therefore, Plaintiffs have no evidence that Defendants are liable under TUFTA for the transfers made from ALG, Medicus, US Tox, UTox, True Labs, Apex Pharma, Dallasite, Executive Healthcare, or Total Pharma to Next Health, or from Next Health to Defendants.

For the reasons set forth above, Plaintiffs have no evidence that the transfers to Defendants violated TUFTA and thus Defendants are entitled to summary judgment on this claim.

**D.**      **Violations of 18 U.S.C. § 1962(c)**

**1.**      ***Plaintiffs' Civil RICO Claim Against Defendants Are Barred by the Statute of Limitations***

As discussed in Section V.A.2., *supra*, there is significant evidence that shows Plaintiffs knew or should have known, on or before July 20, 2015, of its alleged injury of paying allegedly fraudulent bills for lab services and prescriptions. Pursuant to the four-year-statute of limitations for civil RICO claims, Plaintiffs must have filed their civil RICO claim against Defendants on or before July 20, 2019. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 152 (1987). Since Plaintiffs did not move to add Defendants as individual defendants until September 30, 2019, their civil RICO claims against Defendants are barred by the statute of limitations. *See id;* Dkt. 293.

It is well established that the Fifth Circuit applies the "injury discovery" and "separate accrual" rules to determine when the statute of limitations clock begins to run. *Lewis v. Danos*, 83 F.4th 948, 955 (5th Cir. 2023). Pursuant to the "injury discovery" rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury. *Id.* The Fifth Circuit has explicitly stated that it considers when a plaintiff is first made aware of her injuries, not when she

discovers Defendants' "enterprise racketeering scheme." *Id.* Relatedly, the "separate accrual" rule provides that when a pattern of RICO activity causes a continuing series of separate injuries, a civil RICO claim accrues for each injury when the plaintiff discovers, or should have discovered, that injury. *Id.* However, the "separate accrual" rule does not apply where a plaintiff already knows or should know of the fraud. *Deshazo v. Nations Energy Co. Ltd.*, 286 F. App'x 110, 117 (5th Cir. 2008) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 186-87 (1997)). The evidence outlined in Section V.A.2., *supra*, shows that on or before July 20, 2015, Plaintiffs had suffered the alleged injury from the alleged fraud, and knew or should have known of the fraud allegedly committed by Defendants and the "enterprise." Plaintiffs failed to file their civil RICO claim against Defendants within four years and Plaintiffs' claims are thus time barred.

### 2. *Plaintiffs Have No Evidence that Defendants Had the Intent to Defraud, as Required for Mail Fraud and Wire Fraud, Two of the Predicate Acts Alleged in Plaintiffs' RICO Claim*

Pursuant to 18 U.S.C. § 1962, the common elements of any civil RICO claim are "(1) a person who engages in (2) a pattern of racketeering activity; (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (quoting *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007). A pattern of racketeering activity consists of two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity. *Id.* The predicate criminal acts pled by Plaintiffs in this case are violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1956 (Money Laundering). Dkt. 584, ¶ 482.

"Violation of the wire-fraud statute requires the specific intent to defraud, *i.e.,* a conscious knowing intent to defraud." *U.S. v. Patterson*, 294 Fed.Appx. 985, 986 (5th Cir. 2008) (quoting *U.S. v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007). Apart from the mode of communication, the

elements of wire fraud "directly parallel those of the mail fraud statute." *U.S. v. Briscoe*, 65 F.3d 576, 583 (7th Cir. 1995). Accordingly, both wire fraud and mail fraud require the intent to defraud.

Despite extensive discovery, Plaintiffs have no evidence that shows Defendants acted with the intent to defraud. Rather, after a lengthy discovery period, there is still no evidence that Defendants took any action relating to Next Health with the intent to defraud. The *mens rea* element is the linchpin of both mail fraud and wire fraud, two of the three predicate acts supporting Plaintiffs' RICO claim against Defendants. Without two predicate acts, there is no "pattern of racketeering." *St. Germain*, 556 F.3d at 263. Therefore, the Court must grant Defendants' Motion for Summary Judgment as to Plaintiffs' RICO claim against Defendants.

**E.**    **Additional or Exemplary Damages, Attorney's Fees, and Costs**

Because Plaintiffs' claims for compensatory and other damages are time-barred and/or lack merit and should be dismissed, the Court also should dismiss Plaintiffs' claims for common-law exemplary damages, attorneys' fees and costs. These are not recoverable in the absence of liability and an award of compensatory damages.

## VI.    PRAYER

**THEREFORE,** Defendants Cary Rossel and Jeremy Rossel respectfully prays that the Court grant this Motion and enter an order granting summary judgment to Defendants on all of Plaintiffs' claims and render a take-nothing judgment in favor of Defendants on all claims by Plaintiff against these Defendants Cary Rossel and Jeremy Rossel.  Defendants also pray for such other relief, both at law and equity, as this Court deems just.

Respectfully submitted,

By: */s/ John A. Scully*_____
JOHN A. SCULLY
State Bar No. 17936500
John.Scully@cooperscully.com
NISHA P. BYERS
State Bar No. 00791460
Nisha.Byers@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
(T): 214-712-9500
(F): 214-712-7540

**ATTORNEYS FOR DEFENDANTS
CARY ROSSEL AND JEREMY ROSSEL**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been served on all counsel of record via e-mail on the 15th day of November, 2023.


*/s/ John A. Scully*_____