## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY,<br><br>    Plaintiffs,<br><br>v.<br><br>JEREMY ROSSEL, et al.,<br><br>    Defendants. | Case No. 3:21-cv-01547-L-BT |

## BRIEF IN SUPPORT OF

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT <u>AGAINST DEFENDANTS AMIR MORTAZAVI AND ARVIN ZEINALI</u>

| **FIGARI + DAVENPORT, LLP** | **SINTON, SCOTT, MINOCK & KEREW** |
|---|---|
| Andrew G. Jubinsky<br>andy.jubinsky@figdav.com | Scott P. Kerew<br><u>skerew@ssmklaw.com</u><br>Adam J. Sinton<br><u>asinton@ssmklaw.com</u> |
| 901 Main Street, Suite 3400<br>Dallas, TX 75202<br>T: (214) 939-2000 | Joseph J. Minock<br><u>jminock@ssmklaw.com</u><br>Benjamin D. Van Horn<br><u>bvanhorn@ssmklaw.com</u> |
| | 1550 Market Street, Suite 400<br>Denver, Colorado 80202 |
| | *Counsel for Plaintiffs* |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................iii

INTRODUCTION.............................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS.......................................3

    A.  UnitedHealthcare.................................................................3

    B.  Next Health.......................................................................7

    C.  Misrepresentations that lab tests were ordered by Dr. Rao
        Dr. Kim, Dr. Parameswara, and Dr. Sozi................................10

    D.  Pharmacy claims omitted that the prescribing physician
        received kickbacks from Next Health......................................15

    E.  Lab claims omitted that the referring physician received
        kickbacks from Next Health...............................................23

    F.  Pharmacy claims for prescriptions that falsely represented
        that patients paid co-pay obligations ....................................27

SUMMARY JUDGMENT STANDARD.....................................................31

CONSEQUENCES OF PLEADING THE FIFTH AMENDMENT.........................31

FRAUD.......................................................................................34

    A.  UHC is entitled to partial summary judgment on its fraud
        claim against Amir Mortazavi for his participation in the
        ADAR scheme ...............................................................37

    B.  UHC is entitled to partial summary judgment on its fraud
        claims against Amir Mortazavi and Arvin Zeinali for their
        participation in submitting kickback-induced pharmacy
        claims........................................................................38

    C.  UHC is entitled to partial summary judgment on its fraud
        claim against Amir Mortazavi for his participation in sub
        mitting kickback-induced lab claims .....................................39

    D.  UHC is entitled to partial summary judgment on its fraud
        claims against Amir Mortazavi and Arvin Zeinali for their
        participation in submitting claims where no co-pays had
        been collected ...............................................................40

CONCLUSION...............................................................................42

# TABLE OF AUTHORITIES

**Supreme Court**

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976)...............................................................................32

*Field v. Mans*,
    516 U.S. 59 (1995)................................................................................36

*Gasperini v. Ctr. For Humanities, Inc.*,
    518 U.S. 415 (1996)..............................................................................34

*Scott v. Harris*,
    550 U.S. 372 (2007)..............................................................................31

**Fifth Circuit**

*Bohnsack v. Varco, L.P.*,
    668 F.3d 262 (5th Cir. 2012).................................................................37

*Davis-Lynch, Inc. v. Moreno*,
    667 F.3d 539 (5th Cir. 2012)...........................................................32, 33

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008).................................................................35

*Lewis v. Bank of America NA*,
    343 F.3d 540 (5th Cir. 2003).................................................................36

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994).................................................................31

*O'Hare v. Graham*,
    455 F. App'x 377 (5th Cir. 2011)..........................................................31

*Smith v. Regional Transit Auth.*,
    827 F.3d 412 (5th Cir. 2016).................................................................31

*State Farm Life Ins. Co. v. Gutterman*,
    896 F.2d 116 (5th Cir. 1990).................................................................32

## U.S. District Courts

*ClaimHub, Inc. v. Universal Risk Ins. Servs., Inc.*,
    No. H-10-2841, 2011 WL 13247456 (S.D. Tex. July 25, 2011)..................35

*Indep. Receivables Corp. v. Precision Recovery Analytics, Inc.*,
    No. 1:11-CV-008-LY, 2012 WL 12874526 (W.D. Tex. May 16, 2012)..........35

*In re Cross*,
    653 B.R. 362 (Bankr. E.D. Tex. 2023).....................................................33

*In re Enron Corp. Sec., Derivative & Erisa Litig.*,
    762 F. Supp. 2d 942 (S.D. Tex. 2010).....................................................32

*United States ex rel. Shank v. Lewis Enters., Inc.*,
    No. 04-CV-4105-JPG, 2006 WL 1064072 (S.D. Ill. Apr. 21, 2006)..............32

*United States ex rel. Gonzalez v. Fresenius Med. Care N.A.*,
    571 F. Supp. 2d 758 (W.D. Tex. 2008).....................................................32

*Vestas-Am. Wind Tech., Inc. v. Salazar*,
    No. 6:19-CV-076-H, 2021 WL 1399296 (N.D. Tex. Feb. 1, 2021) ................36

## Texas Supreme Court

*Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*,
    960 S.W.2d 41 (Tex. 1998)...............................................…..................34, 37

*Italian Cowboy Partners, Ltd. v. Prudential Insurance Co. of Am.*,
    341 S.W.3d 323 (Tex. 2011)...................................................…..............36

*Leyendecker & Assoc., Inc. v. Wechter*,
    683 S.W.2d 369 (Tex. 1984)...................................................................36

## Texas Court of Appeals

*In re Arthur Andersen LLP*,
    121 S.W.3d 471 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding).....35

*Lesikar v. Rappeport*,
    33 S.W.3d 282 (Tex. App.—Texarkana 2000, pet. denied)..........................35

*Maulding v. Niemeyer*,
    241 S.W.2d 733 (Tex.Civ.App.—El Paso 1951).......................................36

*Portlock v. Perry*,
    852 S.W.2d 578 (Tex. App.—Dallas 1993, pet. denied)............................36

*Turner v. Biscoe*,
    171 S.W.2d 118 (Tex.Civ.App.—Waco 1943)..............................…................36

**Federal Rule**

Fed. R. Civ. P. 56.........................................................................…...................31

## INTRODUCTION

UHC is a payor of health benefits in the United States. In less than two years, from 2015–2016, a group of executives, operating through the Next Health, LLC enterprise, organized a massive healthcare billing fraud scheme that defrauded UHC out of more than $120 million by submitting false and misleading claims seeking payment for lab tests and pharmacy prescriptions. The fraud was complex. Next Health's two majority owners pleaded guilty to, and have each served years of prison time for, federal crimes based on their management of the company.

But those two majority owners were not the only executives involved in the schemes. This motion seeks partial summary judgment against two other of Next Health's former executives, Defendants Amir Mortazavi and Arvin Zeinali, on UHC's fraud claims. Messrs. Mortazavi and Zeinali invoked their Fifth Amendment right against self-incrimination rather than answer any questions at deposition (or in response to UHC's interrogatories) about their management of Next Health and their proven involvement in the following fraudulent schemes.

First, Next Health, in an initiative managed by Amir Mortazavi, joined up with a sober living facility organization (known as ADAR) to take advantage of its residents. Next Health's labs represented in claims submitted to UHC that certain drug tests for those residents had been ordered by licensed physicians. But the residents never saw a doctor, and Next Health just used those residents to churn out drug tests that could be billed to UHC. Because of this scheme, UHC paid Next Health's labs

$13,201,570 that it would not have had it known that those tests weren't ordered by licensed physicians.

Second, Amir Mortazavi and Arvin Zeinali oversaw a scheme that resulted in Next Health's licensed pharmacies submitting claims to UHC that concealed that the prescriptions reflected in those claims had been ordered by medical providers who received kickbacks through their investments in Next Health's Class G pharmacies. Because of this scheme, UHC paid $8,554,821 to the Next Health pharmacies that it wouldn't have had it known that the claims were induced by kickbacks.

Third, Amir Mortazavi directed and recruited physicians into a scheme that resulted in Next Health's licensed laboratories submitting claims to UHC that concealed that the lab claims had been ordered by medical providers who received kickbacks through their investments in syndicated, unlicensed Next Health labs. Because of this scheme, UHC paid $8,707,791 to the Next Health labs that it wouldn't have had it known that the claims were induced by kickbacks.

And Fourth, Next Health's licensed pharmacies represented that they collected patient co-pay obligations related to the patient and prescription listed in the claims. But in fact, for 85% of the claims submitted by Next Health's pharmacies, patients had not paid co-pays. Amir Mortazavi and Arvin Zeinali knew that the representations that co-pays had been paid were false and helped direct the scheme, which caused UHC to pay $32,330,300 that it otherwise would not have.

