**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY, | |
| Plaintiffs, | Case No. 3:21-cv-01547-L-BT |
| v. | |
| JEREMY ROSSEL, et al., | |
| Defendants. | |

**BRIEF IN SUPPORT OF**

**PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT**
**FILED BY DEFENDANTS CARY ROSSEL AND JEREMY ROSSEL**

**FIGARI + DAVENPORT, LLP**

Andrew G. Jubinsky
andy.jubinsky@figdav.com

901 Main Street, Suite 3400
Dallas, TX 75202
T: (214) 939-2000

**SINTON, SCOTT, MINOCK & KEREW**

Scott P. Kerew
skerew@ssmklaw.com
Adam J. Sinton
asinton@ssmklaw.com
Benjamin D. Van Horn
bvanhorn@ssmklaw.com

1550 Market Street, Suite 400
Denver, Colorado 80202

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………...……………iii

INTRODUCTION………………………………………………………………………...1

FACTUAL BACKGROUND………………………………………….……………………2

   I.   Plaintiffs and Their Payment of Claims……………………………………...…………2

   II.   Next Health: Rossel Defendants' Fraudulent Enterprise…………….………………4

   III.   Rossel Defendants……………………………………………..…………………..6

   IV.   Rossel Defendants participated in the scheme to submit
claims containing the misrepresentation that lab tests were
ordered by Dr. Rao, Dr. Kim, Dr. Parameswara, and Dr. Sozi……………………………6

   V.   Rossel Defendants participated in the scheme to submit
pharmacy claims that omitted that the prescribing physician
received kickbacks from Next Health………………………………...…………………..11

   VI.   Rossel Defendants participated in the scheme to submit lab
claims that omitted that referring physicians received kickbacks………..………………13

   VII.   Rossel Defendants participated in submitting pharmacy claims
for prescriptions that falsely represented patients paid co-pays…………………………15

   VIII.   Rossel Defendants were involved in misrepresentations designed
to disguise the identity of labs that performed services……………….…..……….…..18

   IX.   2015 Denial of United Toxicology Claims……………………………...……………19

   X.   2016 Investigation of Next Health……………………………………………………..20

   XI.   Litigation………………………………………………………………...……………22

   XII.   Additional Fraudulent Transfer Facts……………………………………………23

ARGUMENT……………………………………………………………...………………25

   I.   The Court should deny Rossel Defendants' "no evidence" motion
because it isn't supported by record evidence………………………….……………..26

   II.   Fraud……………………………………………………………….……………29

      a.   Rossel Defendants may be held liable as principals for fraud…………….………29

b. There is significant evidence from which a reasonable jury
could find each element of fraud and fraudulent nondisclosure
regarding Rossel Defendants and that Rossel Defendants
participated directly in those schemes……………………………………………..30

    1. Material Misrepresentation……………………………………..……………………..31

    2. Material Omission and Duty to Disclose (Fraudulent
      Nondisclosure)…………………………………………….……….………………31

    3. Fraudulent Intent / Knowledge……………………….……………………………33

    4. Justifiable Reliance……………………………………………………………34

    5. Causation / Damages……………………………………………………………38

III.    A rational jury could find Rossel Defendants liable for conspiracy
to commit fraud……………………………………………………………….………38

IV.    A rational jury could find Rossel Defendants liable for fraudulent
transfer………………………………………………………………………….………..39

V.    A rational jury could find Rossel Defendants had the intent to
defraud, as required by mail fraud and wire fraud RICO predicate acts…………………42

VI.    UHC filed its claims against Rossel Defendants within the statute
of limitations periods for fraud and civil RICO………………………….………..………..43

    a. UHC's fraud claim is not barred by the statute of limitations………….………………44

    1. UHC alleges distinct fraudulent representations/omissions,
      each discovered at different times……………………………….……….………45

    2. Continued concealment riddles the timeline of UHC's
      discovery of the distinct fraudulent representations/omissions…………………47

    b. UHC's civil RICO claim is not barred by the statute of limitations…………………48

CONCLUSION………………………………………………………………….………………50

## TABLE OF AUTHORITIES

**Supreme Court**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)……………………………………………………………27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)……………………………………………………………27

*Field v. Mans*,
516 U.S. 59 (1995)……………………………………………………………35

**Fifth Circuit**

*Ashe v. Corley*,
992 F.2d 540 (5th Cir. 1993)……………………………………………27

*Crowe v. Henry*,
115 F.3d 294 (5th Cir. 1997)……………………………………………43

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008)……………………………………31, 33

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002)……………………………………………33

*In re Life Partners Holdings, Inc.*,
926 F.3d 103 (5th Cir. 2019)……………………………………………39

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
939 F.2d 1257 (5th Cir. 1991)……………………………………………34

*Janvey v. GMAG, L.L.C.*,
977 F.3d 422 (5th Cir. 2020)……………………………………………41

*Lewis v. Bank of America NA*,
343 F.3d 540 (5th Cir. 2003)……………………………………35, 36

*Lewis v. Danos*,
83 F.4th 948 (5th Cir. 2023)……………………………………………48

*Love v. National Med. Enterprises*,
230 F.3d 765 (5th Cir. 2000)……………………………………48, 49

*O'Hare v. Graham*,
455 F. App'x 377 (5th Cir. 2011)……………………………………29

4

*Russ v. International Paper Co.*,
    943 F.2d 589, 591 (5th Cir. 1991)……………………….………………………27

*Texas v. Allan Constr. Co.*,
    851 F.2d 1526 (5th Cir. 1988)………………………….……………………..48

*United States v. Akpan*,
    407 F.3d 360 (5th Cir. 2005)…………………………….……………………43

*United States v. Blocker*,
    104 F.3d 720 (5th Cir. 1997)…………………………….……………………43

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
    848 F.3d 366 (5th Cir. 2017)…………………………….……………………43

*United States v. Mann*,
    493 F.3d 484 (5th Cir. 2007)…………………………….……………………43

*United States v. Nguyen*,
    504 F.3d 561 (5th Cir. 2007)…………………………….…………………..43

**U.S. District Courts**

*BB Energy LP v. Devon Energy Production Company LP*,
    No. 3:07-cv-0723-O, 2008 WL 2164583 (N.D. Tex. May 23, 2008)…………………….26

*Casteneda v. Flores*, No. 5:05-cv-0129,
    2007 WL 1671742 (S.D. Tex. June 8, 2007)……………………….…………………26

*ClaimHub, Inc. v. Universal Risk Ins. Servs., Inc.*,
    No. H-10-2841, 2011 WL 13247456 (S.D. Tex. July 25, 2011)…………….………29

*Indep. Receivables Corp. v. Precision Recovery Analytics, Inc.*,
    No. 1:11-CV-008-LY, 2012 WL 12874526 (W.D. Tex. May 16, 2012)…………..……29

*In re Enron Corp. Sec., Derivative & Erisa Litig.*,
    762 F. Supp. 2d 942 (S.D. Tex. 2010)…..……….………………..……………38

*Mills v. City of Port Arthur, Texas*,
    No. CIVA 1:05CV298, 2006 WL 3531460 (E.D. Tex. Dec. 4, 2006)…………..………30

*Pierce v. N. Dallas Honey Co.*,
    2020 WL 1047903 (N.D. Tex. Mar. 3, 2020)……………………..……………31, 32

*SB Premium, LLC v. Wolfpack Wholesale, Inc.*,
    3:17-cv-931-L, 2018 WL 4362726 (N.D. Tex. Sept. 13, 2018)…………………32

*Taylor v. Rothstein Kass & Co., PLLC,*
  No. 3:19-CV-1594-D, 2020 WL 554583 (N.D. Tex. Feb. 4, 2020)………..…..……….30

*United Healthcare Services, Inc., et al. v. Synergen Health, LLC,*
  No. 3:20-cv-00301, 2023 WL 4186370 (N.D. Tex. June 26, 2023)…..…………..…….37

**Texas Supreme Court**

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.,*
  590 S.W.3d 471 (Tex. 2019)…………………………….……..…..…………35

*See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,*
  51 S.W.3d 573 (Tex. 2001)…………………………….……….…..…………34

*Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,*
  960 S.W.2d 41 (Tex. 1998)………………………………………..…..……..34, 37

*Hooks v. Samson Lone Star, Ltd. P'ship,*
  457 S.W.3d 52 (Tex. 2015)…………………..……………………..44, 45, 47

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.,*
  546 S.W.3d 648 (Tex. 2018))………………………………….....………35

*Ins. Co. of N. Am. v. Morris,*
  981 S.W.2d 667 (Tex. 1998)………………………………….…..…….…………38

*Leyendecker & Assoc., Inc. v. Wechter,*
  683 S.W.2d 369 (Tex. 1984)………………………………………….…………29

*Russell v. Russell,*
  865 S.W.2d 929 (Tex. 1993)……………………………………………….…..33

*S.V. v. R.V.,*
  933 S.W.2d 1 (Tex. 1996)………………………………………..…..…….45, 47

**Texas Court of Appeals**

*Aland v. Martin,*
  271 S.W.3d 424 (Tex.App.—Dallas 2008, no pet.)…………………….…..………33

*Holland v. Thompson,*
  338 S.W.3d 586, (Tex.App.—El Paso 2010 (pet. denied)……………..……..……..32

*Flores v. Robinson Roofing & Constr. Co.,*
  161 S.W.3d 750 (Tex.App.—Fort Worth 2005, pet. denied)……………..…..……….31

*In re Arthur Andersen LLP*,
    121 S.W.3d 471 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding)……..…..29

*In re GTG Sols., Inc.*,
    642 S.W.3d 4 (Tex.App.—El Paso 2021)…………………………..…..……………30

*Lesikar v. Rappeport*,
    33 S.W.3d 282 (Tex. App.—Texarkana 2000, pet. denied)………………………….31

*Maulding v. Niemeyer*,
    241 S.W.2d 733 (Tex.Civ.App.—El Paso 1951)………………………………….….33

*National Founders Corp. v. Cent. Nat. Bank*,
    521 S.W.2d 92 (Tex.App.—Houston [14th Dist.] 1975)…………………….……….43

*Nwokedi v. Unlimited Restoration Specialists, Inc.*,
    428 S.W.3d 191(Tex.Civ.App.—Houston [1st Dist.] 2014, pet. denied)………...…….33

*Portlock v. Perry*,
    852 S.W.2d 578 (Tex. App.—Dallas [5th Dist.] 1993, pet. denied)………...……………29

*Syrian Am. Oil Corp., S.A. v. Pecten Orient Co.*,
    524 S.W.3d 350 (Tex. App.—Houston [1st Dist.] 2017, no pet.)…………....………….44

*Turner v. Biscoe*,
    171 S.W.2d 118 (Tex.Civ.App.—Waco 1943)………………….…...…………….33

**Statutes**

Tex. Bus. & Com. Code § 24.005…………..……………………………..……39, 40, 41

Tex. Bus. & Com. Code § 24.006…………………………………………..……...39

Tex. Bus. & Com. Code § 24.008………………………………………………….39

Tex. Bus. & Com. Code § 24.009……………………………………………39, 41, 42

Tex. Civ. Prac. & Rem. Code § 16.004…………………………………………..…….44

# INTRODUCTION

Plaintiffs ("UHC") is a payor of health benefits in the United States. In less than two years, from 2015–2016, a group of executives, operating through the Next Health, LLC enterprise, organized a massive healthcare billing fraud scheme that defrauded UHC out of more than $120 million by submitting fraudulent claims seeking payment for lab tests and pharmacy prescriptions. The fraud was complex. Two of Next Health's owners pleaded guilty to, and have served years of prison time for, federal crimes based on their fraudulent management of the company. But those two majority owners were not the only executives involved. Defendants Cary Rossel and Jeremy Rossel ("Rossel Defendants") each participated in, and profited from, the Next Health schemes. Rossel Defendants, however, move for summary judgement, arguing that (1) substantively, UHC has "no evidence" to support its fraud, conspiracy, fraudulent transfer, and RICO claims against them; and (2) even if it did have evidence, UHC's claims are time-barred.

