| | |
|---|---|
| **From:** | Robert Shutan |
| **To:** | Amir Mortazavi |
| **CC:** | Solstice; Jeremy Rossel; Cary Rossel |
| **Sent:** | 11/30/2015 6:00:13 PM |
| **Subject:** | Re: 100 Box Canyon - document review |
| **Attachments:** | Gracy Title Wiring Instructions.pdf; 100 Box Canyon Closing Docs.pdf |

Everyone,

The closing docs for 100 Box Canyon are attached. Please let em know if there are any questions.

Thanks,
Rob Shutan

On Mon, Nov 30, 2015 at 4:00 PM, Amir Mortazavi <amortazavi@next-health.us> wrote:
aSap

Regards,

Amir Darius Mortazavi
Chief Commercial Officer
Next Health
5710 LBJ Freeway #300
Dallas Texas 75240

(210) 386-3152 Direct

Sent From Amir's iPhone

On Nov 30, 2015, at 3:27 PM, Solstice <erik@solsticerecovery.com> wrote:

Rob,
Please get Jeremy and Cary the documents in a PDF if they have the same trouble I am having opening these documents.  I have strep throat and need your assistance please.
Erik

Sent from my iPhone

Begin forwarded message:

**From:** "Marie Farber" <DoNotReply@prod-zix.stewart.com>
**Date:** November 30, 2015 at 2:43:11 PM CST
**To:** erik@solsticerecovery.com
**Subject: RE: 100 Box Canyon - document review**
**Reply-To:** SecureEmailReply@prod-zix.stewart.com



**EXHIBIT 14**
**Witness: J. Rossel**
11/3/23          M.A.

CONFIDENTIAL

APP. 292
NH-00488170

**Stewart Title**

Please Choose Your Preferred Language/ S'il-vous-plaît, choisir le language désiré:

English Français Español Italiana Polska Română Česky

Thank you for choosing Stewart. As part of our commitment to protecting your privacy, we have sent you a secure message, powered by ZixCorp. To retrieve your message, simply click the Open Message button below.

Open Message

**Do not reply to this notification message; this message was auto-generated by the sender's security system. To reply to the sender, click Open Message.**

The secure message expires on Mar 29, 2016 @ 07:43 PM (GMT).

If clicking Open Message does not work, copy and paste the link below into your Internet browser address bar.
https://secureemail.stewart.com/?servlet_name=m&zpurl=https%3A%2F%2Fprod-zix.stewart.com%2Fs%2Fe&m=ABAOw4VxF8UF5W0gersLc0Dp&em=erik%40solsticerecovery%2ecom

Want to send and receive your secure messages transparently?
Click here to learn more.

**Nouveau message de courriel sécurisé de Stewart**

Merci d'avoir choisi la compagnie d'assurance titres Stewart. Dans le cadre de notre engagement pour la protection de votre vie privée, nous vous avons envoyé un message sécurisé géré par ZixCorp. Pour récupérer ce message, il vous suffit de cliquer sur le bouton d'ouverture du message ci-dessous (« Ouvrir le message»)

Ouvrir le message

APP. 293
NH-00488171

**Ne répondez pas à ce message de notification, il a été généré automatiquement par le système de sécurité de l'expéditeur. Pour répondre à l'expéditeur, cliquez sur « Ouvrir le message ».**

Le message sécurisé expirera le Mar 29, 2016 @ 07:43 PM (GMT).

Si le bouton d'ouverture du message ne fonctionne pas, copiez-collez le lien ci-dessous dans la barre d'adresse de votre navigateur Internet.
https://secureemail.stewart.com/?servlet_name=m&zpurl=https%3A%2F%2Fprod-zix.stewart.com%2Fs%2Fe&m=ABAOw4VxF8UF5W0gersLc0Dp&em=erik%40solsticerecovery%2ecom

Vous souhaitez envoyer et recevoir vos messages sécurisés en toute transparence ?
Cliquez ici pour en savoir plus.

---

## Nuevo mensaje de correo electrónico seguro de Stewart

---

Gracias por elegir a Stewart. Como parte de nuestro compromiso de proteger su privacidad, le hemos enviado un mensaje seguro, generado por ZixCorp. Para leer su mensaje, simplemente oprima en el botón Abrir Mensaje a continuación.

Abrir mensaje

**No responda a este mensaje de aviso; este mensaje es generado automáticamente por el sistema de seguridad del remitente. Para responder oprima el botón Abrir Mensaje.**

El mensaje seguro expira el Mar 29, 2016 @ 07:43 PM (GMT).

Si cuando oprima Abrir Mensaje no funciona, copie el siguiente enlace en la barra de direcciones de su navegador de Internet.
https://secureemail.stewart.com/?servlet_name=m&zpurl=https%3A%2F%2Fprod-zix.stewart.com%2Fs%2Fe&m=ABAOw4VxF8UF5W0gersLc0Dp&em=erik%40solsticerecovery%2ecom

¿Desea enviar y recibir sus mensajes seguros transparentemente?
Oprima aquí para obtener más información.

---

## Nuovo messaggio email sicuro da parte di Stewart

---

APP. 294
NH-00488172

Grazie per aver scelto Stewart. Come parte del nostro impegno a proteggere la Sua privacy, Le abbiamo inviato un messaggio sicuro, potenziato da ZixCorp. Per recuperare il messaggio, faccia semplicemente clic sul tasto Open Message ("Apri Messaggio") sotto riportato.



**Non risponda a questo messaggio di notifica; questo messaggio è stato autogenerato dal sistema di sicurezza del mittente. Per rispondere al mittente, faccia clic su Apri Messaggio.**

Il messaggio sicuro scade il Mar 29, 2016 @ 07:43 PM (GMT).

Se facendo clic sul tasto per aprire il messaggio non funziona, copi ed incolli il link qui sotto nella sbarra dell'indirizzo del browser di Internet.
https://secureemail.stewart.com/?servlet_name=m&zpurl=https%3A%2F%2Fprod-zix.stewart.com%2Fs%2Fe&m=ABAOw4VxF8UF5W0gersLc0Dp&em=erik%40solsticerecovery%2ecom

Desidera inviare e ricevere i messaggi sicuri in modo trasparente?
Faccia clic qui per saperne di più.

---

### Nowa, bezpieczna wiadomość e-mail od firmy Stewart

---

Dziękujemy za wybranie firmy Stewart. W ramach zobowiązania do ochrony Twojej prywatności wysłaliśmy Ci bezpieczną wiadomość obsługiwaną przez firmę ZixCorp. Aby ją odczytać, po prostu kliknij poniższy przycisk Open Message („Otwórz wiadomość").



**Nie odpowiadaj na to powiadomienie; wiadomość została wygenerowana automatycznie przez system bezpieczeństwa nadawcy. Aby odpowiedzieć nadawcy, kliknij przycisk „Otwórz wiadomość".**

Ważność tej bezpiecznej wiadomości wygasa Mar 29, 2016 @ 07:43 PM (GMT).

Jeśli kliknięcie przycisku „Otwórz wiadomość" nie spowoduje jej otwarcia, poniższe łącze skopiuj do paska adresu w przeglądarce internetowej.
https://secureemail.stewart.com/?servlet_name=m&zpurl=https%3A%2F%2Fprod-zix.stewart.com%2Fs%2Fe&m=ABAOw4VxF8UF5W0gersLc0Dp&

APP. 295

em=erik%40solsticerecovery%2ecom

Chcesz, aby sposób wysyłania i odbierania Twoich bezpiecznych wiadomości był przejrzysty?
Kliknij tutaj, aby dowiedzieć się więcej.

---

## E-mail securizat nou, din partea Stewart

---

Vă mulțumim că ați ales Stewart. Ca parte a angajamentului nostru de a vă proteja confidențialitatea, v-am trimis un e-mail securizat, dezvoltat cu tehnologie ZixCorp. Pentru a vă accesa mesajul, faceți clic pe butonul Open Message (Deschidere mesaj) de mai jos.

Deschidere Mesaj

**Nu răspundeți la acest mesaj de notificare; acest mesaj a fost generat automat de către sistemul de securitate al expeditorului. Pentru a trimite un răspuns expeditorului, faceți clic pe Deschidere mesaj.**

Acest mesaj securizat expiră la data de Mar 29, 2016 @ 07:43 PM (GMT).

Dacă nu puteți accesa mesajul făcând clic pe Deschidere mesaj, copiați și lipiți link-ul de mai jos în bara pentru adresă a browser-ului dvs. de internet.
https://secureemail.stewart.com/?servlet_name=m&zpurl=https%3A%2F%2Fprod-zix.stewart.com%2Fs%2Fe&m=ABAOw4VxF8UF5W0gersLc0Dp&
em=erik%40solsticerecovery%2ecom

Doriți să trimiteți și să primiți mesajele dvs. securizate în mod transparent?
Faceți clic aici pentru informații suplimentare.

---

## Nová zabezpečená e-mailová zpráva od společnosti Stewart

---

Děkujeme Vám, že jste si vybrali společnost Stewart. V rámci našeho závazku k ochraně Vašeho soukromí jsme Vám zaslali zabezpečenou zprávu, využívající technologii ZixCorp. Chcete-li načíst svou zprávu, jednoduše klikněte na tlačítko Open Message (Otevřít zprávu).

APP. 296
NH-00488174

Otevřít zprávu

**Neodpovídejte na tuto zprávu; tato zpráva byla generována automaticky bezpečnostním systémem odesílatele. Chcete-li odpovědět odesílateli, klikněte na tlačítko Otevřít zprávu.**

Platnost zabezpečené zprávy vyprší Mar 29, 2016 @ 07:43 PM (GMT).

Pokud se Vám kliknutím na tlačítko Otevřít zprávu nepodaří zprávu otevřít, zkopírujte a vložte následující odkaz do adresové řádky Vašeho internetového prohlížeče. https://secureemail.stewart.com/?servlet_name=m&zpurl=https%3A%2F%2Fprod-zix.stewart.com%2Fs%2Fe&m=ABAOw4VxF8UF5W0gersLc0Dp& em=erik%40solsticerecovery%2ecom

Chcete odesílat a přijímat zabezpečené zprávy transparentně? Klikněte zde pro další informace.

APP. 297
NH-00488175

**From:** Jeremy Rossel
**To:** Percy Gomez; Melanie Stark; Derrell Hughes
**Sent:** 12/11/2015 12:44:25 PM
**Subject:** Re: Eric Bugen - Adar Group

Let's move to $150k please.  Amir just texted me on this topic.

