IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED HEALTHCARE | § | |
| SERVICES, INC. and | § | |
| UNITEDHEALTHCARE | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 3:21-cv-1547-L-BT |
| | § | |
| JEREMY ROSSEL, AMIR | § | |
| MORTAZAVI, CARY ROSSEL, | § | |
| ARVIN ZEINALI, YAN NAROSOV, | § | |
| and SEMYON NAROSOV, | § | |
| | § | |
| Defendants. | | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are (i) Defendants Cary Rossel and Jeremy Rossel's (the "Rossel Defendants") Motion for Summary Judgment (ECF No. 679), and (ii) Plaintiffs UnitedHealthcare Services, Inc. and UnitedHealthcare Insurance Company's Motion for Partial Summary Judgment Against Defendants Amir Mortazavi and Arvin Zeinali (ECF No. 681). For the reasons set forth below, the undersigned finds and concludes that Plaintiffs fail to raise a genuine dispute of material fact as to certain of their fraud-based claims against the Rossel Defendants. Therefore, the undersigned recommends that the District Judge **GRANT**, in part, the Rossel Defendants' Motion and **DISMISS** with prejudice Plaintiffs' claims for fraud by nondisclosure and for violations of the Texas

Uniform Fraudulent Transfer Act. The undersigned further recommends that the District Judge decline to make credibility determinations and indulge inferences in Plaintiffs' favor pertaining to Mortazavi and Zeinali's invocation of their Fifth Amendment rights and, thus, the District Judge should **DENY** Plaintiffs' Motion for Partial Summary Judgment Against Mortazavi and Zeinali.

## Background

### A. <u>Procedural History</u>

In late November 2016, the government obtained an indictment against two majority owners of Next Health LLC—Defendants Semyon Narosov and Andrew Hillman—charging them with operating a kickback scheme at Forest Park Medical Center Dallas. *See United States of America v. Alan Andrew Beauchamp, et al.*, No. 3:16-cr-0516 (N.D. Tex). On January 26, 2017, Plaintiffs—a payor of health benefits that administers and insures health and welfare benefit plans—sued Next Health LLC and affiliated entities (collectively, "Next Health") for a variety of claims related to a multi-million-dollar healthcare fraud involving alleged false claims seeking payment for lab tests and prescription medications. *See United Healthcare Services, Inc., et al. v. Next Health, LLC, et al.*, No. 3:17-cv-00243 (N.D. Tex.) (the "Next Health litigation"), Compl., ECF No. 1.

On September 30, 2019, Plaintiffs sought leave to file their First Amended Complaint in the Next Health litigation, adding as individual defendants executives associated with Next Health, including Narosov and Hillman, as well as Cary Rossel, Jeremy Rossel, Amir Mortazavi, Arvin Zeinali, and Yan Narosov

(collectively, the "Executive Defendants"). *Next Health*, No. 3:17-cv-00243, Mot. for Leave to Amend, ECF No. 293. With respect to the Executive Defendants, Plaintiffs sought to add claims for fraud and fraudulent nondisclosure; conspiracy to commit fraud; fraudulent transfers; and violations of 18 U.S.C. § 1962(c). On January 7, 2020, the Court granted Plaintiffs' motion, and Plaintiffs filed their First Amended Complaint. *Next Health*, No. 3:17-cv-00243, First Am. Compl., ECF No. 348.

In July 2021, United States District Judge Ada E. Brown severed Plaintiffs' claims against the Executive Defendants, giving rise to the instant lawsuit. *Next Health*, No. 3:17-cv-00243, Order, ECF No. 613. The Second Amended Complaint filed in the Next Health litigation, *see Next Health*, No. 3:17-cv-00243, ECF No. 584, became the live pleading in this severed action. Following Judge Brown's recusal, the matter was reassigned to United States District Judge Sam A. Lindsay who has referred the matter to the undersigned for pretrial management under 28 U.S.C. § 636(b). *See* ECF Nos. 621, 672.[1]

---

[1] The *Next Health* case was reassigned to United States District Judge Brantley Starr who, in March 2023, granted Plaintiffs' motion for case-ending sanctions against Next Health and its collective of licensed laboratories and pharmacies, struck those parties' pleadings, granted summary judgment against Next Health on Plaintiffs' fraud claims, and granted default judgment for Plaintiffs. *See United Healthcare Servs., Inc. v. Next Health LLC*, 2023 WL 2589237, at *7 (N.D. Tex. Mar. 21, 2023). Judge Starr treated Plaintiffs' summary judgment motion on the fraud claims as unopposed, noting that Next Health provided a one-page, "limited response" which stated only that "[Next Health] has no representatives or employees who can assist or direct any actions of counsel [which] ethically precludes . . . the formation of any substantive response." *United Healthcare Servs., Inc. v. Next Health LLC*, 2023 WL 2589237, at *7 (N.D. Tex. Mar. 21, 2023).

The Rossel Defendants now move for summary judgment as to all Plaintiffs'
claims against them, and Plaintiffs move for partial summary judgment as to their
fraud claims against Defendants Mortazavi and Zeinali. In addition, the Rossel
Defendants, as well as Mortazavi and Zeinali, have filed evidentiary objections.

## B. Facts[2]

### 1. Plaintiffs' Payment of Next Health Claims

Plaintiffs made payments to labs and pharmacies owned and operated by
Next Health LLC based on information in claims submitted to them by Defendants.
UHC000076148,       UHC000076149,       UHC000076150,       UHC000076151,
UHC000076152, UHC000076153, UHC000076154, UHC000489322 (UHC Lab
Claim   Data),   UHC000485731,   UHC000485732,   UHC000485733,
UHC000485734 (UHC Pharma Claim Data) (collectively, "UHC Claim Data").[3]

To timely process the volume of claims Plaintiffs receive, they must rely on
providers to submit claims that contain true, accurate, and complete information.
Tobin Decl. ¶ 4, ECF No. 706-5 at 45.[4] Plaintiffs rely on the information contained

---

On June 27, 2023, Judge Starr entered a final judgment in Plaintiffs' favor against
Next Health for over $120 million. *See Next Health*, 3:17-cv-00243, Final J., ECF
No. 750.

[2] This section sets forth the facts in accordance with the summary judgment
standard summarized *infra*. The recitation of the facts draws from the uncontested
evidence contained in the summary judgment record provided by the parties, and
evidence to which the undersigned has overruled a party's objection.

[3] Plaintiffs have manually filed the UHC Claim Data under seal with the Court per
ECF No. 690.

[4] Citations to the summary judgment record and the parties' briefing refer to the
CM/ECF page number at the top of each page rather than page numbers at the
bottom of each filing. Except where otherwise noted, citations in this Background

in claims to make payment determinations on those claims. *Id.* ¶ 5. The representations in each claim are material to this payment determination because they allow Plaintiffs to determine whether benefits need to be paid, and, if so, the amount of, and to whom, those benefits should be paid. *Id.*

Next Health labs and pharmacies submitted thousands of claims to Plaintiffs for payment. UHC Claim Data (filed manually under seal). Each claim submitted by a Next Health lab represented that the lab services listed therein had been ordered by a licensed medical provider and that the provider chose the listed diagnosis codes that support the services (i.e., their medical necessity). *Id.* The representation in Next Health lab claims that the lab services were ordered by a licensed medical provider is material to Plaintiffs' payment determinations as they would not pay for lab services not ordered by a licensed medical provider. Wilson Dep. 78, ECF No. 706-2 at 147; Tobin Decl. ¶ 6, ECF No. 706-5 at 45.

None of the lab or pharmacy claims Next Health submitted to Plaintiffs disclosed that the referring/prescribing provider had a financial interest in the claim. UHC Claim Data (filed manually under seal). Plaintiffs do not pay for lab services or prescriptions that were ordered by a physician with a financial interest in the ancillary provider billing for those services/prescriptions. Pls.' Resp. to Mortazavi's Second Set of Interrog. 20, ECF No. 706-6 at 42-44; Tobin Decl. ¶ 6,

---

section are to the Appendix to Plaintiffs' Response to Motion for Summary Judgment filed by Defendants Cary Rossel and Jeremy Rossel (ECF No. 706-1 through 706-8) (Pls.' Summ. J. Resp. App.).

ECF No. 706-5 at 45; UHC000492491 (OptumRx 2016 Provider Manual), ECF No. 706-8 at 6. If Plaintiffs knew the lab services or prescriptions listed were induced by kickbacks, they would not have paid the amounts listed in the claims. Wilson Dep. 79, ECF No. 706-2 at 148; Tobin Decl. ¶ 6, ECF No. 706-5 at 45.

By submitting claims to Plaintiffs, Next Health pharmacies—required to collect co-payments from patients—represented that they collected patient co-pays related to the patient and prescription listed in the claims. UHC Pharma Claim Data (filed manually under seal); UHC000492439 (OptumRx 2016 Provider Manual), ECF No. 706-8 at 4. Whether a co-pay for a prescription has been collected from a patient is material because Plaintiffs do not pay pharmacy benefits unless a patient has paid their co-pay. Tobin Decl. ¶¶ 5, 6, ECF No. 706-5 at 45. If Plaintiffs knew that a co-pay had not been collected, they would not have made a payment to the pharmacy submitting the claim. Tobin Decl. ¶ 6, ECF No. 706-5 at 45; Anderson Dep. 63-65, ECF No. 706-2 at 8-10.

### 2. *Next Health and its Founders, Executives, and Marketers*

Next Health LLC began to operate in January 2015. Cary Dep. 61, ECF No. 706-2 at 36. It was the parent company for several licensed subsidiary entities that sought payments, in the form of claims for healthcare benefits, from Plaintiffs, including (a) five licensed laboratory entities: United Toxicology, LLC; US Toxicology, LLC; Medicus Laboratories, LLC; American Laboratories Group, LLC (ALG); and True Labs, LLC, and (b) at least four Class A licensed pharmacies

6

entities. Next Health was also the parent of dozens of shell companies—both syndicated, unlicensed labs and Class G pharmacies—that Next Health and its executives used to disguise kickbacks to physician referral sources by characterizing those kickbacks as distributions on those physicians' investments in the shell companies. S. Narosov Factual Resume ¶¶ 3(a), 10, ECF No. 706-5 at 48, 49; S. Narosov Dep. 25, 30, 32, ECF No. 706-2 at 93-95; Cary Dep. 11, ECF No. 706-2 at 27; Cary Dep. Ex. 1 (NH-00494287) (Legal Entity Org. Chart), ECF No. 706-2 at 157; Jeremy Dep. 65, 196, 251, ECF No. 706-2 at 48, 74, 75; Anderson Dep. 17, ECF No. 706-2 at 3.

Defendant Semyon Narosov was a founder of Next Health and on its Board of Managers. In 2018, Narosov (as well as Andrew Hillman) pleaded guilty to using Next Health to launder money derived from healthcare fraud. *See generally* Plea Agreement, *U.S. v. Semyon Narosov, Andrew Hillman*, No. 3:18-CR-0475-JJZ, 2018 WL 11193541, ECF Nos. 8, 9 (N.D. Tex. Sept. 24, 2018).

Defendant Cary Rossel was a founder of Next Health and a member of its Board of Managers, as well as a part owner of Next Health, a general partner in Next Health subsidiary Pharma Holdings US, and he received distributions for his ownership. Cary 03/15/2021 Resp. to Pls.' Interrog. 1, ECF No. 706-6 at 39; Cary Dep. Ex. 5, ECF No. 706-2 at 158. Cary assisted in creating the organizational structure of Next Health and its subsidiaries. Yan Dep. 24-25, ECF No. 706-2 at 155-56.

Defendant Jeremy Rossel was Next Health's Chief Financial Officer and, starting in August 2016, he was also a member of its Board of Managers. Jeremy 03/15/2021 Resp. to Pls.' Interrog. 1, ECF No. 706-6 at 41; Jeremy Dep. 37, ECF No. 706-2 at 46. Jeremy was a part owner of Next Health and received distributions for his ownership. Cary Dep. Ex. 5, ECF No. 706-2 at 158-86; Jeremy Dep. 43, ECF No. 706-2 at 47. Jeremy was generally responsible for Next Health and its subsidiaries' bookkeeping and payment processing between bank accounts and to third parties. Jeremy Dep. 65, 73, ECF No. 706-2 at 48, 51.

Defendant Amir Mortazavi held the titles of Next Health's Director of Pharmacy, Chief Commercial Officer, and Chief Development Officer. 03/15/2021 Mortazavi Resp. to Interrog. 1, Appendix to Plaintiffs' Motion for Partial Summary Judgment against Defendants Amir Mortazavi and Arvin Zeinali (Pls.' Summ. J. App.), ECF No. 682-3 at 2. Mortazavi held an ownership interest in Next Health through a company called AM Healthcare Holdings, LLC. BVA 01636, ECF No. 682-3 at 110. In addition to salary, he received distributions from Next Health through AM Healthcare Holdings. *See, e.g.*, NH-00222735, ECF No. 682-3 at 144.