Defendants' participation in and directorial authority over these schemes is supported by more than just their refusal to answer questions and provide discovery

based on their assertions of their Fifth Amendment privilege. Their conduct is corroborated by documents and testimony about them from others familiar with the schemes—documents and testimony these Defendants cannot contradict. In the Fifth Circuit, a court may harbor an adverse inference against parties to civil actions that invoke the Fifth Amendment during discovery. And a refusal to sit for deposition, combined with corroborating evidence, is sufficient for a court to grant summary judgment. So here, the Court is left with considerable, uncontradicted evidence that Defendants helped orchestrate these schemes and nothing but silence from Defendants. There is therefore here no dispute of material fact as to the fraud claims against Defendants, and the Court should grant partial summary judgment against them.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. UnitedHealthcare

1.      Plaintiffs United Healthcare Services, Inc. and UnitedHealthcare Insurance Company, Inc. ("Plaintiffs" or "UHC") administer and insure health and welfare benefit plans. Plaintiffs made payments to labs and pharmacies owned and operated by Next Health LLC based on information in claims submitted to them by Defendants. (UHC000076148, UHC000076149, UHC000076150, UHC000076151, UHC000076152, UHC000076153, UHC000076154, UHC000489322 (these eight files are referred to as "UHC Lab Claim Data"), UHC000485731, UHC000485732,

3

UHC000485733, UHC000485734 (these four files are referred to as "UHC Pharma Claim Data") (collectively, "UHC Claim Data").)[1]

2.      Payers like UHC receive millions of claims per day. (J. Shimek Dep. 37:18–24, App. 56; Tobin Decl. ¶ 3, App. 70.)[2] UHC must process this volume of claims in a timely manner, and as a result it is impossible for every claim to be reviewed by hand. (J. Shimek Dep. 34:4–21, App. 55; Tobin Decl. ¶¶ 3–4, App. 70.) So, by necessity, and as is common industry practice, most claims are processed without human intervention. (J. Shimek Dep. 34:4–21, App. 55; Tobin Decl. ¶ 3, App. 70.)

3.      To timely process this volume of claims, payers like UHC must rely on providers to submit claims that contain true, accurate, and complete information. (J. Shimek Dep. 34:4–21, 37:18–24, App. 55–56; Tobin Decl. ¶ 4, App. 70.)

4.      Next Health labs and pharmacies submitted thousands of claims to UHC for payment. Each claim submitted to UHC at issue in this case contained the following information: the member's demographic information (including name, date of birth, address); the member's health benefit plan information (including group number and member ID); the provider's information (including name, address, tax identification number ("TIN"), and National Provider Identification number ("NPI"));

---

[1]      The spreadsheets filed with this motion contain Protected Health Information ("PHI"). *See* 45 C.F.R. § 160.103. UHC is not permitted to file PHI publicly on the record. 45 C.F.R. § 164.512(e). The spreadsheets have been marked on a drive labeled "Private" pursuant to the parties' protective order (Doc. 618) and are being filed physically/manually with the Court, along with other Excel files that cannot be filed electronically. These exhibits do not have, and are not cited with, an "App." number.

[2]      For ease of reference, exhibits to this motion that were filed using CM/ECF are pin-cited to the "App." page number in the lower right corner of the appendix.

the name and NPI of the medical provider who referred the patient to receive the services or prescription in the claim; and information about the services rendered or prescription dispensed. (UHC Claim Data.)

5.    Each claim submitted to UHC by a Next Health lab represented that the lab services listed therein had been ordered by a licensed medical provider (*e.g.*, a physician) and that the provider chose the listed diagnosis codes that support the services (*i.e.*, their medical necessity). (*See*, *e.g.*, UHC Lab Claim Data, Column "AZ" (referring provider NPI), Column "AC" (diagnosis code).)

6.    By submitting claims to UHC, Next Health pharmacies represented that they collected patient co-pay obligations related to the patient and prescription listed in the claims, as required by the OptumRx pharmacy manual. (UHC Pharma Claim Data; UHC000492439, App. 338; UHC 8/31/21 Response to Mortazavi Interrogatory 1, App. 200.)

7.    None of the lab or pharmacy claims Next Health submitted to UHC disclosed that the referring/prescribing provider had a financial interest in the claim. (UHC Claim Data.)

8.    UHC relies on the information contained in claims to make payment determinations on those claims. (J. Shimek Dep. 37:18–24, App. 56; Tobin Decl. ¶ 5, App. 70.) The representations in each claim are material to this payment determination because it allows UHC to determine whether benefits need to be paid, and, if benefits are to be paid, the amount of benefits to pay and how and to whom those benefits should be paid. (Tobin Decl. ¶ 5, App. 70.)

9.     The representation in Next Health lab claims that the lab services were ordered by a licensed medical provider is material to UHC's payment determinations because UHC would not pay for lab services that were not ordered by a licensed medical provider. (UHC 30(b)(6) Dep. 78:16–21, App. 58; Tobin Decl. ¶ 6, App. 70; UHC 8/31/21 Response to A. Mortazavi Interrogatory 2, App. 201; *see also* C. Anderson Dep. 38:3–6, App. 30.)

10.     UHC does not pay for lab services or prescriptions that were ordered by a physician with a financial interest in the ancillary provider billing for those services/prescriptions. (UHC 4/20/23 Response to Mortazavi Interrogatory 20, App. 238; Tobin Decl. ¶ 6, App. 70; UHC000492491, App. 354.) If UHC knew the lab services or pharmacy prescriptions listed in the claims were induced by kickbacks, then UHC would not have paid the amounts listed in the claims. (UHC 30(b)(6) Dep. 79:5–8, App. 59; Tobin Decl. ¶ 6, App. 70; *see also* C. Anderson Dep. 27:3–20, 50:2–8, 54:2–5, App. 29, 31–32.)

11.     Pharmacies    are    required    to    collect    co-pays    from    patients. (UHC000492439, App. 338.) Whether a co-pay for a prescription has been collected from a patient is material to UHC because UHC does not pay pharmacy benefits unless a patient has paid their co-pay. (Tobin Decl. ¶¶ 5–6, App. 70.) If UHC knew that a co-pay had not been collected from the patient listed in a claim, then UHC would not have made a payment to the Next Health pharmacy submitting the claim. (Tobin Decl. ¶ 6, App. 70; *see also* C. Anderson Dep. 63:11–15, 64:8–22, 65:3–23, App. 34.)

**B. Next Health**

12.      Next Health LLC is a legal entity that was organized under the laws of the State of Texas in 2014 and began to operate in January 2015. (C. Rossel Dep. 61:13–24, App. 24.)

13.      Next Health LLC was the parent company for several licensed subsidiary entities that sought payments, in the form of claims for healthcare benefits, from UHC. Those entities included (a) five licensed laboratory entities: United Toxicology, LLC; US Toxicology, LLC; Medicus Laboratories, LLC; American Laboratories Group, LLC; and True Labs, LLC (all of which were out of network with UHC) and (b) at least four Class A licensed pharmacies entities: Executive Healthcare, LLC d/b/a The Apothecary Shop; Total Pharma LLC d/b/a Lot Pharma; Dallasite, Inc. d/b/a Pinnacle Pharmacy; and Apex Pharma LLC (all of which were participating (network) providers, through UHC's pharmacy benefit manager, OptumRx's network). (S. Narosov Factual Resume ¶ 3(a), 10, App. 73; S. Narosov Dep. 25:8–15, 30:14–17, 32:12–14, App. 2, 3; C. Rossel Dep. 11:13–16 (and Dep. Ex. 1, NH-00494287, App. 310), App. 23; C. Anderson Dep. 17:18–18:5, App. 27–28; J. Rossel Dep. 65:2–5, 196:11–23, 251:15–22, App. 51–53.)

14.      Next Health LLC was also the parent of dozens of shell companies—both syndicated, unlicensed labs and Class G pharmacies—that Next Health and its executives used to disguise kickbacks to physician referral sources by characterizing those kickbacks as distributions on those physicians' investments in the shell companies, including (a) unlicensed lab entities Guardian Toxicology, LLC, Trident Laboratories,

LLC, Infinity Toxicology, LLC, and National Toxicology, LLC and (b) Class G pharmacies Absolute Pharma LLC, Patients Pharma LLC, Legacy Pharma LLC, Select Pharma LLC, and Hilltree Pharmacy LLC. (S. Narosov Factual Resume ¶ 3(a), 10, App. 73–74; S. Narosov Dep. 25:8–15, 30:14–17, 32:12–14, App. 2–3; C. Rossel Dep. 11:13–16 (and Dep. Ex. 1, NH-00494287, App. 310), App. 23; C. Anderson Dep. 17:18–18:5, App. 27–28; J. Rossel Dep. 65:2–5, 196:11–23, 251:15–22, App. 51–53.) Next Health LLC and its subsidiary entities are referred to herein as "Next Health."

15.     Defendant Semyon Narosov was a founder of Next Health and on Next Health's Board of Managers. Semyon "Narosov and others known and unknown, acting through the Next Health entities described in the Information, knowingly and willfully executed a scheme or artifice to defraud health care benefit programs." (S. Narosov Factual Resume ¶ 3, App. 73.) As set forth below, the "others known" include Defendants Amir Mortazavi and Arvin Zeinali.

16.     Defendant Cary Rossel was a founder of Next Health and a member of Next Health's Board of Managers. (03/15/2021 C. Rossel Resp. to Interrog. 1, App. 174.)