Rossel Defendants are wrong on both points. As to the substance, their "no evidence" motion improperly fails to point to the record to show an absence of material fact—which may be permitted in Texas state court, but it is not satisfactory under Federal Rule of Civil Procedure 56. Moreover, as tens of thousands of documents and dozens of hours of deposition testimony demonstrate, there is plenty of evidence to put Rossel Defendants in the heart of UHC's claims. And as for the statute of limitations, Rossel Defendants ignore the fact that most of the claims at issue accrued within four years of UHC filing suit, so they would be timely without any equitable tolling. As for the rest of the claims, UHC exercised reasonable diligence to unravel the multiple schemes that were being intentionally concealed, thus delaying accrual of UHC's claims. the single report Rossel Defendants highlight was insufficient such that UHC should have been aware of its harm. The Court should deny Rossel Defendants' motion for summary judgment.

# FACTUAL BACKGROUND

## I. Plaintiffs and Their Payment of Claims

1.      Plaintiffs United Healthcare Services, Inc. and UnitedHealthcare Insurance Company, Inc. ("Plaintiffs" or "UHC") administer and insure health and welfare benefit plans. Plaintiffs made payments to labs and pharmacies owned and operated by Next Health LLC based on information in claims submitted to them by Defendants. (UHC000076148, UHC000076149, UHC000076150, UHC000076151, UHC000076152, UHC000076153, UHC000076154, UHC000489322 (these eight files are referred to as "UHC Lab Claim Data"), UHC000485731, UHC000485732, UHC000485733, UHC000485734 (these four files are referred to as "UHC Pharma Claim Data") (collectively, "UHC Claim Data").)[1]

2.      Payers like UHC receive millions of claims per day. (Shimek Dep. 37, App. 118; Tobin Decl. ¶ 3, App. 336.)[2] UHC must process this volume of claims in a timely manner, and as a result, it is impossible for every claim to be reviewed by hand. (Shimek Dep. 34, App. 117; Tobin Decl. ¶¶ 3–4, App. 336.) So, by necessity, and as is common industry practice, most claims are processed without human intervention. (Shimek Dep. 34, App. 117; Tobin Decl. ¶ 3, App. 336.)

3.      To timely process this volume of claims, payers like UHC must rely on providers to submit claims that contain true, accurate, and complete information. (Shimek Dep. 34, 37, App. 117-8; Tobin Decl. ¶ 4, App. 336.)

---

[1]      The spreadsheets filed with this motion contain Protected Health Information ("PHI"). *See* 45 C.F.R. § 160.103. UHC is not permitted to file PHI publicly on the record. 45 C.F.R. § 164.512(e). The spreadsheets have been marked on a drive labeled "Private" pursuant to the parties' protective order (Doc. 618) and were previously filed physically/manually with the Court in support of UHC's motion for partial summary judgment against Amir Mortazavi and Arvin Zeinali, along with other Excel files that cannot be filed electronically. (*See* Notice, Doc. 683.) These exhibits do not have, and are not cited with, an "App." number.

[2]      For ease of reference, exhibits to this motion that were filed using CM/ECF are pin-cited to the "App." page number in the lower right corner of the appendix.

4.     Next Health labs and pharmacies submitted thousands of claims to UHC for payment. Each claim submitted to UHC at issue in this case contained the following information: the member's demographic information (including name, date of birth, address); the member's health benefit plan information (including group number and member ID); the provider's information (including name, address, tax identification number ("TIN"), and National Provider Identification number ("NPI")); the name and NPI of the medical provider who referred the patient to receive the services or prescription in the claim; and information about the services rendered or prescription dispensed. (UHC Claim Data.)

5.     UHC relies on the information contained in claims to make payment determinations on those claims. (Shimek Dep. 37, App. 118; Tobin Decl. ¶ 5, App. 336.) The representations in each claim are material to this payment determination because it allows UHC to determine whether benefits need to be paid, and, if benefits are to be paid, the amount of benefits to pay and how and to whom those benefits should be paid. (Tobin Decl. ¶ 5, App. 336.)

6.     Each claim submitted to UHC by a Next Health lab represented that the lab services listed therein had been ordered by a licensed medical provider (*e.g.*, a physician) and that the provider chose the listed diagnosis codes that support the services (*i.e.*, their medical necessity). (*See*, *e.g.*, UHC Lab Claim Data, Column "AZ" (referring provider NPI), Column "AC" (diagnosis code).)

7.     The representation in Next Health lab claims that the lab services were ordered by a licensed medical provider is material to UHC's payment determinations because UHC would not pay for lab services that were not ordered by a licensed medical provider. (Wilson Dep. 78, App. 147; Tobin Decl. ¶ 6, App. 336; *see also* Anderson Dep. 38, App. 5.)

8.      None of the lab or pharmacy claims Next Health submitted to UHC disclosed that the referring/prescribing provider had a financial interest in the claim. (UHC Claim Data.)

9.      UHC does not pay for lab services or prescriptions that were ordered by a physician with a financial interest in the ancillary provider billing for those services/prescriptions. (UHC 4/20/23 Resp. to Mortazavi Interrog. 20, App. 394–95; Tobin Decl. ¶ 6, App. 336; UHC000492491, App. 936.) If UHC knew the lab services or pharmacy prescriptions listed in the claims were induced by kickbacks, then UHC would not have paid the amounts listed in the claims. (Wilson Dep. 79, App. 148; Tobin Decl. ¶ 6, App. 336; *see also* Anderson Dep. 27, 50, 54, App. 4, 6, 7.)

10.     By submitting claims to UHC, Next Health pharmacies represented that they collected patient co-pay obligations related to the patient and prescription listed in the claims, as required by the OptumRx pharmacy manual. (UHC Pharma Claim Data; UHC000492439, App. 934; UHC 8/31/21 Resp. to Mortazavi Interrog. 1, App. 396–98.)

11.     Pharmacies are required to collect co-pays from patients. (UHC000492439, App. 934.) Whether a co-pay for a prescription has been collected from a patient is material to UHC because UHC does not pay pharmacy benefits unless a patient has paid their co-pay. (Tobin Decl. ¶¶ 5–6, App. 336.) If UHC knew that a co-pay had not been collected from the patient listed in a claim, then UHC would not have made a payment to the Next Health pharmacy submitting the claim. (Tobin Decl. ¶ 6, App. 336; *see also* Anderson Dep. 63-65, App. 8–10.)

## II.    Next Health: Rossel Defendants' Fraudulent Enterprise

12.     Next Health LLC is a legal entity that was organized under the laws of the State of Texas in 2014 and began to operate in January 2015. (Cary Dep. 61, App. 36.) Next Health LLC and its subsidiary entities are referred to herein as "Next Health."

13.     Next Health LLC was the parent company for several licensed subsidiary entities that sought payments, in the form of claims for healthcare benefits, from UHC. Those entities included (a) five licensed laboratory entities: United Toxicology, LLC; US Toxicology, LLC; Medicus Laboratories, LLC; American Laboratories Group, LLC ("ALG"); and True Labs, LLC (all of which were out of network with UHC) and (b) at least four Class A licensed pharmacies entities: Executive Healthcare, LLC d/b/a The Apothecary Shop; Total Pharma LLC d/b/a Lot Pharma; Dallasite, Inc. d/b/a Pinnacle Pharmacy; and Apex Pharma LLC (all of which were participating (network) providers, through UHC's pharmacy benefit manager, OptumRx's network). (S. Narosov Factual Resume ¶ 3(a), 10, App. 339, 340; S. Narosov Dep. 25, 30, 32, App. 93–95; Cary Dep. 11, App. 27; Cary Dep. Ex. 1 (NH-00494287), App. 157; Anderson Dep. 17, App. 3; Jeremy Dep. 65, 196, 251, App. 48, 74, 75.)

14.     Next Health was also the parent of dozens of shell companies—both syndicated, unlicensed labs and Class G pharmacies—that Next Health and its executives used to disguise kickbacks to physician referral sources by characterizing those kickbacks as distributions on those physicians' investments in the shell companies, including (a) unlicensed "syndicated" lab entities Guardian Toxicology, LLC, Trident Laboratories, LLC, Infinity Toxicology, LLC, and National Toxicology, LLC and (b) Class G pharmacies Absolute Pharma LLC, Patients Pharma LLC, Legacy Pharma LLC, Select Pharma LLC, and Hilltree Pharmacy LLC. (S. Narosov Factual Resume ¶ 3(a), 10, App. 339, 340; S. Narosov Dep. 25, 30, 32, App. 93–95; Cary Dep. 11, App. 27; Cary Dep. Ex. 1 (NH-00494287), App. 157; Anderson Dep. 17, App. 3; Jeremy Dep. 65, 196, 251, App. 48, 74, 75.)

### III. Rossel Defendants

15. Defendant Cary Rossel was a founder of Next Health and a member of Next Health's Board of Managers. (Cary 03.15.2021 Resp. to UHC Interrog. 1, App. 390.) Cary was a part owner of Next Health, general partner in Next Health subsidiary Pharma Holdings US, and received distributions for his ownership. (Cary Dep. Ex. 5, App. 158.) Cary assisted in creating the organizational structure of Next Health and its subsidiaries. (Yan Dep. 24–25, App. 155–56.) As explained below, Cary facilitated numerous of Next Health's fraudulent schemes.

16. Defendant Jeremy Rossel was Next Health's Chief Financial Officer. (Jeremy 03/15/2021 Resp. to UHC Interrog. 1, App. 392.) Starting in August 2016, he was also a member of Next Health's Board of Managers. (Jeremy Dep. 37, App. 46.) Jeremy was a part owner of Next Health and received distributions for his ownership. (Cary Dep. Ex. 5, App. 158; Jeremy Dep. 43, App. 47.) Jeremy was generally responsible for Next Health and its subsidiaries' bookkeeping and payment processing between bank accounts and to third parties. (Jeremy Dep. 65, 73, App. 48, 51.) As explained below, Jeremy facilitated numerous of Next Health's fraudulent schemes.

### IV. Rossel Defendants participated in the scheme to submit claims containing the misrepresentation that lab tests were ordered by Dr. Rao, Dr. Kim, Dr. Parameswara, and Dr. Sozi.

17. Erik Bugen was a Next Health third-party marketer, who founded the Austin Drug and Rehabilitation Foundation (a/k/a "ADAR Group" or "ADAR") with Kirk Zajac. Bugen used the ADAR Group to create and operate a set of sober-living clinics in Austin and Houston where staff collected urine and saliva specimens that were tested at Next Health labs. (Bugen Decl. ¶ 3, App. 319.)

18. Bugen is not a physician and has no medical training. Bugen paid Dr. Sekhar Rao, Dr. Yun Kim, Dr. Vinay Parameswara, and Rita Thomas, FNP to use their signatures and NPI

numbers to order unnecessary laboratory testing from Next Health. Bugen's associate, Kirk Zajac, paid Dr. Nikandi Sozi to use her signature and NPI number to order unnecessary laboratory testing from Next Health for specimens collected at a Houston location. (Bugen Decl. ¶ 4, App. 319–20.)

19. Claims submitted to UHC by Next Health labs based on tests that were originated by the ADAR Group falsely identified Dr. Rao, Dr. Parameswara, Dr. Kim, Dr. Sozi, or Ms. Thomas (the physicians associated with ADAR) as the referring physician that ordered the lab services listed in the claim. (UHC Claim Data.) But no physicians ever saw any patients at ADAR clinics in Austin or Houston. Patients did not see doctors prior to obtaining testing, did not receive the results, did not consult with doctors after test results were received, and did not know the real reason why their samples were taken and sent to Next Health laboratories. (Bugen Decl. ¶ 4, App. 319–20.) Next Health executives, including Jeremy, knew that Bugen was not a medical provider. Jeremy Dep. 113, App. 56.)

20. In June 2015, Bugen began sending Next Health urine specimens in so that Next Health could perform lab tests and bill payers for performing those tests. (Bugen Decl. ¶ 9, App. 321–22; Jeremy Dep. 92, App. 55.)

21. In August 2015, Bugen communicated with Next Health executives about Next Health helping him purchase a home to be used to house people with commercial insurance from whom he could collect lab specimens that would be sent to Next Health labs for testing. (Bugen Decl. ¶¶ 11–12, App. 322.) Jeremy facilitated the ADAR scheme by countersigning the documents enabling Bugen to purchase the homes and wired Bugen the money for the purchase. (Jeremy Dep. Ex. 1 (NH-00684699–NH-00684715) and Ex. 2 (NH-00235880—NH-00235881), App. 260–78; Jeremy Dep. 76, 82–83, App. 52–54.)