Sent from my iPhone

On Dec 11, 2015, at 10:16 AM, Jeremy Rossel <jrossel@next-health.us> wrote:

Derrel - see below.  Total commission is $100k (essentially $75k advance)

Percy - can you make sure we get the receivable on the books

Sent from my iPhone

Begin forwarded message:

**From:** Amir Mortazavi <amortazavi@next-health.us>
**Date:** December 11, 2015 at 10:10:53 AM CST
**To:** Jeremy Rossel <jrossel@next-health.us>
**Subject: Re: Eric Bugen**

Spoke to him let's advance him $100k total for this month and watch billings catch up

Regards,

Amir Darius Mortazavi
Chief Commercial Officer
Next Health
5710 LBJ Freeway #300
Dallas Texas 75240

(210) 386-3152 Direct

Sent From Amir's iPhone

On Dec 11, 2015, at 4:16 AM, Jeremy Rossel <jrossel@next-health.us> wrote:

Amir-

As a follow up to our conversation - can you call Eric and make him comfortable.  With United healthcare still not paying - his actual commissions this month will be $25k.  As you know we have started to bill uhc substance abuse through Medicus but we won't see meaningful collections until January.  Last month commissions were reflective of the last of the uhc payments we got before they turned us off.

EXHIBIT 15

Witness: J. Rossel

11/3/23        M.A.

APP. 298   NH00234991

I would be comfortable advancing him what he needs.

Sent from my iPhone

CONFIDENTIAL



6710 LBJ Freeway
Suite 100
Dallas, TX 75240
nexthealthusa.com

May 16, 2016

Erik Bugen
6408 Canon Wren Drive
Austin, Texas 78746

Effective date: April 13, 2016

Next Health LLC hereby agrees to release any filed liens that may exist on the below
properties:

- 8101 Vailview Cove Austin TX 78750
- 100 Box Canyon Road Wimberley, Texas 78676
- 9203 Quail Field Dr Austin, Texas 78758

Next Health LLC

By:

Name:      Jeremy Rossel

Its:         Chief Financial Officer/Treasurer



CONFIDENTIAL

APP. 300 NH000056955

| | |
|---|---|
| **From:** | Ellen Gray |
| **To:** | Jeremy Rossel |
| **Sent:** | 9/27/2016 5:25:10 PM |
| **Subject:** | FW: Meds Direct Rx, LLC Invoice (instead of LLC RX) |
| **Attachments:** | Pharma Holdings invoice .pdf |

Jeremy – this invoice is for Meds Direct RX instead of LLC RX.  Description is the same.  Your father is requesting payment.  Do you want me to send this to Josh I. for approval?

Thanks,
Ellen

**From:** Cary Rossel
**Sent:** Tuesday, September 27, 2016 5:13 PM
**To:** Ellen Gray <egray@next-health.us>
**Subject:** Meds Direct Rx, LLC Invoice

Ellen:

Please process the attached invoice from Meds Direct Rx, LLC for immediate payment.

Thanks.

Cary

Cary Rossel
(214) 697-7262

CONFIDENTIALITY NOTICE: The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

CONFIDENTIALITY NOTICE: The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.



EXHIBIT 21
Witness: J. Rossel
11/3/23          M.A.

 Meds Direct Rx, Inc.
882 3rd Ave
10th Floor Suite 1000
Brooklyn, NY 11232

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/27/2016 | 201708 |

| Bill To |
|---------|
| Pharma Holdings US<br>5710 LBJ Freeway, Suite 300<br>Dallas, TX 75240 |

**Wiring Instructions**

**Meds Direct Rx, Inc.**

**TD Bank, N.A.**
**Routing Number:  026013673**
**Account Number:  4332520158**

| Description | Amount |
|-------------|--------|
| Advertising, Marketing, Promotion and Consulting | 131,000.00 |
| | |
| **Total** | **$131,000.00** |

APP 502 MDRX-0217798

| | |
|---|---|
| **From:** | Jeremy Rossel </O=OEXCH080/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EA68DC6C16CD42FB8DD2331A20FD5632-JROSSEL@NEXTHEA> |
| **To:** | Ellen Gray |
| **Sent:** | 10/3/2016 1:21:57 PM |
| **Subject:** | Fwd: 3 invoices to pay |
| **Attachments:** | 3254_001.pdf; ATT00001.htm; ATT00002.htm; ATT00003.htm; Inv_201709_from_Meds_Direct_Rx_Inc._4148.pdf; Pharma Holdings invoice .pdf |

I approve.  Please pay today. Thank you.

Sent from my iPhone

Begin forwarded message:

**From:** Ellen Gray <egray@next-health.us>
**Date:** October 3, 2016 at 1:14:54 PM CDT
**To:** Jeremy Rossel <jrossel@next-health.us>
**Subject: 3 invoices to pay**

Jeremy,
Please approve payment of these 3 invoices totaling $170,714.95 to Meds Direct RX LLC.

Thanks,
Ellen

-----Original Message-----
From: Jeremy Rossel
Sent: Monday, October 03, 2016 12:54 PM
To: Ellen Gray <egray@next-health.us>
Subject: LLC RX 3

CONFIDENTIALITY NOTICE: The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

CONFIDENTIALITY NOTICE: The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.



**EXHIBIT 22**

Witness: J. Rossel

11/3/23    M.A.

APPX001409

 Meds Direct Rx, Inc.
882 3rd Ave
10th Floor Suite 1000
Brooklyn, NY 11232

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/28/2016 | 201709 |

**Bill To**

Pharma Holdings US
5710 LBJ Freeway, Suite 300
Dallas, TX 75240

**Wiring Instructions**

**Meds Direct Rx, Inc.**

**TD Bank, N.A.**
**Routing Number:  026013673**
**Account Number:  4332520158**

| Description | Amount |
|------------|--------|
| Advertising, Marketing, Promotion and Consulting | 36,000.00 |
| | |
| **Total** | $36,000.00 |

APP. 304    NH 01471410

 Meds Direct Rx, Inc.
882 3rd Ave
10th Floor Suite 1000
Brooklyn, NY 11232

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/19/2016 | 201707 |

| Bill To |
|---------|
| Pharma Holdings US<br>5710 LBJ Freeway, Suite 300<br>Dallas, TX 75240 |

**Wiring Instructions**

**Meds Direct Rx, Inc.**

**TD Bank, N.A.**
**Routing Number:  026013673**
**Account Number:  4332520158**

| Description | Amount |
|-------------|--------|
| Advertising, Marketing, Promotion and Consulting | 3,714.95 |
| **Total** | **$3,714.95** |

CONFIDENTIAL



Meds Direct Rx, Inc.
882 3rd Ave
10th Floor Suite 1000
Brooklyn, NY 11232

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/27/2016 | 201708 |

| Bill To |
|---------|
| Pharma Holdings US<br>5710 LBJ Freeway, Suite 300<br>Dallas, TX 75240 |

**Wiring Instructions**

**Meds Direct Rx, Inc.**

**TD Bank, N.A.**
**Routing Number: 026013673**
**Account Number: 4332520158**

| Description | Amount |
|-------------|--------|
| Advertising, Marketing, Promotion and Consulting | 131,000.00 |
| | |
| **Total** | **$131,000.00** |

APP. 306 NH 06471412

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED HEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE COMPANY, | § § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § § | |
| NEXT HEALTH LLC, UNITED TOXICOLOGY LLC, MEDICUS LABORATORIES LLC, US TOXICOLOGY LLC, AMERICAN LABORATORIES GROUP LLC, ERIK BUGEN, KIRK ZAJAC, EXECUTIVE HEALTHCARE LLC, APEX PHARMA LLC, DALLASITE, INC. TOTAL PHARMA LLC, TRUE LABS LLC, ANDREW HILLMAN, SEMYON NAROSOV, JEREMY ROSSEL, ROB CLOSE, AMIR MORTAZAVI, MIKE AUSTIN, NICK AUSTIN, CARY ROSSEL, JEN SEARS, ALLE BYESEDA, JOSH IHDE, JOSH DANIEL, ARVIN ZEINALI, YAN NAROSOV, and PIONEER LABORATORIES LLC. | § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 3:17-CV-243-E-BT |
| *Defendants*. | § § | |

JEREMY ROSSEL'S FIRST AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR ADMISSION TO DEFENDANT JEREMY ROSSEL

**TO:**   Plaintiffs United Healthcare Services, Inc., United Healthcare Insurance Company, by and through their attorneys of record, Scott P. Kerew, Sinton Scott Minock & Kerew, 113 Alderwood Hill NE, Atlanta, Georgia 30328; Adam J. Sinton, Sinton Scott Minock & Kerew, 1525 Raleigh Street, Denver, Colorado 80204; and Andrew J. Jubinsky, Figari + Davenport, LLP, 901 Main Street, Suite 3400, Dallas, Texas 75202-3796.

JEREMY ROSSEL'S FIRST AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR ADMISSION TO DEFENDANT JEREMY ROSSEL                    **Page 1**
D/1032842v1

APP. 307

## OBJECTIONS TO DEFINITIONS & INSTRUCTIONS

Defendant objects to the Instructions that preface Plaintiffs' discovery requests as they require Defendant to respond to interrogatories in a particular manner and with information that is beyond that required by FRCP 33, and thus is beyond the scope of permissible discovery. Specifically, Plaintiffs' "Instructions," unnumbered paragraphs 3, 5, and 6 contain instructions that are not part of FRCP 33.

The Parties have agreed that the terms "You" and "Your" will be defined as Jeremy Rossel.

Defendant specifically objects to **paragraph 2** of Plaintiffs' Definitions on the grounds that Plaintiff's defined term of "**Next Health**" is ambiguous, overbroad, and seeks information and materials that are irrelevant, as it includes in the definition potentially numerous separate, although related entities, as well as innumerable individuals. Thus, Defendant is forced to guess as what information is being requested. Plaintiffs have requested that Defendant further define Next Health. Defendant agrees that the term "Next Health" will be defined as the following entities for purposes of responding:

Next Health, LLC, and those entities that were wholly owned by Next Health, LLC and/or that it held an interest in, and which it oversaw and managed.

All responses are made with incorporation of the agreed or proposed Definitions and subject to the Objections to Instructions.