Defendant Arvin Zeinali was the director of Next Health's Pharmacy division responsible for managing Next Health pharmacists across multiple locations, and an owner of Next Health through a company called ISM Holdings, LLC. S. Narosov Dep. 190:24-191:4, ECF No. 682-2 at 18; 4/12/2021 Zeinali Resp. to Interrog. 1, ECF No. 682-3 at 3; Zeinali 00000025, ECF No. 682-3 at 196. In addition to salary,

he received distributions from Next Health through ISM Holdings. *See, e.g.*, NH-00222735, ECF No. 682-3 at 144.

Erik Bugen was a Next Health marketer, who founded the Austin Drug and Rehabilitation Foundation (a/k/a "ADAR Group" or "ADAR") with Kirk Zajac, which Bugen used to create and operate a set of clinics in Austin and Houston where staff collected urine and saliva specimens that were tested at Next Health labs. Bugen Decl. ¶ 3, ECF No. 706-5 at 28.

### 3. *The ADAR Group*

Bugen and Zajac paid multiple doctors to use the doctors' signatures and NPI numbers to order laboratory testing from Next Health for samples collected in Austin and Houston. Bugen Decl. ¶¶ 3, 4, ECF No. 706-5 at 28-29. Claims submitted to Plaintiffs by Next Health labs based on tests that were originated by the ADAR Group falsely identified the physicians associated with ADAR as the referring physician that ordered the lab services listed in the claim. UHC Claim Data (filed manually under seal). Patients, however, did not see doctors prior to obtaining testing, did not receive the results, did not consult with doctors after test results were received, and did not know the real reason why their samples were taken and sent to Next Health laboratories. Bugen Decl. ¶ 4, ECF No. 706-5 at 28-29. Next Health executives, including Jeremy Rossel, knew that Bugen was not a medical provider. Jeremy Dep. 113, ECF No. 706-2 at 56.

In June 2015, Bugen began sending Next Health urine specimens so that Next Health could perform lab tests and bill payers for performing those tests.

Bugen Decl. ¶ 9, ECF No. 706-5 at 30-31; Jeremy Dep. 92, ECF No. 706-2 at 55. In August 2015, Bugen communicated with Next Health executives about Next Health helping him purchase a "sober living home" to be used to house people with commercial medical insurance from whom he could collect lab specimens that would be sent to Next Health labs for testing. Bugen Decl. ¶¶ 11-12, ECF No. 706-5 at 31-32. Jeremy Rossel countersigned the documents enabling Bugen to purchase the home and wired Bugen the money for the purchase. Jeremy Dep. Ex. 1 (NH-00684699–NH-00684715) and Ex. 2 (NH-00235880—NH-00235881), ECF No. 706-4 at 12-28, 29-30; Jeremy Dep. 76, 82-83, ECF No. 706-2 at 52-54.

In September 2015, Jeremy met with Bugen in Dallas and, after the meeting, Jeremy wrote to Bugen: "I hope you enjoyed your visit and have a better appreciation of the opportunity we have in front of us." Jeremy Dep. Ex. 3, 706-4 at 31. During the same month, Bugen wrote to Next Health executives, including Jeremy, to persuade Next Health to loan him money to purchase a second sober living home that he would fill with people with commercial medical insurance from whom he would collect lab specimens and send them to Next Health labs. Bugen Decl. ¶¶ 13, 15, ECF No. 706-5 at 31-32; NH-00679720, ECF No. 706-7 at 98.

Bugen e-mailed Jeremy and other Next Health executives, stating that he was putting earnest money down on a property which could hold twenty more patients. Bugen stated that he was "sticking with United clients . . . to keep the model of United clients a little less noticeable by United Healthcare." Jeremy Dep. Ex. 4, ECF No. 706-4 at 32-33; Jeremy Dep. 148-49, ECF No. 706-2 at 66-67.

Next Health arranged to pay the ADAR group commissions of 35% of net income it received from the amounts paid on claims; the commissions to be paid to Bugen were based on the number of tests that the ADAR group referred to Next Health; and the arrangement precluded Bugen from sending samples for testing to other labs. Jeremy Dep. 126-28, 135, 140, 261, ECF No. 706-2 at 58-60, 62, 65, 80. Jeremy facilitated and authorized the payments of commissions to Bugen and the ADAR group. Jeremy Dep. 266-67, ECF No. 706-2 at 81-82.

On September 8, 2015, Jeremy sent the Next Health executives a commission report for the ADAR program that discussed options regarding a second deal with Bugen, based on how much Next Health paid Bugen in the first deal, for sending samples that could be tested at Next Health labs. Jeremy Dep. Ex. 9 (NH-00235785–NH-00235792), ECF No. 706-4 at 34-40; Jeremy Dep. 130, ECF No. 706-2 at 61.

On September 28, 2015, Jeremy e-mailed other Next Health executives concerning the second loan provided to Bugen, noting that both sober living homes would be subject to a trust, with Cary acting as the trustee. Jeremy Dep. Ex. 11 (NH-00088149), ECF No. 706-4 at 41; Jeremy Dep. 137-38, ECF No. 706-2 at 63-64.

In November 2015, Jeremy and Cary were included in discussions concerning the financial importance of Next Health's relationship with Bugen. Jeremy Dep. Ex. 13 (NH-00233747), ECF No. 706-24 at 42-43. Later that month, Jeremy and Cary were copied on the closing documents for one of Bugen's sober homes. Jeremy Dep. Ex. 14, ECF No. 706-5 at 1-6.

In December 2015, Jeremy worked to advance a $150,000 commission to the ADAR group to assist Bugen. Jeremy Dep. Ex. 15 (NH00234991), ECF No. 706-5 at 7-8; Jeremy Dep. 175, 180, ECF No. 706-2 at 70-71; NH-00235295, ECF No. 706-6 at 104. Next Health also purchased a third home for Bugen and ADAR. Bugen Decl. ¶ 24, ECF No. 706-5 at 35. Jeremy testified that he recalls Next Health purchasing three different homes for Bugen and that he "lead the execution of these [loan] transactions." Jeremy Dep. 122, 155, 158, ECF No. 706-2 at 57, 68-69.

Between June 2015 and May 2016, Next Health paid Bugen—in transactions approved by Jeremy—more than $2,278,000 in cash and another $1,000,000 used to purchase three properties, which payments were made in exchange for sending Next Health requests for testing. Bugen Decl. ¶ 33, ECF No. 706-5 at 36.

In May 2016, after Next Health found out that Bugen and ADAR were the subject of a CBS News investigation, Jeremy signed documents on behalf of Next Health releasing Bugen from the liens on the three homes Next Health purchased for him, rather than accelerating the loans. Jeremy Dep. Ex. 16 (NH-00056955), ECF No. 706-5 at 9; Jeremy Dep. 180-81, ECF No. 706-2 at 71-72.

In May 2016, Jeremy's team calculated that, through its relationship with Bugen and ADAR, Next Health had received $14,510,183 in insurance payments; of that, more than $13 million had been paid by Plaintiffs. NH-00213878, ECF No. 706-6 at 103 (e-mail); NH-00213879 (spreadsheet attached to e-mail with "Collection Summary" tab showing calculation of UHC payments) (previously filed manually under seal).

### *4. Kickback-Induced Lab Claims*

Next Health labs submitted thousands of claims to Plaintiffs for lab services referred by physicians who were, directly or indirectly, paid by Next Health to induce those referrals. Graves Report, Ex. 3.1, ECF No. 707-6 at 10 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health) and Ex. 4.1, ECF No. 706-6 at 29 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United"); S. Narosov Dep. 92, ECF No. 706-2 at 105. None of these claims disclosed that the referring physician was paid by Next Health to induce the lab order. UHC Lab Claim Data (filed manually under seal).

Next Health paid kickbacks to referring physicians through sham investment distributions from subsidiaries that sounded like labs but were not licensed to perform any services (including Guardian Toxicology, Infinity Toxicology, Trident Toxicology, and National Toxicology) and marketing commissions paid to marketers (including Brigham Buhler's entity, BLB Premiere). Graves Report, Ex. 3.1, ECF No. 706-6 at 10 (citing Next Health financial distribution documents to compile physicians and the amounts they were paid by Next Health), and Ex. 3.2, ECF No. 706-6 at 24 (citing Next Health financial distribution report to total payments Next Health made to marketers).

Jeremy oversaw and directed the accountants and finance employees who worked to process these payments to route them through Next Health's various subsidiaries. Jeremy Dep. 49-50, 68-69, 75-79, ECF No. 706-2 at 49-50, 68-69, 75-

79; Ex. 26 to Cary Dep., ECF No. 706-4 at 3-5; NH-01656701, ECF No. 706-4 at 10-11; NH-00894260, ECF No. 706-7 at 99; NH-00894261 (Next Health Distribution Summary filed manually under seal).

Jeremy also was involved in a "lab consolidation plan" under which high-volume physician referral sources would be paid more and low-volume physician referral sources were no longer permitted to invest or received a lower percentage or return on their investment. NH-00172606, ECF No. 706-6 at 88 (cover e-mail); NH-00172607, ECF No. 706-6 at 89 (describing plan to move high-performing physician referral sources to new syndicated lab); NH-00172608 (filed manually under seal).

Jeremy participated in making payments to marketing referral sources, which, in turn, paid kickbacks to physicians that sent Next Health labs referrals. One such relationship was with Brigham Buhler and BLB Premier. *See, e.g.*, NH-00211588, ECF No. 706-6 at 97 (Jeremy overseeing wire of $1.2 million payment to BLB); NH-00209382, ECF No. 706-6 at 93 (cover e-mail); NH-00209383, ECF No. 706-6 at 94 (example of monthly kickback payment).

Jeremy also was involved in the payment of medical directorship wages to physicians with high referral volume. *See, e.g.*, NH-00649081, ECF No. 706-7 at 97 (cover e-mail); NH-00649082 (filed manually; spreadsheet attached to email showing monthly rates medical directors were paid and the Next Health labs they were "sending [referrals] to"); NH-00394935, ECF No. 706-6 at 107 (terminating medical directorships in syndicated labs with no referral volume).

UHC paid Next Health labs United Toxicology, US Toxicology, Medicus, and ALG millions of dollars for lab services induced by kickbacks disguised as investment distributions. Graves Report Ex. 4.1, ECF No. 706-6 at 29-36 (citing UHC Lab Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims from invested physician referral sources).

### 5. *Submission of Claims Falsely Representing that Patients Paid Co-pays*

Next Health's Chief Compliance Officer Chris Anderson testified that (1) it was impermissible for a pharmacy entity to not collect co-pays from patients but instead for a pharmacy to provide those funds on behalf of patients; and (2) he came to learn that Next Health was nevertheless providing funds to pay for co-pays for prescriptions to provide false documentation that co-pays were being paid by patients. Anderson Dep. 13, 64-65, 75-76, 82, 86-87, ECF No. 706-2 at 2, 9-10, 11-12, 15-17. Narosov acknowledged that it was illegal for Next Health to use gift or debit cards to pay for patients' copay obligations, but that Next Health did so. S. Narosov Dep. 131, ECF No. 706-2 at 108; S. Narosov Factual Resume ¶ 7, ECF No. 706-5 at 49. Narosov also confirmed that he caused Next Health to funnel a portion of fraud proceeds through a series of shell corporations to charitable organizations, which then paid the co-pay on prescriptions, to falsify co-pay documentation to satisfy payor audits. S. Narosov Factual Resume ¶ 6, ECF No. 706-5 at 49. According to Narosov, at least 85% of the pharmacy claims submitted to Plaintiffs

falsely represented that the member paid a co-pay. S. Narosov Dep. 125-26, ECF No. 706-2 at 106-07.

Anderson testified that Allan Cohen and Karynn Harvard of Next Health reported to Cary and that Cary was approving payments for the Bishop program (by which money was funneled from Next Health to Bishop Jerry Maynard through a Patient Assistance Program (PAP)), using shell entities LLC RX and Meds Direct Rx, after which Bishop Maynard's charity, City of Life, would issue checks to cover otherwise unpaid co-pays. Anderson Dep. 79-80, 90-91, ECF No. 706-2 at 13-14, 18-19. Anderson further testified that payments were being made under Cary's direction. Anderson Dep. 96-97, ECF No. 706-2 at 20-21.

Cary stated that he knew that "without the PAP program, we are out of business." Cary Dep. Ex. 22, ECF No. 706-3 at 24. A text message from Cary to Narosov reflects Cary stating that Cary "sent josh another invoice from Allan for another donation that had been made to the church." Cary Dep. Ex. 25, ECF No. 706-3 at 27. Cary approved most of the payments through LLX Rx and Meds Direct Rx that ultimately led to City of Life covering the unpaid co-pays. Cary Dep. Exhs. 8, 14, 15, 17, 18, 19, 20, 24, 25, 26, ECF No. 706-3 at 7, 8, 14-15, 16-17, 18-19, 20-21, 25-26, 27, 28. Cary also received text updates from Allan Cohen showing payments from Meds Direct Rx to Bishop Jerry Maynard. Cary Dep. Ex. 16, ECF No. 706-3 at 11. And Cary sent personal wires to LLC Rx. Cary Dep. Ex. 27, ECF No. 706-4 at 11.