17.     Defendant Jeremy Rossel was Next Health's Chief Financial Officer. (03/15/2021 J. Rossel Resp. to Interrog. 1, App. 183.)

18.     Defendant Amir Mortazavi held the titles of Next Health's Director of Pharmacy, Chief Commercial Officer, and Chief Development Officer. (03/15/2021 Mortazavi Resp. to Interrog. 1, App. 162.) Amir Mortazavi held an ownership interest in Next Health through a company called AM Healthcare Holdings, LLC. (BVA

00000099, App. 270.) In addition to salary, Amir Mortazavi received distributions from Next Health through AM Healthcare Holdings. (*See*, *e.g.*, NH-00222735, App. 304.)

19.     Defendant Arvin Zeinali was the director of Next Health's Pharmacy division (S. Narosov Dep. 190:24–191:4, App. 18), responsible for managing Next Health pharmacists across multiple locations (04/12/2021 Zeinali Resp. to Interrog. 1, App. 192), and an owner of Next Health through a company called ISM Holdings, LLC. (Zeinali 00000025, App. 356). In addition to salary, Arvin Zeinali received distributions from Next Health through ISM Holdings. (*See*, *e.g.*, NH-00222735, App. 304.)

20.     Chris Anderson, who provided deposition testimony in this case, was Chief Compliance Officer of Next Health. (C. Anderson Dep. 13:11–17, App. 26.)

21.     Jen Sears, who provided deposition testimony in this case, was one of the Directors of Sirius Laboratories, which was a subsidiary of Next Health that created protocols for Next Health's substance abuse testing programs. (J. Sears Dep. 10:16–11:18, App. 39.)

22.     Erik Bugen was a Next Health marketer, who founded the Austin Drug and Rehabilitation Foundation (a/k/a "ADAR Group" or "ADAR") with Kirk Zajac, which Bugen used to create and operate a set of clinics in Austin and Houston where staff collected urine and saliva specimens that were tested at Next Health labs. (Bugen Decl. ¶ 3, App. 60.)

### C. Misrepresentations that lab tests were ordered by Dr. Rao, Dr. Kim, Dr. Parameswara, and Dr. Sozi

23.     Claims submitted to UHC under Next Health Labs falsely identified Dr. Sekhar Rao, Dr. Vinay Parameswara, Dr. Yun Kim, or Dr. Nakandi Sozi (the physicians associated with ADAR) as the referring physician that ordered the lab services listed in the claim, as demonstrated by the following evidence:

a.      Erik Bugen founded ADAR and used it to create and operate clinics in Austin and Houston where staff collected urine and saliva specimens from individuals with commercial insurance. (Bugen Decl. ¶ 3, App. 60.)

b.      Bugen is not a physician and has no medical training. Bugen paid Dr. Rao, Dr. Kim, and Dr. Parameswara to use their signatures an NPI numbers to order unnecessary laboratory testing from Next Health. Bugen's associate, Kirk Zajac, paid Dr. Sozi to use her signature and NPI number to order unnecessary laboratory testing from Next Health for specimens collected at a Houston location. (Bugen Decl. ¶ 4, App. 60–61.)

c.      No physicians ever saw any patients at ADAR clinics in Austin or Houston. Patients did not see doctors prior to obtaining testing, did not receive the results, did not consult with doctors after test results were received, and did not know the real reason why their samples were taken and sent to Next Health laboratories. (Bugen Decl. ¶ 4, App. 60–61.)

d.      Bugen began sending Next Health urine specimens in June 2015. (Bugen Decl. ¶ 9, App. 62–63.) In August 2015, Bugen communicated with Next Health executives, including Amir Mortazavi, about purchasing a home to be used to

house people with commercial insurance from whom he could collect lab specimens that would be sent to Next Health labs for testing. (Bugen Decl. ¶¶ 11–12, App. 63.)

      e.    In September 2015, Bugen went to Dallas, Texas and met with Next Health executives, including Amir Mortazavi, to discuss plans to increase unnecessary orders of tests from Next Health labs. (Bugen Decl. ¶ 13, App. 63–64.) During the same month, Bugen wrote to Next Health executives, including Amir Mortazavi, to persuade Next Health to loan him money to purchase another house that he would fill with people with commercial insurance from whom he would collect lab specimens and send them to Next Health labs. (Bugen Decl. ¶ 15, App. 64; NH-00679720, App. 311.)

      f.    Amir Mortazavi initially responded to his plan by saying, "Sounds great let's push ahead" and then later following up to say "This looks very promising. I would like to create a system at gauging what we are doing on each deal/facility and compare that to the volume from the anticipated facility … This all pencils for me but I want us all to have a clear picture of how to move forward and do several more deals just like this." (Bugen Decl. ¶ 15, App. 64; NH-00014140, App. 283; NH-00178338, App. 289.)

      g.    In December 2015, Next Health purchased a third home for Bugen and ADAR, which Bugen coordinated with Next Health executives, including Amir Mortazavi. (Bugen Decl. ¶ 24, App. 67.)

      h.    Between June 2015 and May 2016, Next Health paid Bugen more than $2,278,000 in cash and another $1,000,000 used to purchase three properties,

11

in exchange for sending Next Health requests for unnecessary testing. (Bugen Decl. ¶ 33, App. 68.)

       i.     In May 2016, after Next Health found out that Bugen and ADAR were the subject of a CBS News investigation, Next Health released Bugen from the liens on the three homes Next Health purchased for him rather than calling the loans. (NH-00056955, App. 285.)

       j.     On May 20, 2016, Next Health calculated that, through its relationship with Bugen and ADAR, it received $14,510,183 in insurance payments; of that, more than $13 million had been paid by UHC. (NH-00213878, App. 303 (email), NH-00213879 (excel attached to email with "Collection Summary" tab showing calculation of UHC payments) (filed manually).)

       k.     On June 9, 2016, CBS News released a story highlighting the ADAR Group scam. The video is still available. (*See* Questionable Tactics Used to Profit from Genetic Testing Boom, CBS NEWS (June 9, 2016), available at https://www.cbsnews.com/news/cbs-news-investigation-genetic-testing-scam-call-kirk-zajac-craigslist/.)

       l.     On November 1, 2016, Erik Bugen pleaded guilty to healthcare fraud in connection with his activities with the ADAR Group. *See United States v. Bugen*, 3:17-cr-00370-D (N.D. Tex.). Dr. Parameswara pleaded guilty to conspiracy to commit healthcare fraud and Dr. Rao was found guilty of two counts of health care fraud. *See United States v. Rao*, 3:19-cr-00507-L, Dkt. Nos. 69, 219 (N.D. Tex.).

24.    Defendant Amir Mortazavi knowingly participated in the submission of these false claims that resulted in UHC paying more than $13 million for lab services that were not actually ordered by any licensed provider, as demonstrated by the following evidence:

a.    Semyon Narosov testified that Amir Mortazavi managed the relationship with ADAR and Bugen. (S. Narosov Dep. 102:20–103:19, App 9.)

b.    Chris Anderson testified that Amir Mortazavi was the chief salesperson in charge of the ADAR relationship. (C. Anderson Dep. 52:12–20, 58:20–59:7, App. 31–33.)

c.    Jen Sears testified that Amir Mortazavi oversaw the ADAR relationship with Next Health. (J. Sears Dep. 136:1–137:13, App. 47.)

d.    Amir Mortazavi advocated for Next Health to pay Bugen hundreds of thousands of dollars in advance to avoid risking the referral relationship and for Next Health to fund the purchase of homes for Bugen that would be used to fill with clients that had UnitedHealthcare insurance plans from whom lab specimens would be collected and sent to Next Health so that they could be billed to UHC. (NH-00014057, App. 279; NH-00234991, App. 305; NH-00177790, App. 286.)

e.    Jen Sears testified that Amir Mortazavi was aware that ADAR patients were not actually seeing physicians. (J. Sears Dep. 49:6–50:6, App. 42–43.)

f.    Jen Sears testified that Amir Mortazavi knew that Bugen and Zajac were creating forged medical records so that they could be sent to UnitedHealthcare as evidence that ADAR patients were seeing physicians. (J. Sears Dep.