22.     In September 2015, Jeremy met with Bugen in Dallas. After the meeting, Jeremy wrote to Bugen: "I hope you enjoyed your visit and have a better appreciation of the opportunity we have in front of us." (Jeremy Dep. Ex. 3, App. 279.) During the same month, Bugen wrote to Next Health executives, including Jeremy, to persuade Next Health to loan him money to purchase a second home that he would fill with people with commercial insurance from whom he would collect lab specimens and send them to Next Health labs. (Bugen Decl. ¶¶ 13, 15, App. 322–23; NH-00679720, App. 711.)

23.     Bugen emailed Jeremy and other Next Health executives, stating that he was putting earnest money down on a property which could hold twenty more patients. Bugen stated that he was "sticking with United clients … to keep the model of United clients a little less noticeable by United Healthcare." (Jeremy Dep. Ex. 4, App. 280; Jeremy Dep. 148–49, App. 66–67.)

24.     As Jeremy testified, Next Health arranged to pay the ADAR group commissions of 35% of net income Next Health received from the amounts paid on claims. (Jeremy Dep. 126–28, 135, App. 58–60, 62.) Jeremy testified that the commissions to be paid to Bugen were based on the number of tests that the ADAR group referred to Next Health. (Jeremy Dep. 261, App. 80.) Jeremy also testified that the arrangement precluded Bugen from sending samples for testing to other labs. (Jeremy Dep. 140, App. 65.) Jeremy facilitated and authorized the payments of commissions to Bugen and the ADAR group. (Jeremy Dep. 266–67, App. 81–82.)

25.     On September 8, 2015, Jeremy sent the Next Health executives a commission report for the ADAR program that discussed options regarding a second deal with Bugen, based on how much Next Health paid Bugen in the first deal, for sending samples that could be tested at Next Health labs. (Jeremy Dep. Ex. 9 (NH-00235785–NH-00235792), App. 282–88; Jeremy Dep. 130, App. 61.)

26.     On September 28, 2015, Jeremy emailed other Next Health executives concerning the second loan provided to Erik Bugen, noting that both sober living houses would be subject to a trust, with Cary acting as the trustee. (Jeremy Dep. Ex. 11 (NH-00088149), App. 289; Jeremy Dep. 137–38, App. 63–64; *see also* UHC 10.23.2023 Resp. to Cary Interrog. 8, App. 415–16.)

27.     In November 2015, Jeremy was included in discussions concerning the financial importance of Next Health's relationship with Bugen. (Jeremy Dep. Ex. 13 (NH-00233747), App. 290.) Later that month, Jeremy is copied on the closing documents for one of Bugen's sober homes. (Jeremy Dep. Ex. 14, App. 292.)

28.     In December 2015, following a conversation with Amir Mortazavi, Jeremy worked to advance a $150,000 commission to the ADAR group to assist Bugen. (Jeremy Dep. Ex. 15 (NH-00234991), App. 298; Jeremy Dep. 175, 180, App. 70–71; NH-00235295, App. 455.)

29.     Also in December 2015, Next Health purchased a third home for Bugen and ADAR. (Bugen Decl. ¶ 24, App. 326.) Jeremy testified that he recalls Next Health purchasing three different homes for Bugen and that he "lead the execution of these [loan] transactions." (Jeremy Dep. 122, 155, 158, App. 57, 68–69.)

30.     Between June 2015 and May 2016, Next Health paid Bugen—again in transactions approved by Jeremy—more than $2,278,000 in cash and another $1,000,000 used to purchase three properties, which payments made in exchange for sending Next Health requests for testing. (Bugen Decl. ¶ 33, App. 327.)

31.     In May 2016, after Next Health found out that Bugen and ADAR were the subject of a CBS News investigation, Jeremy signed documents on behalf of Next Health releasing Bugen from the liens on the three homes Next Health purchased for him, rather than calling the loans. (Jeremy Dep. Ex. 16 (NH-00056955), App. 300; Jeremy Dep. 180–81, App. 71–72.)

32.    Also in May 2016, Jeremy's team calculated that, through its relationship with Bugen and ADAR, Next Health had received $14,510,183 in insurance payments; of that, more than $13 million had been paid by UHC. (NH-00213878, App. 454 (email), NH-00213879 (excel attached to email with "Collection Summary" tab showing calculation of UHC payments) (previously filed manually).)

33.    On June 9, 2016, CBS News released a story highlighting the ADAR Group scam. The video is still available. (*See* Questionable Tactics Used to Profit from Genetic Testing Boom, CBS NEWS (June 9, 2016), available at https://www.cbsnews.com/news/cbs-news-investigation-genetic-testing-scam-call-kirk-zajac-craigslist/.)

34.    During September and November 2016, with Jeremy Rossel sitting on the Board of Managers, Next Health acknowledged to UHC the falsity of the claims that represented that tests were ordered by Dr. Sekhar Rao, Dr. Vinay Parameswara, or Dr. Yun Kim. But the parties did not reach a resolution, as additional questions about Next Health arose, including Semyon Narosov and Andrew Hillman being indicted in connection with Forest Park Medical Center. *See United States v. Beauchamp, et al.*, No. 3:16-cr-00516, ECF 7 (N.D. Tex. Dec. 1, 2016). In discussions with UHC regarding the ADAR Group scam, Next Health tried to resolve the issue by offering to repay only about $150,000, which UHC rejected. (Jeremy Dep. 37, App. 46; Wilson Dep. 58–59, App. 140–41.)

35.    On November 1, 2017, Erik Bugen pleaded guilty to healthcare fraud in connection with his activities with the ADAR Group. *See United States v. Bugen*, 3:17-cr-00370-D, ECF 55 (N.D. Tex. Nov. 1, 2017). Dr. Parameswara pleaded guilty to conspiracy to commit healthcare fraud and Dr. Rao was found guilty of two counts of health care fraud. *See United States v. Rao*, 3:19-cr-00507-L, Dkt. Nos. 69, 219 (N.D. Tex.).

**V.  Rossel Defendants participated in the scheme to submit pharmacy claims that omitted that the prescribing physician received kickbacks from Next Health.**

36.  Next Health pharmacies submitted thousands of claims to UHC for medications prescribed by physicians who were, directly or indirectly, paid by Next Health. (Graves Report Ex. 3.1, App. 361 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health); Graves Report Ex. 4.1, App. 380 (citing UHC Pharma Claim Data to compile number of "Claims Submitted" and "Amount Paid by United"); S. Narosov Dep. 181–82, App. 110-111.) None of these claims disclosed that the prescribing physician was paid by Next Health to induce the prescription order. (UHC Pharma Claim Data.)

37.  Next Health paid kickbacks to prescribing physicians through sham investment distributions in Class G pharmacies (including Hilltree, Select, Legacy, Absolute, and Patients) and commissions paid through marketers (including Vinson Woodlee and Med Left, LLC), which in turn "induced [physicians] through kickbacks" to order prescriptions. (S. Narosov Dep. 46–50, 56–57, 180–83, 188–89, App. 101-2, 109–14; S. Narosov Factual Resume ¶¶ 3(a), 10, App. 339, 340; V. Woodlee Factual Resume ¶¶ 12–13, 17–20, 22–24, 29–30, App. 348, 351, 353.) Semyon Narosov testified that he could not identify any of "Vinson Woodlee's doctors who were not receiving payments that were intended to induce the doctor to order from Next Health." (S. Narosov Dep. 61, App. 103.)

38.  Next Health paid kickbacks to scores of prescribing physicians through sham investments in Class G subsidiaries. (Graves Report Ex. 3.1, App. 361 (citing Next Health financial distribution documents to identify physicians invested in Next Health Class G pharmacies and amounts they were paid).)

39.  Jeremy knowingly participated in the scheme to defraud UHC by causing the submission of kickback-induced claims for prescriptions. Jeremy and his accounting team recorded

all the cash receipts and payments coming into Next Health and its subsidiary pharmacies. Jeremy oversaw payment of kickbacks to physicians disguised as distributions on those physicians' ownerships of equity in Next Health's Class G pharmacies. (Jeremy Dep. 68–69, 184, App. 49-50, 73; NH-00894260, App. 712; NH-00894261 (Next Health Distribution Summary filed manually).)

40.    Jeremy and Cary were also involved in making payments to marketing referral sources, which, in turn paid kickbacks to physicians that wrote prescriptions that could be filled at Next Health pharmacies. One such relationship was with Vinson Woodlee and MedLeft. (NH-00088139, App. 937 (cover email); NH-00088140 (excel sheet showing Woodlee invested and non-invested physicians).)

41.    Cary knowingly participated in the scheme to defraud UHC by assisting in the legal organization of Next Health's Class G pharmacies that were used to pay physicians kickbacks. (UHC 10.23.2023 Resp. to Cary Interrog. 4, App. 939–40.) Cary was the general partner of Pharma Holdings U.S., which was the managing member of the Class G pharmacies. (*See, e.g.*, NH-00454215, App. 459 (regarding Legacy Pharma); NH-00488396, App. 583 (regarding Hilltree Pharma); NH-00902306, App. 713 (regarding Select Pharma); NH-00983469, App. 835 (regarding Legacy Pharmacy).)

42.    UHC paid Next Health subsidiary pharmacies Executive Healthcare LLC, Apex Pharma LLC, Dallasite, Inc., and Total Pharma LLC millions of dollars for kickback-induced prescriptions. (Graves Report Ex. 4.1, App. 380 (citing UHC Pharma Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims based on prescriptions from physicians getting paid by Next Health through sham investment distributions).)

**VI. Rossel Defendants participated in the scheme to submit lab claims that omitted that referring physicians received kickbacks.**

43.     Next Health labs submitted thousands of claims to UHC for lab services referred by physicians who were, directly or indirectly, paid by Next Health to induce those referrals. (Graves Report, Ex. 3.1, App. 361 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health) and Ex. 4.1, App. 380 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United"); S. Narosov Dep. 92, App. 105.) None of these claims disclosed that the referring physician was paid by Next Health to induce the lab order. (UHC Lab Claim Data.)

44.     Next Health paid kickbacks to referring physicians through sham investment distributions from subsidiaries that sounded like labs but were not licensed to perform any services (including Guardian Toxicology, Infinity Toxicology, Trident Toxicology, and National Toxicology) and marketing commissions paid to marketers (including Brigham Buhler's entity BLB Premiere). (Graves Report, Ex. 3.1, App. 361 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health), and Ex. 3.2, App. 375 (citing Next Health financial distribution report to total payments Next Health made to marketers).)

45.     Next Health paid kickbacks to many referring physicians through sham investments in the unlicensed, syndicated lab entities, including dozens of referring physicians in Guardian Toxicology, Infinity Toxicology, Trident Toxicology, and National Toxicology. (Graves Report Ex. 3.1, App. 361 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health).)

46.     Jeremy knowingly participated in the scheme to defraud UHC by causing the submission of kickback-induced claims for lab services. He oversaw and directed the accountants and finance employees who worked to route tens of millions of dollars through Next Health's various

syndicated subsidiaries to disguise the source and purpose of the payments being made to the referral sources. (Jeremy Dep. 68–69, 251–53, 258–59, App. 49–50, 75–79; NH-00894260, App. 712; NH-00894261 (Next Health Distribution Summary filed manually).)

47.     Jeremy and Cary were further involved in a "lab consolidation plan" that rooted out low-volume physician referral sources and re-organized high-volume physician referral sources into syndicated entities that would pay higher amounts to the high-volume referral sources. This plan was meant to ensure that high-volume physician referral sources would be paid more (i.e., receive a better kickback) and low-volume physician referral sources were no longer permitted to invest or received a lower percentage or return on their investment. (NH-00172606, App. 439 (cover meeting); NH-00172607, App. 440 (describing plan to move high-performing physician referral sources to new syndicated lab); NH-00172608 (filed manually).

48.     Jeremy was also involved in making payments to marketing referral sources, which, in turn paid kickbacks to physicians that sent Next Health labs referrals. One such relationship was with Brigham Buhler and BLB Premier. (*See, e.g.*, NH-00211588, App. 448 (Jeremy overseeing wire of $1.2 million kickback payment to BLB); NH-00209382, App. 444 (cover email); NH-00209383, App. 445 (example of monthly kickback payment).

49.     Jeremy was further involved in the payment of medical directorship wages to physicians with high referral volume. (*See, e.g.*, NH-00649081, App. 710 (cover email); NH-00649082 (filed manually; spreadsheet attached to email showing monthly rates medical directors were paid and the Next Health labs they were "sending [referrals] to"); NH-00394935, App. 458 (terminating medical directorships in syndicated labs with no referral volume).)