## OBJECTIONS AND RESPONSES TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**          Identify your role(s) and/or title(s) at Next Health, and for each role or title, identify your start and end dates, job duties and responsibilities, who reported to you, and to whom you reported.

**RESPONSE:**   From September 2013 to approximately February 2015, I held the title of Chief Financial Officer of Forge Health System, LLC.  My role was to establish systems and processes for accounting, payroll, treasury, and tax and to work with clinical employees in establishing information systems and certain other back office functions.  I reported to Mike Austin and the two majority owners Andrew Hillman and Semyon Narosov.  Reports directly to me included accounting personnel.

I held the title of Chief Financial Officer of Next Health, LLC from approximately January 2015 until February 2017.  My role was to establish systems and processes for accounting, payroll, treasury, and tax.  I reported to Mike Austin and the two majority owners Hillman and Narosov.  I also assisted with certain day to day information technology matters such as establishing a company intranet and working with the Chief Information Officer on system enhancements and personnel management.  Reports directly to me included accounting, tax, accounts payable and purchasing, and information technology personnel.

I verbally resigned in August 2016 as I did not have actual authority over financial matters, which was instead controlled by Hillman and Narosov. I agreed to stay in my role through year-end.  In September 2016, I agreed to serve on the Next Health, LLC Board.  In February 2017, I resigned all positions and left the Company on March 7, 2017.

**INTERROGATORY NO. 2:**          Describe your role as Next Health's Chief Financial Officer including: a list of all personnel you oversaw or managed, either directly or indirectly; all external providers of billing services, accounting services, or other financial services; and your role in overseeing the finances of Next Health's subsidiaries.

**RESPONSE:**   Plaintiffs have agreed this Interrogatory will be restated as "Describe your role as Next Health's Chief Financial Officer from 2014-2017 including: a list of all personnel you oversaw or managed, either directly or indirectly; all external providers of billing services, account services, or other financial services; and your role in overseeing the finances of Next Health's subsidiaries."

Defendant objects to this interrogatory as vague and overbroad as to the word "Describe" defined in paragraph X of Plaintiffs' Definitions on the grounds that Plaintiffs' defined term "Describe" adds an instruction, rather than a definition, regarding what to do if asked to describe a process, which appears to attempt to include several interrogatory subparts into a definition. This goes beyond the scope of FRCP 26 and 33. Accordingly, Jeremy Rossel will use the common and ordinary meaning of describe from the Merriam-Webster dictionary: to represent or give an account of in words.

**COMES NOW**, Defendant Jeremy Rossel ("Defendant"), one of the Defendants in the above Defendants in the above-entitled and numbered cause, and pursuant to Fed.R.Civ.P. 26, 33, and 36, hereby submits the following First Amended Objections and Responses to Plaintiffs' First Set of Interrogatories and Requests for Admission to Defendant Jeremy Rossel.

Respectfully Submitted,

**COOPER & SCULLY, P.C.**


BY:    *JOHN A. SCULLY*
    **JOHN A. SCULLY**
    Texas State Bar No. 17936500
    john.scully@cooperscully.com
    **NISHA P. BYERS**
    Texas State Bar No. 00791460
    nisha.byers@cooperscully.com

900 Jackson Street, Suite 900
Dallas, TX 75202
Phone: 214-712-9500
Facsimile: 214-712-9540

**ATTORNEYS FOR DEFENDANTS
CARY ROSSEL AND JEREMY ROSSEL**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document has been served on all counsel of record via email on the 15th day of March, 2021.

*/s/ Nisha P. Byers*
Nisha P. Byers

Defendant objects to the request for all personnel that were overseen or managed, directly or indirectly, as overbroad, not limited to a relevant time or scope, and seeks information which is not relevant and/or is not reasonably calculated to lead to the discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1) and 34(b).  Defendant also objects to a request for all external providers of billing services, accounting services, or other financial services as overbroad, not limited to a relevant time or scope, and seeks information which is not relevant and/or is not reasonably calculated to lead to the discovery of admissible evidence.  Fed. R. Civ. P. 26(b)(1) and 34(b). Defendant provides the following information to the best of his ability given the objectionable request.

Beginning in 2015, my role as the Chief Financial Officer of Next Health, LLC was to establish systems and processes for accounting, payroll, treasury, and tax and assist with certain information technology matters.  Initially, as instructed by Hillman, Narosov, and Mike Austin, I led the partnership roll-up and exchange of ownership to form the legal structure of Next Health, LLC and its subsidiaries, which included working with outside legal counsel and a third party valuation firm.   Next Health, LLC's businesses included laboratories, pharmacies, surgical implant distributors, physician groups, and a surgical hospital, all of which were operating under the direction of Hillman and Narosov prior to the formation of Next Health, LLC.  I established accounting, tax, treasury, and information technology functions post the formation of Next Health, LLC.  I managed the completion of a financial audit of the consolidated Next Health organization and assisted in the restructuring of debt obligations, including consolidating loans and securing a new credit facility for Next Health.

I do not recall the names of all personnel I oversaw or managed, or all external providers of billing, accounting, and financial services.  I do recall that I oversaw Darrel Huges, Melanie Stark, Percy Gomez, and Ellen Gray, and their reports.  I also recall the following:

External billing services: Synergy (lab and hospital billing) and Surgical Notes (hospital transcription and coding).
Accounting Services:  BDO USA LLP (financial auditor), UHY LLC (predecessor financial auditor for implants business).
Other Financial Services: Frost Bank, BB&T Bank, Henderson Wilson Edwards LLP (tax), Montgomery Coscia Greilich LLP (tax), BVA Group (Valuation), Meadowlark Advisors (restructuring).

My team and I were responsible for the accounting of financial transactions in accordance with generally accepted accounting principals for Next Health, LLC and its subsidiaries.  We recorded cash receipts/payments and prepared and issued payments related to customary obligations of companies, including accounts payable, distributions, and tax payments.   We interacted with external tax providers for the preparation and filing of tax returns.  While I was responsible for the bookkeeping of financial transactions, I did not have actual authority over Next Health's billing, investment, and purchasing decisions. Those decisions were controlled by Hillman and Narosov.

**INTERROGATORY NO. 3:**        Describe your involvement in the lab consolidation plan intended to reorganize high-volume referral sources.

**RESPONSE:**  Defendant objects to this interrogatory as vague and overbroad as to the word "Describe" defined in paragraph X of Plaintiffs' Definitions on the grounds that Plaintiffs' defined term "Describe" adds an instruction, rather than a definition, regarding what to do if asked to describe a process, which appears to attempt to include several interrogatory subparts into a definition. This goes beyond the scope of FRCP 26 and 33. Accordingly, Jeremy Rossel will use the common and ordinary meaning of describe from the Merriam-Webster dictionary: to represent or give an account of in words.

Defendant objects to the vague term of "lab consolidation plan." Defendant provides the following information to the best of his ability given the objectionable request.

I do not know what "lab consolidation plan" is being referenced.  In my role, the accounting department would be notified of partnership changes in order to properly account for such changes in accounting and tax records.

**INTERROGATORY NO. 4:**        Describe your role in determining which Next Health Laboratory Affiliate would conduct and/or bill United for Laboratory Services.

**RESPONSE:**  Defendant objects to this interrogatory as vague and overbroad as to the word "Describe" defined in paragraph X of Plaintiffs' Definitions on the grounds that Plaintiffs' defined term "Describe" adds an instruction, rather than a definition, regarding what to do if asked to describe a process, which appears to attempt to include several interrogatory subparts into a definition. This goes beyond the scope of FRCP 26 and 33. Accordingly, Jeremy Rossel will use the common and ordinary meaning of describe from the Merriam-Webster dictionary: to represent or give an account of in words.

I was not involved in determining laboratory billing decisions.  To the best of my knowledge, laboratory billing decisions were directed by Hillman. Laboratory billing practices were established prior to my involvement with Next Health.  I did not oversee or direct laboratory billing during my tenure at Next Health.

**INTERROGATORY NO. 5:**        Describe your knowledge of Next Health's utilization of Medicus Laboratories LLC, either directly or through a billing company, for claims submitted for substance abuse lab services.

**RESPONSE:**  Defendant objects to this interrogatory as vague and overbroad as to the word "Describe" defined in paragraph X of Plaintiffs' Definitions on the grounds that Plaintiffs' defined term "Describe" adds an instruction, rather than a definition, regarding what to do if asked to describe a process, which appears to attempt to include several interrogatory subparts into a definition. This goes beyond the scope of FRCP 26 and 33. Accordingly, Jeremy Rossel will use the common and ordinary meaning of describe from the Merriam-Webster dictionary: to represent or give an account of in words.

**JEREMY ROSSEL'S FIRST AMENDED OBJECTIONS AND RESPONSES TO**
**PLAINTIFFS' FIRST SET OF INTERROGATORIES AND**
**REQUESTS FOR ADMISSION TO DEFENDANT JEREMY ROSSEL**                **Page 6**
D/1032842v1

I was not involved in the establishment of Next Health's utilization of Medicus Laboratories LLC. To my recollection, utilization of Medicus Laboratories LLC for substance abuse lab services was done in accordance with existing contractual arrangements among the companies.

**INTERROGATORY NO. 6:**     Describe the development and purpose of a "fixed fee" model for compensating addiction treatment facility owners.

**RESPONSE:** The Plaintiffs have agreed this Interrogatory will be restated as "Describe the development and purpose of Next Health's fixed fee model that it used for compensating addition treatment facility owners."

Defendant objects to this interrogatory as vague and overbroad as to the word "Describe" defined in paragraph X of Plaintiffs' Definitions on the grounds that Plaintiffs' defined term "Describe" adds an instruction, rather than a definition, regarding what to do if asked to describe a process, which appears to attempt to include several interrogatory subparts into a definition. This goes beyond the scope of FRCP 26 and 33. Accordingly, Jeremy Rossel will use the common and ordinary meaning of describe from the Merriam-Webster dictionary: to represent or give an account of in words.

To the best of my recollection some Next Health affiliated labs entered into third party marketing agreements that provided for marketing payments. To the best of my recollection, these agreements were reviewed by outside legal counsel and internal compliance personnel.

**INTERROGATORY NO. 7:**     Describe your relationship with Erik Bugen and the ADAR Group, including but not limited to your involvement and/or knowledge of Next Health loaning money to Erik Bugen, and your understanding of why Erik Bugen's 8101 Valview Cove facility aimed to house individuals with United Healthcare insurance plans.