When Anderson confronted Cary, Cary admitted to Anderson that he had authorized the payments. Anderson Dep. 99-100, 103, ECF No. 706-2 at 22-24. Anderson testified that Cary undermined his compliance efforts. Anderson Dep. 160, ECF No. 706-2 at 25.

Jeremy was also aware of the PAP and that it was related to Meds Direct Rx. Jeremy Dep. 274-76, 280-84, ECF No. 706-2 at 83-85, 86-90. In September 2016, Next Health accounting personnel asked Jeremy to approve payments to Meds Direct Rx, stating that his father—Cary—was requesting he make the payment. Jeremy Dep. Ex. 21, ECF No. 706-5 at 10; Cary Dep. Ex. 26, ECF No. 706-3 at 28-29. In October 2016, Jeremy approved additional payments to Meds Direct Rx for over $170,000. Jeremy Dep. Ex. 22 (NH-01471409 - NH-01471412), ECF No. 706-5 at 12-15.

In total, Plaintiffs paid four Next Health pharmacies a total of at least $38,035,647, at least 85% of which was based on the false representation that co-pays had been collected from the patients listed in the claims submitted by that pharmacy. UHC Pharma Claim Data; Graves Report ¶ 166, ECF No. 706-6 at 9; S. Narosov Dep. 125-26, ECF No. 706-2 at 106-107.[5]

---

[5] The factual record, viewed in the light most favorable to Plaintiffs, includes evidence supporting the Rossel Defendants' involvement in other fraudulent schemes related to Next Health. To preserve scarce judicial resources, this recommendation only addresses those alleged Next Health schemes necessary to resolve the Rossel Defendants' pending summary judgment motion. Thus, the omission in the factual recitation of background facts concerning a particular Next Health scheme does not prevent Plaintiffs from presenting admissible evidence at trial related to other alleged schemes.

**Legal Standard**

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a summary judgment motion, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential

18

elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a summary judgment motion. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## Preliminary Matters

The Rossel Defendants object to several pieces of evidence Plaintiffs submitted in support of their response to the Rossel Defendants' summary judgment motion. *See* Reply Br. in Support of Cary Rossel and Jeremy Rossel's Mot. for Summ. J. (Rossel Defs.' Reply Br.) 8-10, ECF No. 719. In addition, Defendants Zeinali and Mortazavi object to evidence Plaintiffs submitted in support of their motion for partial summary judgment as to their fraud claims against Zeinali and Mortazavi. *See* Zeinali's Opp'n to Pls.' Mot. for Partial Summ. J. (Zeinali Resp. Br.) 31-34, ECF No. 704; Mortazavi's Br. in Support of Resp. to Pls.' Mot. for Partial Summ. J. (Mortazavi Resp. Br.) 10-12, ECF No. 712. The Rossel Defendants also adopt and incorporate Zeinali's objections. *See* Rossel Defs.' Reply Br. 8. Because the evidentiary objections largely overlap, the Court may consider them together.

To promote efficiency, the Court should consider only the objections to evidence necessary to the determination of the pending motions for summary judgment. If the recommendation relies on evidence but does not discuss an objection, the undersigned considered both the evidence proffered and objections, and, to the extent portions of the evidence are relevant, admissible, and necessary to the resolution of particular issues, these objections are overruled. To the extent the recommendation does not rely on other evidence about which either party complains, the objections are denied as moot. *Accord Balfour Beatty Rail Inc. v.*

*Kansas City S. Ry. Co.*, 2012 WL 3100833, at *20 (N.D. Tex. July 31, 2012) (Lindsay, J.).

### 1. *Plaintiffs' Claims Data, Documents Produced by Next Health During Discovery, Summary Charts*

As previously explained, *see supra* note 3, Plaintiffs manually filed certain claims data reflecting, among other things, payments made to Defendants based on information in lab and pharmacy claims submitted to them by Defendants. In addition, Plaintiffs' evidence includes the OptumRx 2016 Provider Manual (UHC000492439), as well as documents produced by Next Health during discovery including, among others, Commission Reports e-mails (UHC000492491) and United Toxicology's attorneys' e-mails with attachments (UHC000493777; UHC000493784; UHC000493875; UHC000493980; UHC000494067). Plaintiffs' evidence also includes two summary charts, "UHC Summary Ex.1 – Fed. R. Evid. 1006" and "UHC Summary Ex. 2 – Fed. R. Evid. 1006."[6]

The Rossel Defendants argue that these exhibits have not been properly authenticated and are hearsay. Rossel Defs.' Reply Br. 8. Zeinali and Mortazavi make similar objections to Next Health documents included in Plaintiffs' appendix

---

[6] Summary charts pursuant to Fed. R. Evid. 1006 are admissible "as long as the summary is not otherwise objectionable, for example, because it contains hearsay." *Encompass Office Sols., Inc. v. Connecticut Gen. Life Ins. Co.*, 2017 WL 3268034, at *n.4 (N.D. Tex. July 31, 2017) (Lindsay, J.) (compiling cases). Movants contend the above-referenced summary charts are comprised of hearsay evidence (Next Health entities' banking transactions) that are not properly authenticated by affidavit or testimony of a custodian.

in support of their motion for partial summary judgment. Zeinali Resp. Br. 32; Mortazavi Resp. Br. 10-11. Plaintiffs counter that "Next Health's documents could be properly authenticated at trial" and that the contents of the Next Health documents "are not hearsay, fall under one of the exceptions to hearsay, or contain content that could be elucidated at trial through other means," including being "qualified as business records or statements of party opponents." Reply Br. in Support of Pls.' Mot. Partial Summ. J (Pls.' Reply Br.) 12 (citing Fed. R. Evid. 801(d), 803(6)), ECF No. 718.

"At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c); *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017); *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016)).

As the Fifth Circuit explained in *Maurer*, after "a 2010 revision to Rule 56, materials cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible in evidence.'" 870 F.3d at 384 (emphasis in original; internal quotations and citations omitted). This "flexibility allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and expense it takes to authenticate everything in the record." *Id.* Furthermore, "[a]uthentication is a low burden," *Allen v. Hays*, 812 F. App'x 185, 193 (5th Cir.

2020), that can be satisfied in a variety of ways, including through "testimony by a witness with knowledge," Fed. R. Evid. 901(b)(1); "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," id. R. 901(b)(4); the presence of a seal and signature, id. R. 902(1); and the presence of a signature and certification, id. R. 902(2).

While the deficiencies noted by Rossel Defendants, Zeinali, and Mortazavi may well warrant exclusion at trial, at the summary-judgment stage, some or all of the objected-to statements may be admissible under an exception to the hearsay rule. *See, e.g.*, Fed. R. Evid. 803(1), (2) and (3). Some may be admissible for a non-hearsay purpose. *See* Fed. R. Evid. 801(c). The Defendants may raise their hearsay objections to specific evidence at trial. But at this summary-judgment phase, Defendants have not shown that Plaintiffs will be unable to introduce the information Defendants identify as hearsay in an acceptable format at trial or that Plaintiffs will not be able to authenticate this information at trial.[7] Accordingly, the objections are **OVERRULED**.

### 2. *Expert Report of Dean Graves*

The Rossel Defendants, Zeinali, and Mortazavi argue that the Expert Report of Dean Graves is hearsay and inadmissible. *See* Rossel Defs.' Reply Br. 8; Zeinali

---

[7] Although Plaintiffs only responded to Zeinali's and Mortazavi's objections, this analysis applies equally to the Rossel Defendants' objections based on hearsay and lack of authentication.

Resp. Br. 33. A party may support or dispute summary judgment using unsworn expert reports, provided their opinions reflected in an expert report are "capable of being presented in a form that would be admissible in evidence." *Patel v. Tex. Tech. Univ.*, 941 F.3d 743, 746-47 (5th Cir. 2019). Graves is an expert and Plaintiffs contend he "can provide the same opinions expressed in his report at trial, so his report is competent summary judgment evidence, and [Defendants] have not shown otherwise." Pls.' Reply Br. 15. In light of *Patel*, and Plaintiffs' representation that Graves can perform the same analysis contained in his report and present it to the jury from the witness stand at trial, the objection to Dean Graves's Expert Report is **OVERRULED**.

### 3. *Semyon Narosov's and Vinson Woodlee's Factual Resumes*

The Rossel Defendants assert that the Factual Resumes filed in support of Narosov's and Woodlee's guilty pleas are hearsay because they are not sworn to and do not follow the federal rules regarding an admissible declaration. Rossel Defs.' Reply Br. 10. They further argue that the statements made in the Factual Resumes are not stated to be based on personal knowledge. *Id.* Defendants Zeinali and Mortazavi object to Woodlee's Factual Resume on similar grounds. Zeinali Resp. Br. 32-33; Mortazavi Resp. Br. 11.

A sworn statement does not need to be an affidavit or declaration to be competent summary judgment evidence. *See* Fed. R. Civ. P. 56(c)(1). Moreover, courts in this circuit have referred to Factual Resumes in support of guilty pleas in determining motions for summary judgment. *See, e.g.*, *Longinos-Ruiz v. United*

*States*, 2013 WL 1785380, at *1 (N.D. Tex. Apr. 1, 2013) (Means, J.); *Mori Seiki USA, Inc. v. McIntyre*, 2008 WL 577283, at *2 (N.D. Tex. Mar. 4, 2008) (Boyle, J.); *United States v. Tarango-Pena*, 173 F. Supp. 2d 588, 591 (E.D. Tex. 2001).

Here, even though the Factual Resumes are not affidavits or declarations, they are sworn statements. In his plea agreement, Narosov signed and attested that he would "give complete and truthful information and/or testimony concerning [his] participation in the offense" (Narosov Plea Agreement, No. 3:18-CR-00475-JJZ, ECF No. 7 ¶ 7), which included his signed Factual Resume supporting that plea (Pls.' Summ. J. App., ECF No. 682-2 at 71-77). Similarly, Woodlee signed and attested in his plea agreement that he would "give complete and truthful information and/or testimony concerning [his] participation in the offense" (Woodlee Plea Agreement, No. 3:20-CR-00384-N, ECF No. 27 at ¶ 9), which included his signed Factual Resume supporting that plea (Pls.' Summ. J. App., ECF No. 682-2 at 78-92). Thereafter, both Narosov and Woodlee appeared and testified under oath at hearings under Federal Rule of Criminal Procedure 11. With respect to both individuals, a court determined that each understood the government's right to use against him any statement he made under oath in a prosecution for perjury, that his plea was voluntary, and that there was a factual basis for his plea. *See* Fed. R. Crim. P. 11(b)(2)-(3).

For these reasons, Narosov's and Woodlee's respective Factual Resumes are competent summary judgment evidence, and the objections are **OVERRULED**.

### *4. Discovery Responses*

The Rossel Defendants argue, with respect to Plaintiffs' own answers to interrogatories, that Plaintiffs' answers are inappropriate evidence for summary judgment because they are unverified and not based on personal knowledge. Rossel Defs.' Reply Br. 8-9.

Rule 56 specifically approves of citation to materials in the record, including admissions and interrogatory answers to make assertions of fact in support of a summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A). Responses to interrogatories must be verified by the responding party's signature. Fed. R. Civ. P. 33(b)(5). Unverified answers to interrogatories and interrogatories not based on personal knowledge proffered by a nonmovant are not competent summary judgment evidence. *Brady v. Blue Cross & Blue Shield of Texas, Inc.*, 767 F. Supp. 131, 135 (N.D. Tex. 1991) (Fitzwater, J.); *Magana v. Tarrant/Dallas Printing, Inc.*, 1998 WL 548686, at *5 (N.D. Tex. Aug. 21, 1998) (Fitzwater, J.); *Tesco Corp. v. Weatherford Int'l, Inc.*, 904 F. Supp. 2d 622, 636 (S.D. Tex. 2012).

Plaintiffs rely on several of their own interrogatory answers to support their factual allegations. *See* Pls.' Resp. to Cary Rossel's 9/15/2023 Interr. & Pls.' Resp. to Jeremy Rossel's 9/27/2023 Interr., Pls.' Summ. J. Resp. App., ECF No. 706-6 at 63-71; Pls.' Resp. to Amir Mortazavi's First Set of Interr., Pls.' Summ. J. App., ECF No. 682-3 at 38-55. These responses contain no signature page and are unverified. Plaintiffs' responses to Mortazavi's second set of interrogatories, however, are verified. *See* Pls.' Summ. J. App., ECF No. 682-3 at 66-83; *see generally* Fed. R.

26

Civ. P. 33(b)(5) (requiring both person providing answers and attorney posing objections to sign interrogatory responses).