13

55:13–57:22, 66:13–68:25, 72:16–79:17, 79:18–83:8, 140:1–141:7 (cumulatively dis-

cussing "blank template" medical record that was filled out by non-medical personnel

in response to UHC audit, using forged physician signature, and submitted to UHC

with Amir Mortazavi's knowledge), App. 44–48; NH-01423752, App. 336 (Jen show-

ing Amir a template form that "worked beautifully as proof" in response to payer

audits).)

       g.     Jen Sears even kept Amir Mortazavi apprised of how many fake

medical intake assessment form documents had been successfully faked and back-

dated, at one time providing Amir Mortazavi with a link to 85% of the completed

back-dated forms "for our UHC clients" and notifying him that there were still 35

more forms to complete. (NH-00014101–02, App. 280–81.)

       h.     Jen Sears testified that after getting word about the news inves-

tigation into ADAR, Amir Mortazavi instructed her to destroy her communications

with Bugen. (J. Sears Dep. 17:12–19:10, 160:25–161:4 (Q. "[A]re you saying Mr. Mor-

tazavi also asked you to delete your emails? … A. It was emails and text messages."),

App. 40, 49.)

       i.     When confronted with his involvement with and knowledge of the

ADAR claims, Amir Mortazavi declined to answer every question, invoking his right

against self-incrimination under the Fifth Amendment. (Mortazavi Dep. 54:16–57:4

(payments to owners of substance abuse facilities in exchange for referrals), 63:17–

64:5 (his concern for the reimbursement rates for lab services performed on sober

living residents and commissions to facilities with patients with high rates), 64:20–

65:11 (payment of kickbacks to Sirius Labs, which was associated with ADAR), 68:7–17 (same), 69:7–70:9 (physicians not choosing tests to order and Next Health providing blanket order forms to substance abuse facilities), 70:10–74:1 (several aspects of ADAR relationship, including purchasing homes for group and hiding scheme from UHC), 75:16–78:7 (loans to Bugen to purchase additional homes), 79:23–83:25 (forged records), 85:5–23 (lack of diagnosis notes from medical provider), 87:4–88:17 (UHC denying ADAR-related claims impacting cash flow and creating fake documentation to satisfy audit), 88:22–97:10 (fake documentation), 104:3–20 (regarding destroying records), App. 374, 376–82, 386.)

25.    UHC paid Next Health labs **$13,201,570** for claims that falsely represented that tests were ordered by Dr. Rao, Dr. Kim, Dr. Parameswara, or Dr. Sozi. (Graves Report, Ex. 4.2, App. 156–58 (citing UHC Lab Claim Data to total "Claim Amount Paid by United" based on purported referrals from Dr. Rao (NPI 1346330099), Dr. Kim (NPI 1326272246), Dr. Parameswara (NPI 1326272246), or Dr. Sozi (NPI 1972769255)).)

## D. Pharmacy claims omitted that the prescribing physician received kickbacks from Next Health

26.    Next Health pharmacies submitted thousands of claims to UHC for medications prescribed by physicians who were, directly or indirectly, paid by Next Health. (Graves Report Ex. 3.1, App. 121–34 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health) and Ex. 4.1, App. 148–55 (citing UHC Pharma Claim Data to compile number of "Claims Submitted" and "Amount Paid by United"); S. Narosov Dep. 181:23–

15

182:16, App. 16–17.) None of these claims disclosed that the prescribing physician was paid by Next Health to induce the prescription order. (UHC Pharma Claim Data.)

27.     Next Health paid kickbacks to prescribing physicians through sham investment distributions in Class G pharmacies (including Hilltree, Select, Legacy, Absolute, and Patients) and commissions paid through marketers (including Vinson Woodlee and Med Left, LLC). (S. Narosov Dep. 46:14–50:6, 56:11–14, 180:25–183:13, 188:18–189:20, App. 4–5; S. Narosov Factual Resume ¶¶ 3(a), 10, App. 73–74; V. Woodlee Factual Resume ¶¶ 12–13, 17–20, 22–24, App. 82–85.) For example, Next Health made payments to marketer Vinson Woodlee's entity Med Left, which in turn "induced [physicians] through kickbacks" to order prescriptions. (S. Narosov Dep. 57:12–15, App. 16–17; V. Woodlee Factual Resume ¶¶ 12–13, 29–30, App. 82–87.) Semyon Narosov testified that he could not identify any of "Vinson Woodlee's doctors who were not receiving payments that were intended to induce the doctor to order from Next Health." (S. Narosov Dep. 61:10–15, App. 6.)

28.     Next Health paid kickbacks to scores of prescribing physicians through sham investments in Class G subsidiaries, including at least 11 prescribing physicians in Legacy Pharmacy, at least 28 prescribing physicians in Absolute Pharma, at least 26 prescribing physicians in Patients Pharma, at least 10 prescribing physicians in Select Pharma, and at least 30 prescribing physicians in Hilltree Pharmacy. (Graves Report Ex. 3.1, App. 121–34 (citing Next Health financial distribution documents to identify physicians invested in Next Health Class G pharmacies and amounts they were paid).)

16

29.     Defendant Amir Mortazavi knowingly participated in the scheme to de-fraud UHC by causing the submission of kickback-induced claims for prescriptions, as demonstrated by the following evidence:

a.     Semyon Narosov testified that Amir Mortazavi was one of the "folks that aided and abetted [him in] causing kickbacks to be given in the form of dividends or through payments through marketers." (S. Narosov Dep. 78:3–16, App. 7; S. Narosov Factual Resume ¶ 3(a), App. 73.)

b.     Semyon Narosov testified that Amir Mortazavi "was the poster child of" Next Health's kickback arrangements. (S. Narosov Dep. 84:4–12, App. 480.)

c.     Semyon Narosov testified that Amir Mortazavi discussed with physicians certain medications to prescribe that would result in higher payments and, as a result, larger kickback distributions. (S. Narosov Dep. 195:3–11, App. 19.)

d.     Amir Mortazavi drafted a script explaining that prescribing phy-sicians were being moved out of investments in Class A pharmacy entities and into Class G pharmacy entities because they knew that prescribing physician investors were prohibited and by investing in a Class G entity, they could avoid the disclosure requirements imposed on Class A pharmacies. (NH-001367714–16, App. 329–31.) He also oversaw the transition of those invested prescribing physicians from the Class A pharmacies (*e.g.*, Dallasite and Apex) into Class G entities (*e.g.*, Hilltree). (NH-01376916, App. 333.)

e.     Amir Mortazavi monitored prescription volume from invested prescribing physicians, fielded complaints from prescribing physicians about other

17

investors who were not providing sufficient volume, and divested prescribing physicians who did not increase their volume. (NH-00178841–42, App. 292–93; NH-01142954–55, App. 314–15; NH-01146353, App. 318–20; NH-01147358, App. 321)

  f. When confronted with his involvement with and knowledge of Next Health's payment of kickbacks to prescribing physicians, Amir Mortazavi declined to answer every question, invoking his right against self-incrimination under the Fifth Amendment. (Mortazavi Dep. 35:12–17 (Next Health paid kickbacks to physicians in the form of investment distributions), 36:19–37:9 (physicians who ordered prescriptions from Next Health were offered investment interests in Next Health pharmacy entities based on their volume of orders), 39:1–40:24 (kicking physicians out of investment interests if they did not order sufficient prescriptions from Next Health), 52:25–53:5 (physicians were paid through MSOs based on their referral volumes), App. 369–70, 373.)

  30. Defendant Arvin Zeinali knowingly participated in the scheme to defraud UHC by causing the submission of kickback-induced claims for prescriptions, as demonstrated by the following evidence:

  a. Semyon Narosov testified that Arvin Zeinali would also discuss with physicians that they might want to prescribe certain medication compounds because Next Health would get paid more and, as a result, the physicians kickback distributions would be higher. (S. Narosov Dep. 195:3–11, App. 19.)

  b. Semyon Narosov testified that Arvin Zeinali was one of the "folks that aided and abetted [him in] causing kickbacks to be given in the form of dividends or

through payments through marketers." (S. Narosov Dep. 78:3–16, App. 7; S. Narosov Factual Resume ¶ 3(a), App. 73.)

c. Arvin Zeinali kept track of distributions made to physicians based on their investments percentages and referral volumes and made suggestions about which physicians would be offered higher investment opportunities, and therefore higher distributions, based on those referral volumes. (NH-01368318 (email), App. 332, NH-001368319 (excel file attached to email and filed manually).)

d. When physicians were offered investment opportunities in Class G pharmacies, Arvin Zeinali worked to remind physicians that they could order prescriptions from pharmacies in which they were invested so that their distributions would be higher. (NH-01345756, App. 324.)

e. When invested physicians with "full share(s)" had disproportionately low volume to justify the distributions they would be paid, Arvin Zeinali oversaw other Next Health employees that engaged with the physicians to convince them to write more prescriptions. (NH-01047272–73, App. 312–13.)

f. After opening Legacy Pharmacy, a Class G pharmacy for investment and distributions, Arvin Zeinali oversaw a first kickback distribution of $157,000 to invested physicians. He stated: "I understand this is a small distribution and the drs are expecting $600k to $1 mil in distributions, but they need to realize this is based off of April business which is collected [from payors, including UHC] in May. Also this is a new syndication and once we have it fully syndicated, we fully expect it to

distribute accordingly. … We definitely don't want them to become disinterested and unmotivated[.]" (NH-01330330, App. 323.)

g.  When discussing a physician that was being paid double kickbacks—both as an investor in a Class G pharmacy and through Vinson Woodlee's company Med Left—Arvin Zeinali coordinated with Vinson Woodlee to decide how the physician should be paid for writing prescriptions. (NH-00389858, App. 308.)

h.  When discussing whether to offer a physician an additional kickback of "medical director" wages of "$5k/month," Arvin Zeinali suggested that Next Health pay the kickback to a physician that writes more than twenty prescriptions per month. (NH-01359616–18, App. 325–27.)

i.  When confronted with his involvement with and knowledge of Next Health's payment of kickbacks to physicians, Arvin Zeinali declined to answer every question, invoking his right against self-incrimination under the Fifth Amendment. (Zeinali Dep. 24:5–27:23 (creation of Class G pharmacies as investment vehicles to support kickback payments), 28:6–13 (overseeing relationship with Vinson Woodlee), 29:19–23 (tracking physician ordering volume for purpose of paying appropriate kickbacks through investments), 30:23–31:3 (paying Woodlee marketer fees to recruit physicians into kickback scheme), 32:29–33:3 (paying sham medical director wages), 61:24–62:5 (sending physicians distributions on investments in Class G pharmacies to influence them to write prescriptions), 63:10–16 (divesting physicians with low referral volume), 68:23–69:11 (investments in Class G pharmacies to influence

20

referrals, 69:22–70:5 (failing to disclose influencing investments to UHC), App. 438–40, 447–50.)