50. Finally, as explained above, Jeremy and Cary were involved in paying kickbacks to Erik Bugen and the ADAR Group in exchange for generating lab referrals, which took the form of commissions and in the purchasing of sober living homes. (*See* ¶¶ 17–35, *supra*.)

51. UHC paid Next Health labs United Toxicology, US Toxicology, Medicus Laboratories, and American Laboratories Group millions of dollars for lab services induced by kickbacks disguised as investment distributions. (Graves Report Ex. 4.1, App. 380 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims from invested physician referral sources.)

**VII. Rossel Defendants participated in submitting pharmacy claims for prescriptions that falsely represented patients paid co-pays.**

52. Next Health's Chief Compliance Officer Chris Anderson testified that it was not permissible for a pharmacy entity, including the Next Health pharmacies, to not collect co-pays from patients but instead for a pharmacy to provide those funds on behalf of patients. He further testified that he came to learn that Next Health was doing just that—providing funds to pay for co-pays for prescriptions to provide false documentation that co-pays were being paid by patients. (Anderson Dep. 13, 64–65, 75–76, 82, 86–87, App. 2, 9–10, 11–12, 15–17.)

53. The OptumRx manual expressly states that "[w]aiving the amount associated with the Member Cost-Sharing is strictly prohibited[.]" (UHC000492439, App. 934.)

54. Semyon Narosov acknowledged that it was illegal for Next Health to utilize gift cards or debit cards to pay for patients' copay obligations, but that Next Health did so anyway. (S. Narosov Dep. 131, App. 108; S. Narosov Factual Resume ¶ 7, App. 340.)

55. Semyon Narosov further confirmed that he caused Next Health to funnel a portion of fraud proceeds through a series of shell corporations to charitable organizations, which then

paid the co-pay on prescriptions, often without the beneficiaries' knowledge, to falsify co-pay documentation to satisfy payor audits. (S. Narosov Factual Resume ¶ 6, App. 340.)

56.     According to Semyon Narosov, at least 85% of the pharmacy claims submitted to UHC falsely represented that UHC's member paid a copay. (S. Narosov Dep. 125–26, App. 106–07.)

57.     Cary, in furtherance of the scheme to defraud UHC, knowingly participated in the misrepresentation that co-pays were being collected. Cary Rossel, along with a man named Allan Cohen, arranged to pay Bishop Jerry Maynard (an actual Bishop in Tennessee who operated a charity called City of Life) thousands of dollars per month under the table through what Next Health called a Patient Assistance Program ("PAP")—using shell entities LLC RX and Meds Direct Rx—to cause City of Life to issue checks to cover otherwise unpaid co-pays. In that way, the money traveled in a circle—from Next Health to the Bishop/City of Life, who took a cut, and from City of Life back to Next Health—which then used the freshly laundered proceeds to give the appearance that co-pays were being funded by legitimate charitable contributions. Cary approved most of the payments that were funneled to the Bishop through LLX Rx and Meds Direct Rx. (Cary Dep. Exs. 8, 14, 15, 17, 18, 19, 20, 24, 26, App. 188, 216, 222–28, 233–36.)

58.     Cary understood the importance of keeping this illicit scheme going. He stated that knew that "without the PAP program, we are out of business." (Cary Dep. Ex. 22, App. 232.) A text message from Cary to Semyon reflects Cary stating that Cary "sent josh another invoice from Allan for another donation that had been made to the church." (Cary Dep. Ex. 25, App. 235.) Cary also received text updates from Allan Cohen showing payments from Meds Direct Rx to Bishop Jerry Maynard. (Cary Dep. Ex. 16, App. 219.) Cary also sent personal wires to LLC Rx. (Cary Dep. Ex. 27, App. 259.)

59.     Chris Anderson testified that Allan Cohen and Karynn Harvard reported to Cary and that Cary was approving payments for the Bishop program. (Anderson Dep. 79–80, 90–91, App. 13–14, 18–19.) He testified that payments were being made "at the direction of" Cary. (Anderson Dep. 96–97, App. 20–21.) When Chris Anderson confronted Cary about it, Cary admitted to Chris Anderson that he had authorized the payments. (Anderson Dep. 99–100, 103, App. 22–24.) Chris Anderson testified that Cary undermined his compliance efforts in this and other aspects of his role at Next Health. (Anderson Dep. 160, App. 25.)

60.     Jeremy was also aware of the PAP and that it was related to Meds Direct Rx. (Jeremy Dep. 274–76, 280–84, App. 83–90.) In September 2016, Next Health accounting personnel asked Jeremy to approve payments to Meds Direct Rx, which funds were used by Allan Cohen to assist in the faking of copay payments through the Bishop program. (Jeremy Dep. Ex. 21, App. 301; Cary Dep. Ex. 26, App. 236.) In October 2016, Jeremy approved additional payments to Meds Direct Rx for over $170,000 for payments to the Bishop. (Jeremy Dep. Ex. 22 (NH-01471409–NH-01471412), App. 303; Jeremy Dep. 287, App. 91; UHC 10.27.2023 Resp. to Jeremy Interrog. 5, App. 420–21.)

61.     UHC paid Next Health pharmacies Executive Healthcare LLC ($16,321,767), Apex Pharma LLC ($6,265,128), Dallasite, Inc. ($8,742,227), and Total Pharma LLC ($6,706,526) a total of at least $38,035,647, at least 85% of which (*i.e.*, $32,330,300) was based on the false representation that co-pays had been collected from the patients listed in the claims submitted by that pharmacy. (UHC Pharma Claim Data; Graves Report Para. 166, App. 360; S. Narosov Dep. 125–26, App. 106-107.)

**VIII. Rossel Defendants were involved in misrepresentations designed to disguise the identity of labs that performed services.**

62.     In each claim submitted to UHC under a particular lab's billing credentials, the lab entity denoted in the claim was represented to have performed the lab services listed therein. (UHC Claim Data.)

63.     In June 2016, UHC began denying payment on claims submitted to it by United Toxicology and US Toxicology. Next Health then decided to hold off submitting claims to UHC using those labs' billing information while they came up with a plan. (Dudley Decl. ¶ 11, App. 331; NH-00017094, App. 433; NH-00092544, App. 435; NH-00195297, App. 443.)

64.     Around the same time, Next Health's billing company, Synergen Health LLC, analyzed the average volume of claims being submitted to UHC and suggested to Next Health's executives that they spread out the tests performed at United Toxicology, US Toxicology, and Medicus across multiple labs' billing information to try to avoid scrutiny from UHC. (Dudley Decl. ¶ 11, App. 331; NH-00092700, App. 437; NH-00195297, App. 443.)

65.     Over the next several months, from July 29, 2016, and going forward, Next Health began submitting claims for tests performed by United Toxicology, US Toxicology, and Medicus on specimens provided by members with UHC insurance using the billing credentials of ALG and True Labs—other Next Health-owned lab entities that had not performed the tests but were used only as billing conduits. (Dudley Decl. ¶ 11, App. 331; NH-00017023, App. 430; NH-00017053, App. 431; NH-00312561, App. 456; NH-00194279 (filed manually).)

66.     Jeremy knew about and encouraged disguising claims for lab services performed by United Toxicology, US Toxicology, and Medicus under the billing information of ALG and True Labs, and he closely monitored United's payments on those claims. (NH-00213293, App.

452 (Jeremy copied on email outlining plan that "starting tomorrow UHC samples … are going to be billed through ALG").)

67.     During this time, Synergen closely monitored payments from UHC. On August 24, 2016, Synergen sent the following message to Next Health executives, including Jeremy: "We are happy to see the UHC payments coming through ALG. … If you can please provide us with the information to setup more CLIA IDs [i.e., billing entities] and newer entities we will be able to further distribute the claims and as a result **stay below the radar**." (NH-00192412, App. 441 (emphasis supplied).)

68.     Based on the success of this lab-switching program, and after Synergen's suggestion, Cary started looking to buy additional CLIAs so that Next Health could further distribute claims submitted to UHC. (Cary Dep. Ex. 9, App. 199.) At one point, Next Health owner Andrew Hillman texted Cary about his plan to "mov[e] bcbs and United [samples] to the new lab and buy[] a pharmacy outside next health" to illicitly submit claims through labs other than those that had performed the testing; Cary responded that he was "with you all the way!" (Cary Dep. Ex. 10, App. 204.)

## IX.     2015 Denial of United Toxicology Claims

69.     UHC administers both government-funded plans (*i.e.*, Medicare and Medicaid) and commercial plans. (Tobin Dep. pp.145–46, App. 132–33.) As an administrator of government-funded plans, UHC is required to make certain reports to the Centers for Medicare & Medicaid ("CMS") regarding potential fraud, waste, and abuse activity that may be impacting Medicare patients. (Tobin Dep. 211–12, App. 137–38; Wilson Dep. 117, App. 149.)

70.     On July 20, 2015, a National Benefit Integrity MEDIC Complaint Form (the "MEDIC Report") was filed with a CMS contractor concerning United Toxicology. (MEDIC

Report, App. 428; Tobin Dep. 196–98, App. 134–36.) The MEDIC Report pasted a SIRIS report from Cigna concerning United Toxicology. (MEDIC Report, App. 428; Wilson Dep. 117, 121, App. 149–50.) Specifically, Cigna investigated United Toxicology's billing practices for patients receiving health care benefits through Medicare Parts C and D. *Id.* The MEDIC Report indicates that Medicare programs administered by UHC had only $24,521 of "exposure" to United Toxicology. *Id.* The MEDIC report identifies the owner of United Toxicology as "U.S. Health Group." (MEDIC Report, App. 428.)

71.     In August of 2015, UHC placed United Toxicology on prepayment review based on a tip that United Toxicology was a lab on paper only (*i.e.*, a billing entity with no brick-and-mortar office). (Wilson Dep. 67–68, App. 142–43.)

72.     In or around early September of 2015, attorneys for United Toxicology contacted UHC's legal department, advised that United Toxicology was considering pursuing litigation to force UHC to reprocess and pay unpaid claims. (Wilson Dep. 70, App. 144.) Attorneys for United Toxicology also invited UHC visit the United Toxicology facility to allay the concern that the lab did not exist. (Wilson Dep. 74, App. 146; Tobin Dep. 93, App. 121.) The invitation for UHC to perform an on-site visit was accompanied by assurances from United Toxicology's counsel throughout the fall and winter of 2015 that then-existing allegations were categorically false and the result of a dispute with disgruntled employees. (Wilson Dep. 74, App. 146; UHC000493980, Seal App. 6.)

## X.     2016 Investigation of Next Health

73.     By January of 2016, and at the direction of UHC's legal department, the prepayment review flag on United Toxicology's claims was lifted and UHC's Special Investigations Unit ("UHC SIU") opened an investigation of United Toxicology in advance of conducting an on-site

visit to confirm that it was, in fact, a brick-and-mortar lab. (Tobin Dep. 91, App. 120; Wilson Dep. 70–71, App. 144–45.)

74.     During the January 21, 2016 on-site inspection, UHC SIU investigators learned that United Toxicology was in the same building as two other functioning laboratories that were also owned by "Next Health." (Tobin Dep. 116–17, App. 122–23.)

75.     Following the United Toxicology on-site inspection, UHC SIU opened an investigative file for Next Health-owned lab US Toxicology on February 2, 2016. (Tobin Dep. 121, App. 122–23.)

76.     In March 2016, amidst UHC SIU's process of requesting medical records from United Toxicology, UHC began receiving member and customer complaints in the Austin, Texas area about claims for unwanted drug tests performed by United Toxicology. (Tobin Dep. 123, 125–26, 131–32, App 125, 127–30; Wilson Dep. 58, 159, App. 140, 153.) Beginning in March of 2016, UHC SIU investigators took multiple trips to Austin, Texas to interviewed affected members and learned that the common thread was a purported clinic called the ADAR Group. (*Id.*; *see also* generally Paras. 32–34, *supra*.) UHC SIU continued to investigate United Toxicology, but the focus shifted towards The ADAR Group-related claims. (Tobin Dep. 123–26, 131–32, App. 125–30.) UHC SIU determined that the ADAR Group was offering UHC members $50 for urine specimens and, after speaking with ADAR Group operators Erik Bugen and Kirk Zajac, that Next Health was paying them a "commission" for each successfully billed test. *Id.*

77.     UHC placed a pre-pay review flag on United Toxicology. (Wilson Dep. 157–58, App. 151–52.) As UHC learned more about the ADAR Group, UHC connected it to US Toxicology and Medicus, in addition to United Toxicology, so it then placed pre-pay review flags on those labs as well. *Id.*

28

78.     Beginning in July of 2016, a second set of attorneys for United Toxicology, Joe and Henry Ackels, contacted UHC, threatening litigation regarding the stopped payments. (*Id.*; UHC000493875, Seal App. 5.)