**RESPONSE:** Defendant objects to this interrogatory as vague and overbroad as to the word "Describe" defined in paragraph X of Plaintiffs' Definitions on the grounds that Plaintiffs' defined term "Describe" adds an instruction, rather than a definition, regarding what to do if asked to describe a process, which appears to attempt to include several interrogatory subparts into a definition. This goes beyond the scope of FRCP 26 and 33. Accordingly, Jeremy Rossel will use the common and ordinary meaning of describe from the Merriam-Webster dictionary: to represent or give an account of in words.

I did not have a relationship with Erik Bugen and the ADAR group. I met Erik Bugen briefly once at the Next Health Dallas office. Otherwise, my interactions with Bugen were primarily via email related to contractual obligations.

I understood Bugen and the ADAR Group ran sober living homes. I have no knowledge of the ADAR Group operations and demographics of the sober living home residents. I was instructed by Mike Austin to have Next Health, LLC loan Bugen funds for the purchase of properties that I understood were intended to be used as sober living facilities. I worked with an outside law firm to prepare commercially reasonable loan documents for these transactions and another outside law firm to review those documents for compliance with healthcare regulations.

APP. 313

## RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**     Admit that you held ownership interest in Next Health.

**RESPONSE**:  Admitted.

**REQUEST FOR ADMISSION NO. 2:**     Admit that you were Next Health's Chief Financial Officer.

**RESPONSE**: Jeremy Rossel cannot truthfully admit or deny this request as phrased.  Jeremy Rossel admits that he held the title of Next Health Chief Financial Officer from January 2015-February 2017.  Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 3:**     Admit that Cary Rossel is your father.

**RESPONSE**:  Admitted

**REQUEST FOR ADMISSION NO. 4:**     Admit that Semyon Narosov is your brother-in-law.

**RESPONSE**:  Jeremy Rossel cannot truthfully admit or deny this request as phrased.  Jeremy Rossel admits that Semyon Narosov was his brother-in-law from October 2012 until August 2020.  Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 5:**     Admit you oversaw Next Health's accountants and finance personnel including but not limited to: Darrel Hughes, Melanie Stark, Percy Gomez, Ellen Gray, and Corban Milam.

**RESPONSE**:  Jeremy Rossel cannot truthfully admit or deny this request as phrased.  During January 2015 to February 2017, Jeremy Rossel oversaw the accounting work of Darrel Huges, Melanie Stark, Percy Gomez and Ellen Gray.  Jeremy also worked with Corban Milam, and was listed as his manager, but Corban Milam routinely interacted with and took instruction directly from Hillman. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 6:**     Admit that you approved investment distributions to physicians.

**RESPONSE**:  Jeremy Rossel cannot truthfully admit or deny this request as phrased. In response to this request, Jeremy Rossel states that he approved distributions to partnership owners as defined in and in accordance with Company Agreements and ownership percentages. Partnership owners may or may not be physicians. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 7:**     Admit that you wrote off or approved of the writing off of patient account balances.

APP. 314

**RESPONSE**:   Jeremy Rossel cannot truthfully admit or deny this request as phrased.  In response to this request, Jeremy Rossel states that he was responsible for the accounting of financial transactions in accordance with generally accepted accounting principles in the United States (US GAAP).  US GAAP requires stating all receivables (including both insurance and patient receivables) at fair value, which approximates expected future cash collections typically based on historical collection trends. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 8:**   Admit you were aware of Next Health's policy of ignoring patients' payment responsibilities, sometimes referred to as a "zero pay" policy.

**RESPONSE**:   Defendant objects to this request as vague and argumentative.  Jeremy Rossel cannot truthfully admit or deny this request as phrased.  In response to this request, Jeremy Rossel states that to the best of his recollection, laboratory billing practices were established prior to his involvement with Next Health with oversight from outside legal counsel and compliance personnel.  Jeremey Rossel admits that Next Health did not use collection agencies to collect patient payment responsibilities.  Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 9:**   Admit that you paid Erik Bugen a $150,000.00 advance on behalf of Next Health in anticipation of Laboratory Service Referrals to Next Health Affiliates.

**RESPONSE**:   Defendant objects to this request as vague as to date and purpose of the referenced payment. Jeremy Rossel lacks knowledge or information to answer this request, has made reasonable inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny this request.

**REQUEST FOR ADMISSION NO. 10:**   Admit that you assisted Erik Bugen and the ADAR Group in obtaining three separate properties in and around Austin, Texas.

**RESPONSE**:   Defendant objects to this request as vague as to the meaning of the phrase "assisted Eric Bugen and the ADAR Group," as "assisted" is not specific and can encompass a variety of actions. Jeremy Rossel will interpret "assisted" as "had involvement with."

Jeremy Rossel cannot truthfully admit or deny this request as phrased. In response to this request, Jeremy Rossel states that as instructed by Mike Austin, he worked with outside legal counsel to document loans made by Next Health, LLC to Erik Bugen for the purchase of sober living homes. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 11:**   Admit that you did due diligence and title research regarding the properties that Erik Bugen purchased for the ADAR Group.

**RESPONSE**:   Defendant objects to this request as vague as to "the properties," as the property locations are not identified or described in any manner.

Jeremy Rossel cannot truthfully admit or deny this request as phrased. In response to this request, Jeremy Rossel states that he worked with title companies and lawyers in the transactions

APP. 315

and closing of the properties Erik Bugen purchased with loans from Next Health, LLC.  Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 12:**    Admit that on May 16, 2016, you released Erik Bugen from any liens associated with the loans made by Next Health.

**RESPONSE**:  Jeremy Rossel cannot truthfully admit or deny this request as phrased. In response to this request, Jeremy Rossel states that in his role as Chief Financial Officer, and as a result of full repayment of the loans, Jeremy Rossel sent Erik Bugen a lien release letter from Next Health, LLC. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 13:**    Admit that you directed Next Health, either directly or through a billing company, to use Medicus Laboratory LLC's billing credentials to submit Claims to United for substance abuse lab services from December 4, 2015 through January 18, 2016 despite knowing that the claims were for specimens not referred to Medicus Laboratory LLC and for services Medicus Laboratory LLC did not perform.

**RESPONSE**:  Denied.

**REQUEST FOR ADMISSION NO. 14:**    Admit that you directed Next Health, either directly or through a billing company, to use American Laboratory Group LLC ("ALG")'s billing credentials to submit Claims to United from July 2016 through December of 2016 despite knowing the claims were for specimens not referred to ALG and for services ALG did not perform.

**RESPONSE**:  Denied.

**REQUEST FOR ADMISSION NO. 15:**    Admit that you directed Next Health, either directly or through a billing company, to use True Lab LLC's billing credentials to submit Claims to United from August 2016 through January 2017 despite knowing the claims were for specimens not referred to True Labs LLC and for services True Labs LLC did not perform.

**RESPONSE**:  Denied.

**REQUEST FOR ADMISSION NO. 16:**    Admit that you kept, maintained or received volume reports, which tracked Lab Referrals by physician.

**RESPONSE**:  Jeremy Rossel cannot truthfully admit or deny this request as phrased. In response to this request, Jeremy Rossel states that he received volume reports from time to time for accounting purposes. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 17:**    Admit that you approved payments to physicians acting as medical directors for Laboratory Affiliates.

**RESPONSE**:  Jeremy Rossel cannot truthfully admit or deny this request as phrased. In response to this request, Jeremy Rossel states that medical director payments were reviewed by the President of Laboratory Operations and compliance personnel.  Jeremy Rossel's team was

APP. 316

responsible for the accounts payable function, which included operationally making payments for many transactions, including payments owed to Medical Directors. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 18:**   Admit that you approved payments to physicians acting as medical directors for Shell Labs.

**RESPONSE**:  Jeremy Rossel cannot truthfully admit or deny this request as phrased. In response to this request, Jeremy Rossel states that medical director payments were reviewed by the President of Laboratory Operations and compliance personnel.  Jeremy Rossel's team was responsible for the accounts payable function, which included operationally making payments for many transactions, including payments owed to Medical Directors. Except as otherwise admitted, this request is denied.

**REQUEST FOR ADMISSION NO. 19:**   Admit that Next Health did not use collection agencies to collect United Members' payment responsibilities for Laboratory Services.

**RESPONSE**:  Admitted.

**REQUEST FOR ADMISSION NO. 20:**   Admit that you explained to Medical Providers that Next Health did not use collection agencies to collect United Members' payment responsibilities for Laboratory Services.

**RESPONSE**:  Denied.

**REQUEST FOR ADMISSION NO. 21:**   Admit that you reviewed and approved the Apex Pharma billing policy that was sent to Caremark auditors in December of 2014.

**RESPONSE**:  Denied.

**REQUEST FOR ADMISSION NO. 22:**   Admit that Next Health wrote off more than 95% of United members' payment responsibilities for Laboratory Services that were not satisfied by United.

**RESPONSE**:  Jeremy Rossel lacks knowledge or information to answer this request, has made reasonable inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny this request.

APP. 317

## DECLARATION

My name is Jeremy Rossel, my date of birth is November 21, 1974, and my address is 1979 Hathaway Lane, Frisco, Texas, 75036 and USA. I declare under penalty of perjury that I have read the above and foregoing Objections and Responses to Plaintiffs' First Set of Interrogatories to Defendant Jeremy Rossel, and that the statements contained therein are within my personal knowledge and are true and correct.

Executed in Denton County, State of Texas, on the 15th Day of March, 2021.

JEREMY ROSSEL

JEREMY ROSSEL'S FIRST AMENDED OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES AND
REQUESTS FOR ADMISSION TO DEFENDANT JEREMY ROSSEL
D/1032842v1

Page 12

APP. 318

## DECLARATION OF ERIK BUGEN

1.      My name is Erik Bugen. I am over 18 years of age and of competent mind to make this declaration. The facts stated in this declaration are based on my personal knowledge and are true and correct.

2.      In 2015, my former fraternity brothers, Matt and Britt Hawrylak, explained to me that companies were willing to pay money in exchange for requesting lab services and other medical products from those companies. The payments were generally based on a percentage of the payment received by the companies from insurers for performing the services. As a result, the more testing requested from these companies, the more money paid. The Hawrylak's helped me open a clinic in Killeen, Texas, where staff collected urine and saliva specimens from individuals with TRICARE.