Accordingly, the Rossel Defendants' objection to Plaintiffs' reliance on their own unverified responses to interrogatories is **SUSTAINED**. However, the Rossel Defendants' objection to Plaintiffs' responses to Mortazavi's second set of interrogatories is **OVERRULED**, because those responses are verified. Insofar as the Rossel Defendants object to these same exhibits based on lack of personal knowledge, however, they have not identified specific passages of Plaintiffs' interrogatory responses they contend are not based on personal knowledge and, therefore, these objections are **OVERRULED**. *See Watts v. L-3 Commc'ns Corp.*, 2013 WL 3789868, at *5 (N.D. Tex. July 22, 2013) (Fish, J.) (overruling "generic objection" to lack of personal knowledge where movant failed to identify "objectionable portions" of affidavit).

Finally, Defendants Zeinali and Mortazavi object to Plaintiffs' citation to other parties' verified answers to interrogatories and requests for admission. Zeinali Resp. Br. 33; Mortazavi Resp. Br. 11-12. These objections are **OVERRULED**. *See* Fed. R. Civ. P. 56(c)(1)(A) (approving of citation to materials in the record, including admissions and interrogatory answers, to make assertions of fact in support of a summary judgment motion).

### 5. *Declarations of Kelly Tobin, Erik Bugen, and Vinson Woodlee*

The Rossel Defendants object to multiple statements throughout the Declarations of Kelly Tobin, Erik Bugen, and Vinson Woodlee. Under Rule 56(c)(4), if a party uses affidavits or declarations to support or oppose a summary judgment motion, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

The Rossel Defendants make various objections to multiple statements in Kelly Tobin's Declaration, including that such statements are not based on personal knowledge, are speculative, and are conclusory. Rossel Defs.' Reply Br. 10. They object that Paragraph 6 of Tobin's declaration contains retrospective comments about what Plaintiffs "would have" done had they known of certain Next Health actions. *Id.* They also object to paragraphs 7 and 9-11, although Tobin's Declaration only has six paragraphs.

In her Declaration, Tobin states under penalty of perjury that "her statements . . . are based on [her] personal knowledge gathered during the course of [her] employment as an insurance investigator during the past 20 years." Tobin Decl. ¶ 1, Pls.' Summ. J. Resp. App., ECF No. 706-5 at 45. The Rossel Defendants objections to Tobin's Declaration have no merit. Rather, the Declaration appears to adequately meet the standards of Rule 56(c). Accordingly, the Rossel Defendants' objections to Tobin's Declaration are **OVERRULED**.

The Rossel Defendants object to numerous statements in Erik Bugen's Declaration, contending that "several parts of it are conclusory and contain hearsay. Many of the allegations alluded to in the declaration rely on statements made by Rob Close, Jen Sears, and Alle Byesda, and are hearsay and inadmissible." Rossel Defs.' Reply Br. 9 (objecting to ¶¶ 6, 7, 8, 9, 10, 11, 12, 13, 20 of Bugen's Declaration). They also object that "[o]ther allegations also rely on statements made by Amir Mortizavi and are hearsay." *Id.* (objecting to ¶ 15 of Bugen's Declaration).

As a threshold matter, the Rossel Defendants object that portions of Bugen's Declaration are conclusory. This objection is vague and unsupported by any reference to Bugen's ten-page Declaration and, therefore, need not be considered by the Court. In any event, the objection lacks merit and is **OVERRULED**.

Further, it does not appear that Plaintiffs rely on any hearsay within Bugen's Declaration to demonstrate an issue of material fact relevant to the Court's analysis of the pending motions, but to the extent there is reliance on hearsay within Bugen's Declaration that does not fall within a hearsay exception, the objection is **SUSTAINED**.

The Rossel Defendants object to Corey Dudley's Declaration "as the documents cited to by Mr. Dudley are not included as evidence and are therefore hearsay and not competent summary judgment evidence." Rossel Defs.' Reply Br. 9. Additionally, they object to Dudley's quotations of Nick Austin's statements that Next Health was "working to set up another lab to accession/process/bill through"

and that the tests were "going to come through U. Tox." as hearsay. *Id.* (citing Dudley Decl. ¶ 11, ECF No. 706-5 at 40).

Plaintiffs have not responded to this objection. The undersigned has examined the summary judgment record and is unable to locate the documents cited by Dudley in his Declaration. The Rossel Defendants' objection to all the documents cited by Dudley in his Declaration—to the extent those documents are not included in the summary judgment record—is **SUSTAINED**. Similarly, the Rossel Defendants' objection to Dudley's quotations of Nick Austin's statements as hearsay is **SUSTAINED**.

### Analysis

### A. <u>The Rossel Defendants' Motion for Summary Judgment</u>

The Rossel Defendants move for summary judgment on two grounds: (1) Plaintiffs have no evidence as to numerous elements of their claims for fraud and fraudulent nondisclosure; conspiracy to commit fraud; fraudulent transfers; and violations of 18 U.S.C. § 1962(c); and (2) limitations bars Plaintiffs' fraud and civil RICO claims. Rossel Defs.' Summ J. Br. 8-10, ECF No. 680.

As an initial matter, prior to addressing the merits, Plaintiffs urge that the Rossel Defendants' "no evidence" summary judgment motion should be denied "on its face" because it is not supported by record evidence and, therefore, the Rossel Defendants have not satisfied their initial burden as the moving party. *See* Pls.' Summ. J. Resp. Br. 33-34, ECF No. 709. Such motions, Plaintiffs argue, are "pleadings that may be filed in state court, but not federal court." *Id.* (citation

omitted). Plaintiffs further contend that because the Rossel Defendants have offered "no evidence—not even an affidavit of denial by either of them—that undermines the merits of UHC's fraud, conspiracy, fraudulent transfer, and RICO claims" they have failed, "under the appropriate federal standard, to provide record evidence demonstrating the absence of a genuine dispute of material fact [and] [t]he motion should be denied on its face for this reason alone." *Id.*

In response, the Rossel Defendants assert that they have met their initial burden because they "pointed . . . to the absence of evidence supporting certain essential elements of Plaintiffs' claims[,]" and contend that Plaintiffs' "argument on this point should be disregarded." Rossel Defs.' Reply Br. 11 (citations omitted).

In *Austin v. Kroger*, the Fifth Circuit responded to the contention that federal law does not allow so-called "no evidence" summary judgment motions by explaining that

> it has long been the rule that when the nonmovant has the burden of proof at trial, the moving party may make a proper summary judgment motion, thereby shifting the summary judgment burden to the nonmovant, with an allegation that the nonmovant has failed to establish an element essential to that party's case.

*Austin v. Kroger Texas L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). In a footnote, the Fifth Circuit highlighted an "important distinction:"

> [W]hile it is true that a movant cannot support a motion for summary judgment with a conclusory assertion that the nonmovant has no evidence to support his *case*, a movant may support a motion for summary judgment by pointing out that there is no evidence to support a *specific element* of the nonmovant's claim.

*Id.* at 335 n.10 (original emphasis) (citation omitted). Thus, the Fifth Circuit concluded in *Austin* that "[the movant] satisfied its summary judgment burden when it alleged that there was no evidence of causation—an essential element to [the nonmovant's] ordinary negligence claim." *Id.* at 335. Based on the defendant's motion, Austin, the nonmovant, "was required to present causation evidence to survive summary judgment." *Id.*

Federal courts in Texas applying this "important distinction" concur finding that "such a motion can be proper when correctly pled." *Slaughter v. Walmart, Inc.*, 2023 WL 2783262, at *3 (E.D. Tex. Apr. 4, 2023) (citations omitted), *accepted by* 2023 WL 3060788 (E.D. Tex. Apr. 22, 2023); *see, e.g.*, *Bell v. Marmaxx Operating Corp.*, 2021 WL 5505561, at *2 (N.D. Tex. Nov. 23, 2021) (Starr, J.) (finding that where summary judgment movant alleged there was no evidence of the specific element of causation, burden shifted to the nonmovant to show evidence of causation); *Cid v. Wal-Mart Stores E., Inc.*, 2020 WL 3485622, at *2 (N.D. Tex. May 18, 2020) (Cummings, J.) (noting that "in the realm of premises liability, a no evidence motion for summary judgment is feasible—so long as the movant points out that there is no evidence to support a specific element of the nonmovant's claim).

The Rossel Defendants' motion, by essentially stating that there is no evidence for almost all of the elements for every one of Plaintiffs' claims, "blurs the line-drawing set out in *Austin* and risks making Rule 56's other summary judgment burden-shifting mechanisms obsolete." *Hanan v. Crete Carrier Corp.*,

2020 WL 42269, at *2 (N.D. Tex. Jan. 3, 2020) (Boyle, J.) (citing Fed. R. Civ. P. 56(c)(1)(A)-(B)). Nevertheless, the Court should not deny the motion out of hand, as—in certain instances—the Rossel Defendants meet the letter of what *Austin* requires by pointing to specific elements of the various claims against them and asserting that Plaintiffs have no evidence to support that specific element. *See generally* Rossel Defs.' Summ. J. Br. 21-30. Under *Austin*, therefore, the Court should find that the Rossel Defendants' summary judgment motion is sufficient—barely—to shift the burden to Plaintiffs to show they have evidence of the various elements of their claims. *See Austin*, 864 F.3d at 335.

### 1. *Plaintiffs' Fraud Claims*

Plaintiffs allege a complex and wide-ranging fraudulent scheme comprised of misrepresentations and failures to disclose in connection with the submission of lab and pharmacy bills for payment. *See, e.g.*, Sec. Am. Compl. ¶¶ 295-300. Plaintiffs further allege that the "Next Health Executives," including the Rossel Defendants, are responsible for the allegedly fraudulent misrepresentations, directly or under an alter ego theory of liability. *Id.* ¶¶ 355-56.

In support of their summary judgment motion, the Rossel Defendants argue that that (1) "Plaintiffs' fraud claims are time barred because they were not brought within the four-year statute of limitations"; and (2) "Plaintiffs' claims of fraud and fraudulent nondisclosure against Defendants, individually, fail because Plaintiffs have no evidence of one or more of the elements of each cause of action." Rossel Defs.' Summ. J. Br. 13. They also argue that "[a]s a matter of law, Plaintiffs could

not have justifiably relied on billing submitted after they were on notice of alleged billing fraud." *Id.* And, they assert, Plaintiffs' theory of alter ego liability fails. *Id.*

### a. Liability as Principals for Fraud

The Rossel Defendants assert that they may not be held liable for fraud they allegedly committed through Next Health unless Plaintiffs can show that they acted as Next Health's alter ego. *See* Rossel Defs.' Summ. J. Br. 27-28. The Rossel Defendants have made this same argument before. *See* Cary Br. Supp. Mot. to Dismiss at 8-9, ECF No. 424.

Judge Brown, however, in denying the Executive Defendants' motions to dismiss Plaintiffs' fraud claims, set forth the applicable law and rejected the notion that piercing the corporate veil was the only means to hold the Executive Defendants liable for fraud in conjunction with Next Health:

> Each party to a fraudulent scheme is responsible for the acts of others in furtherance of the scheme. *In re Arthur Andersen LLP*, 121 S.W.3d 471, 481 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). Thus, a defendant may be liable for fraud without making any fraudulent representations where he "allegedly participated in the fraudulent transactions and reaped the benefits," even by silent acquiescence. *Id.*; *see Indep. Receivables Corp. v. Precision Recovery Analytics, Inc.*, No. 1:11-CV-008-LY, 2012 WL 12874526, at *6 (W.D. Tex. May 16, 2012); *ClaimHub, Inc. v. Universal Risk Ins. Servs., Inc.*, No. H-10-2841, 2011 WL 13247456, at *3 (S.D. Tex. July 25, 2011). Further, "[a] corporation's [agent] is personally liable for tortious acts which he directs or participates in during his employment." *O'Hare v. Graham*, 455 F. App'x 377, 380 (5th Cir. 2011) (quoting *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)); *see also Portlock v. Perry*, 852 S.W.2d 578, 582 (Tex. App.—Dallas 1993, pet. denied) ("corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the conduct, either actual or constructive").

*United Healthcare Services, Inc. v. Next Health, LLC*, 2021 WL 764035, at *5 (N.D. Tex. Feb. 26, 2021) (Brown, J.).

The Rossel Defendants provide no basis for the undersigned to deviate from Judge Brown's analysis. Further, the undersigned agrees with Plaintiffs that the cases cited by the Rossel Defendants do not undermine the legal principles set forth by Judge Brown. *See Taylor v. Rothstein Kass & Co., PLLC*, 2020 WL 554583, at *9 (N.D. Tex. Feb. 4, 2020) (dismissing receiver's claim against auditor for "participation in a fraudulent scheme" where receiver failed to allege with particularity that auditor engaged in fraud, but only alleged that auditor issued a clean audit opinion despite the red flags)[8]; *In re GTG Sols., Inc.*, 642 S.W.3d 41, 45 (Tex. App.—El Paso 2021) (discussing veil-piercing standard); *Mills v. City of Port Arthur, Texas*, 2006 WL 3531460, at *9-10 (E.D. Tex. Dec. 4, 2006) (refusing to hold a city liable for alleged conduct of economic development corporation under alter-ego theory), *aff'd*, 234 F. App'x 285 (5th Cir. 2007).