31.     UHC paid Next Health subsidiary pharmacies Executive Healthcare LLC, Apex Pharma LLC, Dallasite, Inc., and Total Pharma LLC at least **$8,554,821** for kickback-induced prescriptions. (Graves Report Ex. 4.1, App. 148–55 (citing UHC Pharma Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims based on prescriptions from physicians getting paid by Next Health through sham investment distributions).) Specifically, UHC paid (a) $1,196,718 for prescriptions written by physicians who received kickbacks through Select Pharma; (b) $216,629 for prescriptions written by physicians who received kickbacks through Legacy Pharma; (c) $3,068,242 for prescriptions written by physicians who received kickbacks through Hilltree Pharmacy; (d) $2,002,598 for prescriptions written by physicians who received kickbacks through Absolute Pharma; and (e) $2,070,634 for prescriptions written by physicians who received kickbacks through Patients Pharma. (Graves Report Ex. 4.1, App. 148–55.)

| Hilltree Pharma | | Absolute Pharma | |
|---|---|---|---|
| Invested Prescribing Provider NPI | UHC Prescription Payments | Invested Prescribing Provider NPI | UHC Prescription Payments |
| 1962450916 | $7,148 | 1740476191 | $435,507 |
| 1629137815 | $223,823 | 1467694687 | $344,616 |
| 1245289917 | $255,459 | 1962563981 | $91,288 |
| 1609842442 | $169,221 | 1831325026 | $140,876 |
| 1396814232 | $107,988 | 1093802985 | $22,229 |
| 1366485286 | $115,133 | 1750389508 | $30,928 |
| 1912937921 | $188,282 | 1679544308 | $51,640 |
| 1154315091 | $258,158 | 1366530750 | $9,842 |
| 1699718767 | $87,890 | 1588945794 | $178,330 |
| 1437239860 | $141,008 | 1568624682 | $36,194 |

| | |
|---|---|
| 1881695559 | $227,704 |
| 1396730776 | $156,589 |
| 1548362858 | $70,806 |
| 1003808064 | $8,590 |
| 1376546051 | $39,677 |
| 1447466883 | $82,639 |
| 1457348963 | $82,293 |
| 1932201241 | $92,297 |
| 1053563163 | $9,344 |
| 1558359901 | $31,308 |
| 1295771137 | $139,701 |
| 1922093996 | $70,937 |
| 1184680209 | $53,222 |
| 1821013020 | $79,520 |
| 1518929348 | $13,545 |
| 1982699518 | $49,263 |
| 1700881257 | $20,167 |
| 1831101583 | $35,312 |
| 1881643971 | $8,118 |
| 1053563163 | $9,344 |
| 1598738148 | $62,265 |
| 1962597831 | $19,938 |
| 1639336746 | $72,212 |
| 1558315739 | $6,768 |
| 1104814573 | $34,336 |
| 1730394040 | $7,209 |
| 1588608459 | $11,904 |
| 1306159652 | $5,219 |
| 1003850991 | $13,905 |
| **Total** | **$3,068,242** |

| Select Pharma | |
|---|---|
| Invested Prescribing Provider NPI | UHC Prescription Payments |
| 1023052974 | $498,260 |
| 1245210830 | $124,951 |
| 1922101310 | $219,449 |
| 1356396832 | $171,689 |
| 1245394519 | $112,795 |
| 1407848013 | $69,574 |
| **Total** | **$1,196,718** |

| | |
|---|---|
| 1306876768 | $99,675 |
| 1205091410 | $49,991 |
| 1215954714 | $53,032 |
| 1215297247 | $14,625 |
| 1316919053 | $8,321 |
| 1295801744 | $171,221 |
| 1134175276 | $56,245 |
| 1326307794 | $27,913 |
| 1083914741 | $26,604 |
| 1811156979 | $56,002 |
| 1639161870 | $20,121 |
| 1528037512 | $63,243 |
| 1164403408 | $14,155 |
| **Total** | **$2,002,598** |

| Legacy Pharma | |
|---|---|
| Invested Prescribing Provider NPI | UHC Prescription Payments |
| 1750330619 | $43,376 |
| 1053453555 | $64,410 |
| 1598828758 | $58,986 |
| 1376596395 | $8,121 |
| 1306863253 | $41,736 |
| **Total** | **$216,629** |

| Patients Pharma | |
|---|---|
| Invested Prescribing Provider NPI | UHC Prescription Payments |
| 1639122179 | $67,742 |
| 1467439166 | $26,765 |
| 1962489930 | $251,026 |
| 1487631545 | $338,426 |
| 1710142484 | $142,404 |
| 1346440914 | $170,037 |
| 1033137435 | $36,109 |
| 1073531158 | $151,508 |
| 1598923989 | $70,829 |
| 1942332242 | $53,224 |
| 1841366465 | $29,008 |
| 1689636805 | $3,203 |
| 1033313556 | $41,295 |

| | |
|---|---|
| 1164679429 | $77,749 |
| 1184825994 | $7,295 |
| 1902865520 | $62,286 |
| 1447450796 | $202,504 |
| 1629050521 | $80,811 |
| 1568415206 | $40,238 |
| 1639122179 | $67,742 |
| 1356370282 | $21,871 |
| 1427051416 | $25,277 |
| 1538140074 | $94,820 |
| 1831196534 | $8,465 |
| **Total** | **$2,070,634** |

### E.  Lab claims omitted that the referring physician received kickbacks from Next Health

32.     Next Health labs submitted thousands of claims to UHC for lab services referred by physicians who were, directly or indirectly, paid by Next Health to induce those referrals. (Graves Report, Ex. 3.1, App. 121–35 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health) and Ex. 4.1, App. 148–55 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United"); S. Narosov Dep. 92:6–14, App. 8.) None of these claims disclosed that the referring physician was paid by Next Health to induce the lab order. (UHC Lab Claim Data.)

33.     Next Health paid kickbacks to referring physicians through sham investment distributions from subsidiaries that sounded like labs but were not licensed to perform any services (including Guardian Toxicology, Infinity Toxicology, Trident Toxicology, and National Toxicology) and marketing commissions paid to marketers (including Brigham Buhler's entity BLB Premiere). (Graves Report, Ex. 3.1, App. 121–35 (citing Next Health financial distribution documents to compile physicians

23

and the amounts they were paid by Next Health) and Ex. 3.2, App. 135–37 (citing Next Health financial distribution report to total payments Next Health made to marketers).)

34.     Next Health paid kickbacks to many referring physicians through sham investments in the unlicensed lab shell entities, including dozens of referring physicians in Guardian Toxicology, Infinity Toxicology, Trident Toxicology, and National Toxicology. (Graves Report Ex. 3.1, App. 121–35 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health).)

35.     Defendant Amir Mortazavi knowingly participated in the scheme to defraud UHC by causing the submission of kickback-induced claims for lab services, as demonstrated by the following evidence:

        a.     Semyon Narosov testified that Amir Mortazavi was responsible for managing relationships with Next Health's referral sources and marketers, (S. Narosov Dep. 59:5–19, App. 6), that Amir Mortazavi was involved in determining the number of shares that a referring physician could purchase, based on anticipated volume of referrals from that physician, (S. Narosov Dep. 269:9–270:25, App. 21), and that Amir Mortazavi was "very well aware" that payments from Next Health to marketer Brigham Buhler were kickbacks to induce referrals. (S. Narosov Dep. 58:17–59:3, App. 6.)

        b.     Amir Mortazavi managed invested physicians' ownership in Next Health shell lab entities, determined the number of shares referral sources could

purchase based on expected volume, tracked their referral volume, tracked their referral volumes, threatened to divest them if they did not make sufficient referrals, and complained when low volume referral sources were not divested. As he stated: "[D]addy is coming to the rescue. Lets [sic] kick the dogs out. Time to play hard ball." (NH-00178259, App. 287–88; NH-00179456 (email) App. 300, NH-00179457 (excel attached to email and filed manually); NH-00178861–63, App. 297–99; NH-00203535–36, App. 301–02; NH-01144238, App. 316 ("WE WON'T ALLOW THEM TO INVEST UNTIL THEY ARE SENDING" specimens (caps in original).) He also divested referral sources if he found out that they were getting investment distributions from another lab. (NH-00014134, App. 282.)