79.     Jonathan Wilson of UHC's legal department and members of UHC's SIU had their first in-person meeting with the Ackels on September 14, 2016, during which the Ackels, on behalf of Next Health, disclaimed Next Health's knowing involvement in the ADAR scam (i.e., the ADAR Group's practices). (UHC000493784, Seal App. 3; Tobin Dep. 137, App. 131; Wilson Dep. 58–59, App. 140–41.)

80.     UHC's legal department and the Ackels had a second in-person meeting on November 14, 2016, to discuss repayment of the ADAR-related claims. (UHC000493777, App. Seal App 1.)

## XI.     Litigation

81.     On January 26, 2017, UHC sued Next Health, LLC, its licensed laboratories that were the subjects of the 2016 SIU investigations, and the owners of the ADAR Group. (*See UnitedHealthcare Ins. Co. v. Next Health*, *et al.*, No. 3:17-cv-00243, Doc. 1.)

82.     Less than a month after UHC filed suit, Defendant Jeremy Rossel resigned from his positions as Chief Financial Officer and board member of Next Health, LLC. (Jeremy 03.15.2021 Resp. to UHC Interrog. 1, App. 309 ("In February 2017, I resigned all positions and left the Company on March 7, 2017.").)

83.     By December of 2017, Cary, had become Next Health LLC's only remaining member, sole manager, "last man standing," and sole litigation contact. (*See* 9/30/2021 Hr'g Tr. 22, 77, App. 426–27 (Mr. Rossel testified that he is the "last man standing," "sole representative of Next

Health."); *see also id.* at 17–18, App. 424–25 ("I'm the manager of Next Health. There are no employees. There haven't been any employees for Next Health since December 2017.").)

84.     Beginning in the Fall of 2017, UHC sought production of Next Health's electronically stored communications, including emails ("ESI"). Next Health, under Cary's sole leadership, failed to produce more than 100,000 responsive ESI documents until July 2019. (*See* Timeline of Discovery Violations, Doc. 714-1 at 3–11; *see also* Order Granting Case-Ending Sanctions and Citing Timeline, Doc. 738 (Case No. 3:17-cv-00243-X-BT (N.D. Tex.).)

85.     In the 60 days that followed the production of Next Health emails, UHC's attorneys reviewed the documents, identified the individual defendants who had an active role in the fraudulent scheme, and moved to amend UHC's complaint to include the Rossel Defendants, among others. (Mot. to Amend, Doc. 293.)

## XII.    Additional Fraudulent Transfer Facts

86.     From 2015 to 2016, UHC paid the following Next Health-owned entities millions of dollars based on the entities' submission of fraudulent claims for reimbursement for lab tests and pharmaceutical prescriptions: ALG, Medicus, US Toxicology, United Toxicology, True Labs, Apex Pharma, Dallasite, Executive Healthcare, and/or Total Pharma (collectively, "Lab and Pharmacy Entities"). (UHC Claim Data.)

87.     From 2015 to 2017, The Lab and Pharmacy Entities transferred tens of millions of dollars to Next Health and certain Next Health affiliates, including Pharma Holdings US. For example, from June to August 2016, United Toxicology transferred $1,888,247 to Next Health. (UHC Summary Ex. 1, App. 945.)[3] During that same time-period, Hilltree Pharmacy, Legacy

---

[3]     During litigation, Next Health produced a massive database called "Great Plains," which tracked Next Health and its subsidiaries' financial transactions. Rossel Defendants have their own copy of Great Plains. That virtual database would be impossible to provide to the Court in a useable

Pharmacy, and Select Pharmacy transferred $1,670,366 to Pharma Holdings US (UHC Summary 2, App. 946.) Because payments from UHC were procured fraudulently in the manner discussed above—and Next Health, Pharma Holdings US, and Lab and Pharmacy Entities should have known that suit was a foreseeable consequence of their actions—UHC is a "creditor" and the Lab and Pharmacy Entities, Next Health, and Pharma Holdings US are "debtors," as those terms are defined in the Texas Uniform Fraudulent Transfers Act. The debtors retained possession of the money they procured from UHC. (UHC Claim Data.) Lab and Pharmacy Entities received nothing of value in exchange for these transfers to Next Health and Pharma Holdings U.S. provided no value to these entities.

88.     But despite the threat of litigation and ongoing litigation, Lab and Pharmacy Entities nonetheless continued to transfer funds to Next Health and Pharma Holdings US. Notwithstanding the failed settlement discussions and lawsuit, Next Health transferred more than $9.4 million to the Next Health Executives. Examples of these transactions, which were pulled from Next Health's internal accounting database (the Great Plains database) can be found in UHC's responses to Rossel Defendants' interrogatories. During the pendency of this action alone, Next Health and Pharma Holdings US transferred at least $1.6 million to Cary and $88,000 to Jeremy. (UHC 10.23.2023 Resp. to Cary Interrog. 9, App. 416–17; UHC 10.27.2023 Resp. to Jeremy Interrog. 10, App. 942–44.) Of course, the exact extent of the transfers made to Rossel Defendants is information peculiarly available to them. Rossel Defendants have, however, refused to supply

---

format, either through CM/ECF or by delivering a physical drive. Therefore, UHC's counsel, with the assistance of UHC's expert, has provided several screenshots of data from Great Plains in a more useable format, labeled "Summary Ex. ___." These summaries are admissible under Fed. R. Evid. 1006. Should the Court require UHC to provide this information in another format, UHC will endeavor to do so.

UHC with their financial information, and UHC has a pending motion to compel that information. (Doc. 674.)

89.     Cary has repeatedly admitted, and in fact advocated, that debtors have been "defunct" since September 2017 when, during the pendency of UHC's lawsuit against Next Health, Cary, acting a Next Health's sole manager, "sold" off Next Health's last remaining revenue-generating assets—Pharma Holdings U.S. and Pharmacy Entities—to his new company Critical Healthcare Management, LLC, for no cash and a promissory note. (Cary Dep. 14–15, 23–24, 118–19, App. 28-29, 34–35, 43–44.) In just a four-month period in 2016, the year prior, the Pharmacy Entities (and other of Next Health-owned pharmacies) were grossing more than $150 million and netted its owners distributions of over $9 million, but the promissory note was valued only at $1.2 million. (Cary Dep. 112–18, App. 37–43; NH-01470474, App. 907–32.)

90.     On June 27, 2023, the Court entered judgment against the Lab and Pharmacy Entities *and* Next Health and Pharma Holdings US on UHC's fraudulent transfer claims—meaning all necessary elements of fraudulent transfer have been conclusively established as a matter of law. (*See* Final Judgment, Doc. 750, No. 3:17-cv-00243 (N.D. Tex.) (entering final default judgment against Next Health and Lab and Pharmacy Entities, finding them liable on same Second Amended Complaint, Doc. 584, that is the operative pleading in this case).)

## ARGUMENT

Rossel Defendants move for summary judgement on two general grounds. On one hand, they substantively argue that UHC has "no evidence" to support its fraud, conspiracy, fraudulent transfer, and RICO claims against them. And on the other, they claim that UHC's claims are time-barred. They are wrong on both points.

Substantively, their "no evidence" motion improperly fails to provide record support to show an absence of material fact, so they have failed to meet their burden. Moreover, while UHC doesn't have the space to provide the Court with every piece of evidence supporting its claims—and so only exemplar documents and testimony are highlighted here—tens of thousands of documents and hours of deposition testimony demonstrate the existence of a dispute of material fact on each of the improperly "contested" claims. And as for the statute of limitations, Rossel Defendants ignore the fact that most of the claims at issue accrued within four years of UHC filing suit, so they would be timely without any equitable tolling. As for the rest of the claims, UHC exercised reasonable diligence to unravel the multiple schemes that were being intentionally concealed, thus delaying accrual of UHC's claims. The single report Rossel Defendants highlight was insufficient such that UHC should have been aware of its harm. The motion should be denied.

## I. The Court should deny Rossel Defendants' "no evidence" motion because it isn't supported by record evidence.

Rossel Defendants' argument on the merits is based only on their conclusion that UHC has "no evidence" to support its claims. But that conclusion is not properly supported (nor could it be), and it must be rejected.

A "no-evidence motion for summary judgment ... is a pleading that may be filed in state court, but not federal court." *BB Energy LP v. Devon Energy Production Company LP*, No. 3:07-cv-0723-O, 2008 WL 2164583, at *12 (N.D. Tex. May 23, 2008) (O'Connor, J.) (citing *Casteneda v. Flores*, No. 5:05-cv-0129, 2007 WL 1671742, at *2–3 (S.D. Tex. June 8, 2007)). Under federal law, the party moving for summary judgment bears the burden of *referring to the record* to show the absence of genuine issues of material fact. *BB Energy LP*, 2008 WL 2164583, at *12. Therefore, "*even when the non-movant bears the burden of proof at trial*, '[s]imply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward

with evidence demonstrating material issues of fact as to every element of its case.'" *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993) (emphasis supplied; citing *Russ v. International Paper Co.*, 943 F.2d 589, 591 (5th Cir.1991)). "It is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (concurring opinion)).

Rossel Defendants believe they have done enough under the federal standard, citing *Celotex* for the proposition that the "movant can satisfy its summary judgment obligations by pointing out to the district court that there is an absence of evidence on an essential element of the non-movant's claim." (Mot. Br. at 12.)[4] But this reading of the movant's burden over-simplifies *Celotex*. As the Fifth Circuit explained, *Celotex* didn't lessen the movant's burden to support a motion by "identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Russ*, 943 F.2d at 592 (quoting *Celotex*, 477 U.S. at 323; noting that *Celotix* didn't disturb *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970), "which stated that the party opposing a motion for summary judgment must respond only after the moving party meets its initial burden.").

So, in the Fifth Circuit's view, a motion for summary judgment that "makes no reference to affidavits, depositions, or interrogatories" is no better than one filed under Rule 12(b)(6). *Ashe*, 992 F.2d at 544. That is because when no evidence is supplied, "both standards 'reduce to the same question,'" which is whether the non-movant has adequately pleaded its case. *Id.* Therefore, a "mere conclusory statement that the other side has no evidence is not enough to satisfy a movant's

---

[4]     All page citations to Rossel Defendants' opening brief are to ECF page number (at the top), not to the document's internal page number (at the bottom).

burden" and is ineffective to shift the burden back to the non-movant to support its case beyond the "sufficiency of the [ ] complaint." *Id.*

Here, Rossel Defendants have offered no evidence—not even an affidavit of denial by either of them—that undermines the merits of UHC's fraud, conspiracy, fraudulent transfer, and RICO claims. As the above-cited cases make plain, Rossel Defendants have therefore failed, under the appropriate federal standard, to provide record evidence demonstrating the absence of a genuine dispute of material fact. The motion should be denied on its face for this reason alone. The Court has, after all, already found UHC's pleadings against Rossel Defendants satisfactory under the high Rule 9(b) threshold. (Order, Doc. 558.)

The Court's denial of Rossel Defendants' motion for this fundamental failure would be especially appropriate in a case of this magnitude. During this six-year litigation, more than a million documents have been collected from a variety of corporations, individuals, and third parties in a variety of locations and jurisdictions. And fifteen depositions have been taken, with the potential for more, based on the parties' agreement. Several key discovery motions also remain pending before the Court—two of which seek additional documents from Rossel Defendants. (*See* Docs. 664, 666, 674, 675, 676). There are mountains of documents and hours of testimony that place Rossel Defendants at the center of the fraud and racketeering schemes at issue.

The Court should not endorse a defense practice that, faced with all this evidence, would permit a defendant to trigger its opponent to spend an extraordinary amount of time and money to sift through the record to demonstrate the existence of facts that have not been put at issue. UHC need not respond to Rossel Defendants' motion with evidence. But, in the abundance of caution, as the foregoing statement of facts and the following argument reflect, UHC has presented evidence sufficient to demonstrate the existence of a dispute of material fact.