3.      Kirk Zajac and I founded the ADAR Foundation (aka "ADAR Group" or "ADAR"), which we used to create and operate a separate set of clinics in Austin and Houston where staff collected urine and saliva specimens from individuals with commercial insurance. The first clinic was opened in about July 2015 and was located at 600 28th St., Suite 105, Austin, TX 78949. In December 2015, we changed locations to 3705 Medical Parkway, Suite 440, Austin, TX 78705. We also established a clinic in Houston, located at 2028 Buffalo Terrace, Houston, TX 77019 on or around October 8, 2015.

4.      I am not a physician and have no medical training. Neither does Kirk Zajac. No physicians ever saw any patients at the above-described clinics. I paid Dr. Sekhar Rao, Dr. Yun Kim, Dr. Vinay Parameswara, and Rita Thomas, FNP to use their signatures and National Provider Identification numbers to order unnecessary laboratory testing and specialty pharmacy products from Next Health. Kirk Zajac paid Dr. Love Nakandi Sozi to use her signature and National

Page 1 of 10

APP. 319

UHC-NonP-025532

Provider Identification number to order unnecessary laboratory testing at the ADAR Houston clinic (i.e., "Wellness & Recovery, LLC"). Patients did not see any doctors prior to obtaining testing, did not receive the results, did not consult with doctors after test results were received (if ever), and did not know the real reason why their samples were taken and sent to Next Health-affiliated laboratories.

5.      Kirk and I worked together to draft advertisements that we posted online to attract individuals with commercial insurance. We offered gift cards to people with commercial insurance in exchange for their urine and saliva specimens. We also offered gift cards to people in exchange for referring other individuals with commercial insurance to our clinics. Kirk purchased a lot of gift cards for this purpose. Kirk bought so many gift cards from Wells Fargo that his bank account was suspended. He opened a new account at ABC Bank in Austin through an entity called Ridgebury Ventures. He purchased gift cards in bulk from a national gift card supply company.

6.      We sent the lab specimens that we collected at these clinics to several different out-of-network labs, but mostly to Next Health. I was introduced to Next Health in 2015 by Abe Hernandez. Abe Hernandez owns an addiction treatment facility in the Austin area. In or around May 2015, Abe and I went to an Austin steakhouse for dinner with Next Health representatives Rob Close, Jen Sears, and Alle Byeseda. During this dinner, we discussed Next Health paying me for specimens that would be sent to Next Health for toxicology testing. They explained to us that Next Health was an out-of-network laboratory with UnitedHealthcare ("United"), but that Next Health would never hold patients financially responsible for testing charges that were not paid for by United. I left dinner with a general agreement with these Next Health representatives that I would collect and send specimens to Next Health in exchange for money.

Page **2** of **10**

CONFIDENTIAL

APP. 320

7.      We signed a contract a few days later.  The contract was written as though medical providers determined whether to collect specimens and where to send specimens for testing, but based on what I told Alle Byeseda, Jen Sears, and Rob Close, Next Health knew that Kirk and I actually controlled the collection of the specimens and that we determined where to send the specimens for testing.  Alle, Jen, and Rob each told us that doctors did not actually need to see patients.

8.      Next Health representatives Jen Sears and Alle Byeseda sent me blank custom protocol set up forms and instructed me to have them signed by Dr. Rao, Dr. Kim, and Dr. Parameswara.  I forwarded the forms to the doctors and instructed them to sign the documents without selecting any tests.  Jen Sears and Alle Byeseda picked the tests to perform or instructed me on what tests to select to maximize payments from commercial insurers, including United.  Jen Sears and Alle Byeseda also told me to submit two specimens per week, per person, to maximize payments from commercial insurers, including United, without drawing United's attention or getting claims denied.  Jen, Alle, and Rob each separately told me multiple times to focus on United members because United paid the most for testing. Jen and Alle continued to provide Kirk and me with instructions on what tests to order to maximize billing and what diagnosis codes to use that would look like they supported the tests.

9.      I began sending urine specimens to Next Health in June 2015.  On July 20, 2015, I approached Rob Close, Next Health's National Sales Director, about loaning me $275,000 to purchase a property that I could operate as a sober home for individuals with commercial insurance, including United insurance, so that I could collect even more urine specimens to send to Next Health for testing.  Rob told me that he would talk with his Next Health partners, but that he needed to know the volume of specimens that I had sent to Next Health to that point.  I said that

Page 3 of 10

APP. 321

UHC-NonP-025534

I had sent 400 specimens from United members and more than 60 DNA samples and that I would continue to send over 400 specimens per month.

10.    On July 24, 2015, Rob Close asked me "Will we get another 400 a month with this new house?" I told Rob that I planned on sending 400-500 specimens per month to Next Health "until the wheels fall off." Rob told me that he presented my plan to Next Health's board of directors and they agreed to loan me $275,000 at 5% interest to use to purchase the property.

11.    On July 27, 2015, I asked about the status of the transaction and Rob told me that it was in the hands of Next Health's Chief Executive Officer, Mike Austin.  Throughout August 2015, I kept Next Health executives, including Mike Austin, Jeremy Rossel, Amir Mortizavi, and Rob Close, informed about my progress towards purchasing the house at 9203 Quail Field Drive by sending emails containing property inspection reports and other information about the property and purchasing process.

12.    On August 28, 2015, I closed on 9203 Quail Field Drive using the $275,000 loan that Next Health gave me.  On August 31, 2015, Rob Close told me to start looking for another property to serve as a collection site for specimens that could be sent to Next Health.

13.    On September 1, 2015, I went to Dallas to meet with Next Health officers and directors the next morning.  On September 2, 2015, Rob Close told me to first meet him at 4300 Westgrove Drive, Addison, TX 75001, a private jet hanger called Millionaire Dallas, to meet with Next Health's owners Semyon Narosov and Andrew Hillman.  Semyon and Andrew told me that I was making everyone a lot of money and to keep it up.  Later that day, I went to Next Health's offices at 5710 Lyndon B. Johnson Freeway and met with more officers and directors, including Amir Mortizavi and Rob Close.  During these meetings, I explained that I would continue to work

APP. 322

CONFIDENTIAL

UHC-NonP-025535

on increasing the number of specimens that I sent to Next Health and would order other unnecessary Next Health products and services, such as specialty pharmacy products, as well.

14.     On September 4, 2015, after the encouragement I received from Next Health's officers and directors, I put $5,000 earnest money down on a second property (8101 Vailview Cove).  I forwarded the email reflecting this transaction to Next Health executives Rob Close, Jeremy Rossel, Mike Austin, and Amir Mortizavi.  I explained that this new property fit the model that we discussed in Dallas (on Wednesday, September 2, 2015) and that I would increase the number of specimens sent to Next Health to more than 1,000 per month by the end of October.  I told them that I was targeting United members (because United was paying the most for the services) and that I would disguise the source of the large volume of referrals by paying another physician to use his credentials to request the services, so that each physician would appear to have referred 500 specimens, instead of one physician with 1,000 referrals.  Rob helped me draft this email in a way that would persuade the Next Health executives to move forward.

15.     In response to my email outlining the plan to more than double the number of specimens I would send to Next Health for unnecessary testing and describing how to disguise the requests for unnecessary lab services from United, Amir Mortazavi, Next Health's Chief Commercial Officer, responded "Sounds great let's push ahead[.]"  Andrew Hillman, a Next Health Director, responded "Exciting sir. Shabat Shalom."  Semyon Narosov, a Next Health Director, responded "Sounds great[.]"  After the weekend, Amir Mortazavi responded again and said, "This looks very promising. I would like to create a system at gauging what we are doing on each deal/facility and compare that to the volume from the anticipated facility. . . . This all pencils for me but I want us all to have a clear picture of how to move forward and do several more deals just like this."

Page **5** of **10**

APP. 323

UHC-NonP-025536

16.    On September 15, 2015, Sirius Laboratories wired me $117,005.08 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

17.    In mid-September I found Dr. Vinay Parameswara and Dr. Yun Kim on indeed.com, a recruiting and hiring website. I told each physician that I would pay them a few thousand dollars per month for them to review toxicology test results. Both physicians agreed to this arrangement and provided me with their billing credentials, including their National Provider Identification numbers and their DEA registration numbers. Both physicians ordered stamps reflecting their signatures and National Provider Identification numbers. On September 21, 2015, I forwarded Dr. Parameswara's acknowledgment of my request to order the stamps to Next Health representatives Jeremy Rossel and Alle Byeseda.

18.    On September 29, 2015, Jeremy Rossel emailed me documents to sign relating to Next Health's loans that I used to purchase 9203 Quail Field Dr. and 8101 Vailview Cove. The agreement set out that Next Health would withhold the greater of 40% of my monthly commission check or $80,000 until the loans were paid off. I wrote back and explained that withholding 40% of my commissions would make it impossible for me to continue to expand operations. I proposed that a flat amount of $50,000 per month be withheld.

19.    On October 15, 2015, Sirius Laboratories wired me $25,294.74 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

20.    In October 2015, United withheld payments from Next Health for several claims and requested supporting medical records for the claims before payment would be released. Supporting medical records for the claims that came from my clinics did not exist, because none of the doctors ever saw any patients and the tests were just ordered so that Next Health and I could make money from them. Jen Sears provided Kirk Zajac and me with a template for fake intake

Page **6** of **10**

APP. 324

UHC-NonP-025537

forms, which came from a California addiction treatment facility that had been audited by insurance companies. She told us that the form "works beautifully" for proof of medical necessity in audits performed by insurance companies. Kirk used Next Health's template and instructions to fabricate records that would make the lab services look legitimate. We were instructed to drop off the forged records at the W Hotel's front desk, in Austin, Texas. Someone from Next Health picked the records up and took them to Dallas. Next Health submitted the forged records to United and, on January 13, 2016, Rob Close told me that United was lifting the payment hold and that I would be receiving a very large check as a result.

21.    On November 16, 2015, Sirius Laboratories wired me $84,607.41 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

22.    In November 2015, four United members who came to an ADAR clinic received what they thought were bills for testing services performed by Next Health. They contacted me because they were assured that they would not be financially responsible for any testing. We were all confused about whether the letter was from UnitedHealthcare or United Toxicology, so I told Alle Byeseda and Jen Sears about this situation. They provided me with a generic letter from Next Health/Sirius Laboratories, which explained to the patients that an "EOB from your insurance company is NOT a bill." However, it turned out that the letter was from United Toxicology, so Alle Byeseda sent these four individuals personalized letters, which clarified that unpaid bills would not be sent to collections. It was difficult, even for Kirk and me, and particularly for ADAR clinic patients, to distinguish between UnitedHealthcare and United Toxicology when we received materials in the mail.