Finally, in response to the Rossel Defendants' summary judgment motion, Plaintiffs make clear that they are not "trying to pierce the corporate veil (as Defendants posit). Rather, [they] are suing Rossel Defendants for their direct participation in the fraud." Pls.' Summ. J. Resp. Br. 37.

---

[8] In *Taylor*, Judge Fitzwater noted that, "it is not clear that Texas law recognizes a cause of action for 'participation in fraud' that is separate from a direct claim for fraud or conspiracy," and that a plaintiff likely has to plead that a party "himself engaged in fraudulent conduct with the requisite knowledge and intent." *Taylor v. Rothstein Kass & Co. PLLC*, 2020 WL 554583, at *7 (N.D. Tex. 2020).

>    b.  *The Rossel Defendants fail to establish as a matter of law that Plaintiffs' fraud claims are barred by the applicable statute of limitations.*

In Texas, "[a] person must bring [a] suit on [fraud] actions not later than four years after the day the cause of action accrues." Tex. Civ. Prac. & Rem. Code § 16.004(a)(4). "Generally, causes of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (cleaned up). But "[b]ecause fraud vitiates whatever it touches, the statute of limitations does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it." *Id.* (cleaned up). Although the date a cause of action accrues is normally a question of law, the determination of when the fraud might have been discovered through the exercise of reasonable diligence is generally a fact issue. *Id.* at 57-58. Nevertheless, in some circumstances where there is actual or constructive notice or when information is "readily and publicly available," a court may determine, as a matter of law, that the exercise of reasonable diligence would have led to the discovery of the wrong within the statutory period and, thus, the accrual of the fraud claim is not tolled. *Id.* at 57-59.

Plaintiffs' fraud claims as against the Rossel Defendants involve alleged misrepresentations that occurred between 2015 and 2016. The Second Amended Complaint breaks these misrepresentations into several discrete groups:

>    i. claims submitted by Next Health subsidiaries for lab services or prescriptions that were ordered by physicians who received kickbacks disguised as investment distributions from a Next Health subsidiary;

36

ii. claims submitted by Next Health subsidiaries for lab services or prescriptions that were purportedly ordered by Dr. Kim, Dr. Parameswara, Dr. Rao, or Dr. Sozi;

iii. claims submitted by ALG after July 12, 2016, for lab services that were not actually ordered from, or performed by, ALG; and

iv. claims submitted by True Labs after September 1, 2016, for lab services that were not actually ordered from, or performed by, True Labs.

Sec. Am. Compl. ¶¶ 380, 381; *id.* at Exhs. A-C, ECF Nos. 584-1 through 584-3; Exhs. G-I, ECF Nos. 584-7 through 584-9. Notably, as to those groups of alleged misrepresentations occurring within the limitations period—any time on or after September 30, 2015 [four years before Plaintiffs sought leave to amend the pleadings to add the Executive Defendants]—there is no limitations issue.

The Rossel Defendants urge that, as a matter of law, "Plaintiffs' fraud claims are time-barred because they are based on allegedly fraudulent activities Plaintiffs knew of or should have discovered by exercising reasonable diligence by at least July 20, 2015, more than four years before the date on which Plaintiffs filed their motion for leave to amend to add [the Executive] Defendants—September 30, 2019." Rossel Defs.' Summ. J. Br. 15. In support, the Rossel Defendants cite to a July 20, 2015 National Benefit Integrity MEDIC Complaint Form (MEDIC Complaint) prepared by Optum, "a division of United Healthcare Group," and produced by Plaintiffs. *See* Rossel Defs.' Summ. J. App., ECF No. 680-1 at 34-35. An Optum employee filed the MEDIC Complaint with Health Integrity, LLC, a contractor for Centers for Medicare and Medicaid, "to report complaints of fraud,

waste, and abuse in Medicare Parts C & D Programs," and specifically to report that Cigna's Special Investigations Unit suspected that Josh Daniel and United Toxicology, LLC were using fraudulent billing practices for patients receiving healthcare benefits through Medicare Parts C and D. *Id.* at 34-35. The MEDIC Complaint alleges that United Toxicology was billing the insurance company "excessive fees" for drug testing services while "waiving any cost share of the customer." *Id.* at 35. After receiving the complaint, the Cigna investigators called United Toxicology and confirmed that "the customers were neither receiving a bill nor expected to pay their cost share for drug testing services . . . [United Toxicology] consider[ed] the insurance payment as payment in full." *Id.*

The Rossel Defendants contend that "[t]he MEDIC Complaint put Plaintiff United Healthcare on notice of the alleged fraud as to Next Health and its executives. . . . [and] their fraud claims against all of Next Health's executives, including [the Rossel] Defendants, began to accrue on July 20, 2015, at the latest, for any alleged billing fraud." Rossel Defs.' Summ. J. Br. 17.

In addition, the Rossel Defendants point to certain entries in Plaintiffs' privilege log which they argue suggest that Next Health entities were being investigated prior to September 2015. *Id.* at 18-19 (citing Rossel Defs.' Summ. J. App., ECF No. 680-1 at 36-45). They also refer to deposition testimony of Plaintiffs' corporate representative, Jonathan Wilson, who, when confronted with the MEDIC Complaint, agreed that it concerned similar types of allegations related to failure to collect customer co-pays for services rendered, albeit not in regard to

commercial insurance and involving a different entity, Cigna. *Id.* at 17 (citing Rossel Defs.' Summ. J. App., ECF No. 680-1 at 28-29).

Plaintiffs counter that the "Rossel Defendants offer no authority for the proposition that dissimilar fraud allegations suspected by one organization (here, Cigna) begins the statute of limitations for any possible fraud-based claims that may be asserted by another (here, UHC)." Pls.' Summ. J. Resp. Br. 52. Plaintiffs also assert that the Rossel Defendants ignore that Plaintiffs "did investigate concerns regarding individual Next Health laboratories as they arose[] and did not conclude at any time prior to September 30, 2015 [four years before they sought leave to amend the pleadings to add the Executive Defendants], that the fraudulent representations or omissions at issue in this case had occurred." *Id.* at 53. Plaintiffs argue based on the summary judgment evidence that, "[a]t the earliest, [their] fraud claim accrued in January of 2016 when [they] conducted [their] onsite investigation of United Toxicology (after being invited by counsel for United Toxicology who all the while assured [them] that United Toxicology's operations were entirely above board)." *Id.* Thus, Plaintiffs contend, because they "sued the Rossel Defendants within four years of [the] site inspection, [their] fraud claim is not time barred." *Id.* Although Plaintiffs address the MEDIC Complaint and Wilson's deposition testimony, they fail to address the various entries in their privilege log highlighted by the Rossel Defendants.

The question of whether Plaintiffs' claims are, in fact, time-barred turns on when Plaintiffs discovered or, by the exercise of reasonable diligence, should have

discovered the alleged fraud. Plaintiffs argue that they did not know and could not have known of the fraud until January of 2016. Pls.' Summ. J. Resp. Br. 53. In support, Plaintiffs provide undisputed evidence that in August of 2015, they placed United Toxicology on prepayment review based on a tip that United Toxicology was a lab on paper only. Pls.' Summ. J. Resp. App., ECF No. 706-2 at 142-43. In early September of 2015, attorneys for United Toxicology contacted Plaintiffs' legal department and advised that United Toxicology was considering pursuing litigation to force Plaintiffs to reprocess and pay unpaid claims. *Id.* at 144. Attorneys for United Toxicology invited Plaintiffs to visit the United Toxicology facility to allay the concern that the lab did not exist. *Id.* at 121, 146. The invitation for an on-site visit was accompanied by assurances from United Toxicology's counsel in the fall and winter of 2015 that then-existing allegations were false and the result of a dispute with disgruntled employees. *Id.* at 146; UHC000493980 (sealed), ECF No. 707-1 at 6.

By January of 2016, and at the direction of Plaintiffs' legal department, the prepayment review flag on United Toxicology's claims was lifted and Plaintiffs' Special Investigations Unit (SIU) opened an investigation of United Toxicology in advance of conducting an on-site visit to confirm that it was, in fact, a brick-and-mortar lab. Pls.' Summ. J. Resp. App., ECF No. 706-2 at 120, 144-45. During the January 21, 2016 on-site inspection, Plaintiffs' SIU investigators learned that United Toxicology was in the same building and shared the same common area as two other functioning laboratories, US Toxicology and Medicus, that were also

owned by "Next Health." *Id.* at 122-24. Following the United Toxicology on-site inspection, Plaintiffs' SIU opened an investigative file for Next Health-owned lab US Toxicology in February 2016. *Id.*

Later, in the spring and summer of 2016, Plaintiffs began receiving member and customer complaints about claims for unwanted testing performed by United Toxicology, ultimately leading to the discovery of the ADAR Group. *Id.* at 125, 127-30, 140, 153. Following investigation, Plaintiffs connected US Toxicology to Medicus, in addition to United Toxicology, and it stopped paying claims from all three laboratories. *Id.* at 151-52. Following further meetings with United Toxicology's attorneys, and threats of litigation for stopped payments, on January 26, 2017, Plaintiffs brought this lawsuit and on September 30, 2019, sought leave to add the Executive Defendants.

This evidence, and the reasonable inferences it supports, gives rise to factual disputes material to determining when Plaintiffs' fraud claims accrued. As the Fifth Circuit has recognized, determining when a plaintiff was on inquiry notice of fraud is a "fact-intensive inquiry . . . typically appropriate for consideration by a jury." *See Margolies v. Deason*, 464 F.3d 547, 553 (5th Cir. 2006) (interpreting almost identical language in the statute of limitations for claims under the Texas Blue Sky Laws, Tex. Rev. Civ. Stat. Ann. art. 581, § 33(H)(2)). "Unless the evidence is such that reasonable minds may not differ as to its effect, the question as to whether a party has exercised diligence in discovering fraud is for the jury." *Id.* (quoting *Ruebeck v. Hunt*, 142 Tex. 167, 176 S.W.2d 738, 740 (1944)).

"In moving for summary judgment on the time bar issue, [the Rossel Defendants] assumed the burden of conclusively establishing that [Plaintiffs] knew or should have known, with the exercise of reasonable diligence, of the alleged fraud." *See id.* at 554 (quotation marks omitted). The summary judgment evidence, taken in the light most favorable to Plaintiffs, does not conclusively establish that Plaintiffs knew or should have known about the alleged fraud before September 30, 2015, which is four years before they sought leave to amend the pleadings to add the Rossel Defendants. In addition, the summary judgment evidence detailed above is sufficient to raise the factual dispute as to whether fraudulent concealment tolls accrual of the statute of limitations. These factual disputes preclude the dismissal of Plaintiffs' fraud claims on summary judgment.

For these reasons, the District Judge should deny the Rossel Defendants' summary judgment motion insofar as they seek dismissal of Plaintiffs' fraud claims as time-barred.

### c. *Plaintiffs raise a genuine dispute of material fact as to each element of their fraud claim.*

To prevail on a fraud claim based on an affirmative misrepresentation, a plaintiff must prove "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastic Corp. USA v. Presidia Eng'rs & Contractors*, 960 S.W.2d

41, 47 (Tex. 1998) (citation omitted); *see also JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (same).

With respect to fraud, the Rossel Defendants attack each element. Rossel Defs.' Summ. J. Br. 22-23. Here, viewing all the above-cited evidence in the light most favorable to Plaintiffs, Plaintiffs have presented evidence sufficient to raise a genuine dispute of material fact as to each element of their fraud claim.

i.   Misrepresentations

First, Plaintiffs have provided enough evidence to raise a genuine dispute of material fact that the Rossel Defendants participated in or facilitated three types of misrepresentations: for claims generated by the ADAR Group, misrepresentations that patients had seen actual medical providers; misrepresentations that patients were paying pharmacy co-pays; and misrepresentations that disguised the identities of labs performing services. *See supra* Sec. B.1—B.5.

Plaintiffs have also provided sufficient evidence that these misrepresentations were material to payment determinations because, had Plaintiffs known the truth, they would not have paid the claims submitted with false information. *See* Wilson Dep. 78-79, ECF No. 706-2 at 148; Tobin Decl. ¶ 6, ECF No. 706-5 at 45; Anderson Dep. 63-65, ECF No. 706-2 at 8-10; Pls.' Resp. to Mortazavi's Second Set of Interrog. 20, ECF No. 706-6 at 42-44; UHC000492491 (OptumRx 2016 Provider Manual), ECF No. 706-8 at 6.

ii.   Intent

As to the element of intent, the Rossel Defendants' criticism of circumstantial evidence is misguided: "[s]ince intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). Regardless, Plaintiffs provide enough evidence to create a genuine factual dispute regarding the Rossel Defendants' scienter.