      c.    When confronted with his involvement with and knowledge of Next Health's payment of kickbacks to prescribing physicians, Amir Mortazavi declined to answer every question, invoking his right against self-incrimination under the Fifth Amendment. (Mortazavi Dep. 20:3–22 (unlicensed labs equivalent to shell holding companies that existed to distribute money to physicians), 21:9–22:4 (dollars distributed to shell companies came from monies paid by payers like UHC), 22:6–13 (payments to physicians based on referral volume), 22:22–23:2 (deciding number of shares offered to physicians based on referral volume), 24:11–25:1 (Guardian Toxicology one of the shell entities; discussing amount of samples needed for physician to obtain a single share), 26:11–27:6 (divesting physicians with low referral volume), 27:8–20 (same), 28:4–29:19 (same but also offering more equity to physicians with higher referral volume), 31:7–32:12 (discussing misattributing physician with low

25

volume to wrong shell entity, as between Trident Toxicology and Guardian Toxicology), 33:10–34:15 (discussing referral volume required to invest), 34:23–35:11 (influencing lab referrals), 47:6–13 (MSOs as another kickback technique), 47:20–48:23 (marketers as another kickback technique), 52:25–53:3 (more about MSOs), 60:8–61:6 (volume based kickbacks), App. 365–73, 375.)

36. UHC paid Next Health labs United Toxicology, US Toxicology, Medicus Laboratories, and American Laboratories Group at least **$8,707,791** for lab services induced by kickbacks disguised as investment distributions. (Graves Report Ex. 4.1, App. 148–55 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims from invested physician referral sources.) Specifically, UHC paid (a) at least $3,164,461 for lab tests ordered by physicians who received kickbacks through Guardian Toxicology; (b) at least $407,425 for lab tests ordered by physicians who received kickbacks through Infinity Toxicology; (c) at least $4,250,907 for lab tests ordered by physicians who received kickbacks through Trident Toxicology; and (d) at least $984,998 for lab tests ordered by physicians who received kickbacks through National Toxicology.

| Guardian Toxicology | | Trident Toxicology | |
|---|---|---|---|
| Invested Referring Provider NPI | UHC Lab Payments | Invested Referring Provider NPI | UHC Lab Payments |
| 1700806866 | $6,244 | 1356370282 | $215,527 |
| 1427084433 | $534,934 | 1861410995 | $298,333 |
| 1528174547 | $48,062 | 1427051416 | $321,526 |
| 1952359622 | $39,459 | 1699718767 | $71,793 |
| 1649345216 | $84,536 | 1609842442 | $59,930 |
| 1831101583 | $238,483 | 1467565986 | $249,685 |
| 1942270400 | $54,277 | 1447450796 | $78,268 |
| 1154493997 | $36,547 | 1629050521 | $323,558 |

| | |
|---|---|
| 1598965428 | $382,869 |
| 1033182837 | $29,320 |
| 1538240031 | $30,503 |
| 1013918242 | $284,749 |
| 1154467116 | $141,286 |
| 1053563163 | $215,077 |
| 1104998046 | $419,229 |
| 1194768911 | $25,165 |
| 1851465355 | $143,305 |
| 1619076114 | $151,146 |
| 1932281441 | $181,827 |
| 1235220468 | $87,328 |
| 1497721104 | $6,791 |
| 1427056449 | $23,324 |
| **Total** | **$3,164,461** |

| | |
|---|---|
| 1568415206 | $40,266 |
| 1639122179 | $42,922 |
| 1720269525 | $278,574 |
| 1487633384 | $100,481 |
| 1750304473 | $97,280 |
| 1598923989 | $152,017 |
| 1912937921 | $66,551 |
| 1639103047 | $297,289 |
| 1093942484 | $215,726 |
| 1154301182 | $149,368 |
| 1487874608 | $34,331 |
| 1134326101 | $129,222 |
| 1013937556 | $262,712 |
| 1881617611 | $424,018 |
| 1932303534 | $120,089 |
| 1386632735 | $187,393 |
| 1336246487 | $34,048 |
| **Total** | **$4,250,907** |

| Infinity Toxicology | |
|---|---|
| **Invested Referring Provider NPI** | **UHC Lab Payments** |
| 1629089982 | $149,549 |
| 1851384077 | $51,956 |
| 1427041557 | $70,006 |
| 1922084821 | $12,623 |
| 1215971015 | $6,902 |
| 1598747750 | $16,389 |
| **Total** | **$407,425** |

| National Toxicology | |
|---|---|
| **Invested Referring Provider NPI** | **UHC Lab Payments** |
| 1376548396 | $112,930 |
| 1356312730 | $13,508 |
| 1316960065 | $38,720 |
| 1114932845 | $27,895 |
| 1386695906 | $791,945 |
| **Total** | **$984,998** |

### F. Pharmacy claims for prescriptions that falsely represented that patients paid co-pay obligations

37.     Next Health's Chief Compliance Officer Chris Anderson testified that it was not permissible for a pharmacy entity, including the Next Health pharmacies, to not collect co-pays from patients but instead for a pharmacy to provide those funds on behalf of patients. He further testified that he came to learn that Next Health was doing just that—providing funds to pay for co-pays for prescriptions to provide false

documentation that co-pays were being paid by patients. (C. Anderson Dep. 64:1–22, 65:3–12, 75:4–76:2, 82:4–13, 86:23–87:4, App. 34–37.)

38.    The OptumRx manual expressly states that "[w]aiving the amount associated with the Member Cost-Sharing is strictly prohibited[.]" (UHC000492439, App. 338.)

39.    Semyon Narosov acknowledged that it was illegal for Next Health to utilize gift cards or debit cards to pay for patients' copay obligations, but that Next Health did so anyway. (S. Narosov Dep. 131:21–24, App. 12; S. Narosov Factual Resume ¶ 7, App. 74.)

40.    Semyon Narosov further confirmed that he caused Next Health to funnel a portion of fraud proceeds through a series of shell corporations to charitable organizations, which then paid the co-pay on prescriptions, often without the beneficiaries' knowledge, to fake co-pay documentation to satisfy payor audits. (S. Narosov Factual Resume ¶ 6, App. 74.)

41.    According to Semyon Narosov, at least 85% of the pharmacy claims submitted to UHC falsely represented that UHC's member paid a copay. (S. Narosov Dep. 125:23–126:13, App. 10–11.)

42.    Defendant Amir Mortazavi, in furtherance of the scheme to defraud UHC, knowingly participated in the misrepresentation that co-pays were being collected, as evidenced by the following:

a.    Semyon Narosov testified that Amir Mortazavi was aware that Next Health pharmacies provided documentation and recordings to private and

28

government health care benefit programs falsely claiming that the Next Health pharmacies collected co-pays from patients. (S. Narosov Dep. 127:24–132:23, App. 11; S. Narosov Factual Resume ¶ 3(e), App. 73.)

       b.    Semyon Narosov further testified that Amir Mortazavi discussed with physicians that Next Health would look the other way on co-pays or make sure that co-pays were met by someone other than the patients. (S. Narosov Dep. 194:22–195:2, App. 18–19.)

       c.    When confronted with his involvement with and knowledge of Next Health's non-collection of patient co-pays for prescriptions pertaining to claims submitted to UHC, Amir Mortazavi declined to answer every question related to collection of patient co-pays, invoking his right against self-incrimination under the Fifth Amendment. (Mortazavi Dep. 116:16–117:7 (whether copays were required), 117:8–119:3 (copay money-laundering scheme through bishop program); 119:4–17 (helping feign co-payments laundered through shell organizations), App. 389–90.)

43.    Defendant Arvin Zeinali, in furtherance of the scheme to defraud UHC, knowingly participated in the misrepresentation that co-pays were being collected, as evidenced by the following:

       a.  Semyon Narosov testified that Arvin Zeinali was aware that Next Health was utilizing gift cards or debit cards to pay for patients' copays, as if they were paid by patients, even though they were not paid by the patients, as part of a plan to pass audits. Semyon Narosov also testified that Arvin Zeinali "push[ed]" this

practice. (S. Narosov Dep. 131:21–132:12; 137:14–23; 147:4–148:25; 154:13–155:3; 194:19–21, App. 12–15, 18.)

b.  Arvin Zeinali made clear in an email that, regarding co-pays for prescriptions filled at Next Health pharmacies, "we, in no way, harass or send our patients to collections." (NH-01411266, App. 335.)

c.  Arvin Zeinali was also involved in decision-making regarding not collecting patient payments. In response to an email chain about an upset patient that was billed, even though "none of [physician's name]'s patient should be billed," the patient received a refund, and Arvin Zeinali responded "Great… Thanks!" (NH-00381469, App. 307.)

d.  When confronted with his involvement with and knowledge of Next Health's non-collection of patient co-pays for prescriptions pertaining to claims submitted to UHC, Arvin Zeinali refused to answer any questions related to collection of patient co-pays, invoking his right against self-incrimination under the Fifth Amendment. (Zeinali Dep. 38:10–14 (policy of forgiving co-pays), 40:16–23 (requirement to collect co-pays), 40:24–41:15 (calling patients to explain co-pays would not be collected), 42:20–43:3 (standard practice to not collect co-pays), 44:21–45:22 (patients unwilling to pay co-pays of several thousand dollars), 45:25–46:16 (disguising co-pays through purchase of pre-paid gift cards), 46:17–47:5 (audits requested co-pay documentation), 47:15–22 (not legal to use gift cards), 49:25–50:23 (faking co-pays by laundering funds through Tennessee charity), 51:17–52:4 (same), 70:6–71:18 (same), App. 442–45, 450.)