## II. Fraud

### a. Rossel Defendants may be held liable as principals for fraud.

Regarding UHC's fraud claim, Rossel Defendants suggest that they may not be held liable for fraud they committed through Next Health unless UHC can show that they acted as Next Health's alter ego. (Mot. Br. at 21–22.) And Rossel Defendants have made this exact argument before. (*See* Jeremy Br. Supp. Mot. to Dismiss at 9, Doc. 420; Cary Br. Supp. Mot. to Dismiss at 8–9, Doc. 424.) But the Court has rejected this argument before *in this case*. (Order, Doc. 558.)

As the Court previously explained, each party to a fraudulent scheme is responsible for the acts of others in furtherance of the scheme. *In re Arthur Andersen LLP*, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) (For "the third parties to be liable for fraud, they need not have made representations directly to the Plaintiffs."). Thus, a defendant may be liable for fraud without making any fraudulent representations where he "allegedly participated in the fraudulent transactions and reaped the benefits," even if by silent acquiescence. *Id.*; *see Independant Receivables Corp. v. Precision Recovery Analytics, Inc.*, No. 1:11-CV-008-LY, 2012 WL 12874526, at *6 (W.D. Tex. May 16, 2012); *ClaimHub, Inc. v. Universal Risk Ins. Servs., Inc.*, No. H-10-2841, 2011 WL 13247456, at *3 (S.D. Tex. July 25, 2011).

Further, "[a] corporation's [agent] is personally liable for tortious acts which he directs or participates in during his employment." *O'Hare v. Graham*, 455 F. App'x 377, 380 (5th Cir. 2011) (quoting *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)); *see also Portlock v. Perry*, 852 S.W.2d 578, 582 (Tex.App.—Dallas 1993, pet. denied) (A "corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the conduct, either actual or constructive.").

The cases Rossel Defendants cite don't undermine these principles. *See Taylor v. Rothstein Kass & Co., PLLC*, No. 3:19-CV-1594-D, 2020 WL 554583, at *9 (N.D. Tex. Feb. 4, 2020) (holding that, to overcome a motion to dismiss, a plaintiff must plead that a corporate officer's "own actions" show "participation in [the] fraudulent scheme … directly"); *In re GTG Sols., Inc.*, 642 S.W.3d 41, 45 (Tex.App.—El Paso 2021) (discussing typical veil-piercing standard); *Mills v. City of Port Arthur, Texas*, No. CIVA 1:05CV298, 2006 WL 3531460, at *9 (E.D. Tex. Dec. 4, 2006) (refusing to hold a city liable for alleged conduct of economic development corporation, *aff'd*, 234 F. App'x 285 (5th Cir. 2007). UHC isn't trying to pierce the corporate veil (as Defendants posit). Rather, UHC is suing Rossel Defendants for their direct participation in the fraud.

### b. There is significant evidence from which a reasonable jury could find each element of fraud and fraudulent nondisclosure regarding Rossel Defendants and that Rossel Defendants participated directly in those schemes.

To prevail on a fraud claim based on an affirmative misrepresentation, a plaintiff must prove: "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *See Formosa Plastic Corp. USA v. Presidia Eng'rs & Contractors*, 960 S.W.2d 41, 47 (Tex. 1998) (citation omitted).

The failure to disclose information is not actionable unless there is a duty to speak. *Id.* The duty arises in four circumstances: (1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; and (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth. *Lesikar v. Rappeport*, 33 S.W.3d 282, 299 (Tex. App.—Texarkana 2000, pet. denied). Rossel

Defendants argue that UHC has "no evidence" to support any of these elements. (Mot. Br. at 22–23.) But there is ample evidence to support each.

### 1. Material Misrepresentation

Here, Rossel Defendants facilitated three types of affirmative misrepresentations: misrepresentations that patients were paying pharmacy co-pays; misrepresentations that disguised the identities of labs performing services; and, for claims generated by the ADAR Group, misrepresentations that patients had seen actual medical providers. These misrepresentations were material to UHC's payment determinations because, had UHC known the truth, it would not have paid the claims submitted with false information.

### 2. Material Omission and Duty to Disclose (Fraudulent Nondisclosure)

For a fraud-by-nondisclosure claim, a plaintiff must allege the defendant concealed or failed to disclose a material fact that the defendant knew the plaintiff was ignorant of or did not have the opportunity to discover. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008). The failure to disclose information is not actionable unless there is a duty to speak. The duty to disclose arises in four circumstances under Texas law: (1) a fiduciary or other special relationship between the parties gives rise to a duty to disclose; (2) new information makes a defendant's earlier representation misleading or untrue; (3) a defendant conveys a false impression by making a partial disclosure; or (4) a defendant who voluntarily discloses information has a duty to disclose the whole truth. *Lesikar v. Rappeport*, 33 S.W.3d 282, 299 (Tex.App.—Texarkana 2000, pet. denied). Courts have generally held that a duty to disclose exists between and among parties to transactions where parties' decisions concerning those transactions are necessarily dependent on and informed by the information and disclosures supplied by the counterparty with whom they're dealing. *See Pierce v. N. Dallas Honey Co.*, 2020 WL 1047903, at *4 (N.D. Tex.

Mar. 3, 2020) (declining to "imply[] a duty" in arms-length consumer contexts, but recognizing duty in "real estate transactions, commercial contracts, or securities").

Here, Rossel Defendants failed to disclose that the claims they caused to be submitted to UHC were the result of lab and pharmacy-based kickback schemes they administered, which were designed to pay physicians in exchange for their referral of lab specimens and ordering pharmacy prescriptions. The kickbacks took a variety of forms, including paying physicians through investments in "syndicated" shell labs, paying physicians through investments in Class G pharmacies, paying physicians using marketing commissions, and paying sham medical director wages.

At least two of the four recognized circumstances giving rise to a duty to disclose are applicable to Rossel Defendants: (1) when a defendant conveys a false impression by making a partial disclosure; and (2) when a defendant who voluntarily discloses information has a duty to disclose the whole truth. As the Court previously found, the "claim submissions conveyed a false impression regarding the reason the services were performed. The payments to physicians resulted in increased claims, including claims for services that were not medically necessary"; "[Rossel] Defendants knew this and, thus, a duty to disclose the whole truth was triggered." (Order, Doc. 558 (citing *SB Premium, LLC v. Wolfpack Wholesale, Inc.*, 3:17-cv-931-L, 2018 WL 4362726, at *11–12 (N.D. Tex. Sept. 13, 2018) (quoting *Holland v. Thompson*, 338 S.W.3d 586, 597–98 (Tex.App.—El Paso 2010 (pet. denied)))).)

Although the Court focused on Rossel Defendants' failure to disclose the fact that the tests were not medically necessary, its analysis applies with equal force to their failure to disclose that the claims were tainted by kickbacks. That is, by providing parts of the truth via other information listed in the claims, Rossel Defendants were required to disclose the whole truth—that the services and prescriptions were ordered by physicians incentivized by kickbacks.

### 3. Fraudulent Intent / Knowledge

Traditional fraud claims require the plaintiff to show that the defendant "knew the representation was false," or that the representation was made "recklessly without knowledge of its truth and as a positive assertion." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 322 (5th Cir. 2002) (citing Texas law). Similarly, for a fraudulent nondisclosure claim, a plaintiff must show that the defendant knew the plaintiff was ignorant of or did not have the opportunity to discover the omitted fact. *Dorsey*, 540 F.3d at 341.

But since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. *Maulding v. Niemeyer*, 241 S.W.2d 733, 737 (Tex.Civ.App.—El Paso 1951) (orig. proceeding); *Turner v. Biscoe*, 171 S.W.2d 118, 119 (Tex.Civ.App.—Waco 1943). And even "[s]light circumstantial evidence' of fraud … is sufficient to support a finding of fraudulent intent." *Id.*; *see also Aland v. Martin*, 271 S.W.3d 424, 429–30 (Tex.App.—Dallas 2008), no pet. ("Any ultimate fact may be proved by circumstantial evidence. An ultimate fact is established by circumstantial evidence when the fact may be fairly and reasonably inferred from other facts proved in the case." (citing *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993)).

Short of a confession, intent cannot ever be proven directly, so it is nearly always "a fact question within the realm of the trier of fact because it is dependent upon the credibility of witnesses and the weight to be given to their testimony." *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 199 (Tex.App.—Houston [1st Dist.] 2014), pet. denied. The Fifth Circuit has "emphasized repeatedly that cases which turn on the moving party's state of mind are not well-suited for summary judgment." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991).

Here, there is significant evidence from which a jury could reasonably infer that Rossel Defendants knew that, in submitting claims to UHC, that they were participating in misrepresenting and omitting material facts. Jeremy lead Next Health's purchase of sober living facilities for Mr. Bugen and the ADAR Group and approved kickback commissions based on referrals from the ADAR Group; Jeremy authorized and accounted for kickback payments to referring physicians and marketers, both through syndicated labs and Class G pharmacies; Jeremy made payments to third-party shell entities that passed along money to the Bishop used to disguise the payment of co-pays; and Jeremy was aware of the lab-switching billing scheme executed through ALG and True Labs. Cary served as trustee on the sober homes purchased for the ADAR Group; Cary was the general partner of Pharma Holdings US, which was the managing member of Next Health's Class G pharmacies, which were used to pay pharmacy-related kickbacks; Cary helped organize the "lab consolidation plan," which increased kickback payments to high-volume physician referral sources; Cary recognized the importance of the bishop co-pay scheme and approved the majority of payments made to third-party shell companies that were used to disguise the payment of co-pays; and Cary led Next Health's efforts to acquire new lab and pharmacy entities to bill through following the success of the lab-switching billing scheme.

### 4. Justifiable Reliance

There is no question that UHC did, in fact, rely on the claims information submitted in making payment determinations and paying Next Health's labs and pharmacies. The only question Rossel Defendants raise is whether that reliance was justifiable. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). The "justifiable reliance" element of common law fraud "does not require a plaintiff to demonstrate reasonableness." *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003). "Justification is a matter of the qualities and characteristics of

the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995). That is why the justifiability of a party's reliance "presents a question of fact for the jury to decide." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019) (quoting *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 654 (Tex. 2018)).

And as the cases make plain, whether UHC's reliance on the information Rossel Defendants submitted was justifiable is a fact-intensive inquiry for the jury. Failing to recognize that, Rossel Defendants state that there were certain red flags that UHC should have recognized because of the MEDIC complaint; they also state that, because UHC is a large and sophisticated payor of claims with its own fraud investigations department, that the Court should determine as a matter of law that UHC wasn't entitled to rely on the information submitted. (Mot. Br. at 23–26.)

Rossel Defendants primarily rely on two cases to support their contention. In *Lewis v. Bank of America NA*, the plaintiff argued that defendant bank's officer fraudulently induced the plaintiff to withdraw funds from a benefits plan and place them in non-tax deferred CDs. 343 F.3d 540, 545 (5th Cir. 2003). The court found that the plaintiff didn't justifiably rely on the officer's representations regarding the tax consequences of doing so because the "record is devoid of evidence that [the plaintiff] perceived Thomas, a loan officer, to be an expert in tax law or investment planning" and the plaintiff later executed a series of loan documents, "each of which listed his CDs as collateral, and none of which characterized the CDs as IRAs or as tax-deferred." *Id.* at 547. Similarly, in *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, the court found that a party couldn't have justifiably relied on oral representations about certain tracts being open to leasing when the party's consummated contract expressly contradicted those representations. 546 S.W.3d 648, 658 (Tex. 2018). In *Orca*, the court also recounted five other "red flags," apart from the direct

contradictions—including lack of assurances in a letter of intent, negation of warranty language, and the plaintiffs own undertaking title verification—when considered as a whole, negated justifiable reliance. *Id.* at 655–58. The parties in *Orca* also had relatively equal access to the information claimed to have been misrepresented. *Id.*

Contrary to the circumstances that supported the decisions in *Lewis* and *Orca*, this is not a case where UHC blindly relied on representations without justification. As an initial matter, the MEDIC complaint didn't concern pharmacy billing at all, so the fraudulent pharmacy claims can be pushed aside. Second, none of the lab-related fraud schemes at issue in this motion involve the substance of fraud reported in the MEDIC complaint—that patients were not being held financially responsible. Third, even after the MEDIC report, United Toxicology's counsel met with UHC and represented that the content of the MEDIC complaint was unfounded, which resulted in UHC again paying United Toxicology claims. Fourth, UHC didn't even learn that all the billing labs at issue here were owned by Next Health until early 2016, during the early stages of its investigation, which culminated in UHC refusing to pay all those labs a few months later. And finally, even after UHC filed suit, Next Health counterclaimed, arguing that the claims UHC refused to pay should have been paid (i.e., that UHC should have continued to rely on the information contained in claims submitted by Next Health labs and pharmacies). Unlike the party making representations in *Lewis*, the Next Health labs enshrined themselves in a cloak of (feigned) trustworthiness on exactly the information they were submitting. And *Orca* is inapposite because the parties here were not negotiating an arms-length transaction based on their equal access to information. Here, Rossel Defendants, their fellow executives, and Next Health had all the information concerning their several different types of fraud they were committing, which they concealed in multiple ways.