23.    Also in November 2015, Dr. Yun Kim began to complain to me, and to Next Health employees Jen Sears and Alle Byeseda, that he needed to see patients if his information was being

CONFIDENTIAL

used to request tests or write prescriptions.  Jen, Alle, Kirk, and I discussed terminating Dr. Kim because of his insistence on actually seeing patients when his information was being used to order tests. On November 30, 2015, Jen Sears told me that she thought she had Dr. Kim "handled" as far as not seeing any patients, so I should not yet terminate him.  I continued to discuss this with Jen Sears and Alle Byeseda and we eventually decided to terminate Dr. Kim.  On December 10, 2015, I wrote to Dr. Kim and told him that there was no way for physicians to see each patient.  I shared my note to Dr. Kim with Alle Byeseda, Jen Sears, and Rob Close.

24.     On December 1, 2015, I closed on a third property financed by Next Health, 100 Box Canyon Rd., Wimberley, TX 78676, for $625,000.00.  Next Health agreed to finance this purchase in exchange for my continued submission of lab specimens.  I coordinated this purchase through communications with Next Health executives Amir Mortazavi, Jeremy Rossel, and Cary Rossel.  Next Health deducted money from my monthly payments to repay the loans they gave me to purchase the three properties.

25.     On December 15, 2015, Sirius Laboratories wired me $150,000.00 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

26.     On January 15, 2019, Sirius Laboratories wired me $18,328.05 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

27.     On January 19, 2016, Sirius Laboratories wired me $23,809.42 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

28.     On February 16, 2016, Sirius Laboratories wired me $300,000.00 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

29.     On March 15, 2016, Sirius Laboratories wired me $400,000.00 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

Page **8** of **10**

APP. 326

UHC-NonP-025539

30.     Effective April 13, 2016, Next Health released their liens on the three properties that they helped me purchase.

31.     On April 15, 2016, Sirius Laboratories wired me $1,159,160.99 as payment for sending lab specimens to Next Health, many of which resulted in claims billed to United.

32.     On June 9, 2016, CBS News broadcast a story that featured Kirk Zajac and the ADAR Group. Before the story aired, I told Rob Close that an undercover reporter had talked to Kirk and that a news crew had come to the Austin ADAR Group location. I was called to Next Health's headquarters a few days later, where Next Health executives informed me that they had to terminate our relationship because of the news story.

33.     In sum, between June 2015 and May 2016, Next Health paid me more than $2,278,000 in cash and more than $1,000,000 used to purchase three properties, in exchange for sending Next Health requests for unnecessary testing services.

34.     I communicated with many Next Health representatives, including Rob Close, Jen Sears, Alle Byeseda, Amir Mortizavi, Jeremy Rossel, Mike Austin, Semyon Narosov, and Andrew Hillman via email and/or text messages. Communicating over email and text is the way we regularly conducted business. The email and text records I have produced to United are true and correct copies of my communications concerning ADAR and Next Health. These business records were automatically generated at or near the time that the occurrence of the matters set forth in the records took place. I maintained these records in the course of regularly conducted activity and the records were made by the regularly conducted activity as a regular practice. The email addresses that I used were erik.bugen@yahoo.com and erik@solsticerecovery.com. The phone numbers I used were 512-497-2172 and 512-949-1788.

CONFIDENTIAL

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Erik Bugen

Dated: 1/23/1?

APP. 328

CONFIDENTIAL

UHC-NonP-025541

## DECLARATION OF COREY DUDLEY

1.      I, Corey Dudley, am over 18 years of age and of competent mind to make this

declaration. The facts stated in this declaration are based on my personal knowledge and are true

and correct.

2.      In or around February 2012, I started working for Business Partners in Healthcare

("BPIH") after William Baus and Josh Daniel recruited me to the company. I worked in the

billing department and my responsibilities included, among other things, overseeing accounts

receivables and revenue cycle management.  As part of my responsibilities, I managed accounts

receivable and call center staff in India and the United States.  I reported to William Baus.

3.      In or around 2013, a *qui tam* lawsuit was filed against BPIH and certain affiliated

entities, including Medicus Laboratories. As part of the resolution of that lawsuit, Medicus paid

$5 million and entered into a Corporate Integrity Agreement ("CIA") with the United States

government. Once the CIA was in place, approximately one-third of my time was devoted to

ensuring Medicus honored its reporting obligations under the terms of the CIA.

4.      BPIH moved office locations in approximately 2014 from a space on Alpha Road

to a building at 5710 LBJ Freeway in Dallas.  Shortly thereafter, the owners of BPIH, Medicus,

and other affiliated entities, including Andrew Hillman, Semyon Narosov, and Josh Daniel,

created Next Health.

5.      Next Health absorbed the administrative operations of BPIH and other affiliated

entities and acted as a parent company and owner to Medicus and other affiliated entities, such as

U.S. Toxicology and United Toxicology. Next Health owned and operated several different

laboratories. I can't recall which laboratories were actually licensed to perform laboratory

APP. 329

services, but I now know that some laboratories were not licensed to perform any laboratory services.

6.     Around the time that Next Health was created, William Baus left and I became Next Health's Director of Billing Services for laboratory operations. I reported to Nick Austin.

7.     As Next Health's Director of Billing Services, I oversaw Next Health's laboratory billing operations. In this role, I coordinated and communicated with Synergen (Next Health's third-party billing agent) about claim submissions to payors, including UnitedHealthcare ("UHC"). I oversaw patient payment collection policies and dealt with complaints from patients and providers about bills (or EOBs that they thought were bills). I also assisted Next Health executives and sales representatives in extracting and/or creating reports that showed specimen referral volume, payment amounts, and other billing information related to tracking laboratory specimens.

8.     When laboratory specimens were sent to Next Health, accessioning teams sorted the specimens and entered demographic information into LabDaq, a software program. Next Health transmitted claim information to Synergen in HL7 data files that came from Next Health's LabDaq software.

9.     Andrew Hillman and Nick Austin decided which laboratory entity would be used to submit claims to payors, including UHC. I know that their decisions were not based on whether any specific laboratory actually performed any testing services.  Instead, when choosing which Next Health-affiliated laboratory would be listed as the billing entity, Hillman and Austin focused on how best to maximize payment from insurers and/or how to avoid claim denials. Oftentimes, the laboratories they chose had not performed the test.

APP. 330

10.     Hillman, Austin and others would frequently ensure that claims submitted to UHC contained misrepresentations about the Next Health labs.  For example, in 2015 they instructed me to inform Synergen that all Sirius Laboratories tests should be billed to UHC through Medicus Laboratories.  The document attached hereto as Exhibit A (NH-00065524) is a true and correct copy of an email I sent to Synergen relaying this instruction.  Misrepresenting lab information in connection with UHC claims was routine at Next Health.

11.     For example, in or around June 2016, UHC was denying many claims submitted by United Toxicology and U.S. Toxicology.  On June 24, 2016, Nick Austin instructed Synergen to stop submitting claims to UHC through United Toxicology and U.S. Toxicology because Next Health was "working to set up another lab to accession/process/bill through… ."  The document attached hereto as Exhibit B (NH-00017094) is a true and correct copy of an email Nick Austin sent, which I was copied on, along with Andrew Hillman, Semyon Narosov, Mike Austin, and Josh Ihde, where he gave this instruction to Synergen. Approximately three weeks later Nick Austin informed Synergen that Next Health had created a new lab that it would use to bill for "UHC samples," despite the fact that the tests were "going to come through United Toxicology." The document attached as Exhibit C (NH-00017053) is a true and correct copy of an email Nick Austin sent with this direction.  Indeed, Nick Austin instructed Synergen to submit claims to UHC through the new lab regardless of where the specimens were actually referred, or where any services were actually performed.  The new lab was "ALG" (a/k/a American Laboratories Group).

12.     In another example, Josh Ihde and other Next Health leaders wanted to bill Next Health lab claims to UHC through Champion Medical Center – an affiliated hospital in

APP. 331

Louisiana. The document attached hereto as Exhibit D (NH-00064791) is a true and correct copy of an email I sent at the direction of Next Health leadership to implement this plan.

13.     Charges for services were usually set by Andrew Hillman and based on a multiplier of the Medicare fee schedule. Charges were generally set around 15x – 17x the Medicare fee schedule.

14.     In or around 2015, Next Health signed a deal with MultiPlan, which resulted in payors paying a percentage of Next Health's billed charges. Jeremy Rossell ran a financial analysis that showed that the MultiPlan deal would result in higher reimbursements if Next Health increased the amounts it charged for tests. After that, Jeremy Rossell and Andrew Hillman decided to increase the charges for services to around 17x – 26x the Medicare fee schedule.

15.     As Director of Billing Services, I was supposed to manage patient billing issues. At Next Health this did not mean collecting deductibles, coinsurance and copayments from patients. Instead, it meant explaining "Next Health's billing policy" to patients and doctors. Josh Daniel, Nick Austin, Andrew Hillman and others made clear to me that Next Health did not intend to collect deductibles, coinsurance and copayments from patients and they instructed me and my team to make this clear to patients. The document attached as Exhibit E (NH-00061751) is a true and correct copy of an email where a provider representative asked me to "Next Health's billing policy" to a patient so "that their concerns about the bills they [were] receiving from United Toxicology and Medicus Laboratories" would be alleviated. The document attached as Exhibit F (NH-00064878) is a true and correct copy of another email where a provider asked me to work with a patient who wanted written confirmation that he would not owe any money in connection with ALG and True Lab claims. Consistent with "Next Health's

APP. 332

billing policy," the patient was told he did not have to pay anything. The document attached as Exhibit G (NH-00046140) is a true and correct copy of another email exchange where a patient wanted confirmation of a "zero balance notice" received from Next Health. The document attached as Exhibit H (NH-00061094) is a true and correct copy of an email exchange where a cancer patient was upset about a $15,000 bill she received from ALG. Again, per "Next Health's billing policy" this member was told she did not have to pay anything.

16.     The documents attached as Exhibits I (NH-00017153) and J (NH-00016786) are true and correct copies of two example emails that reflect Next Health's policy of routinely writing off claims and not holding patients financially responsible for cost-sharing amounts.