First, Jeremy Rossel led Next Health's purchase of sober living facilities for Bugen and the ADAR Group and approved commissions based on referrals from the ADAR Group. *E.g.*, Jeremy Dep. Ex. 1 (NH-00684699–NH-00684715) and Ex. 2 (NH-00235880—NH-00235881), ECF No. 706-4 at 12-28, 29-30; Jeremy Dep. 76, 82-83, ECF No. 706-2 at 52-54. In May 2016, after Next Health learned that Bugen and ADAR were the subject of a CBS News investigation, Jeremy signed documents on behalf of Next Health releasing Bugen from the liens on the three homes Next Health purchased for him, rather than accelerating the loans. Jeremy Dep. Ex. 16 (NH-00056955), ECF No. 706-5 at 9; Jeremy Dep. 180-81, ECF No. 706-2 at 71-72. Based on an e-mail from Bugen, Jeremy also knew that Bugen was "sticking with United clients . . . *to keep the model of United clients a little less noticeable by United Healthcare.*" Jeremy Dep. Ex. 4, ECF No. 706-4 at 32-33 (emphasis supplied); Jeremy Dep. 148-49, ECF No. 706-2 at 66-67.

There is also evidence from which a reasonable juror could find that Jeremy was involved in making payments to marketing referral sources, which, in turn paid kickbacks to physicians that sent Next Health labs referrals. One such

relationship was with Brigham Buhler and BLB Premier. *See, e.g.*, NH-00211588, ECF No. 706-6 at 97 (Jeremy overseeing wire transfer of $1.2 million kickback payment to BLB); NH-00209382, ECF No. 706-6 at 93 (cover e-mail); NH-00209383, ECF No. 706-6 at 94 (example of monthly kickback payment).

Evidence further shows that Jeremy made payments to third-party shell entities that passed along money to the Bishop used to disguise the payment of co-pays. Jeremy Dep. 274-76, 280-84, ECF No. 706-2 at 83-85, 86-90; Jeremy Dep. Ex. 21, ECF No. 706-5 at 10; Cary Dep. Ex. 26, ECF No. 706-3 at 28-29; Jeremy Dep. Ex. 22 (NH-01471409 - NH-01471412), ECF No. 706-5 at 12-15.

Next, Cary Rossel served as trustee on the sober homes purchased for the ADAR Group. Jeremy Dep. Ex. 11 (NH-00088149), ECF No. 706-4 at 41; Jeremy Dep. 137-38, ECF No. 706-2 at 63-64. In November 2015, Jeremy and Cary were included in discussions concerning the financial importance of Next Health's relationship with Bugen. Jeremy Dep. Ex. 13 (NH-00233747), ECF No. 706-24 at 42-43. Later that month, Jeremy and Cary were copied on the closing documents for one of Bugen's sober homes. Jeremy Dep. Ex. 14, ECF No. 706-5 at 1-6.

Cary was the general partner of Pharma Holdings US, which was the managing member of Next Health's Class G pharmacies, which were used to pay pharmacy-related kickbacks. *E.g.*, Cary 03/15/2021 Resp. to Pls.' Interrog. 1, ECF No. 706-6 at 39; Cary Dep. Ex. 5, ECF No. 706-2 at 158.

Cary recognized the importance of the Bishop co-pay scheme stating that he knew that "without the PAP program, we are out of business." Cary Dep. Ex. 22,

ECF No. 706-3 at 24. Cary directed and approved of the majority of payments made to third-party shell companies that were used to disguise the payment of co-pays. *E.g.*, Anderson Dep. 96-97, ECF No. 706-2 at 20-21; Anderson Dep. 99-100, 103, ECF No. 706-2 at 22-24; Cary Dep. Ex. 25, ECF No. 706-3 at 27 (text message from Cary to Narosov reflecting Cary stating that he "sent josh another invoice from Allan for another donation that had been made to the church."); Cary Dep. Exhs. 8, 14, 15, 17, 18, 19, 20, 24, 25, 26, ECF No. 706-3 at 7, 8, 14-15, 16-17, 18-19, 20-21, 25-26, 27, 28; Cary Dep. Ex. 16, ECF No. 706-3 at 11; Cary Dep. Ex. 27, ECF No. 706-4 at 11.

Cary also undermined Anderson's compliance efforts with respect to the co-pay scheme and others in Anderson's role as Chief Compliance Officer at Next Health. Anderson Dep. 160, ECF No. 706-2 at 25.

Although the Rossel Defendants assert in their reply brief that these, and other schemes set forth in the undisputed material facts in Plaintiffs' summary judgment response brief, were "normal business operations," Rossel Defs.' Reply Br. 22, viewing this and other summary judgment evidence in the light most favorable to Plaintiffs, a reasonable juror could conclude from this circumstantial evidence that Jeremy and Cary had knowledge of the fraud perpetrated by Next Health and facilitated and participated in the various fraudulent schemes, Jeremy in his role as Next Health's Chief Financial Officer and, starting in August 2016, as a member of its Board of Managers, and Cary as a founder of Next Health and a member of its Board of Managers, as well as a part owner of Next Health, and a

general partner in Next Health subsidiary Pharma Holdings US, the managing member of Next Health's Class G pharmacies, which were used to pay pharmacy-related kickbacks.

### iii.    Reliance

The Rossel Defendants also contend that they are entitled to summary judgment on Plaintiffs' fraud claims based on billings after July 20, 2015, because "as a matter of law[,] Plaintiffs could not have justifiably relied on representations from anyone at Next Health." Rossel Defs.' Summ. J. Br. 23 (cleaned up). Although "[j]ustifiable reliance usually presents a question of fact . . . the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *United Healthcare Servs., Inc. v. Synergen Health LLC*, 2023 WL 4186370, at *2 (N.D. Tex. June 26, 2023) (Starr, J.) (quoting *JPMorgan*, 546 S.W.3d at 654). The Rossel Defendants contend that those circumstances are present here, where Plaintiffs have a sophisticated fraud department that discovered red flags, such that, "[a]t the very latest, Plaintiffs knew of allegations of billing fraud by United Toxicology and its parent, Next Health, by July 20, 2015, which precludes Plaintiffs from having 'justifiably relied' on Next Health's entities' billing from that date forward." Rossel Defs.' Summ. J. Br. 25.

In *Synergen Health, LLC*, Judge Starr acknowledged and rejected similar arguments made by Synergen in support of its argument that, as a matter of law, Plaintiffs' reliance was not justified. *See Synergen Health, LLC*, 2023 WL 4186370, at *2-3 (rejecting argument that UHC's justifiable reliance could be categorically

negated by touting UHC's fraud department and investigation into United Toxicology). There, Synergen argued Plaintiffs failed to demonstrate justifiable reliance—like the Rossel Defendants do here—pointing to UHC's sophistication, dedicated SIU, and its previous investigation of United Toxicology. *Id.* In denying Synergen's summary judgment motion, Judge Starr stated as follows concerning justifiable reliance:

> [I]n 2015, [UHC] . . . began denying claims from the U[nited] T[oxicology] laboratory, opened an investigation, and commenced payments only after determining that U[nited] T[oxicology] was an actual laboratory. But the U[nited] T[oxicology] laboratory allegations—misrepresenting that a fake laboratory is a real laboratory—involve a different type of fraud than the kind of which United now [alleges.] . . . Accordingly, the Court cannot conclude, as a matter of law, that there is [no] actual reliance on [United's] part. That's a fact issue for the jury.

*Id.* at *3 (internal quotations omitted). Judge Starr further found that UHC's suspicions concerning United Toxicology in August of 2015 were not "strong enough for the Court to conclude that, as a matter of law," UHC did not justifiably rely on later-submitted claims using the Next Health lab billing credentials. *Id.* Judge Starr's analysis in *Synergen Health, LLC* is persuasive, and, even taking into account certain factual dissimilarities between this matter and the *Synergen* case, the question of whether Plaintiffs' reliance was justified is a matter for the jury.[9]

---

[9] The Rossel Defendants cite two cases to support their argument that Plaintiffs could not have justifiably relied on misrepresentations about lab and pharmacy claims. *See* Rossel Defs.' Summ. J. Br. 24-25 (citing *Lewis v. Bank of Am. NA*, 343 F.3d 540, 547 (5th Cir. 2003); *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 656 (Tex. 2018)). But, as Plaintiffs contend, these cases are distinguishable as "this is not a case where [Plaintiffs] blindly relied on

iv.    Causation / Damages

Plaintiffs also have provided sufficient evidence to raise a genuine dispute of material fact that the fraudulent schemes at issue caused them to pay millions of dollars they otherwise would not have based on the fraudulent claims submitted. *E.g.*, NH-00213878, ECF No. 706-6 at 103 (e-mail), NH-00213879 (excel attached to e-mail with "Collection Summary" tab showing calculation of UHC payments) (previously filed manually under seal); Graves Report Ex. 4.1, ECF No. 706-6 at 29-36 (citing UHC Pharma Claim Data to compile number of "Claims Submitted" and "Amount Paid by United" for claims based on prescriptions from physicians getting paid by Next Health through sham investment distributions); Tobin Decl. ¶ 6, ECF No. 706-5 at 45.

For these reasons, the District Judge should deny the Rossel Defendants' no-evidence motion for summary judgment as to Plaintiffs' fraud claim.

> d. *Plaintiffs fail to raise a genuine dispute of material fact as to their fraud by nondisclosure claim.*

With respect to fraud by nondisclosure, the Rossel Defendants attack each element. Rossel Defs.' Summ. J. Br. 26-27. Here, even viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have failed to present evidence

---

representations without justifications." Pls.' Summ. J. Resp. Br. 43. Also, unlike in *Lewis*, there is evidence that Next Health labs "enshrined themselves in a cloak of (feigned) trustworthiness on exactly the information they were submitting[.]" *Id.* And, unlike here, "the parties in *Orca* also had relatively equal access to the information claimed to have been misrepresented." *Id.*

sufficient to raise a genuine dispute of material fact as to each element of their fraud by nondisclosure claim.

> To establish a claim for fraud by nondisclosure, Plaintiffs must show:
>
> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury.

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019).

"As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information. Thus, silence may be equivalent to a false representation only when the particular circumstances impose a duty on the party to speak and he deliberately remains silent." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (citation omitted). "[T]he existence of a duty to disclose is a question of law that must be decided by the court, not by the jury." *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 562 (Tex. 2019), *reh'g denied* (Oct. 18, 2019). A duty to disclose arises in four circumstances:

> (1) there was a fiduciary or other special relationship requiring disclosure, (2) the defendant discovered new information that made an earlier representation misleading or untrue, (3) the defendant created a false impression by making a partial disclosure, or (4) the defendant voluntarily disclosed some information and therefore had a duty to disclose the whole truth.

*Guevara v. Lackner*, 447 S.W.3d 566, 578 (Tex. App.—Corpus Christi–Edinburg 2014, no pet.).

In their response brief, Plaintiffs argue that the Rossel Defendants "failed to disclose that the claims they caused to be submitted to UHC were the result of lab and pharmacy-based kickback schemes they administered, which were designed to pay physicians in exchange for their referral of lab specimens and ordering pharmacy prescriptions." Pls.' Summ. J. Resp. Br. 39. Plaintiffs assert that Defendants had a duty to disclose these facts but fail to cite to any evidence in support of this position. Even assuming the existence of a duty to disclose, in their response, Plaintiffs also fail to cite to evidence showing that Defendants "knew that plaintiff was ignorant of or did not have the opportunity to discover" the material facts allegedly not disclosed. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 341 (5th Cir. 2008). Other than mentioning this element in conclusory fashion, Plaintiffs do not address it in their response brief. *See* Pls.' Summ. J. Resp. Br. 38-39. Plaintiffs rely on the pre-severance memorandum opinion regarding a motion to dismiss on the pleadings to bolster their fraud by nondisclosure claim. *See* Pls.' Summ. J. Resp. Br. 39. But motions to dismiss and motions for summary judgment "are governed by different legal standards[;]" *Lexxus Int'l, Inc. v. Loghry*, 512 F. Supp. 2d 647, 649 (N.D. Tex. 2007) (Lindsay, J.), the former relying entirely on the face of the complaint and the latter weighing the evidence. *See Doe v. Univ. of N. Texas Health Sci. Ctr.*, 2023 WL 5200666, at *2 (N.D. Tex. Aug. 14, 2023) (O'Connor, J.) ("[A] Rule 12(b)(6) . . . motion only entails an examination of the sufficiency of the pleadings. In contrast, a summary-judgment motion typically is based on the pleadings as well as any affidavits, depositions, and other forms of

evidence relevant to the merits of the challenged claim or defense that are available at the time the motion is made.") (citation omitted).

For these reasons, Plaintiffs have failed to raise a genuine dispute of material fact with respect to each element of their fraud by nondisclosure claim and, therefore, the District Judge should grant the Rossel Defendants' no-evidence motion for summary judgment on this claim.

### 2. Plaintiffs' Claims for Conspiracy to Commit Fraud

With respect to the Rossel Defendants, Plaintiffs' conspiracy claims relate to allegations concerning their participation in the scheme to submit claims containing misrepresentations that lab services were ordered by doctors associated with the ADAR Group. *See* Sec. Am. Compl. ¶¶ 395-400.