44.     UHC paid Next Health pharmacies Executive Healthcare LLC ($16,321,767), Apex Pharma LLC ($6,265,128), Dallasite, Inc. ($8,742,227), and Total Pharma LLC ($6,706,526) for a total of at least $38,035,647, at least 85% of which (*i.e.*, $32,330,300) was based on the false representation that co-pays had been collected from the patients listed in the claims submitted by that pharmacy. (UHC Pharma Claim Data; Graves Report ¶ 166, App. 96; S. Narasov Dep. 125:23–126:13, App. 10–11.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Smith v. Regional Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016).

In evaluating a motion under Rule 56, the Court must determine whether, considering the evidence in the light most favorable to the nonmoving party, a rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, this favorable presumption for the non-movant exists only when the non-movant presents an actual controversy of fact. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## CONSEQUENCE OF PLEADING THE FIFTH AMENDMENT

In considering this motion, the Court should adopt an adverse inference against Defendants. It is well-settled that an adverse inference may be drawn in a

civil case when a party asserts his Fifth Amendment privilege. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 1017 (S.D. Tex. 2010) ("Indeed, his refusal to testify could be the basis for granting a summary judgment against him."); *United States ex rel. Gonzalez v. Fresenius Med. Care N.A.*, 571 F. Supp. 2d 758, 764 (W.D. Tex. 2008) ("[I]t is not unconstitutional to force civil defendants to choose between the negative inference drawn from their silence in a civil case and their Fifth Amendment privilege.") (quoting *United States ex rel. Shank v. Lewis Enters., Inc.*, No. 04-CV-4105-JPG, 2006 WL 1064072, at *4 (S.D. Ill. Apr. 21, 2006)).

While "a party seeking summary judgment cannot rely solely on the other party's exercise of his Fifth Amendment rights," *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 n.3 (5th Cir. 1990), the adverse inference associated with that invocation, combined with corroborating evidence, is sufficient for a Court to grant summary judgment. Moreover, a party that invoked the Fifth Amendment during discovery may only withdraw his assertion of the Fifth Amendment privilege if circumstances indicate that (1) the litigant was not using the privilege in a tactical, abusive manner, and (2) the opposing party would not experience undue prejudice as a result. *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 548 (5th Cir. 2012).

In *Davis-Lynch, Inc.*, faced with two parties that asserted their Fifth Amendment privilege during discovery—one of whom waived his privilege more than a

month before the discovery deadline and another that waived his privilege only five days before the discovery deadline—the district court denied both parties attempts to waive their previously asserted Fifth Amendment privilege. *Id.* at 546. The Fifth Circuit found that denial of the first defendant's waiver was erroneous because, given the timing of waiver, the plaintiff still had several weeks left to depose that defendant; but the court found no error as to the second defendant, stating:

> [U]nlike [the first defendant's withdrawal], however, [the second defendant's] withdrawal of his Fifth Amendment privilege in response to [a] motion for summary judgment appears more likely to be an attempt to abuse the system or gain an unfair advantage[.] … In withdrawing the privilege at such a late stage, [the second defendant] withheld information that [the plaintiff] could have used in its investigation, only to provide the information at the last moment, leaving [the plaintiff] at a disadvantage.

*Id.* at 549 (further noting that one factor a court may consider in permitting waiver of an asserted privilege is whether the party is proceeding pro se); *see also, e.g., In re Cross*, 653 B.R. 362 (Bankr. E.D. Tex. 2023) (refusing to permit withdrawal of the privilege where "Defendant waited until after the close of discovery and the filing of a summary judgment motion to attempt to withdraw the privilege").

Here, Messrs. Mortazavi and Zeinali, each represented by competent counsel, have asserted their Fifth Amendment protections in response to two sets of interrogatories and requests for admission—that's two sets of written discovery to each of them—most recently only two months ago. (*See generally* A. Mortazavi 3/27/23 Resps. to Interrogs. and RFAs, App. 216–18; A. Mortazavi 9/8/23 Resps. to Interrogs. and RFAs, App. 244–51; A. Zeinali 3/27/23 Resps. to Interrogs. and RFAs, App. 221–23;

A. Zeinali 9/8/23 Resps. to Interrogs. and RFAs, App. 253–56.) And, even more importantly, both refused to answer a single substantive question at their depositions, choosing instead, upon the "advice of counsel," to assert their Fifth Amendment rights. In fact, even though discovery is now closed per the Fifth Amended Scheduling Order, the most recent Defendants' invocations occurred after the close of discovery per the Fourth Amended Scheduling Order. (*See* Scheduling Order ¶ 6, Doc. 639.)

Defendants have refused to offer testimony or written responses concerning literally every aspect of this case. Defendants would therefore have no legitimate, non-tactical, and non-prejudicial basis to about-face in response to this motion for partial summary judgment and waive the privilege by submitting testimonial or other evidence. And if they try, the Court should reject their attempts. The Court should analyze this motion with the appropriate adverse inference against them in mind.

### FRAUD

UHC now turns to its substantive fraud claim. Under Texas law, to prevail on a fraud claim based on an affirmative misrepresentation, a plaintiff must prove: "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *See Formosa Plastic Corp. USA v. Presidia Eng'rs & Contractors*, 960 S.W.2d 41, 47 (Tex. 1998) (citation omitted); *see also Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 427 (1996) (noting that federal court sitting in diversity applies state substantive law).

For a fraud by nondisclosure claim, a plaintiff must allege (1) the defendant concealed or failed to disclose a material fact that the defendant knew the plaintiff was ignorant of or did not have the opportunity to discover, (2) the defendant intended to induce the plaintiff to take some action by concealing or failing to disclose the material fact, and (3) the plaintiff suffered as a result of acting on the nondisclosure. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008). The failure to disclose information is not actionable unless there is a duty to speak. *Id.* The duty arises in four circumstances: (1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth. *Lesikar v. Rappeport*, 33 S.W.3d 282, 299 (Tex. App.—Texarkana 2000, pet. denied).

Each party to a fraudulent scheme is responsible for the acts of others in furtherance of the scheme. *In re Arthur Andersen LLP*, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). Thus, a defendant may be liable for fraud without making any fraudulent representations where he "allegedly participated in the fraudulent transactions and reaped the benefits," even by silent acquiescence. *Id.*; *see Indep. Receivables Corp. v. Precision Recovery Analytics, Inc.*, No. 1:11-CV-008-LY, 2012 WL 12874526, at *6 (W.D. Tex. May 16, 2012); *ClaimHub, Inc. v. Universal Risk Ins. Servs., Inc.*, No. H-10-2841, 2011 WL 13247456, at *3 (S.D. Tex. July 25, 2011). Further, "[a] corporation's [agent] is personally liable for tortious acts

35

which he directs or participates in during his employment." *O'Hare v. Graham*, 455 F. App'x 377, 380 (5th Cir. 2011) (quoting *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)); *see also Portlock v. Perry*, 852 S.W.2d 578, 582 (Tex. App.—Dallas 1993, pet. denied) ("corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the conduct, either actual or constructive").

Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Maulding v. Niemeyer*, 241 S.W.2d 733, 737 (Tex.Civ.App.—El Paso 1951) (orig. proceeding); *Turner v. Biscoe*, 171 S.W.2d 118, 119 (Tex.Civ.App.—Waco 1943).

A misrepresentation is material if "a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quotations omitted); *see also Vestas-Am. Wind Tech., Inc. v. Salazar*, No. 6:19-CV-076-H, 2021 WL 1399296, at *6 (N.D. Tex. Feb. 1, 2021).

The "justifiable reliance" element of common law fraud "does not require a plaintiff to demonstrate reasonableness." *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995). A "plaintiff is entitled to rely upon representations of fact of such a

36

character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation cannot offer as a defense the plaintiff's failure to make the investigation or examination to verify the same." *Id.* at 72.

Direct damages for common law fraud can be measured by "out-of-pocket" damages, which derive from a restitutionary theory. *See Formosa Plastics Corp. USA*, 960 S.W.2d at 49. "Out-of-pocket damages allow the injured party to recover the actual injury suffered measured by the difference between the value of that which he has parted with, and the value of that which he has received." *Bohnsack v. Varco, L.P.*, 668 F.3d 262 (5th Cir. 2012) (citing *Formosa Plastics*, 960 S.W.2d at 49) (cleaned up).