Rossel Defendants' rule—that if a provider had any kind of problem in the past, then UHC would need to categorically deny all that provider's claims once it found out about that isolated (potentially long ago) problem—would lead to a preposterous and unrealistic result and does not reflect the law. This Court previously acknowledged as much and rejected a similar argument. *See United Healthcare Services, Inc., et al. v. Synergen Health, LLC*, No. 3:20-cv-00301 (N.D. Tex.) (rejecting argument that UHC's justifiable reliance could be categorically negated by touting UHC's fraud department and investigation into United Toxicology). There, Synergen argued, like Rossel Defendants do here, about UHC's sophistication, dedicated special investigations unit, and its previous investigation of United Toxicology. In denying Synergen's motion for summary judgment, the Court summarized as following concerning justifiable reliance:

> [I]n 2015, [UHC] ... began denying claims from the U[nited] T[oxicology] laboratory, opened an investigation, and commenced payments only after determining that U[nited] T[oxicology] was an actual laboratory. But the U[nited] T[oxicology] laboratory allegations—misrepresenting that a fake laboratory is a real laboratory—involve a different type of fraud than the kind of which United now [alleges.] … Accordingly, the Court cannot conclude, as a matter of law, that there is [no] actual reliance on [United's] part. That's a fact issue for the jury.

*Synergen Health, LLC*, 2023 WL 4186370, at *3 (N.D. Tex. June 26, 2023) (internal quotations omitted; further finding that UHC's suspicions of United Toxicology in August of 2015 were not "strong enough for the Court to conclude that, as a matter of law," UHC didn't justifiably rely on later-submitted claims using the Next Health lab billing credentials). The Court's analysis in *Synergen* applies with equal force here. The Court should leave the question of whether UHC's reliance was justified to the jury, with which that inquiry properly belongs.

**5. Causation / Damages**

Rossel Defendants' fraud caused UHC to pay millions of dollars it otherwise wouldn't have based on the fraudulent claims submitted.

## III.    A rational jury could find Rossel Defendants liable for conspiracy to commit fraud.

To establish a civil conspiracy, a plaintiff must prove: (1) a combination of two or more persons; (2) an object to be accomplished (either an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998).

Rossel Defendants attack only the second and third elements, stating that UHC has "no evidence that [Rossel] Defendants were aware of the alleged harm when they voted to approve loans and took actions relating to the trust holding properties." (Mot. Br. at 30.) They also argue that "Jeremy's presence at such a meeting would *not necessarily* mean he was privy to any designs of Erik Bugen or any other Next Health executive." (*Id.* (emphasis supplied).)

But the summary judgment standard isn't about what might "not necessarily" be. As with the intent element of UHC's substantive fraud claims, "a conspiracy is proved by circumstantial evidence." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 812 (S.D. Tex. 2009). Jeremy's (or Cary's) presence at such a meeting *might* not necessarily mean that he was (or they were) privy to Bugen's designs (or conspired with Bugen and other Next Health executives to execute them), but it *could* mean that. And, read in the light most favorably to UHC, Jeremy's authorizing, advocating for, and agreeing with other Next Health executives to pay commissions (i.e., kickbacks) to Bugen and the ADAR Group even *likely* means that he conspired with others to use illegal kickbacks to generate fraudulent referrals for lab tests. Similarly, Jeremy and Cary taking the lead on financing and serving as trustee for the sober homes Next Health purchased for

the ADAR group *likely* means that they both assented to the plan to defraud UHC by helping the ADAR Group generate thousands lab tests not ordered by physicians so that Next Health could fraudulently bill thousands of claims for those tests.

In sum, a reasonable jury could find that could conclude that Rossel Defendants—who met with Bugen during the early stages of the ADAR scheme, cemented that relationship by financing three pieces of real estate for Bugen (and later forgiving the loans), and incentivized Bugen to send specimens to Next Health by paying kickbacks based on a deal that prevented Bugen from sending samples to other labs—did, in fact, conspire with Bugen to submit fraudulent claims to UHC.

## IV. A rational jury could find Rossel Defendants liable for fraudulent transfer.

Under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), a plaintiff may recover for a fraudulent transfer against the debtor, the transferee, or the person for whose benefit the transfer was made. *See* Tex. Bus. & Com. Code §§ 24.008, 24.009. "[T]he elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors." *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019) (citation omitted); *see* Tex. Bus. & Com. Code § 24.005(a)(1). To determine actual intent, a court may consider a non-exclusive list of factors, also known as "badges of fraud," set out in section 24.005. *Id.*; *see* Tex. Bus. & Com. Code § 24.005(b).

Alternatively, a plaintiff may show constructive fraud. *See* Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006(a). Instead of actual intent to hinder, delay, or defraud any of the debtor's creditors, the plaintiff must demonstrate that a debtor made the transfer or incurred an obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation," and either (1) "was engaged or was about to engage in a business or a transaction for which the

remaining assets of the debtor were unreasonably small," or (2) "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *Id.*

Here, Rossel Defendants assert that UHC has failed to show evidence supporting two general categories of fraudulent transfers: (1) cash transfers from ALG, Medicus, US Toxicology, United Toxicology, True Labs, Apex Pharma, Dallasite, Executive Healthcare, and Total Pharma ("Lab and Pharmacy Entities") to Next Health and Pharma Holdings US from 2015–2017 ("Category 1 Transfers"); and (2) cash transfers from Next Health and Pharma Holdings U.S. to Rossel Defendants from 2016–2018 ("Category 2 Transfers"). (Mot. Br. at 32.) They argue UHC has no evidence supporting the various badges of fraud set out in Section 24.005(b) with respect to either of these categories.

Rossel Defendants are focusing on the wrong question, because for each set of transfers, the "debtor" whose intent is under scrutiny is not the Rossel Defendants. For Category 1 Transfers, the "debtors" whose intent is under scrutiny are the Lab and Pharmacy Entities. And for Category 2 Transfers, the "debtors" whose intent is under scrutiny is Next Health and Pharma Holdings US. The Court has already entered judgment against the Lab and Pharmacy Entities *and* Next Health and Pharma Holdings US on UHC's fraudulent transfer claims—meaning those entities' intent has been conclusively established as a matter of law. (*See* Final Judgment, Doc. 750, No. 3:17-cv-00243-X (N.D. Tex.) (entering final default judgment against Next Health and Lab and Pharmacy Entities, finding them liable on same Second Amended Complaint, Doc. 584, that is the operative pleading in this case).) This default judgment establishes as fact the allegations supporting UHC's fraudulent transfer claims—that, at the time of the transfers, that UHC was (and remains) a

"creditor," Next Health and Lab and Pharmacy Entities were (and remain) "debtors," and that those "debtors" transferred assets away with the intent to defraud UHC.

There is therefore no need to engage in the "badges of fraud" analysis of the intent of "debtors" Next Health, Pharma Holdings US, and Lab and Pharmacy Entities. But even were the Court to analyze them, the evidence shows that after UHC stopped paying Next Health's Lab Entities, and even after this litigation was filed, the Lab and Pharmacy Entities continued to make payments to Next Health and Pharma Holdings US, which, in turn continued to make payments to Rossel Defendant—which are badge-of-fraud circumstances. *See* Tex. Bus. Admin. Code. §§ 24.005(b)(4), (9), (10). Cary Rossel has also represented that Next Health has been "defunct" since September 2017, when he, acting as Next Health's sole remaining manager, transferred Next Health's only viable assets—Pharma Holdings US and the Pharmacy Entities—to his other company, Critical Healthcare Management, for no cash. *See* Tex. Bus. Admin. Code. §§ 24.005(b)(7), (8). There is no question that the "debtors" at issue fraudulently transferred assets away. And the fact that some of those transfers were authorized by Cary himself, acting in his capacity as principal for the "debtors" during litigation, is merely icing on the cake.

So, the question isn't whether summary judgment may be entered against UHC, but whether UHC's judgment against the transferor-debtors can be somehow *avoided* by Rossel Defendants. *See* Section 24.009(b). For Category 1 Transfers (i.e., those between Lab and Pharmacy Entities and Next Health), Rossel Defendants are "subsequent transferee[s]," and therefore may be recovered against *unless* they are "good faith transferee[s] who took for value." Section 24.009(b)(2). Under TUFTA, the *transferees*, here Rossel Defendants, "bear[] the burden of proving TUFTA's good faith affirmative defense." *Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 427 (5th Cir. 2020) (citing *Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 756 (Tex.App.—

Fort Worth 2005, pet. denied). It is not UHC's burden to show Rossel Defendants' intent, but Rossel Defendants' burden to show that they are takers for value and in good faith. Rossel Defendants have not supplied the Court with any evidence that they took from Next Health in good faith, so they have failed, as a matter of law, to support their defense that the Category 1 Transfers are not actionable against them.

And for Category 2 Transfers (i.e., between Next Health or Pharma Holdings US and Rossel Defendants), Rossel Defendants are the "first transferee[s]," which is analyzed under Section 24.009(b)(1). This Section provides no similar "good faith" defense. So, because Next Health's intent with respect to those transfers has been established, Rossel Defendants *are* liable as a matter of law. Quite opposite to the outcome Rossel Defendants seek, there is no set of material facts that Rossel Defendants could show that would *prevent* UHC from recovering the monies in the Category 2 Transactions.[5]

## V.      A rational jury could find Rossel Defendants had the intent to defraud, as required by mail fraud and wire fraud RICO predicate acts.

The only substance of UHC's civil RICO claims that Rossel Defendants attack is their argument that UHC has no evidence that Rossel Defendants had the intent to defraud required by federal wire fraud and money laundering statutes. (Mot at 36.)[6] "Violation of the wire-fraud statute requires the specific intent to defraud, i.e., a conscious knowing intent to defraud." *United States*

---

[5]      UHC therefore respectfully requests permission to file a partial affirmative motion for summary judgment against Rossel Defendants. There is no set of facts that Rossel Defendants could supply that would prevent them from being liable under Section 24.009(b)(2).

[6]      Rossel Defendants also state: "Without two predicate acts, there is no pattern of racketeering" (Mot. Br. at 36) without further explanation. This is puzzling because they don't argue that UHC hasn't shown at least two predicate acts. It appears that Rossel Defendants believe that two predicate acts are mail and wire fraud, but that's wrong. The racketeering acts in question don't have to be of two different types to form a pattern of racketeering; they can be the same types of racketeering acts. Here, Rossel Defendants don't dispute that, for example, there are thousands of predicate acts of wire fraud based on the fraudulent claim submissions. (UHC Claims Data.)

*v. Mann*, 493 F.3d 484, 493 (5th Cir. 2007). Mail fraud violations also require specific intent. *United States v. Nguyen*, 504 F.3d 561, 568 (5th Cir. 2007) ("Mail and wire fraud are specific intent crimes that require the government to prove that a defendant knew the scheme involved false representations."). "[A] defendant acts with the intent to defraud when he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005) (internal quotation marks omitted) (quoting *United States v. Blocker*, 104 F.3d 720, 732 (5th Cir. 1997)).

As with Texas-law fraudulent intent, discussed above, the intent element of civil RICO can only be proved circumstantially. Therefore, it would be "plainly inappropriate on motion for summary judgment" to find that persons who materially benefitted from a racketeering scheme did not have the requisite intent. *See, e.g.*, *Crowe v. Henry*, 115 F.3d 294, 297–98 (5th Cir. 1997). And here, there is sufficient evidence from which a reasonable jury could infer that Rossel Defendants intended to commit wire fraud (by submitting fraudulent claims to UHC)

## VI. UHC filed its claims against Rossel Defendants within the statute of limitations periods for fraud and civil RICO.