17.     The document attached as Exhibit K (NH-00024301) is a true and correct copy of an email exchange where a provider asked Next Health to cap bills to patients at $100 to avoid angry patients. I remember several of these types of emails from my time at Next Health. Next Health agreed to cap bills for providers, to write off patient balances, and to send bills to doctors instead of patients so the doctors could discard the bills or explain Next Health's billing policy to the patients before the patient got angry.

18.     These are just a few manifestations of Next Health's policy. In all cases, I was instructed by Next Health's owners to forego collection of patient deductibles, copayments and coinsurance.

19.     Next Health never informed UHC that it was not holding UHC members responsible for their deductible, coinsurance and copayment charges.

20.     I helped pull files and medical records when responding to audit requests. I would often see requisition forms that were missing important information (including physician and/or patient signatures). I always told Next Health's compliance officer (Jose Tabuena or Chris

APP. 333

Anderson) about these issues. It was generally known throughout the Next Health offices that some Next Health clients were using stamps of doctor signatures. It was also generally known that Next Health sales staff were pushing doctors to use custom profiles that included all toxicology tests that could be run by Next Health. Doctors were also being pressured to pair codes for screening tests and confirmation tests together so that Next Health could increase its charges.

21.     After Semyon Narasov and Andrew Hillman were indicted in late 2016 and UnitedHealthcare filed a lawsuit in early 2017, everything slowed down at Next Health. I continued to work at Next Health until November 2017. Before I left, Andrew Hillman offered me a raise and "virtual ownership shares" to stay with Next Health (although Next Health may have become Critical Healthcare Management at that point in time). I felt like this was intended to be hush money and I declined the offer.

22.     Jeremy Rossel, son of Cary Rossel, served as CFO of Next Health and ran a team of finance and accounting personnel that Hillman described as the team of people who manage our 300 LLCs during tours of Next Health's building at 5710 LBJ Freeway. Jeremy Rossel and his team were in charge of paying commissions to Next Health's sales staff. They were also responsible for paying "distributions" to Next Health's owners and investors.

~~23.~~     Cary Rossel was an owner in Next Health and several of its related companies. He had various side deals with Hillman and Narosov. He funded shortfalls in payroll for Next Health and he received distributions of company profits. After Hillman and Narosov were indicted, Cary Rossel became the face of Critical Healthcare Management ("CHM") – which was just a rebranding effort in connection with several of Next Health's affiliated LLCs. It was well-

APP. 334

known through Next Health's offices that Cary was made the fact of CHM because "he was cleaner" than Hillman and Narosov.  Cary's daughter Ilana is married to Semyon Narosov.

I declare under penalty of perjury that the foregoing is true and correct.

Corey Dudley

Date: 5/13/19

APP. 335

**<u>Declaration of Kelly Tobin</u>**

1.      My name is Kelly Tobin. My statements in this declaration are based on my personal knowledge gathered during the course of my employment as an insurance investigator during the past 20 years.

2.      UHC made payments to laboratories and pharmacies owned and operated by Next Health LLC based on claims submitted by those laboratories and pharmacies, including during 2015 and 2016.

3.      UHC receives more than two million claims each day. Due to this volume, UHC's employees cannot manually review each claim that is received. The majority of claims UHC receives must be processed via automated means and without human intervention. This is common across the industry.

4.      In order to timely process the volume of claims it receives each day, UHC necessarily relies upon healthcare services providers to submit claims that contain true, accurate, and complete information. This is also common across the industry.

5.      UHC relies upon the information contained in a claim in order to make payment determinations on that claim. The representations in each claim are material to UHC's payment determinations. They affect UHC's determination about whether benefits need to be paid and, if so, the amount of benefits UHC should pay, and to whom UHC should pay those benefits.

6.      UHC would not have paid the Next Health-related claims if it had known that the listed services had not been ordered by a licensed medical provider. UHC would not have paid the Next Health-related claims if it had known that the listed services or prescriptions were ordered by a provider that had a financial interest in the ancillary provider seeking payment for the services or prescriptions. UHC would not have paid the Next Health-related claims for prescriptions if it had known the patients receiving such prescriptions had not paid their co-pay obligations.

I declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.

_____ *Kelly Tobin*_____          Dated:  ___11/15/2023_____
Kelly Tobin

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2018 SEP 24   AM 11: 49

DEPUTY CLERK

UNITED STATES OF AMERICA

v.

SEMYON NAROSOV (02)

3-18CR-475-L

# FACTUAL RESUME

In support of Semyon Narosov's plea of guilty to the offense in Count One of the
Information, Narosov, the defendant, Toby Shook, the defendant's attorney, and the
United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSES

To prove the offense alleged in Count One of the Information charging a violation
of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h), that is, conspiracy to launder monetary
instruments, the government must prove each of the following elements beyond a
reasonable doubt:

*First*:       That the defendant and at least one other person made an agreement to
               launder monetary instruments, specifically, to violate 18 U.S.C. §
               1956(a)(1)(B)(i); and

*Second*:    That the defendant knew the unlawful purpose of the agreement and joined
             in it willfully, that is, with the intent to further the unlawful purpose.

**Factual Resume - Page 1**

STIPULATED FACTS:

Narosov agrees and stipulates that the following facts are true and correct:

1.    Beginning no later than 2014 to in or around July 2018, in the Dallas Division of the Northern District of Texas and elsewhere, Narosov and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to violate Section 1956(a)(1) of Title 18, United States Code.

2.    It was a part and object of the conspiracy that Narosov and others known and unknown, did knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, health care fraud in violation of 18 U.S.C. § 1347, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

3.    During the money laundering conspiracy, Narosov and others known and unknown, acting through the Next Health entities described in the Information, knowingly and willfully executed a scheme or artifice to defraud health care benefit programs as follows:

Factual Resume - Page 2

a. Narosov, aided and abetted by others, submitted, or caused to be submitted, fraudulent claims to private and government health care benefit programs for prescriptions prescribed by physicians who were monetarily induced by illegal kickbacks in the form of "dividends" from investments in pharmacies or payments through marketers;

b. submitted, or caused to be submitted, fraudulent claims to private and government health care benefit programs for prescriptions that were medically unnecessary;

c. submitted, or caused to be submitted, fraudulent claims to private and government health care benefit programs for prescriptions filled with misbranded and/or non-FDA approved drugs by the Next Health entities;

d. submitted, or caused to be submitted, fraudulent claims to private and government health care benefit programs for prescriptions with improperly substituted ingredients/drugs by Next Health-entity pharmacists for the purpose of maximizing profit regardless of what was in the best interest of the patients; and

e. provided documentation and recordings to private and government health care benefit programs falsely claiming that the Next Health entities collected co-pays from patients.

4. As a result of these fraudulent practices, Narosov and others, acting through the Next Health entities, billed private and government health care benefit programs over

Factual Resume - Page 3

$450 million and collected approximately $150 million in fraud proceeds.

5.      Narosov, aided and abetted by others, then used a portion of the criminally derived proceeds to pay the Next Health entities copays on behalf of beneficiaries so the Next Health entities could pass audits and ensure future reimbursement payments.

6.      To disguise and conceal the source of copay payments, Narosov, aided and abetted by others, funneled a portion of the fraud proceeds through a series of shell corporations to charitable organizations, which then paid the copay on prescriptions for beneficiaries without regard to the beneficiaries' ability to pay and often without the beneficiaries' knowledge.

7.      Narosov, aided and abetted by others, also used a portion of the fraud proceeds to purchase gift cards and money orders, which Next Health entity employees then used to pay the copays on behalf of beneficiaries, often through telephone conversations which were recorded.

8.      Narosov, aided and abetted by others, would then present these recorded conversations and the financial records to health care benefit programs during audits as "evidence" that the Next Health pharmacies were collecting copays per contract.

9.      Narosov, aided and abetted by others, also used a portion of the fraud proceeds to pay illegal kickbacks to doctors.

10.      To disguise and conceal the source of the illegal kickbacks, Narosov, aided and abetted by others, did not pay the kickbacks to the doctors directly.    Instead, Narosov, aided and abetted by others, funneled the kickbacks to the doctors through Class G

pharmacies or paid them through marketers.

11.　Narosov further admits the following items seized by law enforcement are proceeds or were derived from proceeds of the offenses detailed in this factual resume, including but not limited to, the following:

a. $116,732.63 seized from Frost Bank Account #XXXX9375;
b. $25,424.63 seized from Frost Bank Account #XXXX0047;
c. $8,737.90 seized from Frost Bank Account #XXXX0390;
d. $13,314.65 seized from Frost Bank Account #XXXX0412;
e. $13,287.77 seized from Frost Bank Account #XXXX3158;
f. $11,471.29 seized from Frost Bank Account #XXXX2507;
g. $30.89 seized from Frost Bank Account #XXXX5436;
h. $755.55 seized from Frost Bank Account #XXXX9480;
i. $267.15 seized from Frost Bank Account #XXXX9979;
j. $2,982.05 seized from Frost Bank Account #XXXX0004;
k. $163.54 seized from Frost Bank Account #XXXX0012;
l. $3,270.72 seized from Frost Bank Account #XXXX0020;
m. $245.00 seized from Frost Bank Account #XXXX0055;
n. $2,221.82 seized from Frost Bank Account #XXXX2902;
o. $973.05 seized from Frost Bank Account #XXXX9352;
p. $476.05 seized from Frost Bank Account #XXXX0369;
q. $109.43 seized from BB&T Bank Account #XXXX5856;
r. $1,046.09 seized from BB&T Bank Account # XXXX5872;
s. $20.01 seized from BB&T Bank Account #XXXX6003;
t. $2,208.12 seized from BB&T Bank Account #XXXX6089;
u. $35,795.64 seized from Banco Popular de Puerto Rico (BPPR) Account #XXXX5457;
v. $22,084.29 seized from BB&T Bank Account #XXXX2218;
w. $5,440.71 seized from BB&T Bank Account #XXXX 5929;
x. $15,182.27 seized from BB&T Bank Account #XXXX5945;
y. $71,101.48 seized from BB&T Bank Account #XXXX5988;
z. $557,726.25 seized from BB&T Bank Account #XXXX6046;
aa. $19,909.02 seized from BB&T Bank Account #XXXX6100;
bb. Sunseeker 62ft Yacht, Hull # XSK02651G304;
cc. 2017 Mercedes Benz, VIN:　WDDXK7JB3HA018067.