Unlike the crime of conspiracy, civil conspiracy is not an independent cause of action. *Berry v. Lee,* 428 F. Supp. 2d 546, 561 (N.D. Tex. 2006). Instead, civil conspiracy operates as a derivative tort that allows the plaintiff to hold one conspiracy participant liable for the torts committed by another participant if the torts were committed in furtherance of an unlawful conspiracy. *Id.* at 561-62 (citing *Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex. 1996); *Berry v. Golden Light Coffee Co.,* 327 S.W.2d 436, 438 (Tex. 1959)). As a derivative tort, a plaintiff must plead and prove another substantive tort upon which to base a civil-conspiracy claim. *Id.* at 562. A finding of civil conspiracy imposes joint and several liability on all co-conspirators for any actual damages resulting from the acts in furtherance of the conspiracy. *Chu v. Hong,* 249 S.W.3d 441, 445 (Tex. 2008). Therefore, once

a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination. *Id.*

A civil-conspiracy action has five elements:

(1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result.

*First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017).

The Rossel Defendants challenge the second and third elements, stating that Plaintiffs have "no evidence [they] were aware of the alleged harm when they voted to approve loans and took actions relating to the trust holding properties." Rossel Defs.' Summ. J. Br. 30. The Rossel Defendants contend that "[t]hese actions are legitimate business endeavors and show no awareness of any agreement or meeting of the minds to engage in the wrongful conduct cited by Plaintiffs." *Id.* They also assert that Plaintiffs "have no evidence that at the time of the alleged meeting [with Bugen] that Jeremy knew of the design to further an illicit conspiracy to defraud Plaintiffs" and that "Jeremy's presence at such a meeting would *not necessarily* mean he was privy to any designs of Erik Bugen or any other Next Health executive." *Id.* (emphasis supplied).

Plaintiffs counter that "the summary judgment standard isn't about what might 'not necessarily' be[]" and contend that the circumstantial evidence here is such that a reasonable jury could conclude that the Rossel Defendants conspired

with Bugen to submit fraudulent claims to Plaintiffs as part of the ADAR scheme. *See* Pls.' Summ. J. Resp. Br. 46.

As with the intent element of Plaintiffs' substantive fraud claims, "a conspiracy is proved by circumstantial evidence." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 812 (S.D. Tex. 2009). While conspiracy may be shown by circumstantial evidence, proof of material facts "may not be established by piling inference upon inference." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968).

Plaintiffs provide evidence that Jeremy met with Bugen during the early stages of the ADAR scheme, that he cemented that relationship by financing three pieces of real estate for Bugen (and later forgiving the loans), with Cary agreeing to act as trustee for the properties, and that he incentivized Bugen to send specimens to Next Health by paying kickbacks based on a deal that prevented Bugen from sending samples to other labs. *See, e.g.*, Pls.' Summ. J. Resp. App., ECF No. 706-2 at 52-56, 58-72, 80-82; ECF No. 706-4 at 12-43; ECF No. 706-5 at 1, 7, 9, 30-32, 35-36; ECF No. 706-6 at 103-04.[10]

On this record, the Rossel Defendants' contention that "mere presence at a company meeting and assisting in seemingly-legitimate business endeavors are at least just as consistent with a lawful purpose as with allegedly conspiring to submit

---

[10] This evidence consists primarily of Erik Bugen's statements in his Declaration, Jeremy's testimony at his deposition as well as exhibits to his deposition transcript, discovery responses, and exhibits manually filed with the Court.

fraudulent claims to [Plaintiffs]" is not well-taken. Rossel Defs.' Reply Br. 27 (internal quotation marks and citation omitted). Viewing all evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, Plaintiffs have presented evidence sufficient to raise a genuine dispute of material fact as to the second and third elements of their civil conspiracy claim.

For these reasons, the District Judge should deny the Rossel Defendants' no-evidence motion for summary judgment as to Plaintiffs' claims of conspiracy to commit fraud.

### 3. Plaintiffs' Fraudulent Transfer Claims

The Rossel Defendants move for summary judgment on Plaintiffs' fraudulent transfer claims. Rossel Defs.' Summ. J. Br. 30-34. In the Second Amended Complaint, Plaintiffs allege that two sets of transfers are fraudulent: (1) cash transfers from ALG, Medicus, US Toxicology, United Toxicology, True Labs, Apex Pharma, Dallasite, Executive Healthcare, and Total Pharma to Next Health from 2015 to 2017 (Category 1 Transfers); and (2) cash transfers from Next Health to Next Health Executives from 2016-2018 (Category 2 Transfers). *See* Sec. Am. Compl. ¶¶ 458-480.

The applicable state law is the Texas Uniform Fraudulent Transfer Act (TUFTA), Tex. Bus. & Com. Code § 24.001 *et seq.* "The purpose of TUFTA is to prevent debtors from defrauding creditors by placing assets beyond their reach." *Tow v. Amegy Bank N.A.*, 498 B.R. 757, 767 (S.D. Tex. 2013) (internal quotations and citations omitted). TUFTA first requires that a "transfer [is] made or [an]

obligation [is] incurred by a debtor." Tex. Bus. & Com. Code § 24.005(a). TUFTA recognizes two categories of voidable fraudulent transfers: actual fraudulent transfers, *id.* § 24.005(a)(1); and constructive fraudulent transfers, *id.* §§ 24.005(a)(2), 24.006(a). "[T]he elements of an actual fraudulent transfer under TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's creditors." *Matter of Life Partners Holdings, Inc.,* 926 F.3d 103, 117 (5th Cir. 2019) (citation omitted); *see* Tex. Bus. & Com. Code § 24.005(a)(1). To determine actual intent, a court may consider a non-exclusive list of factors, also known as "badges of fraud," set out in section 24.005. *Id.*; *see* Tex. Bus. & Com. Code § 24.005(b). A transfer is not voidable if the recipient took it in good faith and for value. Tex. Bus. & Com. Code § 24.009.

Constructive fraud occurs when a transfer was made without the debtor receiving a reasonably equivalent value in exchange and the debtor either:

> (A) was engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business transaction; or

> (B) intended to incur, or believed or unreasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

*Id.* § 24.005(a)(2).

In support of their summary judgment motion, the Rossel Defendants contend Plaintiffs have no evidence they were a "creditor" when the transfers alleged to be fraudulent were made and "no evidence that any transfers to [them]

were made with the actual intent to hinder, delay, or defraud Plaintiffs." Rossel

Defs.' Summ. J. Br. 30, 32-33.

> In response, Plaintiffs argue that

> [t]he Court has already entered judgment against the Lab and
> Pharmacy Entities and Next Health and Pharma Holdings US on
> UHC's fraudulent transfer claims—meaning those entities' intent has
> been conclusively established as a matter of law. (*See* Final Judgment,
> Doc. 750, No. 3:17-cv-00243-X (N.D. Tex.) (entering final default
> judgment against Next Health and Lab and Pharmacy Entities,
> finding them liable on same Second Amended Complaint, Doc. 584,
> that is the operative pleading in this case).) This default judgment
> establishes as fact the allegations supporting UHC's fraudulent
> transfer claims—that, at the time of the transfers, that UHC was (and
> remains) a "creditor," Next Health and Lab and Pharmacy Entities
> were (and remain) "debtors," and that those "debtors" transferred
> assets away with the intent to defraud UHC.

Pls.' Summ. J. Resp. Br. 47-48. Plaintiffs assert that, in light of Judge Starr's Final

Judgment in the Next Health litigation, there is "no need to engage in the 'badges

of fraud' analysis of the intent of 'debtors' Next Health, Pharma Holdings US, and

Lab and Pharmacy Entities." *Id.* at 48. They also maintain, without providing any

citations to the summary judgment record in support, that, even were the Court to

examine the "badges of fraud," "[t]here is no question that the 'debtors' at issue

fraudulently transferred assets away." *Id.* at 48.

In reply, the Rossel Defendants argue that the "[b]ecause the judgment

against Next Health as to fraudulent transfer was entered upon default, it can have

no precedential effect in a subsequent action." Rossel Defs.' Reply Br. 28 (citation

omitted). They also contend that "Plaintiffs have failed to identify any indication

of fraudulent intent, other than the fact that some transfers referenced were made after Plaintiffs had filed this lawsuit." *Id.*

For the reasons that follow, the Court should find that Plaintiffs have failed to provide evidence sufficient to raise a genuine dispute of material fact regarding actual fraudulent transfer or constructive fraudulent transfer.

First, Plaintiffs assert that the Final Judgment entered by Judge Starr in a different case establishes the "actual intent" element of their TUFTA claim without explaining how a default judgment in a separate lawsuit, against different defendants, applies here. *See* Pls.' Summ. J. Resp. Br. 47-48. Further, and as previously explained, *see supra* note 1, in the Next Health case, Judge Starr granted summary judgment against Next Health on Plaintiffs' fraud claims and granted default judgment for Plaintiffs. *See United Healthcare Servs., Inc. v. Next Health LLC*, 2023 WL 2589237, at *7 (N.D. Tex. Mar. 21, 2023). Judge Starr treated Plaintiffs' summary judgment motion on the fraud claims as unopposed, noting that Next Health provided a one-page, "limited response" which stated only that "[Next Health] has no representatives or employees who can assist or direct any actions of counsel [which] ethically precludes . . . the formation of any substantive response." *Id.* On June 27, 2023, Judge Starr entered a "default judgment against Rob Close, Next Health, and the Lab Defendants in the amount of $90,252,091," and a "default judgment in the amount of $128,287,738.03 against the Entity Defendants, jointly and severally." *See Next Health*, 3:17-cv-00243, Final J., ECF No. 750 at 3.

"Issue preclusion, or collateral estoppel . . . promotes the interests of judicial economy by treating specific issues of fact or law that are validly and necessarily determined between two parties as final and conclusive." *United States v. Shanbaum*, 10 F.3d 305, 311 (5th Cir. 1994). "It is the general rule that issue preclusion attaches only when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." *Arizona v. California*, 530 U.S. 392, 414 (2000) (citations omitted) (cleaned up). "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated." *Id.* (citation omitted). Because the Final Judgment upon which Plaintiffs rely was entered upon default, it can have no precedential effect in this separate and subsequent action. *See id.* It is, therefore, not valid evidence of "actual intent" for the purposes of Plaintiffs' summary judgment motion.

With respect to Plaintiffs' remaining arguments, as the Rossel Defendants correctly note, Plaintiffs attempt to satisfy the "actual intent" element "by offering several statements without supporting them with sufficient evidence." Rossel Defs.' Reply Br. 28. Other than noting that some transfers referenced were made after Plaintiffs had filed this lawsuit, *see* Pls.' Resp. Br. 48, Plaintiffs fail to provide any citation to the summary judgment record.

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. "Rule 56 does not impose a duty

on the court to sift through the record in search of evidence to support the nonmovant's opposition to the summary judgment motion. *Clayton v. U.S. Xpress, Inc.*, 538 F. Supp. 3d 707, 711 (N.D. Tex. 2021) (Lindsay, J.) (cleaned up) (citations omitted). Here, Plaintiffs have failed to identify specific evidence in the record and to articulate the precise manner in which that evidence supports their fraudulent transfer claim as against the Rossel Defendants.

For these reasons, the District Judge should determine that the Rossel Defendants are entitled to judgment as a matter of law on Plaintiffs' fraudulent transfer claims and grant their request for summary judgment as to these claims.[11]

### 4. Plaintiffs' Civil RICO Claims

The Rossel Defendants move for summary judgment with respect to Plaintiffs' civil RICO claims on the basis that (1) Plaintiffs' claims under RICO are barred by the statute of limitations; and (2) Plaintiffs have no evidence establishing that they took any action related to Next Health with the intent to defraud. Rossel Defs.' Summ. J. Br. 10.

> *a. The Rossel Defendants fail to establish as a matter of law that Plaintiffs' civil RICO claims are barred by the applicable statute of limitations.*

---

[11] Plaintiffs request permission to file a partial affirmative motion for summary judgment against the Rossel Defendants, contending that, with respect to the Category 2 Transfers, "[t]here is no set of facts that [the] Rossel Defendants could supply that would prevent them from being liable under Section 24.009(b)(2)." Pls.' Summ. J. Resp. Br. 49 note 5. Plaintiffs contend that "because Next Health's intent with respect to those transfers has been established, Rossel Defendants are liable as a matter of law." *Id.* at 49. Because Plaintiffs rely on the default judgment in the Next Health litigation to establish intent on their TUFTA claims, the District Judge should reject Plaintiffs' request.