These elements are satisfied with respect to the four types of fraudulent misrepresentations described in this motion.

### A. UHC is entitled to partial summary judgment on its fraud claim against Amir Mortazavi for his participation in the ADAR scheme.

Next Health's licensed laboratories submitted claims to UHC misrepresenting that lab services reflected in those claims had been ordered by licensed medical providers—specifically that those tests had been ordered by Dr. Sekhar Rao, Dr. Yun Kim, Dr. Vinay Parameswara, or Dr. Love Nakandi Sozi. But in fact, the patients listed in those claims had never seen a medical provider, and those patients were being used as a part of the ADAR sober living facility scheme. (SUMF ¶¶ 1, 5, 23.) Mr. Mortazavi knew the representations made in those ADAR-generated claims were false. (SUMF ¶ 24.)

UHC justifiably relied on Defendants' misrepresentations by making payments of $13,201,570 to the Next Health labs that submitted the ADAR-related claims (SUMF ¶¶ 2–4, 25), which UHC would not have otherwise made because UHC doesn't pay on claims for services that were not ordered by licensed medical providers. (SUMF ¶¶ 8–9). The "value received" for the services is therefore $0, and thus the amount UHC paid constitutes UHC's "out-of-pocket" damages for this species of fraud. Mr. Mortazavi is liable for these amounts because he participated in the fraudulent ADAR scheme, had knowledge of the scheme, and directed the scheme. (SUMF ¶ 24.) The Court should grant partial summary judgment to UHC against Mr. Mortazavi for this species of common law fraud in the amount of $13,201,570.

### B. UHC is entitled to partial summary judgment on its fraud claims against Amir Mortazavi and Arvin Zeinali for their participation in submitting kickback-induced pharmacy claims.

Next Health's licensed pharmacies submitted claims to UHC that concealed and failed to disclose that the prescriptions reflected in those claims had been ordered by medical providers who received kickbacks in exchange for ordering prescriptions through their investments in Next Health's Class G pharmacies. (SUMF ¶¶ 1, 2, 7, 8, 10, 26–28.) Next Health's licensed pharmacies, by submitting claims for reimbursement, voluntarily submitted information (which was only a partial disclosure) and therefore had a duty to disclose the whole truth regarding the reason such prescriptions were ordered. Next Health's licensed pharmacies also had an independent duty to disclose the whole truth by way of their fiduciary relationship with UHC, as reflected by their network agreements with UHC. (SUMF ¶ 13.) Amir Mortazavi and

Arvin Zeinali knew that Next Health was paying medical providers these kickbacks and that those kickbacks weren't being disclosed to UHC. (SUMF ¶¶ 29, 30.)

UHC justifiably relied on the representation in claims by making payments of $8,554,821 to the Next Health pharmacies that submitted the claims (SUMF ¶ 31), which UHC would not have otherwise made because UHC doesn't pay on claims for services that are induced by kickbacks. (SUMF ¶ 10). The "value received" for the services is therefore $0, and thus the amount UHC paid constitutes UHC's "out-of-pocket" damages for this species of fraud. Amir Mortazavi and Arvin Zeinali are liable for the total amount UHC paid on these pharmacy claims because they participated in the fraudulent pharmacy kickback scheme, had knowledge of the scheme, and directed the scheme. (SUMF ¶¶ 29, 30.) The Court should grant partial summary judgment to UHC against both Amir Mortazavi and Arvin Zeinali for this species of fraud in the amount of $8,554,821.

### C. UHC is entitled to partial summary judgment on its fraud claim against Amir Mortazavi for his participation in submitting kickback-induced lab claims.

Next Health's licensed laboratories submitted claims to UHC that concealed and failed to disclose that the lab services reflected in those claims had been ordered by medical providers who received kickbacks in exchange for ordering lab tests through their investments in Next Health's syndicated laboratories. (SUMF ¶¶ 1, 2, 7, 8, 10, 32, 33, 34.) Next Health's licensed laboratories, by submitting claims for reimbursement, voluntarily submitted information (which was only a partial disclosure) and therefore had a duty to disclose the whole truth regarding the reason such

39

services were ordered. Amir Mortazavi knew that Next Health was paying medical providers these kickbacks and that those kickbacks weren't being disclosed to UHC. (SUMF ¶ 35.)

UHC justifiably relied on the representation in claims and made payments of $8,707,791 to the Next Health labs that submitted the claims, which UHC would not have otherwise made because UHC doesn't pay on claims for services that are induced by kickbacks. (SUMF ¶¶ 2–4, 10, 36). The "value received" for the services is therefore $0, and thus the amount UHC paid constitutes UHC's "out-of-pocket" damages for this species of fraud. Amir Mortazavi is liable for the total amount UHC paid on these pharmacy claims because he participated in the fraudulent lab kickback scheme, had knowledge of the scheme, and directed the scheme. (SUMF ¶ 35.) The Court should grant partial summary judgment to UHC against Amir Mortazavi in the amount of $8,707,791 on UHC's fraud claim.

### D. UHC is entitled to partial summary judgment on its fraud claims against Amir Mortazavi and Arvin Zeinali for their participation in submitting claims where no co-pays had been collected.

By submitting claims to UHC, Next Health's licensed pharmacies represented that they collected patient co-pay obligations related to the patient and prescription listed in the claims, as required by the OptumRx pharmacy manual. But in fact, for many of the claims submitted by Next Health's pharmacies, patients had not paid co-pays. (SUMF ¶¶ 37–41.) Amir Mortazavi and Arvin Zeinali knew that the representations that co-pays had been paid were false. (SUMF ¶¶ 42–43.)

40

UHC justifiably relied on Defendants' misrepresentations by making payments of $38,035,647 to the Next Health pharmacies that submitted the claims (SUMF ¶ 44), which UHC would not have otherwise made because UHC doesn't pay on claims for prescriptions where a corresponding co-pay has not been paid. (SUMF ¶ 11). The "value received" for the prescriptions where no co-pay was paid therefore $0, and thus the amount UHC paid on claims where no co-pay was collected constitutes UHC's "out-of-pocket" damages for this species of fraud.

But because of the spoliation of Computer Rx records by Defendant Cary Rossel, the exact amount of patient co-pays that were collected is unknown and unknowable. (*See Next Health* Order Granting Case-Ending Sanctions, Doc. 738, Case No. 3:17-cv-00243-X-BT (N.D. Tex.); Mot. for Case-Ending Sanctions Against Cary Rossel, Doc. 635, at ECF Page Nos. 15–19.) Therefore, using Semyon Narosov's testimony that only 15% of claims had co-pays that were actually collected, UHC suffered damages of at least $32,330,300 for paying for prescriptions that it should not have, and would not have had it none the truth (*i.e.*, 85% of the amount that it paid to Next Health pharmacies).

Amir Mortazavi and Arvin Zeinali are liable for these amounts because they participated in the fraudulent co-pay scheme, had knowledge of the scheme, and directed the scheme. (SUMF ¶¶ 42–43.) The Court should grant partial summary judgment to UHC against them for this species of fraud in the amount of $32,330,300.

## CONCLUSION

For the foregoing reasons, the Court should grant UHC partial summary judgment against:

- Amir Mortazavi for fraud in the following amounts: (i) $13,201,570 for the fraudulent ADAR claims, (ii) $8,707,791 for the fraudulent lab kickback claims, (iii) $8,554,821 for the fraudulent pharmacy kickback claims, and (iv) $32,330,300 for the fraudulent pharmacy co-pay claims, **for a total of $54,239,661** (which subtracts the $8,554,821 in fraudulent pharmacy kickback claims from the $32,330,300 in fraudulent pharmacy co-pay claims because those damages overlap); and

- Arvin Zeinali for fraud in the following amounts: (i) $8,554,821 for the fraudulent pharmacy kickback claims, and (ii) $32,330,300 for the fraudulent pharmacy co-pay claims, **for a total of $32,330,300** (because the $8,554,821 in fraudulent pharmacy kickback claims overlaps with the $32,330,300 in fraudulent pharmacy co-pay claims).

Respectfully submitted on November 15, 2023.

*/s/ Scott P. Kerew*

<table>
<tr><td><strong>FIGARI + DAVENPORT, LLP</strong></td><td><strong>SINTON, SCOTT, MINOCK &amp; KEREW</strong></td></tr>
<tr><td>Andrew G. Jubinsky<br>andy.jubinsky@figdav.com<br>901 Main Street, Suite 3400<br><br>Dallas, TX 75202-3796<br>Telephone: (214) 939-2000<br>Facsimile: (214) 939-2030</td><td>Scott P. Kerew<br>skerew@ssmklaw.com<br>Adam J. Sinton<br>asinton@ssmklaw.com<br>Joseph J. Minock<br>jminock@ssmklaw.com<br>Benjamin D. Van Horn<br>bvanhorn@ssmklaw.com<br><br>1550 Market Street, Suite 400</td></tr>
</table>

Denver, Colorado 80202

*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the November 15, 2023, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system under Local Rule 5.1(d), which will automatically send notification of such filing to all counsel of record.

*/s/Scott P. Kerew*