Ignoring the inherently fact-intensive inquiries concerning UHC's actual knowledge at various points in time[7]—whether UHC exercised requisite diligence in its discovery of the nature of its injuries, *and if not*, when should reasonable diligence have led UHC to the discovery of said injuries—the Rossel Defendants argue that statutes of limitation completely bar UHC's fraud and RICO claims because of the MEDIC Report, which concerned one lab entity (United Toxicology)

---

[7]     *National Founders Corp. v. Cent. Nat. Bank*, 521 S.W.2d 92, 96 (Tex. Civ. App. 1975), *writ refused NRE* (July 7, 1975) ("Limitations will begin to run against the interest of a corporation, in spite of fraud, when a director or officer of the corporation has sufficient knowledge of the facts to require that person to exercise diligence in fully uncovering the fraud."). Further, a "corporation cannot act or have a mental state by itself." *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 372 (5th Cir. 2017).

and related only to Medicare part C and D, and was based on another company's unverified post on the internet.

The obvious and most fundamental problem with Rossel Defendants' analysis is that it completely skips over the thousands of fraudulent claims (which resulted in millions of dollars of injury) that they helped submit squarely *within* four years of UHC filing suit—meaning there are no limitations issues to consider. But also, because a reasonable jury could find that UHC exercised reasonable diligence throughout its years-long uncovering of the complex fraudulent scheme, Rossel Defendants' motion should be denied in full, even to the extent UHC paid some of the fraudulent claims more than four years before filing suit against them.

### a. UHC's fraud claim is not barred by the statute of limitations.

Under Texas law, the statute of limitations for fraud is four years. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4). "Causes of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015). Here, there are thousands of claims that were submitted by Next Health, with Rossel Defendants' assistance, and paid by UHC, resulting in injury, less than four years before UHC filed suit. In fact, for certain of the fraud schemes—for example, the scheme to submit claims through ALG and True Labs to disguise their true source—Rossel Defendants did not even have the mechanics in place until well into 2016.

But moving past the most obviously timely portions of UHC's claims, in a fraud case where the plaintiff does not have actual knowledge of the fraud, the statute of limitations will not begin to run until the plaintiff objectively should have known—by using reasonable diligence—of the "facts giving rise to its cause of action." *Syrian Am. Oil Corp., S.A. v. Pecten Orient Co.*, 524 S.W.3d 350, 360 (Tex. App.—Houston [1st Dist.] 2017, no pet.). "Because fraud vitiates whatever

it touches, limitations does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it." *Hooks*, 457 S.W.3d at 57; *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996) ("Accrual of a cause of action is deferred in [cases] involving allegations of fraud or fraudulent concealment […] because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run.").[8] Whether a party exercised reasonable diligence to discover a particular fraud, which causes an action to accrue under the statute of limitations, is a question of fact to be assessed by a jury. *Id.* (holding that the Houston Court of Appeals mistakenly concluded as a matter of law the date by which the fraud at issue should have been discovered, thus accruing the statute of limitations).

### 1. UHC alleges distinct fraudulent representations/omissions, each discovered at different times.

Rossel Defendants acknowledge that UHC's allegations concern "various allegedly fraudulent claims," citing to the paragraphs of UHC's complaint that enumerates at least five discrete fraudulent activities (*i.e.*, claims that were fraudulent in various, distinct ways) that the Rossel Defendants personally participated in. (Mot. Br. at 13.) Rossel Defendants offer no authority for the proposition that dissimilar fraud allegations suspected by one organization (here, Cigna) begins the statute of limitations for any possible fraud-based claims that may be asserted by another (here, UHC). Instead, Rossel Defendants vaguely discuss "the fraud" and extrapolate that the reporting of Cigna's fraud report—which involved discrete alleged fraudulent activities against Cigna by United Toxicology and U.S. Health Group—should have made UHC aware of all types of fraud committed by Next Health, other laboratories, pharmacies, and the Rossel Defendants.

---

[8]      The Supreme Court of Texas has recognized its "inconsistent" use of the term "discovery rule" and explained that ("[a]ccrual of a cause of action is deferred in two types of cases. In one type, those involving allegations of fraud or fraudulent concealment, […] [the other type in which the discovery rule applies." *S.V.*, 933 S.W.2d at 6.

Rossel Defendants also disregard the fact that UHC *did* investigate concerns regarding individual Next Health laboratories as they arose, and did not conclude at any time prior to September 30, 2015, that the fraudulent representations or omissions at issue in this case had occurred. In 2015, UHC did flag United Toxicology after the submission of the MEDIC Report and the receipt of a tip that United Toxicology was a lab on paper only. This resulted in the denial of United Toxicology claims through and until the time that *United Toxicology's counsel assured UHC that United Toxicology's practices were above board and invited UHC to tour United Toxicology to demonstrate it was real (all the while threatening litigation against UHC over the claims that had been denied)*. Moreover, and contrary to Rossel Defendants' assertion, the July 20, 2015 MEDIC Report *does not* mention "Next Health," nor does it identify Josh Daniel as being associated with an entity by the name of "Next Health." The MEDIC Report identifies "U.S. Health Group" as United Toxicology's "parent company." Moreover, the MEDIC Report's allegation of waiver of cost share is based largely on United Toxicology's failure to respond to information requests (which would be indicative of an "on paper" lab, which UHC's early investigation determined to be inaccurate). There is no information about the size or scope of the reported member interviews. And, fundamentally, the waiver of cost share in the Medicare context differs significantly from waiver in the commercial context.

At the earliest, UHC's fraud claim accrued in January of 2016 when UHC conducted its onsite investigation of United Toxicology (after being invited by counsel for United Toxicology who all the while assured UHC that United Toxicology's operations were entirely above board). Because UHC sued the Rossel Defendants within four years of UHC's site inspection, UHC's fraud claim is not time barred.

## 2. Continued concealment riddles the timeline of UHC's discovery of the distinct fraudulent representations/omissions.

Beyond the question of when a fraud claim *accrues*, fraudulent concealment doctrine equitably tolls the limitations period of an accrued fraud claim even in the case of known injury, "because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996). Concealment tolls limitations "until the fraud is discovered or could have been discovered with due diligence." *Id.* So, as with accrual itself, whether a defendant's fraudulent concealment of its conduct tolls accrual is a fact-specific inquiry. *Hooks*, 457 S.W.3d at 60.

Even assuming, as Rossel Defendants argue, that all of the different misconduct and misrepresentations at issue in this case are subject to the single date of accrual (*i.e.*, July 20, 2015) a jury need only find that fraudulent concealment was at play for 72 days between July 20, 2015 and September 30, 2019 (the date that UHC moved to amend its complaint to add the Rossel Defendants), to defeat Rossel Defendants' statute of limitations defense. The history of interactions between UHC's legal department and attorneys representing United Toxicology, and later Next Health, and Next Health's eventual conduct after UHC filed its initial complaint far exceeds the necessary 72 days. The concealment of the fraud that UHC now asserts (see discussion above of concealment that began in 2015) continued through 2016 when the Ackels brothers sat face to face with UHC's legal department on more than one occasion disclaiming United Toxicology's association with the ADAR Group and its practices. Next Health, through its counsel, even went so far as to engage in settlement discussions that would include a potential path into UHC's network. Concealment and delay in the form of discovery abuses continued after UHC filed suit against Next Health and its laboratories.

Rossel Defendants cannot benefit from the deceitful concealment that began in September of 2015, when attorneys for United Toxicology first contacted UHC's legal department and disclaimed any suspected wrongdoing. This concealment of United Toxicology's wrongdoing in 2015—continued by counsel for Next Health in 2016, after UHC uncovered the interconnectedness of the various labs beneath Next Health's umbrella—vitiates any notion that UHC should have been aware that Next Health was committing fraud based on Cigna's report.

**b. UHC's civil RICO claim is not barred by the statute of limitations.**

Rossel Defendants correctly state that the Fifth Circuit abides by the rules of "injury discovery" and "separate accrual" for civil RICO claims (*Lewis v. Danos*, 83 F.4th 948, 955 (5th Cir. 2023)), yet the Rossel Defendants incorrectly apply said rules to the record evidence here. "Under the 'injury discovery' rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury and, when a pattern of RICO activity causes a continuing series of separate injuries, the 'separate accrual' rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury." *Id.* (internal citations omitted). Discovery of a civil RICO injury can be delayed or prevented by affirmative acts of concealment on the part of a defendant. *Id*. at 955 ("the defendant must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry." *Id.* (citing *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1529 (5th Cir. 1988) (citations omitted). Under the fraudulent concealment doctrine, "the limitations period is tolled until the plaintiff discovers, or with reasonable diligence should have discovered, the concealed fraud." *Id.*

In *Love v. National Med. Enterprises*, the Fifth Circuit considered the separate accrual rule and fraudulent concealment doctrine in the context of an alleged civil RICO scheme involving fraudulent health insurance claims submitted over a period of years (including more than four years

before the complaint was filed). 230 F.3d 765 (5th Cir. 2000). First, the Court swiftly rejected the notion that any claim submissions submitted in the four years prior to the filing of the complaint were time barred, observing that "[o]bviously, for th[ose] submittals, [the insurance company] could *not* have suffered any injury before Appellees submitted the claim[s] for payment." *Id.* at 775. As to claims submitted more than four years before the suit was filed, the Court reviewed record evidence of the insurer's investigation of other fraudulent activities and found that as a matter of law, it could *not* be said that the insurer's efforts were *not* reasonably diligent, and therefore reversed the trial court's grant of summary judgment as to those injuries. *Id*. at 778 ("In the light of the summary judgment record, we *cannot* conclude, as a matter of law, that [the insurance company's] efforts to investigate whether it was a victim of—had been injured by—the allegedly fraudulent conduct of which it was aware in 1991 (varying charges for the same medication and discharge decisions based on insurance coverage), including *not* seeking information from its insureds through the use of questionnaires or otherwise, were *not* reasonably diligent.")

Rossel Defendants attempt the same glossing over as the *Love* litigants of the nuances related to RICO injury discovery (Mot. Br. at 34 ("there is significant evidence that shows Plaintiffs knew or should have known, on or before July 20, 2015 of its alleged injury of **paying allegedly fraudulent bills**…").) UHC's undertaking of an investigation of certain allegedly fraudulent activities on or about July 20, 2015 does not amount to discovery of the RICO injuries UHC alleges here. As Court held in *Love*, the record evidence contained herein could support a reasonable juror's finding that UHC did exercise reasonable diligence in discovery of its injuries, which were perpetually being concealed from UHC.

## CONCLUSION

Rather than fairly confront the mountain of evidence against them, Rossel Defendants have created a mountain of work for UHC—forcing UHC to spend many days of attorney time collecting evidence on nearly every aspect of this large case to confront their insincere statements that UHC has "no evidence" against them. Their tack is not only idle; it is inappropriately draining on UHC's time and resources. Rossel Defendants have also attempted to mislead the Court by failing to note that most claims at issue caused UHC harm well within four years of it filing suit. And their reliance on a single report of potential fraud—against a different insurer, involving federal dollars and alleged fraudulent conduct that was expressly and repeatedly disclaimed by Next Health—disregard key related record evidence of their continued concealment of the fraud that further tolls the accrual of UHCs claims. The Court should deny Rossel Defendants' motion for summary judgment.

Respectfully submitted on December 20, 2023.

/s/ Scott P. Kerew

**FIGARI + DAVENPORT, LLP**

Andrew G. Jubinsky
andy.jubinsky@figdav.com
901 Main Street, Suite 3400
Dallas, TX 75202-3796
Telephone: (214) 939-2000
Facsimile: (214) 939-2030

**SINTON, SCOTT, MINOCK & KEREW**

Scott P. Kerew
skerew@ssmklaw.com
Adam J. Sinton
asinton@ssmklaw.com
Joseph J. Minock
jminock@ssmklaw.com
Benjamin D. Van Horn
bvanhorn@ssmklaw.com

1550 Market Street, Suite 400
Denver, Colorado 80202

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the December 20, 2023, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system under Local Rule 5.1(d), which will automatically send notification of such filing to all counsel of record.

/s/Scott P. Kerew