12.　This factual resume is not intended to be a complete accounting of all the facts and

**Factual Resume - Page 5**

events related to the offense charged in this case.   The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support Narosov's guilty plea to Count One of the Information.

APP. 342

AGREED TO AND SIGNED on this _____ day of ____ 2018.

_13³ᶜᶜ_____  Sept.

ERIN NEALY COX
UNITED STATES ATTORNEY

_____
ANDREW O. WIRMANI
Assistant United States Attorney

_____
SEMYON NAROSOV
Defendant

_____
TOBY SHOOK
Attorney for Defendant

**Factual Resume - Page 7**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.

VINSON WOODLEE

NO. 3:20-CR-0384-N

## FACTUAL RESUME

In support of Vinson Woodlee's plea of guilty to the offense in Count One of the indictment, Woodlee, the defendant, Scott Thomas, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the indictment charging a violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1)), that is, Conspiracy to Solicit and Receive Kickbacks for Referrals to Federal Health Care Programs, the government must prove each of the following elements beyond a reasonable doubt:[1]

*First.*  That the defendant and at least one other person agreed to commit the crime of Soliciting and Receiving Kickbacks for Referrals to Federal Health Care Programs, as charged in the indictment;

*Second.*  That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

*Third.*  That at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or

---

[1] Fifth Circuit Pattern Jury Instruction 2.15A (5th Cir. 2019).

Factual Resume—Page 1

purpose of the conspiracy.

The elements of Soliciting and Receiving Kickbacks for Referrals to Federal Health Care Programs, in violation of 42 U.S.C. § 1320a-7b(b)(1), are as follows:[2]

First.　　That the defendant solicited and received remuneration, including any kickback, bribe, or rebate;

Second.　That the remuneration was solicited and received in return for referring an individual to Next Health, LLC for the furnishing or arranging for the furnishing of an item;

Third.　　That the item was one for which payment was or might be made, in whole or in part, under a Federal health care program; and

Fourth.　That the defendant acted knowingly and willfully when soliciting and receiving the remuneration.

## STIPULATED FACTS

1.　　　Vinson Woodlee admits and agrees that from at least in or about January 2012 through at least in or about July 2018, in the Northern District of Texas and elsewhere, Woodlee knowingly and willfully conspired, confederated, and agreed with Andrew Hillman, Semyon Narosov, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is, violations of Title 42, United States Code, Sections 1320a-7b(b)(1), by knowingly and willfully asking for and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, for the furnishing of items and services, namely

---

[2] Fifth Circuit Pattern Jury Instruction 2.109A (5th Cir. 2019).

Factual Resume—Page 2

APP. 345

prescriptions, for which payment may be made in whole or in part under a Federal health care program, all in violation of 18 U.S.C. § 371 (42 U.S.C. § 1320a-7b(b)(1)).

2.      Woodlee further admits that it was a purpose and object of the conspiracy for Woodlee and other co-conspirators to unlawfully enrich themselves through the payment, solicitation and receipt of bribes and kickbacks from Next Health in exchange for referring for items and services, namely prescriptions, for which payment was made in whole or in part under a Federal health care program, as defined by 42 U.S.C. § 1320a-7b(f), including TRICARE, CHAMPVA, Medicare, and FECA.

A.    Federal Healthcare Programs

3.      Woodlee agrees that the Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who were over the age of 65 or disabled.

4.      Woodlee agrees that TRICARE was a health care program of the United States Department of Defense Military Health System that provided coverage for DoD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their dependents, and survivors.

5.      Woodlee agrees that CHAMPVA is a health care benefit program that offers insurance coverage, including prescription drug coverage, to family members of veterans who do not qualify for TRICARE.

6.      Woodlee agrees that The Federal Employee Compensation Act ("FECA") was a federally funded health care program as described in 20 C.F.R. § 10.0 that provided

Factual Resume—Page 3

APP. 346

monetary compensation, medical care, and vocational rehabilitation to civilian employees of the United States government, including Postal Service employees, for disability due to personal injury or disease sustained while in the performance of duty.

7.     Woodlee agrees and admits that Medicare, TRICARE, CHAMPVA, and FECA were all "federal health care programs" as defined by 42 U.S.C. § 1320a-7b(f).

**B.     Next Health**

8.     Woodlee agrees that Next Health was a holding company for a hierarchical structure of corporations and other entities that owned and controlled numerous other entities including pharmacies and laboratories that operated in the health care industry. This included Next Health's pharmacies, The Apothecary Shop among others, and their related "parent" company, Pharma Holdings US (PHUS) (hereinafter, collectively, "Next Health"). Next Health began operations in or about 2012.

9.     Woodlee agrees that Next Health's pharmacy operations identified the most profitable prescription medications (i.e., lowest available wholesale cost with highest available reimbursement rates from private and government insurance providers) and then illegally paid physicians and others in exchange for those medications being prescribed through Next Health pharmacies. These very profitable prescriptions included compounding pain and scar creams, pain patches, and wellness supplements.

10.     Woodlee agrees that Next Health tracked each prescription by the prescribing physician, and the individual who recruited the physician, whom Next Health referred to as a "marketer." In most instances, private or government insurance providers paid monies to Next Health for filled prescriptions directly or through pharmacy benefit

Factual Resume—Page 4

managers (PBMs). Woodlee agrees that Next Health would then calculate the net profits (sometimes referred to as profits or net proceeds) for these prescriptions and illegally kickback a percentage of the profits to the prescribing physicians.

11.  Woodlee agrees that Next Health incentivized physicians to maximize prescription referrals and refills for Next Health prescriptions. Woodlee agrees that the scheme led to billing of prescriptions that were not legitimate.

## C.  Woodlee's Involvement in the Scheme

12.  Woodlee agrees and admits that he and his company, Med Left, LLC. ("Med Left") acted as a marketer for Next Health to recruit physicians to the illegal kickback scheme described above. Specifically, Woodlee agrees and admits that he would recruit physicians to write and fill prescriptions at Next Health and, working with Next Health, arrange for the physicians to receive a percentage of the profits that were generated from the physicians' prescription claims filed with federal health insurance and private insurance.

13.  Woodlee agrees that Next Health employed several different methods to disguise its illegal kickbacks to physicians that changed throughout the course of the conspiracy.

### i.  Class A Pharmacies

14.  Woodlee agrees that Next Health agreed to pay kickbacks, and physicians agreed to receive kickbacks through "syndicated" Class A pharmacies. A Class A pharmacy is authorized by the State of Texas to fill and dispense drugs.

Factual Resume—Page 5

15.     Woodlee agrees that Next Health purchased Class A pharmacies and purported to sell ownership interests in those pharmacies to physicians for a nominal fee. Physicians would refer prescriptions to the Class A pharmacies for which they owned shares. The physicians would receive payments from the pharmacies disguised as purported returns on their investments in those pharmacies. Woodlee agrees that these payments were, in fact, kickbacks for the prescription referrals the physicians made to Next Health.

16.     Woodlee agrees and admits that he recruited physicians to participate in the Class A pharmacy scheme in exchange for marketer fees. Woodlee admits that he did so knowing that the scheme was a way for Next Health to pay kickbacks to physicians for prescription referrals.

ii.     **Class G Pharmacies**

17.     Woodlee agrees and admits that Next Health also agreed to pay kickbacks, and physicians agreed to receive kickbacks through "syndicated" Class G pharmacies. A Class G pharmacy is licensed by the State of Texas to process prescriptions and cannot dispense drugs.

18.     Woodlee agrees that Next Health purported to sell ownership interests in Next Health-owned Class G pharmacies to physicians for a nominal fee. Physicians would then refer prescriptions to the Class G pharmacies for which they owned shares. The Class G pharmacies would operate as call centers that purportedly processed the prescriptions by having separate Next Health-owned Class A pharmacies fill the prescriptions. As with the Class A pharmacy scheme, the physicians would receive

Factual Resume—Page 6

payments from the Class G pharmacies disguised as returns on their investments in those pharmacies.

19.     Woodlee agrees that these payments were, in fact, kickbacks for the prescription referrals the physicians made to Next Health. Woodlee understood that this structure allowed Next Health and the physicians to hide the prescribing physicians' ownership interest in the pharmacies because the physicians did not have a direct ownership interest in the Class A pharmacies that filled the prescriptions.

20.     Woodlee agrees and admits that he recruited physicians to participate in the Class G pharmacy scheme in exchange for marketer fees. Woodlee admits that he did so knowing that the scheme was a way for Next Health to pay kickbacks to physicians for prescription referrals.

### iii.     Consulting Agreements

21.     Woodlee agrees and admits that Woodlee and Next Health also agreed to pay kickbacks, and physicians agreed to receive kickbacks, through sham consulting arrangements. Under this scheme, Next Health would pay physicians either directly or funnel payments through Med Left disguised as consulting fees. Next Health paid these consulting fees even though physicians did not provide services pursuant to a consulting agreement. Woodlee agrees and admits that Next Health paid kickbacks through these consulting fees to physicians he recruited to the scheme in exchange for the referral of prescriptions to Next Health.

### iv. Managed Service Organizations ("MSOs")

22.     Woodlee agrees and admits that Next Health also agreed to pay kickbacks, and physicians agreed to receive kickbacks, through Managed Service Organizations ("MSOs"). Under this scheme, Woodlee and other individuals working with Woodlee, created MSO entities that entered into services agreements with Med Left and its pharmacies to purportedly provide a list of services to the Med Left. Next Health would then pay Med Left for purported services provided to Next Health. Med Left would, in turn, pay the MSO entities for the purported services the MSO entities provided to Med Left.

23.     Woodlee agrees and admits that he, along with others, sold ownership interests in the MSOs to physicians. The MSOs would then pay physicians as purported returns on their investments in those pharmacies.

24.     Woodlee agrees and admits, however, that the MSO entities did not provide any services to Med Left. Woodlee agrees and admits that, instead, Woodlee and the physicians used the MSOs to hide payments by Next Health to physicians as kickbacks for the physicians' prescription referrals to Next Health.

25.     Woodlee created several MSO entities for the purpose of paying kickbacks to physicians for their prescription referrals.

26.     Specifically, Woodlee agrees and admits that the following MSO entities and their respective bank accounts: (1) received money from Next Health via Med Left; and (2) were used by Woodlee to pay kickbacks to physicians:

Factual Resume—Page 8