The statute of limitations for RICO is four years. *Rotella v. Wood*, 528 U.S. 549, 553 (2000). The Fifth Circuit "abides by the rules of injury discovery and separate accrual for RICO claims." *Lewis v. Danos*, 83 F.4th 948, 955 (5th Cir. 2023). "Under the 'injury discovery' rule, a civil RICO claim accrues when the plaintiff discovers, or should have discovered, the injury" and, "when a pattern of RICO activity causes a continuing series of separate injuries, the 'separate accrual' rule allows a civil RICO claim to accrue for each injury when the plaintiff discovers, or should have discovered, that injury." *Id.* (citation omitted). Discovery of a civil RICO injury can be delayed or prevented by affirmative acts of concealment on the part of a defendant. *Id.* at 955 ("[T]he defendant must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry.") (citations omitted). Under the fraudulent concealment doctrine, "the limitations period is tolled until the plaintiff discovers, or with reasonable diligence should have discovered, the concealed fraud." *Id.*

In support of their argument that Plaintiffs' civil RICO claims are time-barred, the Rossel Defendants contend "there is significant evidence that shows Plaintiffs knew or should have known, on or before July 20, 2015[,] of its alleged injury of paying allegedly fraudulent bills . . . ." Rossel Defs.' Summ. J. Br. 34. Here, for the reasons previously stated in the Court's analysis rejecting the Rossel Defendants' argument that Plaintiffs' fraud claims were time-barred as a matter of law, *see supra* Sec. A.1.b, the Court should find that whether Plaintiffs exercised

reasonable diligence in their efforts to investigate if they were a victim of—or had been injured by—the allegedly fraudulent conduct, is a question of fact for the jury.

> b. *Plaintiffs have introduced sufficient evidence from which a reasonable jury could infer that the Rossel Defendants intended to commit wire fraud by submitting fraudulent claims to Plaintiffs.*

"Violation of the wire-fraud statute requires the specific intent to defraud, i.e., a conscious knowing intent to defraud." *United States v. Mann,* 493 F.3d 484, 493 (5th Cir. 2007). Mail fraud violations also require specific intent. *United States v. Nguyen,* 504 F.3d 561, 568 (5th Cir. 2007). "[A] defendant acts with the intent to defraud when he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself." *United States v. Akpan,* 407 F.3d 360, 370 (5th Cir. 2005) (cleaned up) (citation omitted).

"Circumstantial evidence can be sufficient to prove fraudulent intent in mail and wire fraud cases." *Crowe v. Henry,* 115 F.3d 294, 297 (5th Cir. 1997). Considering the evidence submitted by Plaintiffs within the context of the difficult evidentiary issues involved (i.e., questions of knowledge and intent), it appears that material questions of fact exist as to the contested element of intent to defraud and there is sufficient evidence from which a reasonable jury could infer that the Rossel Defendants intended to commit wire fraud (by facilitating the submission of fraudulent lab and pharmacy claims to Plaintiffs). *See supra* Sec. B.1—B.5.

For these reasons, the District Judge should deny the Rossel Defendants' no-evidence motion for summary judgment as to Plaintiffs' civil RICO claims.

### B. Plaintiffs' Motion for Partial Summary Judgment Against Amir Mortazavi and Arvin Zeinali

Plaintiffs seek summary judgment as to their fraud claims against Defendants Mortazavi and Zeinali, contending that (1) because Mortazavi and Zeinali refused to answer questions or provide any discovery based on the assertion of their Fifth Amendment privilege against self-incrimination, the Court should draw an adverse inference against them in this civil case; and (2) that adverse inference, combined with other evidence that each helped orchestrate numerous fraudulent schemes, is sufficient for the Court to grant summary judgment in Plaintiffs' favor as to their fraud claims. Pls.' Summ. J. Br. 6-8, ECF No. 682. With respect to their fraud claims, Plaintiffs seek an award of damages against Mortazavi in the amount of $54,239,661 and against Zeinali in the amount of $32,330,300. *Id.* at 47.

Zeinali and Mortazavi respond that, although the Court may draw an adverse inference, summary judgment is not appropriate here because, among other reasons,[12] Plaintiffs' motion asks the Court to make credibility

---

[12] In his response brief, Mortazavi also asserts that he "adopts and incorporates" the statute of limitations argument "filed by Defendants Cary and Jeremy Rossel[.]" Mortazavi Resp. Br. 7, 27. In addition, in their respective response briefs, Mortazavi and Zeinali request that the Court grant summary judgment in their favor because Plaintiffs lack evidence of damages. Mortazavi Resp. Br. 41; Zeinali Resp. Br. 31. The dispositive motions deadline was November 15, 2023. ECF No.

determinations concerning several critical witnesses and indulge inferences in Plaintiffs' favor, which it may not do on summary judgment. Zeinali Resp. Br. 18; Mortazavi Resp. Br. 28-30.

"[I]t is well settled that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Hinojosa v. Butler*, 547 F.3d 285, 291 (5th Cir. 2008) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)). "While parties are free to invoke their Fifth Amendment right in civil cases, a court is equally free to draw adverse inferences from that invocation." *Vestas-Am. Wind Tech., Inc. v. Salazar*, 2021 WL 1399296, at *3 (N.D. Tex. Feb. 1, 2021) (Hendrix, J.); *see also State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990) (declining to draw an adverse inference based on party's invocation of the privilege because the opposing party had "failed to present any other evidence to bolster the inference").

As to each of the fraudulent schemes alleged in the Second Amended Complaint against Mortazavi and Zeinali (four of which pertain to Mortazavi and two of which pertain to Zeinali),[13] Plaintiffs' motion for partial summary judgment

---

662 at 2. Mortazavi and Zeinali failed to move on any grounds. On this record, the Court should decline to address these attempts to seek untimely relief.

[13] These alleged schemes are the ADAR scheme (against Mortazavi); the Class G kickback-induced pharmacy scheme (against Mortazavi and Zeinali); the kickback induced lab claim scheme (against Mortazavi); and the co-pay scheme, involving the submission of claims falsely representing that patients had paid co-pays (against Mortazavi and Zeinali).

relies heavily on Narosov's deposition testimony, Bugen's declaration, and Woodlee's declaration. As noted herein, all three of these witnesses are convicted felons: Narasov pleaded guilty to money laundering and health care fraud, *see U.S. v. Semyon Narosov, Andrew Hillman*, No. 3:18-CR-0475-JJZ (N.D. Tex.); and Bugen and Woodlee pleaded guilty to healthcare fraud, *see U.S. v. Bugen*, 3:17-CR-00370-D (N.D. Tex.) and *U.S. v. Woodlee*, 3:20-CR-00384-N (N.D. Tex.).

Pursuant to Federal Rule of Evidence 609(a)(1)(A), at trial, Narosov's, Bugen's, and Woodlee's convictions would be admissible so that co-defendants, including Mortazavi and Zeinali, would be able to "attack[ ]" their "character for truthfulness." Fed. R. Evid. 609(a)(1)(A); *see also* Fifth Circuit Pattern Jury Instructions (Civil Cases) *Impeachment by Witness's Felony Conviction* (June 2020), available at https://www.lb5.uscourts.gov/juryinstructions/ (last accessed 07/22/24) (instructing the jury that, "in weighing the credibility of a witness[,]" a felony conviction "is one of the circumstances you may take into account in determining the weight to give [that witness's] testimony."). And Plaintiffs fail to persuade the undersigned that Mortazavi and Zeinali should not have that opportunity in this case, where Plaintiffs seek an award of damages against Mortazavi in the amount of $54,239,661 and against Zeinali in the amount of $32,330,300, *see* Pls.' Summ. J. Br. 47, based largely on the testimony of Narosov, Bugen, and Woodlee.

In addition, with respect to their fraud claims against Mortazavi, Plaintiffs rely extensively on the deposition testimony of one of the Directors of Sirius

Laboratories, Jen Sears. Mortazavi has provided evidence from which a reasonable juror could question Sears's credibility. Specifically, Sears filed for bankruptcy and Plaintiffs have a $13 million claim against her in the bankruptcy action. Sears Dep. 114:20-24, App. to Mortazavi's Opp'n to Pls.' Mot. for Partial Summ. J. (Mortazavi Resp. App.), ECF No. 713 at 32. At the time of Sears's deposition, Plaintiffs' claim in bankruptcy had been pending for approximately three or four years. Sears Dep. 145:7-12, ECF No. 713 at 39. When asked at the end of her deposition if she had any "agreements" with Plaintiffs concerning the pursuit of their claim in the bankruptcy, Sears said no. Sears Dep. 115:5-8, ECF No. 713 at 32. Upon further questioning, however, she testified as follows:

> Q.  Do you have any agreements with United Healthcare concerning their pursuit of the claim against you in bankruptcy?
>
> A.  No.
>
> Q.  Okay. Do you have any verbal understanding that they will not oppose the discharge of the United Healthcare claim in bankruptcy in exchange for your testimony today?
>
> A.  They never said they would expunge it. They told me that it would be a conversation and we will see where it goes.
>
> Q.  So they said there will be a conversation about that after you gave your testimony today as to whether they would expunge or agree to discharge the claim in bankruptcy; is that right?
>
> A.  That's correct.

Sears Dep. 115:5-20, ECF No. 713 at 32. In addition, Sears testified that Plaintiffs' attorney had not explained to her why Plaintiffs had not dismissed their $13

million claim against her before she gave her deposition. Sears Dep. 145:3-6, ECF No. 713 at 39.

Sears also acknowledged that she had a written employment agreement with Next Health that was marked as Exhibit 18 to her deposition. Sears Dep. 120:1-9, ECF No. 713 at 33; Sears Employment Agreement, ECF No. 713 at 33. Paragraph 29 of her employment agreement obligated her to report misconduct or violations of law in real time. Sears Dep. 120:10-12, ECF No. 713 at 33. The day of her deposition, however, was the first time that she reported alleged misconduct or violations of law.

In reply, Plaintiffs highlight Sears's deposition testimony that she was there to tell the truth and ask the Court to conclude that "she had no financial incentive to lie." Pls.' Reply Br. 10-11, ECF No. 718 (citing Sears Dep. 121) ("I've been wanting to talk to people about this. Like I have my truth. . . . I can just tell my truth. I mean I don't know if you can use it or not, but it's just the truth and that's it."). It is not for the Court, however, to make credibility determinations about Sears or her possible financial motivations or incentives to provide testimony favorable to Plaintiffs about Mortazavi, as that is the province of the jury. *See Liberty Lobby, 477 U.S. at 255* ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Mortazavi has also provided the deposition testimony of Chris Anderson, Chief of Compliance for Next Health, who testified that Mortazavi cooperated and

received guidance from the compliance department, and that he had a "hands on" approach with respect to certain compliance issues. Anderson Dep. 188:8-12, 190:22-191:2, and Exhs. 18 and 19 thereto, ECF No. 713 at 631-32, 736, 741.

Zeinali highlights certain testimony provided by Narosov at his deposition from which a reasonable juror could potentially infer that Zeinali did not have the requisite intent to defraud. Narosov testified that Next Health kept some of its business practices hidden from Zeinali. Narosov Dep. 210:14-25, App. to Zeinali's Opp'n to Pls.' Mot. for Partial Summ. J. (Zeinali Resp. App.), ECF No. 704-2 at 34 ("[S]ome things were hidden from Arvin [Zeinali].")). Narosov also testified that Zeinali objected to pharmacy business practices that pushed medically unnecessary prescriptions onto patients. Specifically, Narosov testified that Zeinali and others would be "yell[ed] at" by Hillman to "automatically refill[] prescriptions without seeking approval from patients." Narosov Dep. 248:13-15, ECF No. 704-2 at 40. Zeinali "did not like" this automatic refill practice, so he "attempted to stop" it by "saying" to Hillman "that he can't do that." Narosov Dep. 250:17-251:16, ECF No. 704-2 at 41-42.

Viewing all the facts and drawing all reasonable inferences in favor of the nonmoving parties, whether Mortazavi and Zeinali had knowledge of, or participated in, fraudulent misrepresentations and nondisclosures concerning lab and pharmacy claims, and had the requisite intent, will ultimately depend on credibility determinations in the province of the jury, not the Court. Even were the Court to exercise its discretion to draw an adverse inference against Mortazavi and

Zeinali, the remaining evidence upon which Plaintiffs rely, coupled with the adverse inference, is insufficient on this record for the Court to conclude that Plaintiffs have demonstrated beyond peradventure all the elements of their fraud claims against Mortazavi and Zeinali.

For these reasons, the District Judge should DENY Plaintiffs' Motion for Partial Summary Judgment Against Amir Mortazavi and Arvin Zeinali (ECF No. 681).

## Recommendation

For the above-stated reasons, the undersigned recommends that the District Judge:

(1) **GRANT** Defendants Cary Rossel and Jeremy Rossel's Motion for Summary Judgment (ECF No. 679) with respect to Plaintiffs' fraud by nondisclosure and fraudulent transfer (TUFTA) claims, which should be dismissed with prejudice, and **DENY** the motion in all other respects; and

(2) **DENY** Plaintiffs' Motion for Partial Summary Judgment Against Amir Mortazavi and Arvin Zeinali (ECF No. 681).

**SO RECOMMENDED.**

July 23, 2024.

_____

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).